EXHIBIT
1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY DIRECT MARKETING SERVICES, LLC., *et al.*,[1] | ) | Case No. 20-20184 |
| | ) | (Jointly Administered) |
| | ) | (Formerly Jointly Administered under J.C. Penney Company, Inc., 20-20182) |

**PRELIMINARY RESPONSE OF JACKSON WALKER LLP TO RECENT FILINGS BY THE OFFICE OF THE UNITED STATES TRUSTEE**
**[RELATES TO DKT. NOS. 1236 & 1237]**

1. With respect to the relationship between former Jackson Walker LLP ("Jackson Walker" or "Firm") partner Elizabeth Freeman ("Ms. Freeman") and former Bankruptcy Judge David R. Jones ("Judge Jones") there have been recent filings made in certain bankruptcy cases involving Jackson Walker by the Office of the United States Trustee (the "U.S. Trustee") (collectively, the "Filings").[2] Jackson Walker has a long and productive working relationship with the U.S. Trustee for whom it has great respect. The Filings, however, make allegations based, in part, on largely unsubstantiated media stories and from preliminary *allegations* made by the Fifth Circuit in a complaint against Judge Jones filed on October 23, 2023. The Filings are premised upon incorrect and incomplete facts, and necessarily rely upon some degree of speculation about Jackson Walker's knowledge and conduct. The Firm seeks to supplement the record with this statement regarding those issues.

2. In summary, Jackson Walker's management first learned in March of 2021 that a *pro se* litigant had *alleged* a romantic relationship between Ms. Freeman and Judge Jones. The Firm immediately asked Ms. Freeman to confirm or deny the allegation. She denied the charge of a *current* romantic relationship but admitted to a past relationship which had ended. Nevertheless, the Firm retained and consulted with a prominent ethics expert regarding the matter and set up certain safeguards regarding Ms. Freeman's future involvement in Judge Jones' cases. As part of the ethics expert's review, the Firm's General Counsel prepared a statement of relevant facts and presented a draft to Ms. Freeman who, after reviewing it, stated in writing that she had no issues with its accuracy. The factual summary that was confirmed by Ms. Freeman stated, among other things as described below, that there was no ongoing intimate relationship with Judge Jones. As a result, Jackson Walker did ***not*** know of any ongoing intimate relationship between Ms. Freeman

[1] A complete list of each of the Wind-Down Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.ra.kroll.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.
[2] Jackson Walker intends to separately respond to the various Filings at the appropriate time, but submits this Preliminary Response now.

and Judge Jones until 2022 when it learned, quite by accident, that Ms. Freeman's denial was possibly false or at least no longer true. When confronted again she initially denied the relationship but later on admitted to a current romantic relationship. Jackson Walker then commenced discussions with Ms. Freeman and her counsel that ultimately resulted in her separation from the Firm.

3. This filing details the timeline of events, Jackson Walker's knowledge—or lack thereof—of Ms. Freeman's relationship with Judge Jones, and Jackson Walker's actions to address these issues.[3]

## FACTS AND TIMELINE OF EVENTS

### *Application and Employment of Ms. Freeman at Jackson Walker*

4. In early 2018, Ms. Freeman, a law clerk for Judge Jones at the time, sought a potential partnership position at Jackson Walker. As customary, Ms. Freeman was provided with a "Lateral Partner Questionnaire" which she was asked to complete and return in writing. One section asked her to disclose any possible conflicts of interest. In her questionnaire, Ms. Freeman did not disclose any conflicts other than she could not work on matters "currently pending" during her clerkship before Judge Jones.

5. Pursuant to Judge Jones's practice, Ms. Freeman, after she left the Court, could not appear in person before Judge Jones in his court or sign pleadings for cases in his court for six years mirroring in time her clerkship tenure. Importantly, Judge Jones' practice did not prohibit her from working on cases assigned to his Court, and permitted her work to be included in fee applications that came before him.

6. At no time during the interview process did Ms. Freeman mention or indicate that she had in the past—or was currently having—an intimate relationship with Judge Jones. Nor did Ms. Freeman state that she was living with him at the time.

7. Ms. Freeman was ultimately hired by Jackson Walker on May 14, 2018, as an income partner in the bankruptcy group.[4] She was later promoted to equity partner effective January 1, 2021.

### *First Allegation of an Intimate Relationship*

8. On January 21, 2020, McDermott International filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas (Bankr. SDTX Case No. 20-30336). Jackson Walker was retained to serve as co-counsel for McDermott. Judge

---

[3] To this date, Jackson Walker *still* does not know the state or history of the relationship between Judge Jones and Ms. Freeman over time since Judge Jones gave another version of their relationship to *The Wall Street Journal* when he purportedly admitted that he and Ms. Freeman have been living together for years. *See* The Wall Street Journal, "*Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer*," dated Oct. 7, 2023.

[4] Jackson Walker, like many other firms, has two tiers of partnership: an income partner where such partners' compensation consists of a salary and potential bonus, but they do not share in the profits of the firm; and an equity partner who does receive a share of the firm's profits.

Jones was assigned the bankruptcy case. Judge Jones ultimately confirmed McDermott's plan of reorganization on March 12, 2020.

9. Following confirmation of the plan of reorganization by Judge Jones, on July 17, 2020, pro se litigant, Mr. Michael Van Deelen ("Van Deelen") filed a lawsuit in Texas state court against various officers of McDermott. That state court lawsuit was removed to federal court as part of the McDermott bankruptcy case and became an adversary proceeding. *See* Adv. Proc. No. 20-03309. Unhappy with Judge Jones' rulings in the McDermott bankruptcy case, Mr. Van Deelen filed a motion to recuse Judge Jones on July 31, 2020. The focus of that recusal motion was Mr. Van Deelen's criticisms of Judge Jones's rulings; there were no allegations of any relationship between Judge Jones and Ms. Freeman in that initial recusal motion.

10. Thereafter, on Saturday, March 6, 2021, Mr. Van Deelen sent an email to a Jackson Walker partner raising for the first time a question as to whether Ms. Freeman and Judge Jones were in a romantic relationship. Jackson Walker immediately delivered that email to the Southern District of Texas Bankruptcy Court on Monday morning, March 8, 2021. *See* Adv. Pro. No. 20-03309 at Dkt. Nos. 36, 37 & 78. The document was filed under seal given concerns of Mr. Van Deelen's credibility that were raised previously in the bankruptcy case,[5] and given the highly personal nature of the allegation.

11. Mr. Van Deelen thereafter supplemented his motion to recuse, this time attaching the alleged anonymous letter that he previously referenced in his March 6, 2021 email to Jackson Walker. Judge Isgur was ultimately assigned to consider the recusal motion, which recusal motion was ultimately denied after an evidentiary hearing. *See* Adv. Pro. No. 20-03309 at Dkt. No. 42.

12. According to Chief Judge Priscilla Richman:

> "Judge Jones referred the motion to recuse to another bankruptcy judge but did not disclose to that judge the facts regarding his relationship with Ms. Freeman. On information and belief, the judge who ruled on the motion to recuse was unaware that Judge Jones was romantically involved with Ms. Freeman or that they were cohabiting. The motion to recuse was denied and appealed to a federal district court judge, and on information and belief, Judge Jones did not apprise that district court judge of the relationship with Ms. Freeman, and that judge was also unaware of the facts regarding the relationship. The appeal was denied."

*See Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002*, Complaint No. 05-24-9002 at pp. 2-3 (5th Cir. Oct. 13, 2023).

[5] *See e.g.*, McDermott International Case No. 20-30336 at Dkt. No. 694 (*Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt of Court and Prohibited from Further Contact with the Debtors, Their Officers, or Their Counsel*).

***Steps Taken by Jackson Walker***

13. After receipt of the March 6, 2021 email alleging a romantic relationship between Ms. Freeman and Judge Jones, Jackson Walker discussed the allegations therein with Ms. Freeman. Ms. Freeman acknowledged that there had been a romantic relationship between her and Judge Jones, but that such relationship was well in the past, was not ongoing, and was not likely to rekindle. In light of this information, Jackson Walker instructed Ms. Freeman that she could not and should not work on any matters that were assigned to Judge Jones, and Jackson Walker advised that it would deduct from Ms. Freeman's compensation as an equity partner any profits associated with work that was performed by Jackson Walker in cases pending before Judge Jones.

14. Jackson Walker also took the additional step of consulting with outside ethics counsel to ensure that it understood its legal and ethical obligations. Specifically, and beginning on March 8, 2021, Jackson Walker contacted Peter Jarvis, Esq. of the respected law firm of Holland & Knight. Mr. Jarvis is a nationally recognized expert on lawyer professional responsibility and ethics, and was a co-author of *The Law of Lawyering*, a leading treatise on the subject.

15. The General Counsel for the Firm presented Ms. Freeman with a draft letter that Jackson Walker intended to provide to Mr. Jarvis as part of his analysis. That draft letter, a copy of which is attached hereto as **Exhibit 1**, contained several important components. First, the draft letter was presented to Ms. Freeman with a specific request to review it for factual accuracy.[6] To this point, the draft letter stated, as factual assumptions based on Jackson Walker's knowledge at the time, (a) that Ms. Freeman and Judge Jones were close personal friends; (b) that Jackson Walker's understanding was that Judge Jones precluded Ms. Freeman from appearing personally in his court for six years (*i.e.*, the length of Ms. Freeman's judicial clerkship); (c) the draft letter outlined the claims and allegations asserted by Mr. Van Deelen; and (d) that Jackson Walker then understood that, while there had been a romantic relationship between Ms. Freeman and Judge Jones prior to March 2020, that such relationship had ended and that there was no ongoing romantic relationship, nor any romantic relationship expected going forward. The draft letter also stated—and asked Ms. Freeman to confirm—that Judge Jones and Ms. Freeman did not live together. The draft letter also informed Ms. Freeman of Jackson Walker's view that an ongoing intimate relationship with Judge Jones (as opposed to an intimate relationship that had terminated in the past) would be incompatible with Jackson Walker continuing to participate in cases before Judge Jones. Ms. Freeman reviewed the draft letter and confirmed in writing that "I reviewed the letter and have no questions or issues." *See* Exhibit 1. Jackson Walker's outside ethics counsel concluded that the measures taken by Jackson Walker, based on the facts stated in the letter, which were confirmed by Ms. Freeman, were sufficient to meet Jackson Walker's obligations.

16. Notwithstanding the above confirmation from Ms. Freeman and actions taken by Jackson Walker, months later in 2022, a credible third party volunteered new information to a

---

[6] The cover email to Ms. Freeman states, in relevant part: "I will appreciate your review. I want to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with. Once we have your concurrence, I will sen[d] the letter to Peter [Jarvis] in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion."

Jackson Walker partner which led Jackson Walker to again question Ms. Freeman about these allegations. Ms. Freeman again denied any current intimate relationship with Judge Jones. When Jackson Walker continued to question Ms. Freeman, she ultimately admitted that the relationship had resumed. Shortly after these follow up conversations with Ms. Freeman, Ms. Freeman retained her own legal counsel.

17. Upon learning from Ms. Freeman that her relationship with Judge Jones had resumed, Jackson Walker again reached out to its outside ethics counsel, Mr. Jarvis. Mr. Jarvis discussed the situation with Ms. Freeman's attorney. Jackson Walker concluded that the only solution was for Ms. Freeman to leave.

18. Ms. Freeman ultimately agreed separation was appropriate and Ms. Freeman left Jackson Walker to start her own firm.

**CONCLUSION**

19. The above represents the facts and timeline of events as known to Jackson Walker as of the date of this filing.

20. While Jackson Walker has found itself dealing with a very difficult and challenging set of circumstances, the Firm takes very seriously its responsibility to operate in accordance with professional ethics and integrity, as the Firm has done for more than 130 years. Jackson Walker is not perfect—no firm is. But in the case of the relationship that has come to light between Ms. Freeman and Judge Jones, Jackson Walker believes the Firm acted responsibly.

Dated: November 13, 2023
Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

/s/ *William R. Greendyke*

Jason L. Boland (SBT 24040542)
William R. Greendyke (SBT 08390450)
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Email: jason.boland@nortonrosefulbright.com
Email: william.greendyke@nortonrosefulbright.com

*Counsel for Jackson Walker LLP*

**CERTIFICATE OF SERVICE**

I certify that on November 13, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By: */s/ William R. Greendyke*

**From:**                      Freeman, Liz
**Sent:**                   Friday, August 27, 2021 1:15 PM
**To:**                        Cowlishaw, Pat
**Subject:**             RE: Request for Opinion [IMAN-JWDOCS.FID560826]

**Sensitivity:**           Private

**Follow Up Flag:**      Follow up
**Flag Status:**          Completed

Pat,

I reviewed the letter and have no questions or issues. I deeply appreciate the time and effort everyone has put into this very difficult situation. I lament that it was necessary. Thank you for everything.

- Liz

---

**From:** Cowlishaw, Pat <pcowlishaw@jw.com>
**Sent:** Thursday, August 26, 2021 12:57 PM
**To:** Freeman, Liz <efreeman@jw.com>
**Subject:** Request for Opinion [IMAN-JWDOCS.FID560826]
**Importance:** High
**Sensitivity:** Private

Liz,

Enclosed is a draft letter to Peter Jarvis, who is engaged by Jackson Walker to advise us from time to time regarding professional ethics matters. (Peter is a partner at Holland & Knight, where he leads a practice group in the area of legal professional ethics and risk management. He is co-author of *The Law of Lawyering*, a leading treatise on the subject).

The draft has been reviewed by Wade, Matt C, and Bruce, and it incorporates their comments. I will appreciate your review. I want to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with.

Once we have your concurrence, I will sent the letter to Peter in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion.

Please let me know if you have questions. I can say for Wade and me that we know that this has been an extraordinarily difficult matter to ask you to address, that we deeply appreciate your candor, cooperation and your commitment to the firm, and that we look forward very soon to closing the book on this. I would add Matt and Bruce, but you know that they feel that way already. Many thanks.

Pat



Patrick R Cowlishaw
(Direct Dial)
(Direct Fax)

**DRAFT**

August __, 2021

***Privileged and Confidential – Attorney-Client Communication***

Mr. Peter Jarvis
Holland & Knight LLP
601 Southwest 2nd Avenue #1800
Portland, Oregon 97204

Re: Judicial Disqualificaiton Matter

Dear Peter:

This letter concerns the relationship between one of our law firm's partners and a federal bankruptcy judge, which you and I have discussed on several occasions going back to March of this year. I describe below the pertinent circumstances and the measures that the firm and our partner have taken in response. On behalf of Jackson Walker, I ask for your advice regarding the propriety and sufficiency of these measures, both in terms of our professional ethical posture and minimizing the risk that the firm's participation in future contested matters before the judge, through our partner or others, might result in disqualification of the judge or of us.

**Background**

Elizabeth Freeman joined Jackson Walker as a partner in our bankruptcy practice group on May 14, 2018. As with virtually all lateral partner hires, she joined the firm as an "income partner" (salaried). Elizabeth had been a licensed Texas lawyer for 20 years at that time. For the six years preceding her joining Jackson Walker, Elizabeth had worked as a law clerk to Chief Bankruptcy Judge David R. Jones of the Bankruptcy Court of the United States for the Southern District of Texas, Houston Division. Prior to her clerkship, Elizabeth had been a partner in the bankruptcy practice of Porter Hedges in Houston. Prior to his taking the bench October 1, 2011, Judge Jones and Elizabeth were law partners at Porter Hedges. Consistent with this background, Elizabeth and Judge Jones were and remain close personal friends. Both individuals are, and at all relevant times have been, divorced.

Elizabeth enjooyed quick and substantial success at Jackson Walker. From the time of her arrival through today, Houston has became a favored venue for complex debtor cases, in the

energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but Elizabeth's leadership and contribution were recognized as integral. Throughout, Elizabeth adhered to guidelines set by Judge Jones in respect of her status as his former law clerk. Under those guidelines, she could and did work on cases in his court, and the firm's fees for her work could be included in fee applications that came before him for review, but she could not (and did not) appear in his court or sign pleadings to be filed in his court. Elizabeth's understanding has been that Judge Jones expects those guidelines to apply to her for at least as long as the six years she served as his clerk, i.e., at least through May 2024.

In view of her success and contributions, Elizabeth was elected an equity partner in the firm, effective January 1, 2021.

**Van Steelen/McDermott Claim**

Among our debtor cases in progress early this year was a Chapter 11 reorganization proceeding for McDermott International, where we acted as local counsel with Kirkland as lead, and Judge Jones presiding. *In re McDermott International, Inc.,* Case No. 20-30336. In that proceeding Michael Van Deelen, a McDermott shareholder, pursued a *pro se* adversary action against certain Kirkland officers, complaining of actions they had taken in the bankruptcy. *Michael Van Deelen v. David Dickson,* et al., Adversary No. 20-3309. Van Deelen had moved to recuse Judge Jones, citing adverse rulings as evidence of bias. That motion was set for hearing March 10, 2020.

On Saturday, March 6, 2021, Van Deelen sent an e-mail to Matt Cavenaugh, a JW bankruptcy partner who was leading our work in the McDermott case. Van Deelen claimed to have received a "most disturbing communication," which indicated that Elizabeth Freeman had had a romantic relationship with Judge Jones. Van Deelen questioned whether Judge Jones was favoring Jackson Walker and its clients because of his relationship with our partner. Van Deelen provided a copy of what he said was the referenced communication, in the form of an anonymous, unsigned letter, accompanied by an envelope with no return address.

Matt promptly contacted me as the firm's general counsel. We conferred with our managing partner and another long-time firm leader, one of our senior trial partners, that weekend. The latter reached out to Elizabeth, who confirmed that there had been a romantic relationship. No further details were sought at that time. At the firm's request, Elizabeth stopped work on all matters in Judge Jones' court, pending the firm's assessment of the matter.

One of our lawyers delivered a courtesy copy of the Van Deelen communication to Judge Jones' chambers. We also disclosed these matters to our Kirkland co-counsel, who disclosed

---

them to the client. At Judge Jones' request, Judge Isgur presided at the hearing on the motion. Kirkland appeared on behalf of McDermott and argued at the virtual hearing March 10. Judge Isgur denied the motion, based on Van Deelen's failure to present any competent evidence in support of his allegations, and he ordered that the anonymous letter Van Deelen had profferred be sealed. Van Deelen subsequently sought mandamus relief, which was denied.

**Jackson Walker Review**

With the Van Steelen matter resolved, the firm undertook a more complete assessment. From a legal standpoint, we reviewed judicial disqualification precedent inside and outside the Fifth Circuit based on relationships between counsel and judges, as well as opinions and commentary on relevant ethics requirements applicable to lawyers and the distinct requirements applicable to judges. I also conferred with you, beginning on March 8, and continuing from time to time as we learned more facts and were able to confer within firm management. Factually, our managing partner has met with Elizabeth on several occasions, both to better understand the relationship, in particular on a current and going-forward basis, and to keep her apprised of firm management's thinking.

Elizabeth has confirmed that there is no current romantic relationship between herself and Judge Jones and that none is expected going forward. According to Elizabeth, there has been no romantic relationship since prior to the time in March 2020 when COVID caused so many of us to shift to remote work and virtual-only meetings. Judge Jones and Elizabeth each own their own homes; they do not and have not lived together.

The firm, for its part, had concluded and has advised Elizabeth that any romantic, intimate, or sexual relationship between a firm lawyer and a federal judge would create too much risk of disqualification to be compatible with any lawyer in the firm continuing to appear before that judge. There is direct authority that a lawyer appearing before a judge with whom he or she is in a romantic relationship is cause for immediate disqualfication of the judge. *In re Schwarz,* 255 P.3 299 (N.M. 2011). *See* ABA Opinion No. 488 at 6 (2018). While we found no authority regarding judicial disqualification based on the appearance of a lawyer whose law partner has a romantic relationship with the judge, but does not herself appear, the Fifth Circuit has taken a strict approach to disqualifying judges based on other kinds of prohibited relationships between a judge and an equity partner of the lawyer who is appearing before the judge. *In re Billedeaux,* 972 F.2d 104 (5th Cir. 1992); *Potashnik v. Port City Const. Co.,* 609 F.2d 1101 (5th Cir. 1980).

We understand that a close personal relationship remains. We expect that Elizabeth and Judge Jones may see one another socially as friends with some frequency. They enjoy shared interests. Elizabeth assures us that at all times since she left her clerkship and joined Jackson Walker, she and Judge Jones have avoided any discussion of active cases and will continue to do so. With these facts as context, we understand the ethics authorities to agree that a friendship between lawyer and judge is not disqualfying. ABA Opinion No. 488 at 5. As stated by the Seventh Circuit: "In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. . . . Many courts therefore have held that a

judge need not disqualify himself just because a friend – even a close friend – appears as a lawyer." *United States v. Murphy,* 768 F.2d 1518, 1537 (7th Cir. 1985).

The cases we have reviewed treat friendship relationships as a matter of degree. In an extreme circumstance, such as a judge and trial lawyer who frequently vacation together, including shortly after a trial in which the lawyer had appeared before the judge, a close friendship might provide grounds for disqualification. As long as such extremes are avoided, however, we do not understand a continuing close friendship between Elizabeth and Judge Jones to create a basis for disqualifying Judge Jones when Jackson Walker represents clients in his court, through other lawyers or Elizabeth herself.

**Recommended Actions**

After careful consideration of all of these matters, the firm's Management Committee concluded that it would be prudent to maintain separation between Elizabeth and our firm's representation of clients in matters before Judge Jones for some reasonable time following the conclusion of any romantic relationship, and to adjust her compensation during that time so that she does not receive any portion of the profits that may be earned by the firm attributable to cases before him. The objective of these actions is to place any alleged appearance of impropriety well into the past.

More specifically, the Management Committee has determined to take the following steps:
,

1) Continue to require Elizabeth to refrain from working on matters in Judge Jones' court through March 2022, at which point it will have been at least two years since the relationship returned to one of close friendship alone. Since the firm first became aware of this issue last March, Elizabeth has done more than avoid appearing in Judge Jones' court; she has, at our request refrained from all work on any matters before Judge Jones. With the firm's concurrence, she has continued to work on complex bankrupcty matters that are planned to be filed in Houston, prior to the filing of a bankruptcy petition. That is, Elizabeth has worked during the planning stages on cases that may wind up being assigned to Judge Jones after they are filed, but she has refrained from further work once a case is filed if it is assigned to Judge Jones. At present, with only six months remaining until March 2022, we also consider that it will be appropriate for Elizabeth to work on certain matters after the effective date of a confirmed plan in cases assigned to Judge Jones. Her work will be limited to post-effective date matters that will not come before Judge Jones for decision. This includes such matters as advising on plan mechanics and interpretation, or on post-efffective date asset sales outside of the bankruptcy court that were authorized under a plan. None of these activities would come before Judge Jones for decision, nor would they result in fees to be recovered from the estate or presented to the court for approval.

2) Adjust Elizabeth's 2021 distribution of net income to remove any portion of firm net profits derived from cases before Judge Jones. As an equity partner at JW, Elizabeth has been

assigned a percentage share of firm profits for 2021. Her share is __%, which would result in net income of $ ________ at budgeted firm net income of $ ____________. During the year, equity partners receive a monthly draw at 60% of their share of budgeted net income. Additional distributions may be authorized around estimated tax dates, but at year end all equity partners will have received substantially less than their shares of budgeted net income. Net income is budgeted very conservatively, actual net income regularly exceeds budgeted net income by a substantial margin, and is expected to do so in 2021 based on performance to date. Once net income for the year has been determined, the balance is distributed to each equity partner in mid-January. In Elizabeth's case, her final distribution will be calculated by multiplying her assigned percentage share times firm net income, but excluding the portion of firm net income derived from fees received for firm work on cases before Judge Jones. For example, if fees from those cases accounts for 2% of total firm revenues in 2021, then Elizabeth's net income for 2021 would be calculated by multiplying her percentage share times 98% of firm net income, rather than 100%.

**Conclusion**

We will appreciate your careful review of this matter. Please let us know whether you have questions or require additional information. Please let us know whether, in your judgment, the measures we have described are appropriate and sufficient to address these circumstances, from the standpoint of avoiding disqualification of Judge Jones or Jackson Walker when we appear in cases before him and in terms of our own ongoing compliance with applicable ethical requirements. We look forward to hearing from you.

Sincerely,

**DRAFT**

Patrick R Cowlishaw

EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY DIRECT MARKETING SERVICES, LLC., *et al.*,[1] | ) | Case No. 20-20184 |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | (Formerly Jointly Administered under J.C. Penney Company, Inc., 20-20182) |

**JACKSON WALKER LLP'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S AMENDED AND SUPPLEMENTAL MOTION FOR (1) RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9024 APPROVING THE RETENTION AND COMPENSATION APPLICATIONS OF JACKSON WALKER LLP, (2) SANCTIONS, AND (3) RELATED RELIEF**
**[Relates to Dkt. No. 1351]**

[1] A complete list of each of the Wind-Down Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.ra.kroll.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ....................1

II. FACTUAL BACKGROUND....................6

A. Ms. Freeman Graduates from Baylor Law School and Pursues a Career in Bankruptcy....................6

B. David R. Jones is an Acclaimed Bankruptcy Practitioner who was Appointed a Bankruptcy Judge by the Fifth Circuit....................7

C. As the Popularity of the Southern District of Texas Grows for Large and Complex Chapter 11 Cases, so Does JW's Bankruptcy Practice. ....................10

D. Ms. Freeman Applies to JW and Joins the Firm as an Income Partner. ....................11

E. Ms. Freeman Achieves Recognition for Her Abilities and is Promoted to Equity Partner at JW....................12

F. *Anonymous Allegations* of an Intimate Relationship Between Former Judge Jones and Ms. Freeman are Raised on March 6, 2021, in Connection with the *McDermott International* Bankruptcy Cases....................13

G. The Bankruptcy Court Denies Mr. Van Deelen's Recusal Request, which Ruling is Affirmed on Appeal by the District Court. ....................17

H. Ms. Freeman Reveals, for the First Time, the Existence of a Current Relationship with Former Judge Jones after Confronted with New Credible Evidence....................20

I. JW Separates Ms. Freeman from the Firm After Ms. Freeman and Former Judge Jones Refuse to Disclose Their Relationship. ....................22

J. Ms. Freeman Exits JW and Opens her Own Law Firm....................26

K. Ms. Freeman and Former Judge Jones's Relationship Becomes Public....................27

L. The U.S. Trustee Seeks to Vacate Various JW Retention and Fee Orders....................28

M. A Miscellaneous Proceeding is Opened in the Bankruptcy Courts to Address All Pre-Trial and Discovery Matters Relating to the U.S. Trustee's Rule 60(b) Motions....................29

III. RESPONSE....................31

A. The U.S. Trustee Cannot Satisfy his Burden under Rule 60(b) to Demonstrate Extraordinary Circumstances or Any Manifest Injustice to Vacate JW's Retention or Fee Orders....................31

i. Applicable Legal Standard. ....................32

ii. The U.S. Trustee Does Not Have Standing to Assert Estate Claims and Causes of Action. ....................34

iii. The U.S. Trustee's Asserted Estate Claims Were Released Under the Applicable Plans. ....................39

iv. JW Did Not Violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct. ....................43

B. JW Cannot be Held Liable for Former Judge Jones's Misconduct. ....................66

i. There is No Risk of Injustice to the Parties in the Challenged Cases. ......67

ii. There is No Risk of Injustice in Other Chapter 11 Cases. ....................69

iii. Public Confidence Will Not be Undermined if Relief is Denied. ............70

iv. Subsection 455(b) of the Judicial Code Does Not Apply. ....................73

v. Bankruptcy Rules 5002 and 5004 Do Not Apply to Former Judge Jones's Approval of Any JW Retention or Fee Applications. ....................75

vi. In the Mediation Cases, JW's Retention and Fee Applications were Subject to Independent Review and Approval. ....................77

C. The Unprecedented Facts, Mitigating Circumstances, and Overall Equities Do not Warrant Sanctions Amounting to 100% of the Fees and Expenses Paid to JW in All of the Challenged Cases. ....................81

IV. CONCLUSION ....................87

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams*,
2020 WL 4922330 (N.D. Tex. 2020)....64

*Air Line Pilots Assoc., Int'l v. Cont'l Airlines, Inc. (In re Cont'l Airlines Corp.)*,
901 F.2d 1259 (5th Cir. 1990)....67, 73

*In re Am. Int'l Refinery, Inc.*,
676 F.3d 455 (5th Cir. 2012)....45, 46, 52, 84, 85

*Ameriquest Mortg. Co. v. Nosek (In re Nosek)*,
544 F.3d 34 (1st Cir. 2008)....84

*In re Apex Long Term Acute Care-Katy, L.P.*,
599 B.R. 314 (Bankr. S.D. Tex. 2019)....37, 41

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
203 F.3d 914 (5th Cir. 2000)....42

*Arenes v. Boughton (In re Prudhomme)*,
43 F.3d 1000 (5th Cir. 1995)....85

*Attorney U. v. The Mississippi Bar*,
678 So. 2d 963 (Miss. S. Ct. 1996)....60

*Baker v. Cage (In re Whitley)*,
737 F.3d 980 (5th Cir. 2013)....84, 86

*In re Balt. Emergency Servs. IL, Corp.*,
432 F.3d 557 (4th Cir. 2005)....38

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
176 F.3d 610 (2d Cir. 1999)....48

*BFP v. Resolution Trust Corp.*,
511 U.S. 531 (1993)....44

*Blundell v. Home Quality Care Home Health Care, Inc.*,
No. 3:17-CV-1990-L-BN, 2018 WL 276154 (N.D. Tex. Jan. 3, 2018)....32

*In re Bradley*,
495 B.R. 747 (Bankr. S.D. Tex. 2013)....57, 58

*In re Brown*,
511 B.R. 843 (Bankr. S.D. Tex. 2014) ....................51

*Buck v. Davis*,
580 U.S. 100 (2017) ....................32

*In re Cal. Litfunding*,
360 B.R. 310 (Bankr. C.D. Cal. 2007)....................41

*Carroll v. Abide (In re Carroll)*,
850 F.3d 811 (5th Cir. 2017)....................83

*In re Case*,
937 F.2d 1014 (5th Cir. 1991)....................83

*CEATS, Inv. v. Continental Airlines, Inc.*,
755 F.3d 1356 (Fed. Cir. 2014)....................70, 78, 80, 81

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ....................83

*Chapman & Cole v. Itel Container Int'l B.V.*,
865 F.2d 676 (5th Cir. 1989)....................62

*Chiasson v. Bingler (In re Oxford Mgmt., Inc.*),
4 F.3d 1329 (5th Cir. 1993)....................84

*In re Chris Petit and Assocs., P.C.*,
No. 22-50591, 2022 WL 17722853 (Bankr. W.D. Tex. Dec. 13, 2022) ....................52

*In re Circle Inv'rs, Inc.*,
No. 02-39553, 2008 WL 910062 (Bankr. S.D. Tex. Apr. 3, 2008)....................48

*Concat LP v. Unilever, PLC*,
350 F. Supp. 2d 796 (N.D. Cal. 2004) ....................48

*In re Condor Ins. Ltd.*,
601 F.3d 319 (5th Cir. 2010)....................47

*In re Contractor Tech., Ltd.*,
No. CIV.A. H-05-3212, 2006 WL 1492250 (S.D. Tex. May 30, 2006).................... 48, 50

*Curtis v. The Chapman Family Trust (In re Chapman)*,
628 B.R. 512 (Bankr. S.D. Tex. 2021) ....................77

*In re Cushman*,
589 B.R. 469 (Bankr. D. Me. 2018) ....................84

*In re Cygnus Oil & Gas Corp.*,
No. 07-32417, 2007 WL 1580111 (Bankr. S.D. Tex. May 29, 2007)........................ 48, 54, 77

*Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*,
23 F.4th 529 (5th Cir. 2022)..........................................................................................61

*Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*,
540 F.3d 351 (5th Cir. 2008)..........................................................................................43

*Edward H. Bohlin Co. v. Banning Co.*,
6 F.3d 350 (5th Cir. 1993) ............................................................................................32

*In re Enron Corp.*,
No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ................................51

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005)............................................................................ 52, 83

*Eubanks v. Federal Deposit Ins. Corp.*,
977 F.2d 166 (5th Cir. 1992)..................................................................................... 71, 79

*In re EWC, Inc.*,
138 B.R. 276 (Bankr. W.D. Okla. 1992)..........................................................................85

*In re First Leads & Marketing, Inc.*,
2023 WL 4163478 (Bankr. N.D. Ga. 2023).....................................................................37

*In re Fish & Fisher, Inc.*,
574 B.R. 608 (Bankr. S.D. Miss. 2017) ..........................................................................85

*In re Fundamental Long Term Care*,
614 B.R. 753 (Bankr. M.D. Fla. 2020) ...........................................................................51

*Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*,
655 F.2d 463 (2d Cir. 1981)..................................................................................... 44, 85

*In re Genesis Health Ventures, Inc.*,
340 B.R. 729 (Dist. Del. 2006).......................................................................................41

*In re GHR Energy Corp.*,
60 B.R. 52 (Bankr. S.D. Tex. 1985) ...............................................................................86

*Gonzales v. Dankel*,
2023 WL 1781800 (E.D. Tex. 2023) ..............................................................................64

*Harris v. First City Bancorporation of Tex., Inc. (In re First City Bancorporation of Tex., Inc.)*,
282 F.3d 864 (5th Cir. 2002)..................................................................................... 84, 86

*Hartford Underwriters Ins. Co. v. Union Planters, N.A.*,
530 U.S. 1 (2000) ....................................................................................35

*In re Hickman*,
673 S.W.3d 188 (Tenn. 2023) ....................................................................61

*In re Hill*,
342 B.R. 183 (Bankr. D.N.J. 2006) ...........................................................76

*In re Holloway*,
955 F.2d 1008 (5th Cir. 1992) ...................................................................77

*Howe v. Vaughan (In re Howe)*,
913 F.2d 1138 (5th Cir. 1990) ...................................................................41

*Hulin v. Fibreboard Corp.*,
178 F.3d 316 (5th Cir. 1999) .....................................................................41

*IP Petroleum Co. v. Wevanco Energy, L.L.C.*,
116 S.W.3d 888 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ................43

*Jamo v. Katahdin Fed. Credit Union (In re Jamo)*,
283 F.3d 392 (5th Cir. 2002) .....................................................................84

*Jones v. Blume*,
196 S.W.3d 440 (Tex. App.—Dallas 2006, pet. denied) ..............................59

*Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*,
134 F.3d 831, 836 (7th Cir. 1998) ..............................................................47

*Larsen v. Utah State Bar (In re Larsen)*,
379 P.3d 1209 (Utah 2016) .........................................................................61

*Law v. Siegel*,
571 U.S. 415 (2014) ...................................................................................84

*In re LeBlanc*,
927 So. 2d 315 (La. 2007) ..........................................................................64

*Liljeberg v. Health Services Acquisition Corp.*,
486 U.S. 847 (1988) ...................................................................67, 68, 69, 70, 75

*Loftis v. Minar (In re Montanino)*,
15 B.R. 307 (Bankr. D.N.J. 1981) ..............................................................76

*MacNeil Bros. Co. v. Cohen*,
264 F.2d 186 (1st Cir. 1959) .......................................................................72

*Manges v. Seattle-First Nat'l Bank (In re Manges)*,
29 F.3d 1034 (5th Cir. 1994)....71

*In re Marin Motor Oil, Inc.*,
689 F.2d 445 (3d Cir. 1982)....35

*In re Martin*,
817 F.2d 175 (1st Cir. 1987)....46, 50

*In re Matco Elecs. Grp., Inc.*,
383 B.R. 848 (Bankr. N.D.N.Y. 2008)....52

*Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*,
644 F.3d 259 (5th Cir. 2011)....42

*Miller v. Meinhard-Comm. Corp.*,
462 F.2d 358 (5th Cir. 1972)....41

*National Med. Enters., Inc. v. Godbey*,
924 S.W.2d 123 (Tex. 1996)....55, 56

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
48 F.4th 419 (5th Cir. 2022)....41

*In re O'Connor*,
92 S.W.3d 446 (Tex. 2002)....56

*Obduskey v. Wells Fargo*,
No. 22-1156, 2023 WL 1831128 (10th Cir. Feb. 9, 2023)....67

*Office of Disciplinary Counsel v. Price*,
732 A.2d 599 (Pa. 1999)....61, 62

*Okla. State Treasurer v. Linn Operating, Inc. (In re Linn Energy, L.L.C.)*,
927 F.3d 862 (5th Cir. 2019)....41

*In re Old ANR, LLC*,
2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019)....35

*Parker v. Connors Steel Co.*,
855 F.2d 1510 (11th Cir. 1988)....66, 73

*Patterson v. Mobil Corp.*,
335 F.3d 476 (5th Cir. 2003)....67

*Perkins Coie v. Sadkin (In re Sadkin)*,
36 F.3d 473 (5th Cir. 1994)....84

*Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*,
432 F.3d 347 (5th Cir. 2005)........................................45, 46, 83, 85

*Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*,
785 F.2d 1249 (5th Cir. 1986)........................................52

*Potashnick v. Port City Const. Co.*,
609 F.2d 1101 (5th Cir. 1980)........................................75

*In re Poteet Const. Co., Inc.*,
122 B.R. 616 (Bankr. S.D. Ga. 1990)........................................32

*In re Powell*,
533 N.E.2d 831 (Ill. 1988)........................................64

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010)........................................35

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987)........................................41

*In re Roman Cath. Church of Archdiocese of New Orlean*s,
No. 22-30539, 2024 WL 2125507 (5th Cir. May 13, 2024)........................................69

*Rome v. Braunstein*,
19 F.3d 54 (1st Cir. 1994)........................................83

*In re Ronco, In*c.,
838 F.2d 212 (7th Cir. 1988)........................................61

*Ruhl v. HSBC Mortg. Servs., Inc.*,
399 B.R. 49 (E.D. Wis. 2008)........................................36

*In re Schimmelpenninck*,
183 F.3d 347 (5th Cir. 1999)........................................36

*Seven Elves, Inc. v. Eskenazi*,
635 F.2d 396 (5th Cir. 2005)........................................32

*In re Smart World Technologies, LLC*,
423 F.3d 166 (2d Cir. 2005)........................................35, 37

*Smith v. Mixon*,
788 F.2d 229 (4th Cir. 1986)........................................51

*Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*,
647 F.3d 547 (5th Cir. 2011)........................................43

*In re Spiech Farms, LLC*,
603 B.R. 395 (Bankr. W.D. Mich. 2019)....................37

*In re SRC Liquidation, LLC*,
2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019)....................35

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir. 1989)....................36

*In re Sunbeam Corp.*,
287 B.R. 861 (S.D.N.Y. 2003)....................35

*In re SunEdison, Inc.*,
2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019)....................35, 36

*In re Syntax-Brillian Corp.*,
2016 WL 7177615 (D. Del. Dec. 9, 2016)....................36

*Tesco American, Inc. v. Strong Industries, Inc.*
221 S.W.3d 550 (Tex. 2006)....................55, 56, 57

*Thomas v. Allstate Ins.*,
57 F.Supp.2d 361 (S.D. Miss. 1998)....................41

*In re Timber Creek, Inc.*,
187 B.R. 240 (Bankr. W.D. Tenn. 1995)....................53, 54

*In re Tr. Am. Serv. Corp.*,
175 B.R. 413 (Bankr. M.D. Fla. 1994)....................48

*In re TransAmerican Natural Gas Corp.*,
127 B.R. 800 (S.D. Tex. 1991)....................36

*Unauthorized Practice of Law Committee v. American Home Assurance Co., Inc.*,
261 S.W.3d 24 (Tex. 2008)....................57

*United States v. Gellene*,
182 F.3d 578 (7th Cir. 1998)....................61

*United States v. Sutton*,
786 F.2d 1305 (5th Cir. 1986)....................83

*VTX Commc'ns, LLC v. AT&T Inc.*,
2023 U.S. Dist. LEXIS 28110 (S.D. Tex. Feb. 21, 2023)....................43

*Roberts v. Wal-Mart Louisiana, L.L.C.*,
54 F.4th 852 (5th Cir. 2022)....................75, 78, 79

*Matter of Weishoff*,
382 A.2d 632 (N.J. 1978) ....................64

*Whitlock v. Lowe (In re DeBerry)*,
945 F.3d 943 (5th Cir. 2019)....................44

*In re Wibracht*,
Case No. 21-50477-CAG, 2022 WL 981781 (Bankr. W.D. Tex. 2022)....................76

*Woods v. City Nat. Bank & Tr. Co. of Chicago*,
312 U.S. 262 (1941) ....................52

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*,
714 F.3d 860 (5th Cir. 2013)....................38, 43

**Rules and Statutes**

11 U.S.C. § 101(14) .................... 45, 48, 54

11 U.S.C. § 101(45) ....................76

11 U.S.C. § 102....................47

11 U.S.C. § 307....................35, 39, 40,47

11 U.S.C. § 323....................35

11 U.S.C. § 327....................*passim*

11 U.S.C. § 328....................*passim*

11 U.S.C. § 549....................36

11 U.S.C. § 1103....................*passim*

11 U.S.C. § 1106....................35

11 U.S.C. § 1107....................35

11 U.S.C. § 1123....................43

11 U.S.C. § 1127....................41

18 U.S.C. § 152....................61

18 U.S.C. § 1623....................61

28 U.S.C. § 455....................*passim*

28 U.S.C. § 586....................................................................................................40

FED. R. BANKR. P. 2014.......................................................................................*passim*

FED. R. BANKR. P. 5002.......................................................................................*passim*

FED. R. BANKR. P. 5004.........................................................................................67, 77

FED. R. CIV. P. 11 ....................................................................................................62

FED. R. CIV. P. 26....................................................................................................62

FED. R. CIV. P. 60(b) ............................................................................................*passim*

TEX. R. PROF. CONDUCT, Preamble...........................................................................59

TEX. R. PROF. CONDUCT 1.09....................................................................................56

TEX. R. PROF. CONDUCT 3.03.......................................................................... 59, 60, 61

TEX. R. PROF. CONDUCT 4.01.......................................................................... 59, 63, 64

TEX. R. PROF. CONDUCT 5.01.......................................................................... 59, 65

TEX. R. PROF. CONDUCT 5.04....................................................................................59

TEX. R. PROF. CONDUCT 8.03....................................................................................60

TEX. R. PROF. CONDUCT 8.04.......................................................................... 59, 64

**Other Authorities**

ABA Model Rule 8.3(a) ..............................................................................................60

Advisory Op. 58.........................................................................................................74

Black's Law Dictionary (11th ed. 2019) .........................................................51, 60, 73, 76

Code of Conduct for United States Judges, Canon 3.....................................................74, 75

COLLIER ON BANKRUPTCY ¶ 328 (16th ed.)...............................................................85, 86

COLLIER ON BANKRUPTCY ¶ 8.03 (16th ed.) ..............................................................47, 50

COLLIER ON BANKRUPTCY ¶ 2014.05 (16th ed.).............................................................51

*Conn. Bar Ass'n Comm. on Prof'l Ethics*, Informal Op. 13 (2004)......................................60

*S.C. Bar Ethics Advisory Comm.*, Op. 04 (2005), 2005 WL 483384......................................60

*Phil. Bar Ass'n Prof. Guidance Comm.*, Op. 03 (1997)....................60

Restatement (Third) of the Law Governing Lawyers § 5 (2000)....................60

Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 1 (2010)....................60

*Studies in American Tort Law 41* (4th ed. 2009)....................60

*Tex. Comm. on Prof'l Ethics*, Op. 520 (1997)....................58

Jackson Walker LLP ("JW") files this Response (the "Response") in opposition to the *Amended and Supplemental Motion for (1) Relief From Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief* [Dkt. No. 1351] (the "Motion") filed by Kevin M. Epstein, United States Trustee for Region 7 (the "U.S. Trustee"), and in support thereof, states as follows:

## I. PRELIMINARY STATEMENT[2]

1. The actions of former Judge David R. Jones and Ms. Elizabeth Freeman should not be condoned and JW does not in any way. But neither former Judge Jones nor Ms. Freeman are parties to this contested matter, and the U.S. Trustee's requested relief not only fails to impose any consequences on former Judge Jones or Ms. Freeman, but it inequitably and improperly targets JW and each of its partners and employees who were misled by former Judge Jones and Ms. Freeman about the couple's secret relationship. JW at all times acted reasonably and responsibly, and JW reasonably relied on Ms. Freeman's integrity, her duties as an attorney and officer of the Court, and her fiduciary duties as a partner to the firm to disclose all relevant facts throughout her employment. It is ironic that the U.S. Trustee alleges JW should have disclosed the nature of the relationship to the same judge who knew of the relationship, allegedly had a duty to disclose or recuse himself, and who knowingly declined to do so.

2. JW did not violate any ethical rules, disclosure obligations, or fiduciary duties because JW could not disclose information it did not know. And when JW first confirmed the existence of a current romantic relationship between former Judge Jones and Ms. Freeman on March 30, 2022, JW acted reasonably in moving to separate Ms. Freeman from the firm. No

[2] All capitalized terms not otherwise defined in this Preliminary Statement are defined below.

principles of law or equity support punishing JW for not publicly disclosing a relationship that was not only not previously known by JW until late March 2022, but a relationship that the couple had actively hidden from JW.

3. Over and over, the U.S. Trustee has conceded that the inappropriate conduct at issue in the various challenged cases was that of former Judge Jones. JW agrees—it is former Judge Jones's conduct that is the cause of any concern, not JW's. JW has already incurred substantial fees defending itself in the various challenged cases related to a situation it knew nothing about until March 30, 2022. ***Indeed, in 23 of the 33 cases the U.S. Trustee challenges, JW had no knowledge of any romantic relationship, cohabitation, or joint home ownership between former Judge Jones and Ms. Freeman while JW performed legal services for the estates***. And when JW confirmed the relationship, JW took appropriate action and ultimately severed ties with Ms. Freeman.

4. Nonetheless, the U.S. Trustee seeks to punish JW by requesting sanctions against JW for 100% of all fees and expenses paid by the estates in 33 bankruptcy cases, which fees were for services JW indisputably performed and, in the majority of cases, with respect to which Ms. Freeman provided no or nominal work. Such relief is misdirected and unsupportable under applicable law and the facts and circumstances of the various challenged cases.

5. The U.S. Trustee's Motion, at its core, asserts estate-owned claims—*i.e.*, the return of 100% of the fees and expenses paid by the bankruptcy estates to JW based on the unsupported assertions of alleged breaches of duties owed to those estates.[3] There are a myriad of problems with this theory: not only does the U.S. Trustee lack standing to pursue estate-owned claims, but

[3] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at pp. 1-2, 45-46, 48-49, 52, 55-56 & ¶¶ 61, 175, 178, 180, 183, 184, 185, 187, 188, 192, 198, 206, 207, 211 (seeking the "return" of funds and/or "disgorgement").

any such claims were also released under the confirmed plans and confirmation orders that are final and to which the U.S. Trustee did not object or appeal. The applicable reorganized debtor and/or plan agent is the proper party to evaluate and pursue these estate claims (to the extent not released) based on their individual analysis of the facts taking into consideration the costs of pursuing versus the potential benefits and ultimate likelihood of success. Indeed, it is the estates—and the estates alone—that would benefit from the recoveries the U.S. Trustee seeks, and it is the estates—and the estates alone—that would bear the cost of statutorily mandated U.S. Trustee fees as well as their own legal fees associated with pursuing, liquidating, and administering any recoveries on account of these asserted claims.

6. Additionally, the U.S. Trustee's Motion fails to assert any viable legal or factual basis for vacating JW's retention and fee orders (many of which were entered years ago and without any objections, and all of which are final orders with *res judicata* effect). To this point, at least one bankruptcy judge has noted that the entire reorganization plan may have to be vacated in order to obtain the relief requested by the U.S. Trustee.[4] No party can possibly believe that such result would be in the best interests of the various estates.

7. At bottom, the U.S. Trustee's theories are premised on two invalid assumptions: (i) the relationship between former Judge Jones and Ms. Freeman was a disqualifying conflict of interest for JW; and (ii) JW is responsible for the misconduct of Ms. Freeman and former Judge Jones notwithstanding that JW had no actual knowledge of the alleged relationship until March 30, 2022. Neither assumption is correct.

[4] *See, e.g.*, *In re Exco Resources, Inc.*, Case No. 18-30155 (MI), Mar. 26, 2024, Hr'g Tr. pp. 25:15-25 & 26:15-27:23 (Bankr. S.D. Tex. 2024).

8.      A relationship that requires recusal of a judge under 28 U.S.C. § 455 is different from a conflict of interest that requires disqualification of a law firm under section 327 of the Bankruptcy Code.  The former does not *per se* constitute the latter.  There is no reasonable dispute that, had former Judge Jones recused, JW would ***not*** have been disqualified from representing its clients.  Quite the opposite—another judge would have been assigned to preside over the applicable cases; JW would have still been retained as an estate professional; JW would have still performed the same reasonable and necessary legal services for the estates; and JW would have still been compensated for performing those legal services.  In other words, the U.S. Trustee's entire premise incorrectly conflates a "disclosure issue" with a "disqualification issue."

9.      The "imputation theory" pushed by the U.S. Trustee (*i.e.*, Ms. Freeman's knowledge of her secret relationship should be imputed to JW) is equally inapposite, distinguishable, and inapplicable.  The U.S. Trustee seeks to impute Ms. Freeman's knowledge of her secret relationship with former Judge Jones to JW for purposes of section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.  ***Not a single case cited by the U.S. Trustee supports that theory***.  Nor do any cases cited support the U.S. Trustee's imputation theory of liability based on alleged violations of various disciplinary rules.  The referenced disciplinary rules are directed solely at individual attorneys—not law firms—and all require a showing of actual—not constructive or imputed—knowledge.

10.     In addition to these legal infirmities, the U.S. Trustee's Motion wholly fails to account for the multitude of mitigating factors in the challenged cases.  It seeks a judgment equal to 100% of all fees and expenses paid to JW across 33 cases spanning over six years based on an intimate relationship between former Judge Jones and Ms. Freeman that they not only failed to disclose, but ***actively concealed from JW*** and other parties-in-interest.  The U.S. Trustee's Motion

ignores these facts, along with the fact that JW itself acted reasonably in its efforts to comply with any applicable disclosure obligations based on the facts as JW understood them and took appropriate action in severing its ties with Ms. Freeman once it confirmed the relationship.

11.    The U.S. Trustee's Motion also ignores the fact that, in each case, JW performed the work for which it was paid and the work benefitted the bankruptcy estates.  The Motion further fails to account for any of the following pertinent circumstances:  (i) the time periods and facts of any particular case, (ii) whether the cases were "prepackaged" or otherwise involved consensual or non-impairing plans, (iii) whether the plans were the result of a settlement and/or whether they were supported by voting creditors, (iv) whether Ms. Freeman was even involved in the matters (and the extent of Ms. Freeman's involvement), (v) the duration of the cases, (vi) the scope (or limited scope) of JW's employment as local and/or conflicts counsel and the associated fees requested and approved, (vii) the reasonableness and necessity of JW's fees and expenses which indisputably conferred a direct, concrete benefit to the estates, (viii) any voluntary fee reductions and/or professional fee settlements already contained in various of the cases, and (ix) the release and exculpation provisions in favor of JW in the various confirmed plans and confirmation orders.

12.    The U.S. Trustee has also not sought to vacate a single substantive order entered in any of the challenged cases.  To the contrary, the U.S. Trustee has not identified any statement, ruling, decision, order, judgment, mediator recommendation, or settlement that was allegedly improperly influenced by the secret relationship between Ms. Freeman and former Judge Jones. Nor has the U.S. Trustee pled any actual injury to any party allegedly caused by the secret relationship.  Indeed, the U.S. Trustee cannot provide, in light of the indisputable evidence in the record in each of the 33 challenged cases, that ***any*** relevant rulings, decisions, orders, judgments,

mediator recommendations, and/or settlements were not amply supported by applicable law and each case's evidentiary record to which the U.S. Trustee participated in.

13. The U.S. Trustee's Motion must be denied.

## II. FACTUAL BACKGROUND

### A. Ms. Freeman Graduates from Baylor Law School and Pursues a Career in Bankruptcy.

14. Ms. Freeman graduated from Baylor University School of Law in 1997. She was admitted to the Texas Bar in 1998. Upon graduating from law school, Ms. Freeman clerked for the Honorable (Ret.) Bankruptcy Judge Wesley Steen in the Southern District of Texas. Following her clerkship, Ms. Freeman began her career as a bankruptcy associate at the law firm of Locke Lord Bissell & Liddell LLP n/k/a Locke Lord LLP. Ms. Freeman was ultimately promoted to partner. In 2009, Ms. Freeman joined Houston-based Porter Hedges LLP as a partner in the bankruptcy group and remained until 2011 when she left to become former Judge Jones's permanent law clerk. Former Judge Jones was also a partner at Porter Hedges at that time.

15. During all relevant times, Ms. Freeman was a nationally recognized and widely respected bankruptcy attorney. She was active in the local legal community where she frequently planned, attended, and spoke at various local conferences.[5] According to the Texas Board of Legal

---

[5] *See*, *e.g.*, Bankruptcy Bench/Bar Conference Agenda and Reading Materials regarding *The First Bankruptcy Bench/Bar Conference for the Southern District of Texas*, Nov. 6-7, 2008 (available at https://www.txs.uscourts.gov/page/bankruptcy-benchbar-conference-agenda-and-reading-materials) (last visited Apr. 24, 2024); Southern District of Texas Bankruptcy Bench Bar Conference, Corpus Christi, Texas, Apr. 20-22, 2016 (available at https://www.txs.uscourts.gov/sites/txs/files/2016%20Bench%20Bar%20Flyer.pdf) (last visited Apr. 24, 2024); Southern District of Texas Bankruptcy Bench Bar Conference, Corpus Christi, Texas, May 9-11, 2018 (available at https://inns.innsofcourt.org/media/165139/2018%20Bench%20Bar%20Flyer.pdf) (last visited Apr. 24, 2024).

Specialization, only 96 board certified business bankruptcy law lawyers bear that distinction in Texas. Ms. Freeman has held that distinction since 2005.[6]

**B. David R. Jones is an Acclaimed Bankruptcy Practitioner who was Appointed a Bankruptcy Judge by the Fifth Circuit.**

16. Former Judge Jones received his Master of Business Administration from Southern Methodist University in 1986 and his Bachelor of Science in Electrical Engineering from Duke University in 1983. He later graduated from the University of Houston School of Law in 1992. Later in his career and while still on the bench, he returned to Duke University where he received an LLM (or Master of Laws) in 2018.

17. After earning his law degree, former Judge Jones joined the bankruptcy boutique firm of Kirkendall & Isgur. When Judge Marvin Isgur was appointed to the bench on February 1, 2004, former Judge Jones left the firm to join Porter Hedges as a partner in the bankruptcy group. Former Judge Jones developed a successful bankruptcy litigation practice, often representing clients in high stakes, high dollar, and complicated matters. He became widely known as a no-nonsense, tough litigator who had a demanding courtroom presence and demeanor. He prided himself on his trial skillset, knowledge of the evidentiary rules, ability to react quickly on his feet, and ability to obtain results.

18. Former Judge Jones left Porter Hedges in 2011 to join the bench. He was sworn in as a bankruptcy judge for the Southern District of Texas on September 30, 2011. Ms. Freeman followed him to serve as his law clerk, a position she held for approximately six (6) years.

---

[6] *See* Texas Board of Legal Specialization, available at https://www.tbls.org/specialtyarea/BB (last visited May 13, 2024); *see also* Texas Board of Legal Specialization, available at https://www.tbls.org/findlawyer-results (last visited May 13, 2024).

19. To qualify for appointment as a United States bankruptcy judge, nominees must, among other things, possess, and have a reputation for, integrity and good character.[7] Judicial candidates must also possess, and have demonstrated, outstanding legal ability and competence.[8] Former Judge Jones checked all of these boxes. Judicial candidates are also interviewed by a merit selection panel that historically consisted of 3 members—usually the Chief District Judge, a Circuit Judge, and a member of the bar. Candidates are ultimately approved by the Fifth Circuit Court of Appeals following an extensive background check.

20. Former Judge Jones served as Chief Bankruptcy Judge from 2015 to 2022. In 2016, former Judge Jones was instrumental in the creation of the two judge complex case panel for the Southern District of Texas (discussed below). While on the bench, former Judge Jones made it his mission to mentor bankruptcy practitioners.[9] To this point, former Judge Jones created and began hosting monthly evidence and trial technique classes in his courtroom. An array of topics were covered, ranging from mock arguments, mock examinations, expert witness matters, and evidentiary pitfalls, among many other topics. Oftentimes, other bankruptcy judges and prominent local practitioners attended the classes. These classes were widely popular, and continued up until former Judge Jones's announced resignation in October 2023.

21. Notwithstanding this friendly and approachable demeanor off the bench, former Judge Jones was a force of nature on the bench. He was intimidating at times, unapologetically

[7] *See*, *e.g.*, Regulations of the Judicial Conference of the United States for the Selection, Appointment, and Reappointment of United States Bankruptcy Judges, available at https://www.ca5.uscourts.gov/docs/default-source/default-document-library/qualifications-texas-southern-bankruptcy-judge, Ch. 1, Sec. 1.01 ("Minimum Qualifications") (last visited Apr. 24, 2024).

[8] *Id*.

[9] Former Judge Jones was also instrumental in implementing both the "go-to meeting" video hearing platform and "court speak", which made audio recordings of hearings available almost immediately following every hearing. These technology advances, together with other changes, helped make the Southern District of Texas a more user-friendly forum, and thus, an attractive venue.

self-assured of his opinions about issues, and did not hesitate to openly voice his displeasure of lawyers and/or their clients when he disagreed with their legal positions or strategy.[10] This did not deter lawyers from filing complex chapter 11 cases in the Southern District of Texas, however, as former Judge Jones presided over some of the largest and most complex chapter 11 cases in the country during his tenure.

22. On March 30, 2023, former Judge Jones was honored with the Distinguished Service Award for Lifetime Achievement[11] by the Emory University School of Law and the Emory

[10] *See In re KP Engineering, LP*, Case No. 19-34698, Dkt. No. 396, Jan. 30, 2020 Audio Hr'g Tr. at 17:27-18:11 (Bankr. S.D. Tex.) ("Is that really necessary? . . . It was a very simple question. Was that really necessary? . . . Then let's not do it. I don't know why you put professionalism at issue in every single hearing. No one wants to work with you. I find your behavior offensive. It can't serve your constituents. And I don't know why you persist in doing it. Do I need to have [a senior attorney] come over here and baby sit you in every single hearing? . . . Yes or no? . . . Sit down."); *In re Neiman Marcus Group Ltd, LLC, et al.*, Case No. 20-32519, Dkt. No. 2156, Dec. 10, 2020 Hr'g Tr. at pp. 15:15-20:11 (Bankr. S.D. Tex.) ("I don't think you are a good person. I don't think you're a nice person. And there is very much a side of me that wants to treat you exactly the same way that you have treated other people throughout your career and in your life. But to do that, I would be lowering myself down to your level. I would be tarnishing the office that I took an oath to serve and I would be tarnishing a process that I took an oath to protect. So I'm not going to do that. But I want you to know – and for whatever it means, and it may be nothing – that the court believes you to be a thief, a person of the lowest character that attempted to steal, not based on need, not based on necessity, but out of pure greed. . . . You enticed a lawyer at [a law firm] to participate in your wrongful actions that has resulted in the total loss of his credibility, a commodity so valuable and so rare that it simply can't be restored. . . . You play one game with me, you disrespect me one more time, you will see the other side of me that I don't want to come out. And if you doubt my conviction, you talk to any of your lawyers from Houston that know me. They'll tell you."); *In re Bouchard Transportation Co., Inc., et al.*, Case No. 20-34682, Dkt. No. 591, Feb. 26, 2021 Hr'g Tr. at p. 10:6-8 ("[T]here will be a hammer unlike any hammer anyone has ever seen. None of you have ever seen me like this. I am willing to show you in this case to save the company."); *In re TaxMasters, Inc.*, Case No. 12-32065, Dkt. No. 30, Apr. 5, 2012 Hr'g Tr. at pp. 12:1-7, 13:5-7, 22:21-24 & 26:5-8 ("I'll tell you now, and you know me, I am a big believer in punitive damages for folks who intentionally try to usurp the bankruptcy process, and that's where my head is right now. . . . You may also want to rethink where you're going. . . . I think the argument you're making is really dangerous and I would never make it . . . . I told you three times it's not an argument I would make. You chose to make it anyway. You're a big boy, you'll live with that. . . . If you think I'm slightly irritated today, you haven't seen anything yet. And I am not -- and again, I'm not trying to threaten you or scare you or anything else."); *In re Neiman Marcus Group Ltd LLC, et al.*, Case No. 20-32519, Dkt. No. 827, May 29, 2020 Hr'g Tr. at p. 171:9-21 ("[W]hat he gave me was a line of bull. And I don't appreciate it. You're asking me to put a lot of faith in people I don't know. And I expect transparency, I expect forthrightness, and I got neither today from him. And I want you to know that I've noted that, and whatever it is I'm about to do, I won't forget the testimony today. And I'm going to tell you that if [it] weren't for my – I don't know you, and I assume that you're a very fine lawyer – if it weren't for my confidence in [another attorney in the firm], we'd be scheduling a hearing that would have an entirely different implication. That's how bothered I am about that testimony.").

[11] Previous recipients of this lifetime achievement award included figures like Kenneth Klee, Harvey Miller, Richard Levin, and Judge Mary Walrath.

Bankruptcy Developments Journal.[12] Less than 7 months later, on October 15, 2023, former Judge Jones announced that he was resigning from the bench, with such resignation to be effective November 15, 2023.

**C. As the Popularity of the Southern District of Texas Grows for Large and Complex Chapter 11 Cases, so Does JW's Bankruptcy Practice.**

23. Before 2016, many Texas-based companies like Enron Corporation, American Airlines, and Energy Future Holdings, among others, filed their bankruptcy cases in locations other than Texas believing they could achieve quicker and better results.[13] Starting in 2016, the Bankruptcy Court for the Southern District of Texas—led by former Judge Jones—implemented a series of reforms. These changes aimed to streamline the practice in the District, making the venue more attractive to large Texas based companies (and others) that needed restructuring. Included in those reforms was the creation of a two judge "complex case panel" whereby 50% of chapter 11 cases designated as "complex cases" would be randomly assigned to former Judge Jones, and 50% of chapter 11 cases designated as "complex cases" would be randomly assigned to Judge Isgur.[14] In other words, overnight, bankruptcy lawyers that typically worked on large, complex cases before any one of 3 or 4 sitting bankruptcy judges (depending on the time period), now would be practicing almost exclusively (and routinely) before 1 of 2 bankruptcy judges in every case. The Court implemented the change to, among other things, make procedures

[12] The Emory Bankruptcy Developments Journal is the nation's premier student-run bankruptcy journal, and the most subscribed-to publication at Emory Law.

[13] *See* "Chief Judge David Jones: The Man Who Saved the Texas Bankruptcy Practice," The Texas Lawbook, Aug. 23, 2020 (https://texaslawbook.net/chief-judge-david-jones-the-man-who-saved-the-texas-bankruptcy-practice/) (last visited Apr. 24, 2024).

[14] *See*, *e.g.*, S.D. Tex. Bankr. 2016-3 Work Order (effective July 1, 2016). Prior to the implementation of the two-judge complex case panel, chapter 11 cases that were filed in Houston would be randomly assigned to any of the sitting bankruptcy judges based on the then applicable Southern District of Texas case "work order". Divisions outside of Houston had a more limited draw of potential Southern District of Texas judges given the nature of those locations.

more transparent and predictable by way of having rules and procedures that applied specifically to the larger and more complex cases.

24. As cases began to be filed with more consistency in the Southern District of Texas, JW quickly became one of the local go-to law firms due to its reputation, knowledge of local practice, familiarity with the courts, and lower regional billing rates. Indeed, JW cemented itself in this role years before Ms. Freeman joined the firm, oftentimes teaming with other large law firms that did not have a significant bankruptcy practice in the Southern District of Texas.

25. Thus, JW's popularity as local counsel had nothing to do with Ms. Freeman or her unknown relationship with former Judge Jones. Rather, it was tied to JW's efforts outside of the Southern District of Texas to form and strengthen relationships with large law firms that had no significant Houston bankruptcy presence, and to advocate for the Southern District of Texas by emphasizing the benefits of the complex case panel, the quality of the judges in the Southern District of Texas, and the excellence of the local bar.

**D. Ms. Freeman Applies to JW and Joins the Firm as an Income Partner.**

26. In early 2018, while Ms. Freeman clerked for former Judge Jones, Ms. Freeman sought a partnership position at JW. As is customary, Ms. Freeman was provided with a *Lateral Partner Questionnaire* ("LPQ") which she was asked to complete and return in writing. Among other things, the LPQ asked Ms. Freeman to disclose any possible conflicts of interest. Ms. Freeman did not disclose any possible conflicts of interest but wrote that she was "unable to work on [a] matter *currently pending* before Judge Jones" (emphasis added):

15) PLEASE COMPLETE THE ATTACHED FORM REGARDING POSSIBLE CONFLICTS OF INTEREST.

I am not currently representing clients. I am unable to work on an matter currently pending before Judge Jones.

27. JW understood that Ms. Freeman's inability to work on matters currently pending before former Judge Jones was a requirement of former Judge Jones, and was to last for a period that equaled Ms. Freeman's clerkship tenure—here, six (6) years.

28. At no time during the interview or onboarding process with JW did Ms. Freeman disclose that she had in the past—or was currently having—an intimate relationship with former Judge Jones. Nor did she disclose that she lived with former Judge Jones or that they co-owned residential property. JW had no reason to believe otherwise. And even to this date, JW ***still*** does not know the true state or history of the relationship between former Judge Jones and Ms. Freeman.

29. JW hired Ms. Freeman on May 14, 2018, as an income partner in the bankruptcy group.[15] JW announced Ms. Freeman's hiring publicly on May 23, 2018, which announcement acknowledged Ms. Freeman's prior clerkship with former Judge Jones—a fact that was widely known by local practitioners, including the U.S. Trustee.[16]

**E. Ms. Freeman Achieves Recognition for Her Abilities and is Promoted to Equity Partner at JW.**

30. Ms. Freeman continued to excel in the bankruptcy field. Her peers repeatedly recognized her intellect, skillset, and reputation—character traits that were equally apparent to her JW colleagues. To this point, Ms. Freeman was recognized as a "Top Lawyer" in Best of Houstonia, Houstonia Magazine, in 2019; Ms. Freeman was named "H Texas Top Lawyers in Houston" in 2020; Ms. Freeman was recognized by Lawdragon as one of the 500 leading global

[15] JW, like many other firms, has two tiers of partnership: an income partner where such partners' compensation consists of a salary and potential bonus, but they do not share in the profits of the firm; and an equity partner who does receive a share of the firm's profits.

[16] *See JW Expands Bankruptcy/Reorganization, Wealth Planning, and White Collar Defense Practices*, May 23, 2018 (available at https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/) (last visited Apr. 23, 2024) ("Liz brings to our Chambers USA-ranked Bankruptcy practice over 20 years' experience with out-of-court workouts and complex bankruptcy and reorganization matters. Prior to joining JW, Liz was the permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas.").

restructuring and insolvency lawyers in 2020 and 2022; Ms. Freeman was selected as a Texas Rising Star by Texas Super Lawyers (by Thompson Reuters) from 2004-2011 and named a Texas Super Lawyer by Thomson Reuters in 2022; Ms. Freeman was recognized as a Best Lawyer in America for bankruptcy and creditor/debtor rights in 2019, 2021-2023; and Ms. Freeman was Chambers-ranked by Chambers USA as one of America's Leading Lawyers for Business in 2022.

31. JW's younger and mid-level attorneys also viewed Ms. Freeman as a mentor. It was common for such attorneys to ask Ms. Freeman for guidance on bankruptcy matters, even on cases she was not involved. Lawyers outside of JW would also, on occasion, do the same.

32. Ms. Freeman was promoted to equity partner two (2) years into her employment at JW, effective January 1, 2021.

**F. *Anonymous Allegations* of an Intimate Relationship Between Former Judge Jones and Ms. Freeman are Raised on March 6, 2021, in Connection with the *McDermott International* Bankruptcy Cases.**

33. On Saturday, March 6, 2021, the very first ***allegations*** of a possible intimate relationship between former Judge Jones and Ms. Freeman surfaced. *Pro se* litigant Michael Van Deelen raised these allegations in an email to Mr. Cavenaugh in connection with his effort to recuse former Judge Jones from the *McDermott* bankruptcy proceedings.[17] Mr. Van Deelen asserted that he had received an anonymous letter claiming former Judge Jones and Ms. Freeman were in an intimate relationship.

---

[17] By way of additional background, the *McDermott* bankruptcy cases were filed on January 21, 2020—approximately fifteen (15) months ***before*** JW received the email from Mr. Van Deelen. *See In re McDermott International, Inc., et al.*, Case No. 20-30336 (Bankr. S.D. Tex.). The bankruptcy cases were filed as pre-packaged bankruptcy cases that were supported by more than two-thirds of all of McDermott's funded debt creditors for a restructuring transaction that equitized nearly all the company's funded debt, eliminating over $4.6 billion of debt. While all general unsecured claims were unimpaired under the proposed plan (*i.e.*, paid in full or otherwise reinstated), the company's existing common equity interests (of which Mr. Van Deelen held 30,000 shares) would not receive any recovery and would be canceled and extinguished. Unsatisfied with this result, Mr. Van Deelen embarked on an unsuccessful litigation campaign in the *McDermott* bankruptcy proceeding and elsewhere. Former Judge Jones ultimately confirmed the McDermott plan over Mr. Van Deelen's objection which Mr. Van Deelen did not appeal.

34. Upon receiving the March 6, 2021 email, JW discussed the allegations with Ms. Freeman that same day. At that time, Ms. Freeman acknowledged the existence of a prior romantic relationship with former Judge Jones before the COVID-19 pandemic (*i.e.*, sometime prior to March 2020),[18] but stated that such romantic relationship was well in the past and was not ongoing. Indeed, Ms. Freeman told a representative of the firm that she had not even seen former Judge Jones since before the onset of the pandemic, a year earlier.

35. Ms. Freeman's acknowledgment of a past, intimate relationship contradicted the disclosures she made to JW when she joined the firm. Moreover, the admission was contrary to JW's understanding and belief that the relationship between Ms. Freeman and former Judge Jones was on a professional-only basis. Further, Ms. Freeman did not inform JW at this time (or any time) that she had purchased residential property with former Judge Jones in 2017, or that she lived with him.

36. JW delivered Mr. Van Deelen's email to the Southern District of Texas Bankruptcy Court the morning of March 8, 2021—the first business day after receipt.[19] That email was hand

[18] At the time Ms. Freeman acknowledged the existence of this ***prior*** relationship, there was nothing for JW to disclose or supplement. The challenged cases implicated during this time period were filed post-COVID and had concluded prior to Ms. Freeman's later admission to JW, on March 30, 2022, that the relationship with former Judge Jones had resumed. *See, e.g., In re Bouchard Transportation Company, Inc., et. al.*, Case No. 20-34682 (CML) (Nov. 2020 petition date); *In re Gulfport Energy Corporation, et al.*, Case No. 20-35562 (CML) (Nov. 2020 petition date); *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI) (Dec. 2020 petition date); *In re Seadrill Limited, et al.*, Case No. 21-30427 (CML) (Feb. 2021 petition date); *In re Katerra, Inc.*, Case No. 21-31861 (CML) (June 2021 petition date); *In re Seadrill New Finance Limited, et al.*, Case No. 22-90001 (MI) (Jan. 2022 petition date).

Ms. Freeman recently confirmed JW's lack of knowledge in the related litigation pending before U.S. Chief District Judge Alia Moses in the *Bouchard* matter. *See Defendant Elizabeth Carol Freeman's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)*, Civ. Action No. 4:24:cv-00693 [Dkt. No. 18 at ¶ 4] (S.D. Tex. 2024) ("At the time of the [*Bouchard*] case, Freeman was a partner in JW. Freeman and Judge Jones had a close personal relationship when she joined JW in May, 2018. When JW appeared as co-debtor-in-possession counsel in the [*Bouchard*] chapter 11 case, Judge Jones elected not to disclose the relationship with Freeman in the [*Bouchard*] case. ***Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time*** . . . .") (emphasis added).

[19] *See* Adv. Pro. No. 20-03309 at Dkt. Nos. 36, 37 & 78. While the U.S. Trustee purports to be unaware of this proceeding and the allegations initially raised by Mr. Van Deelen, the notice of removal of Mr. Van Deelen's state court complaint against certain McDermott officers—which was the genesis of the adversary proceeding that

delivered and filed under seal given the personal nature of the allegations and related concerns regarding Mr. Van Deelen's erratic disposition and credibility (which were previously raised in the *McDermott* proceedings),[20] and the fact that Ms. Freeman had expressly denied the existence of any current romantic relationship when confronted by JW the day prior.

37. JW immediately consulted with outside ethics counsel and engaged Peter Jarvis of the respected law firm of Holland & Knight. JW took the additional step of instructing Ms. Freeman that she could not work on any matters that were assigned to former Judge Jones, and JW informed Ms. Freeman that the firm would deduct from her compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters that were pending before former Judge Jones in light of this past relationship.

38. To ensure that JW was accurately portraying the relevant facts, JW's general counsel presented Ms. Freeman with a draft letter that outlined the relevant facts known by JW following its discussion with Ms. Freeman; namely, JW understood:

(a) Ms. Freeman and former Judge Jones were and remain close personal friends;

(b) Former Judge Jones precluded Ms. Freeman from appearing personally in his court for six years (*i.e.*, the length of Ms. Freeman's clerkship);

(c) the draft letter outlined the claims and allegations raised by Mr. Van Deelen; and

---

ultimately led to Mr. Van Deelen's recusal request—was noticed on the main bankruptcy case docket to which the U.S. Trustee had appeared.

| | | |
|---|---|---|
| 01/22/2020 | | Notice of Appearance and Request for Notice Filed by Hector Duran Jr (Duran, Hector) (Entered: 01/22/2020) |
| 07/17/2020 | 983 (55 pgs; 2 docs) | Adversary case 20-03309. Nature of Suit: (01 (Determination of removed claim or cause)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Michael Van Deelen. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 07/17/2020) |

[20] For instance, on March 12, 2020, former Judge Jones conducted the McDermott confirmation hearing where Mr. Van Deelen called former Judge Jones a "son of a bitch" (which was audible on the audio recording of the hearing). Mr. Van Deelen also called McDermott's counsel a "pasty white fuck" and threatened McDermott's lawyer by saying "I will have my way with your wife." *See Van Deelen v. Dickson*, Adv. Proc. No. 20-03309 [Adv. Dkt. No. 59, p. 9]; *see also Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt of Court and Prohibited from Further Contact with the Debtors, Their Officers, or Their Counsel, In re McDermott International*, Case No. 20-30336 at Dkt. No. 694.

(d) while there existed a romantic relationship between Ms. Freeman and former Judge Jones at some time prior to March 2020, that relationship had ended and there was no ongoing romantic relationship, nor was any romantic relationship expected going forward.

***The draft letter also stated that former Judge Jones and Ms. Freeman each own their own homes, and that they do not and have not lived together***. The draft letter informed Ms. Freeman of JW's view that an ongoing intimate relationship with former Judge Jones (as opposed to an intimate relationship that had terminated in the past) would be incompatible with JW's continued participation in cases before Judge Jones.[21]

39. JW requested Ms. Freeman to review the letter "to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with." In response, Ms. Freeman confirmed the contents of the letter:

| | |
|---|---|
| **From:** | Freeman, Liz |
| **Sent:** | Friday, August 27, 2021 1:15 PM |
| **To:** | Cowlishaw, Pat |
| **Subject:** | RE: Request for Opinion [IMAN-JWDOCS.FID560826] |
| **Sensitivity:** | Private |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Pat,

I reviewed the letter and have no questions or issues. I deeply appreciate the time and effort everyone has put into this very difficult situation. I lament that it was necessary. Thank you for everything.

- Liz

[21] A true and correct copy of the draft letter presented to Ms. Freeman and her response in acknowledgement of the same is attached hereto as **Exhibit 1**.

### G. The Bankruptcy Court Denies Mr. Van Deelen's Recusal Request, which Ruling is Affirmed on Appeal by the District Court.

40. Judge Isgur was assigned Mr. Van Deelen's recusal request. Judge Isgur ordered that the March 6, 2021 email remain sealed "pending this Court's determination of whether there is credible, admissible evidence in support of the allegations made . . . ."[22]

41. On March 10, 2021, Judge Isgur presided over an evidentiary hearing to consider Mr. Van Deelen's recusal request. At the recusal hearing, Judge Isgur acknowledged that "I've seen it [*i.e.*, the anonymous letter]", and ruled that "anonymous pieces of mail aren't admissible in federal court".[23] Mr. Van Deelen had no other admissible evidence, and thus was unable to meet his clear and convincing burden of proof. Nonetheless, while Mr. Van Deelen could not authenticate the anonymous letter or overcome hearsay objections, and while the anonymous letter remained under seal, ***the recusal hearing was public*** making the nature of the allegations raised clear:[24]

> **Mr. Van Deelen**: Mr. Van Deelen, ***do you have any reasons to believe that Judge Jones has been engaged in an improper sexual relationship with [] Freeman, an attorney with JW*** who is involved in the instant action . . . .
>
> . . .
>
> Mr. Van Deelen: I'm not going to argue with you your Honor. I just want to put this on the record. I'm not trying to do a deposition of Mr. Dupont to ask him about the contents of the anonymous letter. . . . ***I'm trying to do a deposition of Ms. Freeman [inaudible] and her relationship with Judge Jones which I believe was a sexual relationship*** . . . .[25]

---

[22] *See* Adv. Case No. 20-03309, Dkt. No. 40, ¶ 2.

[23] *See* Mar. 10, 2021 Audio Hr'g at 5:19-5:30.

[24] Because Mr. Van Deelen was a *pro se* litigant, Judge Isgur instructed Mr. Van Deelen that he should ask questions to himself rather than simply provide a narrative, pause to allow for any objections, and then respond as appropriate.

[25] *See* Adv. Case No. 20-03309, Mar. 10, 2021 Audio Hr'g at 5:50-6:17 & 8:43-9:6 (emphasis added).

At the conclusion of that public recusal hearing, in the absence of any competent and admissible evidence, Judge Isgur entered an *Order Denying Motion to Recuse*.[26] Mr. Van Deelen appealed, which appeal was assigned to United States District Judge Andrew S. Hanen,[27] who ultimately found that "Judge Isgur did not err in denying the Appellant's Motion to Recuse Judge Jones."[28] Judge Hanen also specifically addressed Mr. Van Deelen's alleged anonymous letter that was the subject of his March 6, 2021 email to JW:

> Appellant claims to have received an anonymous letter that accused Judge Jones of corruption. There is no evidence to suggest that Van Deelen's recitation as to how he came by this "letter" is false. He filed a copy of that letter along with the addendum to his motion to disqualify Judge Jones. (Adv. 20-3309, Doc. No. 39). ***This Court has reviewed the letter*** and determined that: 1) the contents and sender of the letter have not, and perhaps cannot, be verified; and 2) Appellant's general accusation of corruption to the extent it is based upon this "letter" is unsupported by any facts and therefore does not demonstrate that bias or partiality existed.
>
> ***The Court notes that the "letter" is unsigned, contains unsupported allegations of a scurrilous nature, and contains no indicia of personal knowledge of authenticity from anyone. (Id.). Not even Appellant claims the allegations are true. This form of unsupported character assassination has no place in any court proceeding and cannot be grounds for recusal.***[29]

42. As a result of JW's own prompting and filing with the bankruptcy court, two courts were aware of the same allegations that JW was confronting. And two courts, after a public hearing, ruled that recusal was not required because there was no credible evidence to support the

[26] *See* Adv. Case No. 20-03309, Dkt. No. 42.

[27] *See* Appeal No. 4:21-cv-3369 (S.D. Tex.). Mr. Van Deelen also sought a writ of mandamus from the Fifth Circuit to compel recusal (*see* Fifth Circuit Court of Appeals, Case No. 20-20286), but that petition was denied on unrelated grounds. *Id*. at Dkt. No. 24.

[28] *See* Appeal No. 4:21-cv-3369, Dkt. No. 102.

[29] *See* Appeal No. 4:21-cv-3369, Dkt. No. 102 at pp. 37-38 (emphasis added).

"scurrilous" allegations, which amounted to nothing more than an "unsupported character assassination."

43. Fifth Circuit Chief Judge Priscilla Richman further highlighted this point in her Complaint later filed against former Judge Jones:

> Judge Jones referred the motion to recuse to another bankruptcy judge but did not disclose to that judge the facts regarding his relationship with Ms. Freeman. ***On information and belief, the judge who ruled on the motion to recuse was unaware that Judge Jones was romantically involved with Ms. Freeman or that they were cohabiting.*** The motion to recuse was denied and appealed to a federal district court judge, and ***on information and belief, Judge Jones did not apprise that district court judge of the relationship with Ms. Freeman, and that judge was also unaware of the facts regarding the relationship***. The appeal was denied.[30]

44. Just as Chief Judge Richman noted as to both Judge Isgur and Judge Hanen, JW was equally "unaware that Judge Jones was romantically involved with Ms. Freeman or that they were cohabiting" because Ms. Freeman told JW there was no relationship. Yet, the day after learning of Mr. Van Deelen's March 6, 2021 allegations, JW affirmatively confronted Ms. Freeman and asked the very question that apparently was never asked of former Judge Jones. ***Ms. Freeman affirmatively denied the existence of any current intimate relationship to JW at this***

[30] *See Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002*, Complaint No. 05-24-9002 at pp. 2-3 (5th Cir. Oct. 13, 2023) (emphasis added).

***time,***[31] and continued to deny the existence of an ongoing intimate relationship until March 30, 2022, as discussed below.[32]

**H. Ms. Freeman Reveals, for the First Time, the Existence of a Current Relationship with Former Judge Jones after Confronted with New Credible Information.**

45. Following the 2021 allegations and Ms. Freeman's confirmation of JW's understanding of the facts (*i.e.*, no ongoing romantic relationship and no living together), JW did not learn of any other facts pertaining to Ms. Freeman's and former Judge Jones's alleged secret relationship until the Spring of 2022.

46. On February 1, 2022, at a dinner between a JW non-bankruptcy partner and his friend (who happened to also be friends with Ms. Freeman's ex-husband), the friend volunteered that Ms. Freeman and former Judge Jones were living together. The JW partner challenged that assertion and was given further information supporting the allegation.

47. JW's management concluded that they would again confront Ms. Freeman directly. Due to Ms. Freeman's children's Spring Break schedules and related vacation and college trips,

[31] Indeed, in connection with litigation with Mr. Van Deelen currently pending before U.S. Chief District Judge Alia Moses, Ms. Freeman acknowledged that JW had no knowledge of any intimate relationship (or cohabitation) at any time prior to or during the McDermott proceedings. *See Defendant's Elizabeth Carol Freemans's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b), Michael D. Van Deelen v. David R. Jones, Elizabeth Carol Freeman, JW, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP*, Civ. Action No. 4:23-cv-3729 [Dkt. No. 45 at ¶ 3] (S.D. Tex. 2023) ("Freeman and Judge Jones had a close personal relationship when she joined JW in March, 2018. When JW appeared as co-debtor-in-possession counsel in the McDermott chapter 11 case, Judge Jones elected not to disclose the relationship with Freeman in the McDermott case. ***Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time*** . . . .") (emphasis added).

[32] Even the U.S. Trustee has described the relationship between Ms. Freeman and former Judge Jones—whenever it existed and to whatever extent it existed—as a "secret" relationship among them. *See, e.g.*, *United States Trustee's Objection to First and Final Fee Application of the Law Office of Liz Freeman for Allowance and Payment of Fees and Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from January 31, 2023 through June 16, 2023*, filed in *In re IEH Auto Parts Holding LLC*, Case No. 23-90054 (CML) [Dkt. No. 1049, ¶ 33] ("Ms. Freeman had a ***secret relationship*** with Judge Jones . . . .") (emphasis added); *see also Motion of the United States Trustee to Reopen Case* filed in *In re iQor Holdings, Inc., et al.*, Case No. 2034500 (CML) [Dkt. No. 323, ¶ 25] ("Moreover, the U.S. Trustee has acted quickly to address the many cases implicated by JW's and Ms. Freeman's misconduct by appearing in front of Judge Jones despite the ***secret*** relationship between Ms. Freeman and Judge Jones. The information about the ***secret*** relationship only became public on October 6, 2023 . . . ." and p. 9 (arguing that the "***Secret*** Relationship" establishes cause to reopen) (emphasis added).

JW confronted Ms. Freeman in late March 2022. At that meeting, Ms. Freeman once more denied the existence of any current, intimate relationship with former Judge Jones, and stated that the alleged new facts related to an earlier time period.

48. On March 30, 2022, the day after JW confronted Ms. Freeman about the new allegations a second time, Ms. Freeman finally admitted that she and former Judge Jones had rekindled their relationship. Ms. Freeman continued, however, to deny that she and former Judge Jones were living together and she never mentioned the co-ownership of residential property. JW again informed Ms. Freeman that she could not work on any cases pending in former Judge Jones's court, and JW removed her share of partnership profits from cases in front of former Judge Jones which resulted in a retroactive reduction in Ms. Freeman's compensation of approximately $46,373 for 2021 and $32,595 through November 2022.

49. Accordingly, from the time Ms. Freeman joined JW in May 2018 until March 30, 2022—JW lacked knowledge of any ongoing intimate relationship or the fact that the two were living together and jointly owned a home. During this same period, ***JW's representation in 23 of the 33 cases (collectively, the "Pre-March 2022 Cases")***[33] ***now challenged by the U.S. Trustee had already concluded, and JW had no ongoing disclosure obligations***.[34] These Pre-March 2022 Cases account for $10,470,463.80 of the total amount of $21,334,952.30 in fees and expenses the U.S. Trustee seeks to recover from JW. Ms. Freeman's fees account for $1,652,061.50 of these Pre-March 2022 Cases. Of these Pre-March 2022 Cases, 12 cases have been closed (many for years), and 3 cases involve situations where former Judge Jones served only as mediator and had

[33] A chart identifying the Pre-March 2022 Cases and summarizing other key facts is attached hereto as **Exhibit 2**.

[34] In each of the confirmed plans—as is typical—any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code terminated on the confirmation date. *See, e.g., In re Exco Resources, Inc., et al.*, Case No. 18-30155 [Dkt. No. 2103, Art. II.A.2.d]; *see also* **Exhibit 2**.

no ability to issue any rulings or enter any orders.[35] Neither the U.S. Trustee nor any party in interest objected to the reasonableness or necessity of any of JW's fees and expenses incurred in respect of any of the Pre-March 2022 Cases.

**I. JW Separates Ms. Freeman from the Firm After Ms. Freeman and Former Judge Jones Refuse to Disclose Their Relationship.**

50. Ms. Freeman's initial lies and eventual revelation thrust JW into an unprecedented situation. The law firm knew the status quo was not appropriate, yet, the situation involved a highly personal matter involving a sitting Federal Bankruptcy Judge who, as late as October 2023,[36] was convinced that his interpretation of the applicable rules did not require disclosure of the relationship with Ms. Freeman. These unprecedented circumstances required a thoughtful approach.

51. To that end, and as an initial matter, JW instructed Ms. Freeman that she must continue to not work on any matters that were assigned to former Judge Jones, and JW would

[35] *See In re Exco Resources, Inc.*, Case No. 18-30155 (MI); *In re Tailored Brands, Inc., et al.*, Case No: 20-33900 (MI); *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI).

Former Judge Jones served as the presiding judge in the remaining Pre-March 2022 Cases: (1) *In re Westmoreland Coal Company*, Case No. 18-35672 (MI); (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML); (3) *In re McDermott International Inc*., Case No. 20-30336 (MI); (4) *In re Sheridan Holding Company I, LLC*, *et al*., Case No. 20-31886 (CML); (5) *In re Whiting Petroleum, Corporation et al.*, Case No. 20-32021 (CML); (6) *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (CML); (7) *In re Stage Stores, Inc.*, *et al.*, Case No. 20-32564 (CML); (8) *In re Hornbeck Offshore Services, Inc.*, *et al*., Case No. 20-32679 (CML); (9) *In re Chesapeake Energy Corporation*, *et al*., Case No. 20-33233 (CML); (10) *In re Covia Holdings Corporation, et al*., Case No. 20-33295 (CML); (11) *In re Volusion, LLC*, Case No. 20-50082 (MI); (12) *In re Denbury Resources Inc., et al*., Case No. 20-33801 (CML); (13) *In re iQor Holdings, Inc*., Case No. 20-34500 (CML); (14) *In re J.C. Penney Company, Inc., et al*., Case No. 20-20182 (CML); (15) *In re Bouchard Transportation Company, Inc., et. al.*, Case No. 20-34682 (CML); (16) *In re Gulfport Energy Corporation, et al*., Case No. 20-35562 (CML); (17) *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI); (18) *In re Seadrill Limited, et al*., Case No. 21-30427 (CML); (19) *In re Katerra, Inc.*, Case No. 21-31861 (CML); and (20) *In re Seadrill New Finance Limited, et al*., Case No. 22-90001 (MI).

Ms. Freeman did not bill any time in connection with the *Seadrill New Finance* and *Katerra* cases, and Ms. Freeman's fees billed in *Sheridan Holding*, *Hornbeck Offshore*, *IQor*, *Seadrill Limited*, and *Jones Energy* totaled less than $11,000 in each case.

[36] *See* "Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer," The Wall Street Journal, Oct. 7, 2023 (available at https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00) (last visited May 17, 2024).

continue to deduct from her compensation any share of the firm's net income generated from bankruptcy work performed on behalf of clients in matters pending before former Judge Jones.

52. JW also again engaged Mr. Jarvis. JW likewise suggested that Ms. Freeman engage counsel for herself. Ms. Freeman engaged a well-known and widely respected lawyer—Tom Kirkendall. Mr. Kirkendall communicated with both JW and Mr. Jarvis over the next couple months to discuss whether a disclosure could be made in connection with existing and future retention applications. Mr. Kirkendall ultimately suggested disclosure of a "close personal relationship", and provided the following alternative proposals to JW, on behalf of Ms. Freeman:

- Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court. Ms. Freeman does not have have any financial interest in the Firm's cases in Judge Jones' court in that the Firm does not provide to her any compensation based on the Firm's cases in Judge Jones' court and her partner share of the Firm's profits does not include a share in any of the Firm's profits attributable to cases in Judge Jones' court.
- Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court, and Ms. Freeman has no financial interest in the Firm's cases in Judge Jones' court.

53. JW believed the above-suggested language was insufficient, and in fact, would have been misleading to the extent it implied the relationship was only that of a non-intimate friend.[37] Accordingly, JW did not agree to any of Ms. Freeman's suggested "disclosures" and informed Mr. Kirkendall and Ms. Freeman on or around June 2022 that it believed Ms. Freeman's departure from the law firm was the only path forward.

[37] At this time, JW was still unaware that Ms. Freeman and former Judge Jones lived together and that they jointly owned residential property.

54. The parties then discussed the terms of Ms. Freeman's separation and JW encouraged Ms. Freeman to look for other employment. Over the following months, JW, Ms. Freeman, and her counsel negotiated the terms of Ms. Freeman's exit while she continued seeking other employment. A draft Confidential Withdrawal Agreement (the "Withdrawal Agreement") was provided to Ms. Freeman on October 28, 2022.

55. Around this same time, former Judge Jones invited Mr. Cavenaugh to his chambers at the conclusion of a hearing. Former Judge Jones apologized that JW had to deal with the situation. He then reiterated his view: any disclosure obligation belonged to him, and him alone. He further stated that any relationship he had with Ms. Freeman was casual, and no different from encounters with many other lawyers at many other firms. Former Judge Jones also insinuated that he was unhappy with JW's insistence on a full and complete disclosure and Ms. Freeman's exit.

56. At the end of that in-chambers meeting, former Judge Jones handed Mr. Cavenaugh a piece of paper that contained former Judge Jones's proposed disclosure. Former Judge Jones directed that JW "needs to make this happen." Former Judge Jones instructed Mr. Cavenaugh that JW could file the following disclosure in all future applications pending in his Court:[38]

> **To be included in all future employment applications filed before Judge Jones**
>
> Although not specifically required by FED. R. BANKR. P. 2014(a), the Firm makes the following additional disclosures. Veronica Polnick, an associate with the Firm, previously served as a law clerk for Judge Jones. Ms. Polnick maintains a social friendship with Judge Jones and regularly attends a skills class taught by Judge Jones in his courtroom through the Houston Young Lawyers Association. Elizabeth Freeman, a partner with the Firm, also served as a law clerk for Judge Jones. In addition, Ms. Freeman was a partner at Judge Jones' former law firm. Ms. Freeman maintains a close personal relationship with Judge Jones and at Judge Jones' request, does not appear in court before Judge Jones. Finally, Judge Jones officiated a wedding ceremony for Genevieve Graham, an associate with the Firm. Ms. Graham and Judge Jones maintain a social friendship. Ms. Graham also regular attends Judge Jones' skills class along with other associates and partners of the Firm.

[38] Neither Ms. Graham nor Ms. Polnick were aware of or assisted in the drafting of former Judge Jones's proposed disclosure.

57. JW considered the proposed disclosure by former Judge Jones insufficient, inadequate, and misleading for the same reasons as Ms. Freeman's proposed disclosure. Neither told the truth.

58. As former Judge Jones and Ms. Freeman continued refusing to publicly acknowledge their relationship, JW coordinated Ms. Freeman's exit from the firm. Ms. Freeman executed the Withdrawal Agreement on November 29, 2022. Ms. Freeman's withdrawal from JW was effective as of December 1, 2022, at which time Ms. Freeman started her own firm: The Law Office of Liz Freeman PLLC.

59. From the time Ms. Freeman admitted to JW that she had an ongoing romantic relationship with former Judge Jones on March 30, 2022 until her separation from the firm, JW was engaged as an estate professional in only 10 of the 33 cases (collectively, the "Post-March 2022 Cases") subject to the U.S. Trustee's Motions.[39] These Post-March 2022 Cases account for $10,864,486.40 of the total amount of $21,334,952.30 in fees and expenses the U.S. Trustee seeks to recover from JW. Ms. Freeman's fees account for $353,807.81 of these Post-March 2022 Cases.

60. Of the Post-March 2022 Cases, former Judge Jones served only as mediator in 4 of the cases and had no ability to issue any rulings or enter any orders, and in 2 of these 4 mediated cases, The Law Office of Liz Freeman was separately retained as conflicts counsel.[40] The

[39] A chart identifying these Post-March 2022 Cases and summarizing other key facts is attached hereto as **Exhibit 3**.

[40] Former Judge Jones served as mediator in the following Post-March 2022 Cases: (1) *In re HONX, Inc.*, Case No. 22-90035 (MI); (2) *In re Altera Infrastructure LP*, Case No. 22-90130 (MI); (3) *In re Auto Plus Auto Sales LLC*, Case No. 23-90055 (CML); and (4) *In re GWG Holdings, Inc.*, Case No. 22-90032 (MI).

In *HONX, Inc.*, the issues surrounding former Judge Jones's and Ms. Freeman's relationship were known by all parties prior to confirmation, and JW voluntarily reduced its fees by $250,000 with the agreement and consent of its client.

In *GWG*, Ms. Freeman exited the firm during the cases and was retained as conflicts counsel.

And in *AutoPlus*, Ms. Freeman had already exited from the firm and was separately retained by the debtors as co-counsel and conflicts counsel and had her own disclosure obligations. JW filed its fee application in *AutoPlus* on September 29, 2023. *See In re AutoPlus*, Case No. 23-90054, Dkt. No. 911. The deadline to object to that final fee application was October 20, 2023. Two weeks prior to that objection deadline, on October 6, 2023, the Business Insider reported the story of former Judge Jones's relationship with Ms. Freeman. The Court entered an Order

remaining 6 cases involve situations where former Judge Jones was the presiding judge (1 of which is a chapter 7 case).[41]  And of these 6 cases, Ms. Freeman did not bill any time in connection with 5 of them.[42]

61.    As with the Pre-March 2022 Cases, neither the U.S. Trustee nor any party in interest objected to the reasonableness or necessity of any of JW's fees and expenses in any of the Post-March 2022 Cases.

**J.    Ms. Freeman Exits JW and Opens her Own Law Firm.**

62.    Beginning on December 1, 2022, Ms. Freeman was no longer a partner of JW. Nonetheless, JW and Ms. Freeman continued their representation of joint clients for ongoing matters, and worked together to ensure a smooth transition.  Indeed, as noted by the parties' Withdrawal Agreement:  "JW and you expect and intend to confer and cooperate in good faith with respect to future relationships with existing JW bankruptcy practice clients, including the potential transfer of any client matters, in whole or in part, to you and a future employer, all subject to client direction."  The Withdrawal Agreement also contemplated the possibility of Ms. Freeman working as co-counsel with JW following her separation, provided that JW and Ms. Freeman would not work together as co-counsel in matters before Judge Jones.

---

approving JW's final fee application on November 4, 2023.  *See id.*, Dkt. No. 981.  Thus, the U.S. Trustee had the ability to object to JW's final fee application, and chose not to.

[41] Former Judge Jones served as the presiding judge in the following Pre-March 2022 Cases:  (1) *In re Basic Energy Services, Inc., et al.*, Case No. 21-90002 (CML); (2) *In re Strike, LLC*, Case No. 21-90054 (MI); (3) *In re 4E Brands Northamerica, LLC*, Case No. 22-50009 (MI); (4) *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (CML); (5) *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR); and (6) *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI).

The *Brilliant Energy* case was a chapter 7 case.

[42] These cases include *Basic Energy*, *Strike, 4E Brands*, *Sungard AS New Holdings*, *Brilliant Energy*, and *LaForta*.

**K. Ms. Freeman and Former Judge Jones's Relationship Becomes Public.**

63. On October 4, 2023, Mr. Van Deelen—the same *pro se* litigant who sought Judge Jones's recusal in the *McDermott* bankruptcy case—filed a Complaint (the "Van Deelen Complaint") against former Judge Jones in the United States District Court for the Southern District of Texas, Houston Division.[43]

64. According to an interview published by the Wall Street Journal, former Judge Jones publicly acknowledged the secret intimate relationship only *after* the filing of the Van Deelen Complaint, on October 7, 2023.[44] In that interview with the Wall Street Journal, former Judge Jones is quoted as saying: "***I came to the conclusion that I had no duty to disclose***." He added that he didn't want to fuel a perception that "if you were going to be appearing, you should go out and hire Jackson Walker."[45]

65. News of the Van Deelen Complaint and Ms. Freeman's and former Judge Jones's intimate relationship broke, and ultimately resulted in Fifth Circuit Chief Judge Priscilla Richman filing a Complaint against Judge Jones based on "information constituting reasonable grounds for inquiry into whether a covered judge has engaged in misconduct . . . ."[46]

66. That same day, former Judge Jones announced that he would resign from the complex case panel in the Southern District of Texas. Two days later, on October 15, 2023,

[43] *See* S.D. Tex. Case No. 4:23-cv-3729, at Dkt. No. 1.

[44] *See* "Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer," The Wall Street Journal, Oct. 7, 2023 (available at https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00) (last visited May 17, 2024).

[45] *Id*. (emphasis added).

[46] *See Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002*, Complaint No. 05-24-9002 (5th Cir. Oct. 13, 2023).

Judge Jones announced that he was resigning from the bench, with such resignation to be effective November 15, 2023.

67. To date, neither Ms. Freeman nor former Judge Jones have disclosed the full extent or nature of their relationship to JW or publicly.

**L. The U.S. Trustee Seeks to Vacate Various JW Retention and Fee Orders.**

68. On or around October 30, 2023, JW, through outside counsel, contacted the U.S. Trustee's office to discuss the recent news and events and offered an in-person sit down interview with JW so that JW could inform the U.S. Trustee of all relevant facts, timelines, and events as described herein.

69. Instead of interviewing JW, on November 2-3, 2023 and without any prior notice, the U.S. Trustee filed his original Motions premised entirely on the Complaint filed by Chief Judge Richman and various unsubstantiated, uncorroborated, and largely inaccurate news reports.[47] The U.S. Trustee also filed related *Motions for Withdrawal of the Reference and Referral of Motion for Relief under Rule 60(b)(6) and Related Matters* in each case (collectively, the "Motions to Withdraw the Reference").[48]

---

[47] *See In re Westmoreland Coal Company*, Case No. 18-35672 (CML) [Dkt. No. 3360]; *In re J.C. Penney Direct Marketing Services, LLC*, Case No. 20-20184 (CML) [Dkt. No. 1236]; *In re Whiting Petroleum Corporation*, Case No. 20-32021 (CML) [Dkt. No. 1447]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (MI) [Dkt. No. 3178]; *In re Stage Stores LLC*, Case No. 20-32564 (CML) [Dkt. No. 1217]; *In re Chesapeake Energy Corporation*, Case No. 20-33233 (CML) [Dkt. No. 4515]; *In re Covia Holdings Corporation*, Case No. 20-33295 (CML) [Dkt. No. 1477]; *In re Tug Robert J. Bouchard Corporation*, Case No. 20-34758 (CML) [Dkt. No. 354]; *In re Mule Sky LLC*, Case No. 20-35561 (CML) [Dkt. No. 1000]; *In re Seadrill Partners LLC*, Case No. 20-35740 (MI) [Dkt. No. 834); *In re Seadrill Limited*, Case No. 21- 30427 (CML) [Dkt. No. 1588]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 254]; *In re Katerra Inc.,* Case No. 21-31861 (CML) [Dkt. No. 2049]; *In re Basic Energy Services, Inc*., Case No. 21-90002 (CML) [Dkt. No. 1759]; *In re Strike LLC*, Case No. 21-90054 [Dkt. No. 1471]; *In re 4E Brands Northamerica LLC*, Case No. 22-50009 (MI) [Dkt. No. 517]; *In re Sungard AS New Holdings*, Case No. 22-90018 (CML) [Dkt. No. 1026].

[48] *See In re Westmoreland Coal Company*, Case No. 18-35672 (CML) [Dkt. No. 3361]; *In re J.C. Penney Direct Marketing Services, LLC*, Case No. 20-20184 (CML) [Dkt. No. 1237]; *In re Whiting Petroleum Corporation*, Case No. 20-32021 (CML) [Dkt. No. 1448]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (MI) [Dkt. No. 3179]; *In re Stage Stores LLC*, Case No. 20-32564 [Dkt. No. 1217]; *In re Chesapeake Energy Corporation*, Case No. 20-33233 [Dkt. No. 4516]; *In re Covia Holdings Corporation*, Case No. 20-33295 (CML) [Dkt. No. 1478]; *In re Tug Robert J. Bouchard Corporation*, Case No. 20-34758 (CML) [Dkt. No. 355]; *In re Mule Sky LLC*, Case No. 20-35561

**M. A Miscellaneous Proceeding is Opened in the Bankruptcy Courts to Address All Pre-Trial and Discovery Matters Relating to the U.S. Trustee's Rule 60(b) Motions.**

70. On December 9, 2023, with the consent of all of the bankruptcy judges in the Southern District of Texas, Chief Judge Rodriguez entered an *Order Commencing Miscellaneous Proceeding Regarding Employment Orders and Awarded Fees and Expenses to JW, LLP in Affected Cases* (the "Miscellaneous Proceeding"), pursuant to which Chief Judge Rodriguez would consider all pre-trial and discovery matters regarding the Motions, and the underlying presiding judges in each affected case would retain all other substantive matters and issues.[49]

71. Approximately two (2) months later, on January 29, 2024, Chief Judge Rodriguez issued a *Scheduling Order* in the Miscellaneous Proceeding setting various dates and deadlines.[50] The Scheduling Order was amended on February 26, 2024 (as amended, the "Miscellaneous Proceeding Scheduling Order").[51]

(CML) [Dkt. No. 1001]; *In re Seadrill Partners LLC*, Case No. 20-35740 (MI) [Dkt. No. 835); *In re Seadrill Limited*, Case No. 21-30427 (CML) [Dkt. No. 1589]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 255]; *In re Katerra Inc.,* Case No. 21-31861 (CML) [Dkt. No. 2050]; *In re Basic Energy Services, In*c., Case No. 21-90002 (CML) [Dkt. No. 1760]; *In re Strike LLC*, Case No. 21-90054 (MI) [Dkt. No. 1472]; *In re 4E Brands Northamerica LLC*, Case No. 22-50009 (MI) [Dk. No. 518]; *In re Sungard AS New Holdings*, Case No. 22-90018 (CML) [Dkt. No. 1027].

In connection with the Motions to Withdraw the Reference, Chief Judge Rodriguez held a hearing on the motion to withdraw filed in the *Brilliant Energy* case on December 5, 2023. The U.S. Trustee and JW agreed that they would be bound by whatever report and recommendation Chief Judge Rodriguez issued in that case for all other affected cases. On December 21, 2023, Chief Judge Rodriguez issued his *Report and Recommendation to the United States District Court that the United States Trustee's Motion to Withdraw the Reference be Denied* (the "Report and Recommendation"). *See* Miscellaneous Proceeding Case No. 23-00645 (EVR), Dkt. No. 44. The District Court has not yet issued an order on the Report and Recommendation as of the date of this filing.

[49] *See* Case No. 23-00645 (EVR), Dkt. No. 1.

[50] *Id.*, Dkt. No. 57.

[51] *Id.*, Dkt. No. 76.

72. Pursuant to the Scheduling Order, on January 31, 2024, the U.S. Trustee filed motions to reopen various closed chapter 11 cases[52] for the purpose of seeking the same relief as sought in the prior Rule 60(b) Motions filed in various open and pending cases. JW filed responses opposing each of the U.S. Trustee's requests to reopen on March 6, 2023.[53] The closed cases remain closed as of the date of this Response; *provided however*, that JW and the U.S. Trustee agreed that discovery could nonetheless proceed in respect of each of those cases.[54]

[52] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 8]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 279]; (3) *In re McDermott International Inc*., Case No. 20-30336 (MI) [Dkt. No. 1138]; (4) *In re Sheridan Holding Company I, LLC*, *et al*., Case No. 20-31886 (CML) [Dkt. No. 7]; (5) *In re Hornbeck Offshore Services, Inc.*, *et al*., Case No. 20-32680 [Dkt. No. 8] (6) *In re Covia Holdings Corporation, et al*., Case No. 20-33302 (CML) [Dkt. No. 238]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 334]; (8) *In re Denbury Resources Inc., et al*., Case No. 20-33812 (CML) [Dkt. No. 11]; (9) *In re iQor Holdings, Inc*., Case No. 20-34500 (CML) [Dkt. No. 323]; (10) *In re Seadrill New Finance Limited, et al*., Case No. 22-90002 (MI) [Dkt. No. 8]; (11) *In re Exco Resources, Inc*., Case No. 18-30155 (MI) [Dkt. No. 2342]; (12) *In re Tailored Brands, Inc*., Case No. 20-33916 (MI) [Dkt. No. 253].

[53] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 12]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 283]; (3) *In re McDermott International Inc*., Case No. 20-30336 (MI) [Dkt. No. 1142]; (4) *In re Sheridan Holding Company I, LLC*, *et al*., Case No. 20-31886 (CML) [Dkt. No. 11]; (5) *In re Hornbeck Offshore Services, Inc.*, *et al*., Case No. 20-32680 [Dkt. No. 14] (6) *In re Covia Holdings Corporation, et al*., Case No. 20-33302 (CML) [Dkt. No. 247]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 338]; (8) *In re Denbury Resources Inc., et al*., Case No. 20-33812 (CML) [Dkt. No. 15]; (9) *In re iQor Holdings, Inc*., Case No. 20-34500 (CML) [Dkt. No. 327]; (10) *In re Seadrill New Finance Limited, et al*., Case No. 22-90002 (MI) [Dkt. No. 12]; (11) *In re Exco Resources, Inc*., Case No. 18-30155 (MI) [Dkt. No. 2342]; (12) *In re Tailored Brands, Inc*., Case No. 20-33916 (MI) [Dkt. No. 254].

[54] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 10]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 288]; (3) *In re McDermott International Inc*., Case No. 20-30336 (MI) [Dkt. No. 1156]; (4) *In re Sheridan Holding Company I, LLC*, *et al*., Case No. 20-31886 (CML) [Dkt. No. 22]; (5) *In re Hornbeck Offshore Services, Inc.*, *et al*., Case No. 20-32680 (CML) [Dkt. No. 21]; (6) *In re Covia Holdings Corporation, et al*., Case No. 20-33302 (CML) [Dkt. No. 240]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 349]; (8) *In re Denbury Resources Inc., et al*., Case No. 20-33812 (CML) [Dkt. No. 20]; (9) *In re iQor Holdings, Inc*., Case No. 20-34500 (CML) [Dkt. No. 332]; (10) *In re Seadrill New Finance Limited, et al*., Case No. 22-90002 (MI) [Dkt. No. 21]; (11) *In re Exco Resources, Inc*., Case No. 18-30155 (MI) [Dkt. No. 2368]; (12) *In re Tailored Brands, Inc*., Case No. 20-33916 (MI) [Dkt. No. 264].

73. On February 29, 2029,[55] and March 29, 2024,[56] the U.S. Trustee filed his various amended Rule 60(b) Motions in the affected cases per the Scheduling Order.

## III. RESPONSE

### A. The U.S. Trustee Cannot Satisfy his Burden under Rule 60(b) to Demonstrate Extraordinary Circumstances or Any Manifest Injustice to Vacate JW's Retention or Fee Orders.[57]

74. Though nominally framed under Rule 60(b)(6), the U.S. Trustee does not identify the legal standard governing the threshold relief he seeks until the end of his Motion. And for good reason. Rule 60(b)(6) is available only in extraordinary circumstances upon consideration of a multitude of factors and to prevent manifest injustice, all while balancing the requested relief against the need for preserving the finality of judgments or orders.

[55] *In re Westmoreland Coal Company*, Case No. 18-35672 (MI) [Dkt. No. 3377]; *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 282]; *In re McDermott International Inc*., Case No. 20-30336 (MI) [Dkt. No. 1141]; *In re Sheridan Holding Company I, LLC*, *et al*., Case No. 20-31886 (CML) [Dkt. No. 10]; *In re Whiting Petroleum, Corporation et al*., Case No. 20-32021 (CML); [Dkt. No. 1465]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (CML) [Dkt. No. 3224]; *In re Stage Stores, Inc.*, *et al.*, Case No. 20-32564 (CML) [Dkt. No. 1241]; *In re Energy Services Puerto Rico, LLC*, *et al*., Case No. 20-32680(CML) [Dkt. No. 13]; *In re Chesapeake Energy Corporation*, *et al*., Case No. 20-33239 (CML) [Dkt. No. 563]; *In re Covia Finance Company LLC, et al*., Case No. 20-33302 (CML) [Dkt. No. 235]; *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 337]; *In re Denbury Holdings, Inc., et al*., Case No. 20-33801 (CML) [Dkt. No. 14]; *In re iQor Holdings, Inc*., Case No. 20-34500 (CML) [Dkt. No. 326]; *In re J.C. Penney Direct Marketing Services, LLC, et al*., Case No. 20-20182 (CML) [Dkt. No. 1351]; *In re Tug Robert Bouchard, Corporation, et. al.*, Case No. 20-34682 (CML) [Dkt. No. 38]; *In re Mule Sky LLC, et al*., Case No. 20-35562 (CML) [Dkt. No. 1089]; *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI) [Dkt. No. 877]; (18) *In re Seadrill Limited, et al*., Case No. 21-30427 (CML) [Dkt. No. 1621; *In re Katerra, Inc.*, Case No. 21-31861 (CML) [Dkt. No. 2093]; *In re Seadrill Member LLC, et al*., Case No. 22-90002 (MI) [Dkt. No. 11]; *In re Basic Energy Services, Inc., et al*., Case No. 21-90002 (CML) [Dkt. No. 1791]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 284]; *In re Sungard AS New Holdings, LLC, et al*., Case No. 22-90018 (CML) [Dkt. No. 1043]; *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) [Dkt. No. 316]; *In re Strike LLC, et al.*, Case No. 21-90054 (MI) 1540]; *In re 4E Brands North America LLC*, Case No. 22-50009 [Dkt. No. 645].

[56] *In re Exco Services, Inc.,* Case No. 18-30155 (MI) [Dkt. No. 2538]; *In re TMW Merchants LLC., et al*., Case No: 20-33900 (MI) [Dkt. 255]; *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI) [Dkt. No. 2930]; *In re GWG Holdings, Inc., et al*., Case No. 22-90032 (MI) [Dkt. No. 2415]; *In re Altera Infrastructure Project Services LLC, et al.,* Case No. 22-90129 (MI) [Dkt. No. 96]; *In re Auto Plus Auto Sales LLC*, Case No. 23-90055 (CML), Case No. 23-90055 (CML) [Dkt. No. 50]; *In re Honx, Inc.*, Case No. 22-90035 (MI) [Dkt. No. 1379]; *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) [Dkt. No. 316].

[57] Because there have been no final fee orders entered in either the *HONX* (Case No. 22-90035) or *GWG* (Case No. 22-90032) cases, the U.S. Trustee does not rely on Rule 60 with respect to his challenge to JW's fee applications in those cases. All other arguments raised by the U.S. Trustee are substantively the same.

**i. Applicable Legal Standard.**

75. Rule 60(b), made applicable by Bankruptcy Rule 9024, contains six separate clauses. The U.S. Trustee relies solely on the sixth clause (*i.e.*, Rule 60(b)(6)), a "catchall" provision, which permits a court to "relieve a party . . . from a final judgment . . . for any other reason that justifies relief."[58]

76. "Rule 60(b)(6) is available only in 'extraordinary circumstances'"[59] where the movant shows "the initial judgment to have been manifestly unjust."[60] Although there is no firm definition of what constitutes "extraordinary circumstances," the Fifth Circuit recognizes that courts may consider a wide range of factors.[61] Moreover, where the request for relief turns on a judge's failure to recuse, the Fifth Circuit focuses on certain of those factors, including "in an appropriate case, 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process,'" against the need for preserving the finality of judgments and orders.[62] The U.S. Trustee bears the burden of proving such extraordinary circumstances and manifest injustice.

---

[58] *See* FED. R. CIV. P. 60(b)(6).

[59] *Blundell v. Home Quality Care Home Health Care, Inc.*, No. 3:17-CV-1990-L-BN, 2018 WL 276154, at *3 (N.D. Tex. Jan. 3, 2018) (quoting *Buck v. Davis*, 580 U.S. 100, 121 (2017)).

[60] *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 357 (5th Cir. 1993) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990), *abrogated by* 37 F.3d 1069 (5th Cir. 1994)) (internal quotation marks omitted).

[61] In *Seven Elves, Inc. v. Eskenazi*, the Fifth Circuit set forth the following factors to consider: (1) that final judgments should not lightly be disturbed; (2) that a Rule 60(b) motion should not be used as a substitute for appeal; (3) that Rule 60(b) should be liberally construed in order to achieve substantial justice; (4) whether, if the case was not decided on its merits due to a default or dismissal, the interest in deciding the case on its merits outweighs the interest in the finality of the judgment and there is merit in the claim or defense; (5) whether, if the judgment was rendered on the merits, the movant had a fair opportunity to present his claims; (6) whether there are intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack. 635 F.2d 396, 402 (5th Cir. 1981).

[62] *Banning*, 5 F.3d at 357; *see also In re Poteet Const. Co., Inc.*, 122 B.R. 616, 618 (Bankr. S.D. Ga. 1990).

77.     Here, the U.S. Trustee has not pleaded any facts needed to show the kind of extraordinary circumstances or manifest injustice necessary to carry his heavy burden.  Indeed, in 23 of the 33 challenged cases, only Ms. Freeman and former Judge Jones, not JW, knew about their own ongoing intimate relationship and living arrangements in whatever form they may have existed.  And when JW later learned of the existence of that intimate relationship on March 30, 2022, JW affirmatively rejected Ms. Freeman's and former Judge Jones's attempt to further hide the extent of their relationship and otherwise acted reasonably and in good faith to comply with its legal and ethical obligations that culminated with Ms. Freeman's separation from the firm.

78.     In addition to these threshold truths, the U.S. Trustee's Motion wholly neglects the following undisputed material facts:

- neither the U.S. Trustee nor any party in interest challenged (or now challenges) the reasonableness of JW's fees or the necessity or benefit of JW's services to the estates;

- in many cases, the fees awarded to JW were nominal when compared with the total fees awarded to its clients' lead counsel and other estate-retained professionals;

- in various cases, JW's fee award already reflects voluntary fee reductions, discounts, or reductions from estate-professional fee settlements;

- Ms. Freeman did not bill the estates in a number of cases, but when she did, fees for her time were nominal compared to JW's total billings;

- most of the challenged cases involve confirmed plans that did not impair creditors or that were supported by stakeholders;

- most of the challenged cases culminated in confirmed plans that resulted from extensive negotiations across various stakeholder groups each of whom were represented by sophisticated counsel (including a number of prepackaged chapter 11 cases;

- the settlements reached in the various cases were in the best interests of the estates and consistent with the evidentiary record and Bankruptcy Code;

- certain of the confirmed plans were the result of mediated settlements reached with the assistance of Judge Isgur and Judge Lopez serving as mediator, not former Judge Jones;
- not a single order, ruling or judgment has been alleged to have been entered in error and/or otherwise unsupported by the facts and evidentiary record; and
- none of the estates or their respective stakeholders suffered any actual harm due to the Freeman-Jones relationship or its alleged non-disclosure.

79. The U.S. Trustee's Motion also fails legally for a host of reasons. First, the U.S. Trustee lacks standing to prosecute the Motion because the "sanctions" relief he seeks is a thinly disguised claim for "disgorgement" of fees. Claims against JW for those type of "sanctions" are estate-owned claims that must be brought by an appropriate estate representative, not the U.S. Trustee. Second, the confirmed plans, which are no longer subject to challenge, released and exculpated JW from liability for these estate claims. Third, JW did not violate the Bankruptcy Code, Bankruptcy Rules, or Texas Disciplinary Rules of Professional Conduct because, among other things, (a) Ms. Freeman's knowledge and alleged lack of disinterestedness are not imputed to JW; (b) JW could not have disclosed a relationship that was concealed from it; and (c), when JW confirmed the existence of an intimate relationship on March 30, 2022, it acted reasonably and responsibly to address it. Fourth, former Judge Jones's alleged disqualification in cases where JW served as estate-retained counsel does not mandate vacatur of orders approving JW's retention or awarding fees. And fifth, sanctions are not appropriate under the circumstances and equities of the cases given the undisputed facts and other mitigating factors.

**ii. The U.S. Trustee Does Not Have Standing to Assert Estate Claims and Causes of Action.**

80. JW does not dispute that the U.S. Trustee has broad authority to participate and be heard in bankruptcy cases, including the right to file appropriate objections and motions necessary

to fulfill his statutory obligations.[63] That right to participate in a chapter 11 proceeding, however, is wholly distinct from the right to assert and control an estate cause of action—"[t]he former does not equate to the latter."[64]

81. Unless a trustee is appointed to displace the debtor-in-possession or another entity is granted derivative standing, the debtor-in-possession is exclusively "accountable for the estate's property, including its valuable legal claims," consistent with its fiduciary duties.[65] Indeed, the debtor-in-possession alone has the fiduciary duty to weigh the costs and potential benefits of claims and determine whether pursuit of a claim would serve the best interests of the estate or not.[66]

82. The relief the U.S. Trustee seeks is an estate claim dressed up as a claim for sanctions.

83. The Fifth Circuit has repeatedly held that claims based on generalized harm to the estate—*i.e.*, conduct affecting the estate generally versus conduct uniquely affecting a particular creditor—or claims that seek to recover property improperly transferred from the estate, constitute

[63] 11 U.S.C. § 307.

[64] *In re Smart World Technologies, LLC*, 423 F.3d 166, 182 (2d Cir. 2005) (Bankruptcy Code § 1109(b) allows a party in interest to intervene in a pending proceeding but does not allow it to take control of the estate's legal causes of action); *see also Hartford Underwriters Ins. Co. v. Union Planters, N.A.*, 530 U.S. 1, 8 (2000) (section 1109 "does not bestow any right to usurp" the debtor-in-possession's right to initiate "litigation that belongs exclusively to the estate") (internal quotations omitted); *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 455-53 (3d Cir. 1982) (distinguishing between the right to participate in a proceeding "initiated by a . . . debtor in possession" and the right to assert such cause of actions); *In re Sunbeam Corp.*, 287 B.R. 861, 862 (S.D.N.Y. 2003) (right to intervene is distinct from "the right, in essence, to take ownership of the [estate's] causes of action"); *In re Quigley Co., Inc.*, 437 B.R. 102, 158 (Bankr. S.D.N.Y. 2010) ("While section 307 of the Bankruptcy Code grants the United States Trustee the right to appear and be heard on any issue . . ., it does not authorize the United States Trustee to assert control over causes of action belonging to the Quigley estate."); *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 (Bankr. S.D.N.Y. June 21, 2019) ("Party-in-interest standing is a separate requirement, and thus, the party seeking relief in a chapter 11 case must establish constitutional standing, prudential standing, and party-in-interest standing under section 1109(b)"); *In re SRC Liquidation, LLC*, 2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019) (same); *In re Old ANR, LLC*, 2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019) (same).

[65] *In re Smart World Technologies*, 423 F.3d at 183; 11 U.S.C. §§ 323, 1106, & 1107.

[66] *In re Smart World Technologies*, 423 F.3d at 175; *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (U.S. 1985).

estate claims.[67] The relief requested by the U.S. Trustee seeking sanctions to recover funds ***paid by*** the estates ***for*** the estates' and their stakeholders' benefit, based on allegations of improper conduct generally ***affecting*** the estates is unquestionably an estate claim.[68] In fact, the U.S. Trustee accuses JW of causing "damage [to] the administration of the estate generally."[69]

84. Principles of equality of distribution and judicial efficiency necessarily require standing for such estate claims to vest exclusively within the debtor-in-possession.[70] Neither the Bankruptcy Code nor any principal of federal common law contemplates multiple parties pursuing the same claims, and forcing defendants (and the Court) to litigate parallel proceedings, be liable for double damages, or settle the same claims twice. Indeed, such a scenario would violate basic principles of due process. "In making the debtor-in-possession accountable for the estate's legal

---

[67] *In re Schimmelpenninck*, 183 F.3d 347, 359-60 (5th Cir. 1999) (the debtor-in-possession "is the proper party to assert the claim, for the benefit of all creditors, provided the claim advances a generalized grievance"); *see also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (if a claim " is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor," the debtor-in-possession is the proper party to bring the claim and bind all parties-in-interest"); *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 ("If the claim is a general one with no particularized injury, and any creditor could bring the same claim," the debtor-in-possession (or successor to the claim under the confirmed plan) is the proper person to assert it.").

[68] *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 (claim seeking to vacate retention and fee order for estate professional and disgorgement of fees paid and sanctions was an estate claim only the post-confirmation trust that acquired estate claims could pursue and settle); *In re Syntax-Brillian Corp.*, 2016 WL 7177615, at * 11 (D. Del. Dec. 9, 2016) (motion for sanctions and disgorgement against debtor's counsel was an estate cause of action released under the plan); *see also Ruhl v. HSBC Mortg. Servs., Inc.*, 399 B.R. 49, 55-56 (E.D. Wis. 2008) (claims seeking disgorgement of improper interest form mortgage servicer following confirmation and competition of a chapter 13 plan was an "estate" cause of action because the alleged harm was to the estate and any proceeds from the action would return to the estate; accordingly, the estate was the entity with Article III standing to bring the claim); 11 U.S.C. § 549 (vesting the debtor-in-possession with the exclusive right to avoid any post-petition transfer of property that is not authorized by the Bankruptcy Code).

[69] *See* Motion, at § IV.D. As to the Pre-March 2022 Cases, the alleged non-disclosure of something that happened after the various plans went effective could not possibly harm an estate that no longer exists. *See In re TransAmerican Natural Gas Corp.*, 127 B.R. 800, 803-04 (S.D. Tex. 1991) (rejecting argument that post-confirmation claim for breach of fiduciary duty was part of the administration of the estate because the bankruptcy estate had ceased to exist at confirmation).

[70] *In re Schimmelpenninck*, 183 F.3d at 359 ("the Code's general policies of securing and preserving the debtor's property and ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern" when evaluating standing).

claims, Congress vested the debtor with the responsibility to determine how best to handle those claims."[71]

85. Notably, the U.S. Trustee does not seek any statutory-based fines or penalties or other sanctions that would accrue to the government.[72] Rather, whether styled as relief under Rule 60(b) or the Court's sanction authority,[73] the U.S. Trustee's requested relief in reality seeks to have JW "disgorge" or "return" 100% of the fees and expenses paid by the bankruptcy estates back to the estates[74] based on various alleged violations of rules and breaches of fiduciary duties.[75]

86. In each of the cases where a plan was confirmed, estate claims that were not released were transferred to either the reorganized debtor or a plan/liquidating trust agent. In the

[71] *In re Smart World Technologies*, 423 F.3d at 175.

[72] *See In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) Hr'g Tr. pp 5:20-6:1-6:4 (The Court: "Who do you want the money to go?" The U.S. Trustee: "Your Honor, so this is one of the things that we said early on in this case. I think that probably right now my answer would be the most appropriate remedy would be to deposit the money with the Registry of the Court to allow parties-in-interest who had claims against the estate to file that. Perhaps that means that someone needs to be administered. Perhaps that means that it needs to have a trustee." The Court: "That would seem very strange.").

[73] The substantive allegations and relief sought, not the labels of the claims, determines whether a claim is an estate or direct claim. *In re First Leads & Marketing, Inc.*, 2023 WL 4163478, at *2 (Bankr. N.D. Ga. 2023) ("The substance of the allegations, not the labeling of the corresponding claims for relief, controls whether a claim is direct or derivative of the Bankruptcy Estate."); *In re Spiech Farms, LLC*, 603 B.R. 395, 404 (Bankr. W.D. Mich. 2019) (the underlying facts and harm committed determine whether a claim belongs to the bankruptcy estate); *see also In re Apex Long Term Acute Care-Katy, L.P.*, 599 B.R. 314, 322 (Bankr. S.D. Tex. 2019) (examining substance of relief sought rather than the label attached to the claim to determine if the claim was an estate claim transferred and released under a confirmed chapter 11 plan).

[74] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at pp. 1-2, 45-46, 48-49, 52, 55-56 & ¶¶ 61, 175, 178, 180, 183, 184, 185, 187, 188, 192, 198, 206, 207, 211 (seeking the "return" of funds and/or "disgorgement"). *See also Ungaretti & Harris, LLP v. Steinberg (In re Res. Tech. Corp.)*, 356 B.R. 435, 443 (Bankr. N.D. Ill. 2006) (acknowledging that "the estate has a claim for disgorgement of fees").

[75] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at p. 56 & ¶¶ 7, 9, 59, 108, 135, 136, 137, 139, 140, 147, 188 & 193 (referencing JW's fiduciary duties and breaches thereof). Breach of fiduciary duty claims are undeniably estate-owned claims. *See Collins v. Sydow (In re NC12, Inc.)*, 478 B.R. 820, 836 (Bankr. S.D. Tex. 2012) (J. Isgur) ("The breach of fiduciary duty claim is property of the estate. Only the [chapter 7 trustee or debtor] has standing to assert the claim, and therefore the Court dismisses the claim for lack of subject matter jurisdiction."); *In re Margaux City Lights Partners, Ltd.*, 2014 Bankr. LEXIS 4841, *26 (Bankr. N.D. Tex. Nov. 24, 2014) (citing *NC12* for the proposition that a "breach of fiduciary duty claim to belong to the estate when allegations of damages all referred to injury to the debtor").

2 cases where there was no plan,[76] estate claims belong to the debtor or former debtors. And in either case, any other party-in-interest must seek derivative standing to assert estate claims. However, derivative standing requires a showing that (i) the claim is colorable; and (ii) the debtor-in-possession has refused unjustifiably to pursue it.[77] Derivative standing is granted only in narrow circumstances, recognizing that the debtor-in-possession alone has a fiduciary duty to all parties-in-interest, and to protect parties and bankruptcy estates from unnecessary and uneconomical litigation.[78]

87. Unless and until any party in each of the challenged cases seeks and obtains derivative standing to assert an estate claim (such as the estate claims asserted here), exclusive standing to assert and control over such claims remains with the debtor-in-possession or relevant estate fiduciary under the confirmed plans—as it should. The applicable debtors' estates paid JW's fees and expenses; the debtors' estates would be affected by any generalized harm to the estates based on any alleged lack of disclosure; and any sanctions from this proceeding would go solely and exclusively to the debtors' estates in accordance with and pursuant to the respective confirmed plans. Moreover, the costs of this proceeding, including the accrual of any additional U.S. Trustee fees, as well as legal fees that would be incurred to participate in this proceeding, will be borne by the applicable debtors' estates.

88. The U.S. Trustee made no effort to discuss the relief sought or request prosecution by any debtor or plan agent in any of the challenged cases, let alone attempt to satisfy the standard for derivative standing prior to filing his Motions. Instead, the U.S. Trustee's Motion seeks to

---

[76] Of the 33 cases where Rule 60(b) Motions are pending, all but 2 (*Brilliant Energy* and *LaForta*) involve a confirmed plan.

[77] *See Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860-64 (5th Cir. 2013).

[78] *In re Balt. Emergency Servs. IL, Corp.*, 432 F.3d 557, 560-62 (4th Cir. 2005).

bypass these safeguards for the estates and parties-in-interest, without regard to the views or interests of the affected estates.[79]

89. While there may be other avenues to address the conduct of former Judge Jones and Ms. Freeman and the allegations against JW, attempting to assert an estate claim, particularly one with nominal potential benefits to the estates and significant potential costs, is not one of them.[80]

**iii. The U.S. Trustee's Asserted Estate Claims Were Released Under the Applicable Plans.**

**(a) The Confirmed Plans Include Broad Release and Exculpation Provisions in Favor of JW.**

90. In nearly every challenged case,[81] the U.S. Trustee's requested relief against JW is barred under the plan's release and exculpation provisions. The confirmed plans unconditionally released JW from all known and unknown causes of action that belonged to the estate that had any connection to the respective chapter 11 case, and where applicable, to the mediation conducted by former Judge Jones.[82] The confirmed plans also include third-party releases with a similar scope.[83]

91. In addition to the releases, nearly all the confirmed plans exculpate JW from any causes of action related to an act or omission relating to or arising out of the chapter 11 cases.[84]

---

[79] Notably, although the U.S. Trustee is an administrative officer with significant supervisory responsibilities, the U.S. Trustee is not a "party in interest" under section 1109(b). COLLIER ON BANKRUPTCY ¶ 1109.03 (16th ed.). If the U.S. Trustee were a "party in interest" under section 1109(b) of the Bankruptcy Code, then section 307 of the Code would be largely redundant, as would a number of other provisions of the Code that specify that certain actions may be taken either by a party in interest or the U.S. Trustee. *Id*.

[80] JW does not dispute that the U.S. Trustee has the ability to object to JW's final fee applications in the *HONX* (Case No. 22-90035) or *GWG* (Case No. 22-90032) cases, although JW notes that it already provided a voluntary $250,000 fee reduction in *HONX* with its client's agreement.

[81] *Brilliant Energy* is a chapter 7 case, and the *LaForta* chapter 11 case was dismissed. The plan in *Sanchez Energy* did not include a release provision.

[82] *See, e.g.,* **Exhibits 2 & 3**.

[83] *Id.*

[84] *Id.*

These release and exculpation provisions are enforced by a plan injunction, which prohibits any entity from asserting against JW the causes of action so released or subject to exculpation.[85]

92. In a supplemental brief the U.S. Trustee filed in the *Exco Resources* case,[86] the U.S. Trustee argued that he was not a "Releasing Party" under the plain language of the third-party release provision in the confirmed plan; thus, the U.S. Trustee asserted that the release provision did not bar his requested Rule 60(b) relief in that case.[87] But the U.S. Trustee's argument ignores the estate's release and exculpation of JW.

93. Neither section 586 of title 28 of the United States Code or section 307 of the Bankruptcy Code grants the U.S. Trustee the power to assert estate claims against non-debtor parties like the current claims asserted against JW in the challenged cases. And as to these estate-owned claims, JW was released and exculpated.

**(b) Section 1144 of the Bankruptcy Code Bars the U.S. Trustee's Requested Relief.**

94. Section 1144 of the Bankruptcy Code and well-settled *res judicata* principles bar the U.S. Trustee's untimely attempts to collaterally attack the release and exculpation provisions in the confirmed plans. Because a confirmation order is a final judgment entitled to preclusive

[85] *Id.*

[86] *See In re Exco Resources, Inc. et al.*, Case No. 18-30155 (MI), *United States Trustee's Brief in Advance of March 26 Status Conference on the United States Trustee's and Reorganized Debtors' Motions to Reopen and the Threshold Issues Identified by the Court* [Dkt. No. 2349] (the "Exco Brief"). Because the U.S. Trustee's standing arguments raised in the Exco Brief are relevant here, JW has addressed those arguments in this Response for the sake of completeness.

[87] Exco Brief, at ¶¶ 33-34.

effect,[88] all challenges to the confirmed plans' release and exculpation provisions are now barred, and the U.S. Trustee has no ability to modify such plans or to revoke any confirmation orders.[89]

95.     Recognizing this fact, the U.S. Trustee argued in *Exco Resources* that the Fifth Circuit's decision in *Highland Capital* categorically invalidates the plan's exculpation provisions as they relate to JW.[90] But the Fifth Circuit decided *Highland Capital* in September 2022,[91] after the exculpation provisions were approved in *Exco Resources* and the overwhelming majority of the cases at issue here. *Highland Capital* does not retroactively invalidate previously approved exculpation provisions.[92] Rather, challenges to the legality of the provisions of a confirmation

---

[88] *See Okla. State Treasurer v. Linn Operating, Inc. (In re Linn Energy, L.L.C.)*, 927 F.3d 862, 867 (5th Cir. 2019) (holding that confirmation order was a final order that may not be collaterally attacked by parties who were given a fair chance to challenge a provision of a plan approved by the bankruptcy court but failed to do so); *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1143 (5th Cir. 1990) (remarking that "[t]he law in this circuit is well settled that a plan is binding upon all parties once it is confirmed and all questions that could have been raised pertaining to such plan are *res judicata*"); *see also Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987) (relying on the *res judicata* effect of a confirmation order, the court barred a cause of action for enforcement of guaranty based on the release of the third-party guarantor in the confirmed plan).

[89] *See* 11 U.S.C. § 1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation. . ."); 11 U.S.C. § 1144 ("On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order based on allegations of fraud discovered after plan confirmation); *In re Apex Long Term Acute Care – Katy, L.P.*, 599 B.R. 314 (Bankr. S.D. Tex. 2019) (denying motion to reopen case that "necessarily challenges the substance of the confirmation order" by seeking to pursue claims extinguished under the chapter 11 plan and were barred by section 1144, notwithstanding that claims were based on allegations of fraud discovered after plan confirmation); *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733 (D. Del. 2006) (section 1144 bars not only direct actions to revoke a confirmation order after the 180-day period, but also claims that indirectly attack the confirmation order by seeking relief that is inconsistent with the plan's terms); *In re Cal. Litfunding*, 360 B.R. 310, 317-21 (Bankr. C.D. Cal. 2007) (section 1144 barred claims against the debtors' former directors and officers based on alleged fraudulent statements in connection with the debtors' chapter 11 plan and disclosure statement as such claims were released under the plan and any such claims would be inconsistent with findings and holdings in the plan confirmation order); *see also Miller v. Meinhard-Comm. Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment."); *In re BGI, Inc.*, 2012 WL 5392208, at *4 (Bankr. S.D.N.Y. Nov. 2, 2012) ("where the requested relief would reverse what would otherwise be the consequence of a confirmed chapter 11 plan, that action is a collateral attack on the plan and is subject to section 1144's strict limitations").

[90] *See* Exco Brief, ¶ 50 (citing *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 436 (5th Cir. 2022), petitions for cert. pending, No. 22-631 (Jan. 5, 2023) and No. 22-669 (Jan. 16, 2023)).

[91] *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (decided on September 7, 2022).

[92] *See Hulin v. Fibreboard Corp.*, 178 F.3d 316, 323 (5th Cir. 1999) (discussing well-established rule that *res judicata* overrides the retroactive effect of a subsequent judicial decision); *Thomas v. Allstate Ins.*, 57 F.Supp.2d 361, 365 (S.D.

order, like the exculpation provisions here, must be raised through an appeal.[93] The U.S. Trustee did not appeal the confirmation orders in any of the challenged cases.

96. To try and overcome the preclusive effect of the confirmation order in *Exco Resources*, the U.S. Trustee incorrectly relied on the Fifth Circuit's decision on third-party releases in *Applewood Chair Co*.[94] There, the court reaffirmed the general principle that a discharge does not affect a non-debtor guarantor's liability. It held that ambiguous language in a confirmation order that purported to discharge the debtor's directors, officers, and shareholders from creditors' pre-confirmation claims, did not bar a creditor's post-confirmation suit against the debtor's former president and his wife on their pre-petition guaranty of the debtor's indebtedness.[95]

97. Here, however, the issue is not whether JW was discharged from a pre-petition guaranty by amorphous language in a third-party release, but whether the plan's exculpation and the estate's unequivocal release of JW for post-petition conduct (liability for all claims and causes of action related to the chapter 11 cases) bar the U.S. Trustee from seeking the current relief (*i.e.*, to return 100% of the compensation paid by the estates to JW for services rendered to the estates during the cases). *Applewood Chair* simply does not apply.

Miss. 1998) (holding that notwithstanding new, contrary precedent, the prior decision by the federal district court should not be disturbed because of *res judicata*); *In re Klus*, 173 B.R. 51, 56-57 (Bankr. D. Conn. 1994) (barring challenge by a secured creditor based on newly decided Supreme Court precedent to the treatment of its claim in a confirmed plan due to the preclusive effect of the confirmation order).

[93] *See Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*, 644 F.3d 259, 269 (5th Cir. 2011) (holding that the appellant's challenge to the plan and confirmation order on the grounds that liability for fraud should not be excluded from the scope of the release provision was too late).

[94] Exco Brief, at ¶¶ 52-54 (discussing *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000)).

[95] *See Applewood Chair Co.*, 203 F.3d at 917, 919.

98. Further, while the exculpation (and most but not all of the release) provisions include a carve-out for actual fraud, willful misconduct, or gross negligence,[96] the U.S. Trustee's briefing does not allege any such conduct by JW (only Ms. Freeman).[97]

**iv. JW Did Not Violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct.**

99. The U.S. Trustee contends that JW should be "sanctioned" because it was either disqualified from ever being retained in each of the challenged cases, or otherwise failed to disclose a "disqualifying interest" that arose during the course of those cases in alleged violation of various Bankruptcy Code provisions, Bankruptcy Rules, disciplinary rules, and other purportedly applicable law.

100. In an attempt to make that case, the U.S. Trustee throws the proverbial "kitchen sink"[98] at JW. The U.S. Trustee's narrative, however, is built on a reimagined framework for the

[96] *See, e.g.,* Exco Brief, at ¶¶ 5, 35-49.

For the reasons set forth below, JW disputes the U.S. Trustee's assertion that Ms. Freeman's knowledge is imputed to JW. *See IP Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 897 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (to support a finding of gross negligence or willful misconduct, a party must show "***actual subjective knowledge*** of an extreme risk of serious harm") (internal citations omitted) (emphasis added); *VTX Commc'ns, LLC v. AT&T Inc.*, 2023 U.S. Dist. LEXIS 28110, at *28 (S.D. Tex., Feb. 21, 2023) (willful misconduct involves "***intentional*** wrongdoing, not mere negligence, gross negligence or recklessness") (internal citations omitted) (emphasis added).

[97] JW also notes that under well settled Fifth Circuit law, the bankruptcy estate ceases to exist upon confirmation of a chapter 11 plan, and only claims that are specifically and unequivocally preserved in a plan survive. *See Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) ("For a reservation [of a claim held by the estate] to be effective, it 'must be specific and unequivocal'—blanket reservations of 'any and all claims' are insufficient. Though the degree of specificity involved in a plan's reservation of claims will often vary, the reservation must, at a minimum, be specific enough to put 'creditors on notice of any claim [the debtor] wishes to pursue after confirmation.'") (internal citations omitted)); *Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547, 550 (5th Cir. 2011) (unless a plan includes an effective reservation, the plaintiff "has no standing to pursue a claim that the estate owned before it was dissolved"); *Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) (upon confirmation, the debtor loses its status as a debtor in possession and its "authority to pursue claims as though it were a trustee").

Here of course, the claims pursued by the U.S. Trustee are not among the claims retained in any confirmed plan, and even if they were, it would not be the U.S. Trustee who would be entitled to pursue such claims as a representative of the estates. *See* 11 U.S.C. § 1123(b)(3)(B).

[98] The U.S. Trustee has at various times referred to its own Motions as "kitchen sink" motions, admitting that any and every conceivable legal theory—no matter how attenuated or far-fetched—would be thrown at JW.

retention and compensation of professionals in chapter 11 cases, where the provisions of the Bankruptcy Code and Rules are "not the limit of counsel's disclosure obligations"[99] and that disregards a professional's knowledge, intent, or other relevant circumstances.[100]  Essentially, the U.S. Trustee posits that Congress, courts, and ethics committees have enacted a strict-liability disclosure regime, with unwritten, independent obligations of uncertain scope and duration under the common law and rules of professional conduct (including non-binding advisory opinions and committee commentary) that supplement or alter unambiguous language in the Bankruptcy Code and Rules governing retention and compensation.

101.    That is not the law.

      **(a)    JW Complied with the Requirements for Retention and Compensation Under Sections 327, 328, and 1103 of the Bankruptcy Code.**

102.    The requirements for retention and compensation of professionals in a chapter 11 case are governed by Bankruptcy Code sections 327, 328, and 1103 and Bankruptcy Rule 2014.

103.    The Fifth Circuit has long held that, "[i]n matters of statutory interpretation, text is always the alpha."[101]  "Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another . . . ."[102]

---

[99] The U.S. Trustee, among other things, argues that estate-retained professionals like JW are bound by independent, non-statutory "disclosure obligations [that] arise from [their] fiduciary duty."  *See* Motion ¶ 97.  The authorities in the Motion, however, do not create or recognize disclosure obligations in addition to those imposed under the Bankruptcy Code and Rules.  For example, the U.S. Trustee's proposition quotes *dicta* from *In re Futuronics Corp.*, where the Second Circuit found that counsel's "***disclosure duties and the requirements necessary to fulfill them have been provided in the Bankruptcy Rules***" and merely recognized that the rules themselves were "founded upon 'the fiduciary obligation owed by counsel for the debtor to the bankruptcy court."  *Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463 (2d Cir. 1981) (emphasis added).  And while many courts employ sweeping language and general principles regarding bankruptcy disclosures and conflicts in their written opinions, no court has looked beyond the Bankruptcy Code's or Rule's text to impose additional obligations on professionals under the relevant provisions.  Moreover, the U.S. Trustee has not asserted facts sufficient to state a plausible claim for breach of fiduciary duty.

[100] Motion, § IV.D.

[101] *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019).

[102] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1993).

104. No court has found these Bankruptcy Code provisions and Bankruptcy Rule 2014 ambiguous or unclear. Yet, the U.S. Trustee's construction ignores and contradicts the text's plain meaning.[103]

105. Section 327 of the Bankruptcy Code sets forth the relevant requirements for retaining professionals in bankruptcy: at the time of retention, the firm must (a) not hold or represent an "interest adverse" to the estate, and (b) be disinterested.[104] The term "adverse interest" in section 327(a) is "generally considered to have the same meaning as the 'adverse interest' term" in the definition of "disinterested" under section 101(14) of the Bankruptcy Code.[105] A firm is "disinterested" if it satisfies the requirements of section 101(14), including that the firm "does not have an interest ***materially adverse to*** the interest of ***the estate or of any class of creditors or equity security holders*** . . . ."[106] "[T]he twin requirements of disinterestedness and

[103] Even the authorities cited in the U.S. Trustee's Motion, when read together with the applicable statutory and rule provisions, make clear that the requirements for retention as debtor's counsel in chapter 11 case means compliance with Bankruptcy Code section 327(a), full stop. Section 327(a) in turn is coextensive with an attorney's fiduciary duties and subsumes any rules of professional conduct relevant to a professional's disqualification (*e.g.*, rules related to conflicts of interest with the estate), while section 328(c) carries those requirements forward during the case to help ensure that a professional does not become disqualified after its retention. The Court polices the professional's qualifications through the applicable Bankruptcy Rules, namely here, Bankruptcy Rule 2014, which mandates disclosure of all connections that bear on whether the professional has a prohibited "adverse interest" under, *inter alia*, sections 327(a) and 328(c). If the professional discloses all connections required under Bankruptcy Rule 2014, and none of those connections give rise to an adverse interest to the estate, the professional is not disqualified and may be retained and apply for compensation and reimbursement for services rendered.

[104] *See* 11 U.S.C. § 327(a). In the *EXCO Resources* cases, JW was employed as local and oil-and-gas counsel to the official committee of unsecured creditors under section 1103 of the Bankruptcy Code. Section 1103(b) provides, in part, that "[a]n attorney or accountant employed to represent a committee . . . may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case." 11 U.S.C. § 1103(b). There is no "disinterestedness" requirement in order to be retained as committee counsel, although a lack of disinterest could have been considered by the Court under section 328(c) in respect of JW's fee applications during the cases. Although this response focuses on section 327, the substantive arguments apply with equal force (if not more so) to JW's retention under section 1103 in the *EXCO Resources* cases.

[105] *See In re Am. Int'l Refinery*, 676 F.3d at n.7 (emphasis added); *In re W. Delta Oil*, 432 F.3d at 356 (stating the phrases have the same meaning).

[106] *See In re Am. Int'l Refinery*, 676 F.3d at 461 (quoting 11 U.S.C. § 101(14)) (emphasis added).

lack of adversity telescope into what amounts to a single hallmark,"[107] which aims to ensure that a firm employed by the estate does not have a conflict of interest with the estate.

106. In the Fifth Circuit, a party has an "adverse interest" if they:

> (1) [ ] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) [ ] possess a predisposition under circumstances that render such a bias against the estate.[108]

Section 327 is written in the present tense; thus, a professional's retention is valid if, ***when the professional's retention is approved***, the Bankruptcy Code's requirements were satisfied. If a professional is not disqualified at the time of its retention under section 327(a), but later acquires or comes to represent an "adverse interest," courts then look to section 328(c) of the Bankruptcy Code. Under section 328, a court has discretion to deny compensation and reimbursement requested by an estate-retained professional if "at any time during such professional person's employment . . ., such professional person is not a disinterested person, or represents or holds an interest adverse to the interests of the estate with respect to the matter on which such professional person is employed."[109] "The determination of an adverse interest must be made with an eye to the specific facts of each case."[110]

---

[107] *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987).

[108] *In re Am. Int'l Refinery*, 676 F.3d at 461-62 (quoting *In re West Delta Oil*, 432 F.3d at 356) (internal quotation marks omitted).

[109] 11 U.S.C. § 328(c).

[110] *In re Am Int'l Refinery*, 676 F.3d at 462.

       **(i)     JW was Disinterested and Did Not Hold or Represent an Adverse Interest.**

107.     Bankruptcy Rule 2014 sets forth the procedural mechanism through which courts are able to assess whether a firm has or represents a disqualifying or other adverse interest under sections 327(a), 328(c), or 1103(b) of the Bankruptcy Code, as applicable.[111]

108.     Bankruptcy Rule 2014 defines the universe of potential adverse interests, requiring that applicants disclose—to the best of their knowledge—connections with: (a) the debtor, (b) creditors, (c) any other party in interest, (d) their respective attorneys and accountants, (e) the United States trustee, or (f) any person employed in the office of the United States trustee.[112]  The rule's language is limiting,[113] persons not enumerated in the rule's text are ***not*** within its scope.[114]

109.     The purposeful omission of judges and mediators from Bankruptcy Rule 2014's scope is unremarkable.[115]  With the exception of the U.S. Trustee and related employees,[116] Bankruptcy Rule 2014 seeks to identify an applicant's connections to parties in interest[117] that

---

[111] *See, e.g., Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) ("The Code also provides a procedural mechanism to enforce [section 327(a)'s] requirements.  Under [Bankruptcy Rule] 2014, any applying professional must set forth 'to the best of the applicant's knowledge' all known connections of the applicant with the 'debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee' in both the application for employment and an accompanying verified statement."); COLLIER ON BANKRUPTCY ¶ 8.03[1][a] (16th ed.) ("Section 327 is implemented by [Bankruptcy Rule 2014], which states the requirements of the application to be employed.").

[112] FED. R. BANKR. P. 2014(a).

[113] *See* 11 U.S.C. § 102 (providing that, under the Bankruptcy Code, the terms "includes" and "including" are not limiting).

[114] *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010) ("Generally where there are enumerated exceptions 'additional exceptions are not to be implied, in the absence of a contrary legislative intent.'").

[115] The U.S. Trustee concedes that Bankruptcy Rule 2014 does not include connections to judges and mediators.  *See* Motion, § IV.D.

[116] Unlike the other entities identified in Bankruptcy Rule 2014, the Bankruptcy Code expressly authorizes the U.S. Trustee to appear and be heard in any bankruptcy case.  *See* 11 U.S.C. § 307.  The U.S. Trustee, like the Court and mediators, is not a party in interest and, as a result, had to be expressly included in order to fall within the Rule's scope.

[117] Although the term is not defined under the Bankruptcy Code, courts have held that a "party in interest" includes "a party with a 'pecuniary interest in the case, as well as to those parties who have a practical stake in the outcome of the

either hold or represent an interest or stake ***in the estate***, because such connections might give rise to the kind of "adverse interests" or "dual loyalties" that could adversely impact the estate. Judges and mediators are excluded because they cannot hold or represent an interest in a given estate. Rather, judges and mediators are required to recuse or self-disclose under statutes, rules, and guidelines that do not bind JW and are distinct from the provisions of the Bankruptcy Code and Rules applicable to estate professionals.[118] Thus, JW had no obligation to disclose any connections with a presiding judge or mediator under Bankruptcy Rule 2014.

110. The U.S. Trustee now recognizes this and asserts that JW was not disinterested because it "had a material financial interest in having a friendly judge in a relationship with its partner who might lend a less critical eye to its employment and compensation requests,"[119] or,

---

case, or to those parties who will be impacted in any significant way by a decision made in the case.'" *In re Circle Inv'rs, Inc*., No. 02-39553, 2008 WL 910062, at *4 (Bankr. S.D. Tex. Apr. 3, 2008).

[118] *See* Motion, § I ("Bankruptcy Rule 5002 and 5004 and 28 U.S.C. § 455 impose parallel requirements on judges to ensure their orders approving employment and compensation, among others, are likewise free of conflict or partiality").

[119] Motion, § IV.E.1. In the Rule 60(b) Motions and fee objections filed in the challenged cases where Judge Jones only served as a mediator (such cases, collectively, the "Mediation Cases"), the U.S. Trustee is careful to argue throughout that "***Ms. Freeman*** and [JW]" held disqualifying interests, emphasizing that ***Ms. Freeman*** "represented" a party, that ***Ms. Freeman*** would be "overly deferential," and the ***Ms. Freeman*** was "required . . . to disclose" her relationship. *See, e.g.,* Case No. 22-90129 (MI), Dkt. No. 96 (the "Altera Motion") at ¶¶ 82, 83, 97 (emphasis added). Again, JW, not Ms. Freeman or any other individual JW attorney, was retained under section 327. The U.S. Trustee's argument that Ms. Freeman's lack of disinterestedness (assuming, *arguendo*, that she was not disinterested at the relevant time) could be imputed to JW is meritless. *See* Motion, § IV.E.1. Disinterestedness under section 101(14)(C) "implicates only the personal interests of the professional whose disinterestedness is questioned [*i.e.*, JW]," therefore, to violate section 101(14)(C) "[JW] personally must 'have' the prohibited interest; and the representation of an adverse interest cannot be imputed to [JW]." *See, e.g., In re Contractor Tech., Ltd.*, No. CIV.A. H-05-3212, 2006 WL 1492250, at *7 (S.D. Tex. May 30, 2006) (construing the predecessor statute to section 101(14)(C)) (citing *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 629 (2d Cir. 1999)) (internal citations omitted). Indeed, as discussed in ¶ 122, this Court previously "determined *per se* imputation under § 101(14) does not exist." *In re Cygnus Oil & Gas Corp*., No. 07-32417, 2007 WL 1580111, at *1-4 (Bankr. S.D. Tex. May 29, 2007); *see also In re McDermott Int'l, Inc.*, 614 B.R. 244, 255 (Bankr. S.D. Tex. 2020) (Jones, J.) (same). Moreover, the U.S. Trustee's argument that JW could not render itself disinterested through ethical walls or screening procedures is a red herring. *See* Motion § IV.E.2. The cases cited in the Motion are legally and factually inapposite as such measures are designed to "protect confidentiality based on knowledge from past representation." *See Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (finding that an "ethical wall" erected by law firm to separate an attorney working on estate-planning matters for one of the controlling persons of plaintiff bringing patent suit from other attorneys representing patent suit defendant, was insufficient under California law to preclude disqualification of firm from representing defendant, for breach of duty of loyalty to plaintiff); *In re Tr. Am. Serv. Corp.*, 175 B.R. 413, 421 (Bankr. M.D. Fla. 1994) (finding that an accounting firm's dual representation of a debtor's largest unsecured creditor and the unsecured creditors' committee gave rise to conflict of interest and that an ethical wall "is generally not an

where in cases where Judge Jones was appointed as a mediator, that JW's interest in continued employment "conflicted with the estate's interest in having a disinterested mediator."[120] The Motion also suggests that by not disclosing, JW conspired with Judge Jones and Ms. Freeman to create an "unlevel playing field for parties, who might have . . . . objected to the retention of [JW]. . . ."[121]

111. The U.S. Trustee, however, fails to cite any authority in support of the assertion that JW had an adverse interest that would have disqualified JW from representing its clients in any of the cases. Indeed, the opposite is true. If anything, another judge (or mediator) would have been assigned to preside over (or mediate) the applicable cases and JW would have still been retained as an estate professional; JW would have still performed the same reasonable and necessary legal services for the estates; and JW would have still been compensated for those services. Thus, JW did not have a disqualifying interest in respect of its ***clients*** in any case.[122]

112. The Third Circuit's decision in *In re Marvel Entertainment Group, Inc.* is insightful.[123] In *Marvel*, the district court disqualified a law firm from representing a chapter 11 trustee because of the firm's unrelated representation of a significant bank creditor, reasoning that

---

acceptable means of conflict avoidance where the same professional organization actively represents two adverse interests.").

[120] *See, e.g.,* Altera Motion, at ¶ 120.

[121] Motion, at § IV.D.

[122] Many courts have found that the Bankruptcy Code permits a court to disqualify a law firm only "if it had an actual or potential conflict of interest." *In re Marvel Entertainment Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998). A conflict is deemed actual if it places a professional in a position permitting it to favor one interest over an impermissible conflicting interest. *In re Roper & Twardowsky*, 566 B.R. 734, 755 (Bankr. D.N.J. 2017); *see, e.g., In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994) ("[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash."). A "potential" conflict exists where competition between two interests "is presently dormant, but may become active if certain contingencies occur." *In re BH & P, Inc.*, 103 B.R. at 563 (internal quotations omitted). Courts have held that section 327 imposes *per se* disqualification where a law firm has an actual conflict of interest, but permits a court to exercise discretion to disqualify a law firm that has only a potential conflict of interest. *See Marvel*, 140 F.3d at 476.

[123] 140 F.3d 463, 477 (3d Cir. 1998).

the firm's "representation of [the bank] taints the image of objectivity that the trustee and his counsel should possess." On appeal, the Third Circuit found that the district court abused its discretion and applied an "incorrect legal standard" under sections 101 and 327 of the Bankruptcy Code. The *Marvel* court rejected the argument that a firm could be disqualified for the mere "appearance of impropriety," noting that a reference in its prior decision suggesting that a firm could be disqualified based on the "appearance of conflict" was only "a marginal comment [which] will not bear the heavy weight[ ] placed on it."[124] The court found that its precedent "made clear that '[h]orrible imaginings alone cannot be allowed to carry the day," and that "[n]ot every conceivable conflict must result in sending [the trustee] away to lick his wounds.'"[125] The court reasoned that, "[t]o allow disqualification merely on the 'appearance of impropriety' indeed would allow 'horrible imaginings alone' to carry the day."

113. Here, as in *Marvel*, the U.S. Trustee's allegations of a "JW-Freeman-Jones" conspiracy are precisely the kind of "hypothetical, theoretical, speculative"[126] and "horrible imaginings" that cannot disqualify a firm under the Bankruptcy Code.[127] JW itself never held or

---

[124] *Id.* at 477. *See, e.g.,* COLLIER ON BANKRUPTCY ¶ 8.03[8] (16th ed.) (". . . the better view seems to be that disqualification based on [the appearance of impropriety] alone is improper: there must be a concurrent violation of at least one other provision of the Model Code as well."); *Bd. of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1247-48 (2d Cir. 1979) (". . . a federal court should not disqualify an attorney on ethical grounds from representing a party in a pending lawsuit in the absence of a reasonable basis for believing that his or her unprofessional conduct may affect the outcome. An 'appearance of impropriety' on an attorney's part would rarely have this effect. The attorney is the client's choice. Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.") (Mansfield, J., concurring).

[125] *Marvel*, 140 F.3d at 477 (quoting *In re Martin*, 817 F.2d 175, 183 (1st Cir. 1998)).

[126] COLLIER ON BANKRUPTCY ¶ 8.03[9][b] (16th ed.).

[127] *In re Contractor Tech.*, 2006 WL 1492250, at *9 (noting that "[t]he concern about potential issue conflicts or the 'appearance of a conflict' [however,] is legally insufficient to warrant disqualification" under the Bankruptcy Code and Rules). *See, e.g.,* Altera Motion ¶¶ 83 (stating that "[i]n addition to the concern that Judge Jones ***might*** not be impartial, [JW's] client ***might*** reasonably be concerned that that the relationship would lead Ms. Freeman [***not JW***] to be overly deferential . . . ."), 84 ("Parties to the mediation ***might*** also reasonably be concerned that Judge Jones may disclose confidential information . . . .") (emphasis added).

represented an interest (let alone a materially adverse interest) with a competing economic interest in, or that otherwise had any bias against, the estates in the challenged cases. The U.S. Trustee simply cannot articulate an "adverse interest" held or represented by JW that would have disqualified the firm under the applicable provisions of the Bankruptcy Code and Rules in any of the challenged cases.

**(ii) Even if Bankruptcy Rule 2014 Applied, JW Disclosed All of its Known Connections "to the Best of [its] Knowledge."**

114. Bankruptcy Rule 2014 requires broad disclosures concerning a professional's connections with parties in interest. Still, "an attorney is not charged with the duty to disclose 'every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . When an attorney seeks employment in a bankruptcy case, the disclosure required by Rule 2014 should not be 'an impossible task subject to endless litigation over what would be enough.'"[128]

115. Bankruptcy Rule 2014 requires disclosure only "***to the best of the applicant's knowledge***. . . ."[129] While "knowledge" is not defined under the Bankruptcy Code or Rules, courts have construed the term to require "actual knowledge" of the fact.[130] Thus, the U.S. Trustee's

---

[128] *In re Fundamental Long Term Care*, 614 B.R. 753, 761 (Bankr. M.D. Fla. 2020), *aff'd sub nom.* 2021 WL 222779 (M.D. Fla. Jan. 22, 2021), *aff'd*, 81 F.4th 1264 (11th Cir. 2023) (internal citations omitted); *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), *aff'd*, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument that counsel should be disqualified for "a failure to disclose—not connections as required under 2014—but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough."); COLLIER ON BANKRUPTCY ¶ 2014.05 (16th ed.) ("No court has yet suggested that the requirement of disclosure includes listing every relationship and its possible consequence.").

[129] *See* FED. R. BANKR. P. 2014(a) (emphasis added). The professional applicant in each of the challenged cases was JW, not Ms. Freeman.

[130] *See Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir. 1986) ("Although 'knowledge' as used in § 550(b)(1) is not defined in the Code or in the legislative history, we conclude that it does not mean 'constructive notice.' As several courts have noted when analyzing § 544 of the bankruptcy code, '[t]he term 'notice' may include either actual or constructive notice, while the term 'knowledge' includes only actual notice. That Congress selected the term 'knowledge' is significant.'"); *see also* "Knowledge" definition, Black's Law Dictionary (11th ed. 2019) (defining "knowledge" to

reliance on case law supporting the general proposition that all compensation should be denied even if a lack of disclosure was "unintentional" or "negligent" is misplaced (if not misleading). Indeed, every case cited by the U.S. Trustee for this proposition concerns a situation where the facts were actually known by the firm.[131]

116. Here, with respect to the Pre-March 2022 Cases, JW disclosed "to the best of [its] knowledge" all of JW's connections known at that time as required by Bankruptcy Rule 2014. JW likewise supplemented its disclosures as required by Bankruptcy Rule 2014 during the various Pre-March 2022 Cases, again disclosing new connections, if any, "to the best of [JW's] knowledge." An attorney's word is the lynchpin of self-regulation in our industry. Under Texas law, every attorney "has an ethical responsibility to tell the truth as an officer of the court,"[132] and each partner owes a fiduciary duty to his or her own firm. Under the circumstances, JW reasonably relied on Ms. Freeman's integrity, her duties as an attorney and officer of the court, and her fiduciary duties as a partner to the firm to disclose all relevant facts throughout her employment.

117. With respect to the Pre-March 2022 Cases, JW cannot disclose a connection if it does not know one exists, and no rule of construction endorses a reading of Bankruptcy Rule 2014

---

mean "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact.").

[131] *See Woods v. City Nat. Bank & Tr. Co. of Chicago*, 312 U.S. 262 (1941) (finding that indenture trustee, a bondholder committee, and committee's counsel that jointly represented the trustee and committee had conflicts of interest relevant to district court's determination of claims under the Bankruptcy Act); *In re Am. Int'l Refinery*, 676 F.3d 455 (finding that law firm's inadequate disclosures regarding the source of its retainer and its prior relationship with the debtors did not give rise to a "disqualifying interest"); *In re eToys, Inc*., 331 B.R. 176 (Bankr. D. Del. 2005) (finding, among other things, that law firm's simultaneous representation of both chapter 11 debtors and third-party against whom debtors had claims for return of prepetition payments was an "actual conflict of interest."); *In re Matco Elecs. Grp., Inc*., 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008) (finding that law firm's disclosures regarding attorney's relationship to creditor and committee member were "purposely vague"); *In re Chris Petit and Assocs., P.C*., No. 22-50591, 2022 WL 17722853, *10 (Bankr. W.D. Tex. Dec. 13, 2022) (finding law firm failed to adequately disclose pre-bankruptcy relationship with the debtor, or details concerning prepetition payments, under Bankruptcy Rule 2016).

[132] *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1258 n.8 (5th Cir. 1986) (finding no abuse of discretion in the bankruptcy court's reliance on the debtor's attorneys' representations at an evidentiary hearing in addition to the written application to governed by Bankruptcy Rule 9011).

that would render the word "knowledge" meaningless and read into the rule language that its drafters omitted. Thus, a finding that JW violated its Rule 2014 disclosure obligations in the Pre-March 2022 Cases under these circumstances would render unworkable the Bankruptcy Code's retention provisions, imposing on nearly all estate-retained professionals an affirmative, continuing duty to investigate their colleagues to root out any conceivable impropriety or inaccuracy. No person could discharge that kind of obligation, and no court or other party could confidently police those connections.

118. As to the Post-March 2022 Cases, and while JW was not required to make any additional disclosures under Bankruptcy Rule 2014, JW nonetheless took immediate action to address any appearance of impropriety in working with Ms. Freeman's counsel regarding a potential disclosure that could be made.[133] Former Judge Jones and Ms. Freeman, however, refused to make the full truth public. Rather than contribute to their deception, JW determined to separate Ms. Freeman from the firm.

**(iii) Ms. Freeman's Personal Knowledge and Conduct Cannot be Imputed to JW under the Bankruptcy Code or Rules.**

119. The U.S. Trustee's arguments and challenges in the Pre-March 2022 Cases turn on one question: to the extent there was an intimate personal relationship between Ms. Freeman and former Judge Jones at any relevant time, can Ms. Freeman's knowledge be imputed to JW? The answer is "no."[134] And the U.S. Trustee has not, and cannot, cite a single case that has held

[133] *See, supra,* sections II.H through II.I.

[134] As an initial matter, the U.S. Trustee's position is at odds with foundational corporate and alternative-entity law principles in Texas and throughout the country. JW is a limited liability partnership organized under Texas law, where Ms. Freeman joined as an income partner in 2018 and was promoted to equity partner in 2021. "Stated differently, a partnership [*e.g.*, JW] is a distinct legal entity, separate from the partners [*e.g.*, Ms. Freeman] who comprise it." *In re Timber Creek, Inc.*, 187 B.R. 240, 245 n.4 (Bankr. W.D. Tenn. 1995), *aff'd sub nom.* 200 B.R. 624 (W.D. Tenn. 1996). A *per se* rule imputing one partner's knowledge of his or her personal affairs and private life to the entire firm is contrary to law and would undermine the benefits of limited liability and much of the Texas Revised Partnership Act

otherwise in the context of Bankruptcy Rule 2014 (which by its express terms, provides otherwise) or any relevant Bankruptcy Code provision.[135]

120.    The Court's decision in *In re Cygnus Oil & Gas Corp.* is instructive.  In *Cygnus*, this Court adopted a case-by-case approach to determine whether a partner's lack of disinterestedness could be imputed to her entire firm.  This Court analyzed section 101(14)'s plain language and held that the Bankruptcy Code did ***not*** impute a lack of disinterest from one "person" (*e.g.*, a non-disinterested partner) to another "person" (*e.g.*, such partner's law firm),[136] observing that, "[h]ad Congress intended to impute a single member's disqualification to her entire firm, it would have done so."  Indeed, when intended by Congress, the Bankruptcy Rules ***do*** "include vicarious disqualification [*e.g.*, under Bankruptcy Rule 5002(a)[137]]," yet "other requirements of vicarious disqualification are 'noticeabl[y] absent elsewhere in the Bankruptcy Code or Rules,"[138] including in Bankruptcy Rule 2014(a).  Thus, imputing "a single member's [knowledge of an intimate, personal relationship] to her entire firm [*i.e.*, the professional applicant under the

---

and related statutes.  Nevertheless, the U.S. Trustee—without controlling authority—asks this Court to impute ***all*** attorney knowledge for ***all*** purposes.

[135] Had Congress intended to impute one attorney's knowledge of any particular fact to the entire firm for purposes of Bankruptcy Rule 2014, it could have been easily drafted as such.  For example, instead of providing that disclosures must only be made "to the best of the applicant's knowledge", the Rule could have been drafted to (a) impose strict liability (*e.g.*, "The application shall state . . .[any and all connections] . . ."), (b) provide for vicarious liability (*e.g.*, "the applicant shall be responsible for disclosures submitted by the declarant"), or (c) lower the threshold for disclosure by imposing a notice standard.  Of course, Bankruptcy Rule 2014 says none of this.

[136] *In re Cygnus Oil & Gas Corp.*, 2007 WL 1580111, at *3-4.  In *Cygnus*, the Court noted that the term "disinterested person" referred specifically to a "person," which in turn is defined under the Bankruptcy Code to include an "individual, partnership and corporation."  The Court then ruled that the law firm itself (a partnership and, therefore, itself a "person") was disinterested even where one of its equity holders individually was not.  *See also Timber Creek.*, 187 B.R. at 245.

[137] For example, Bankruptcy Rule 5002(a) prohibits bankruptcy judges from approving, among other things, the appointment of "an individual as attorney . . . if the individual is a relative of the bankruptcy judge approving the employment[,]" and further provides that "[w]henever under this subdivision an individual may not be approved for . . . employment, the individual's firm, partnership, corporation, or any other form of business association or relationship, and all members, associates and professional employees thereof also may not be approved for . . . employment."

[138] *See Cygnus*, 2007 WL 1580111, at *2 (citing *Timber Creek*, 187 B.R. at 243).

Bankruptcy Code and Rules]"[139] would require the Court to adopt a reading of Bankruptcy Rule 2014 that deviates from its text and applicable law.

121. Notwithstanding Bankruptcy Rule 2014's plain language and the above-referenced case law, the U.S. Trustee declares, without condition or qualification, that "Texas law imputes one attorney's knowledge to all those in the firm."[140] The U.S. Trustee's argument rests on a small handful of inapplicable and distinguishable Texas state-court decisions.[141] The argument appears rooted in two Texas Supreme Court decisions: *Tesco American, Inc. v. Strong Industries, Inc.* and *National Medical Enterprises, Inc. v. Godbey*.[142]

122. However, in *Tesco*, the Texas Supreme Court confronted facts and issues irrelevant to the U.S. Trustee's Motion. The *Tesco* court did ***not*** examine whether an attorney's private knowledge is imputed, for all purposes, to her entire firm; rather, the court considered whether an appellate judge was disqualified under the Texas Constitution from presiding over a matter where, "unbeknownst to her, before she took the bench another attorney at her very large firm played a very small role in the early stages of the appeal." The Texas Constitution provides, in relevant part, that "[n]o judge shall sit in any case . . . when the judge shall have been counsel in the case." The *Tesco* court found that the appellate judge was constitutionally disqualified. The court's reasoning included an analysis of precedent construing Rule 18 of the Texas Rules of Civil Procedure, which governs the "vicarious disqualification" of Texas trial judges, and its prior holding in *National Medical*. The court noted that:

> [Rule 18] recognizes that a judge is vicariously disqualified under the Constitution as having 'been counsel in the case' if a lawyer with

---

[139] *Id.*

[140] Motion, § IV.B.

[141] *Id.*

[142] 221 S.W.3d 550 (Tex. 2006) and 924 S.W.2d 123 (Tex. 1996), respectively.

> whom the judge previously practiced law served as counsel to a party concerning the matter during their association. This conclusion is consistent with our holding in *National Medical Enterprises, Inc. v. Godbey*,[143] that 'an attorney's knowledge is imputed by law to every other attorney in the firm.'[144]

123. The *National Medical* court, however, imputed a certain ***kind*** of knowledge under circumstances relevant to the facts before the *Tesco* court. Specifically, the *National Medical* court observed that, for purposes of Texas Disciplinary Rule 1.09, imputing an attorney's knowledge to her firm creates an "irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm" because "it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences" and it would help "clients feel more secure."[145]

124. The *National Medical* court found only that "this same presumption applies when, as in the present case, an attorney is obliged to preserve another's confidences [under a joint-defense agreement], not because the other was a client, but because the attorney promised to do so just as if the other had been a client."[146] The *Tesco* court majority applied the *National Medical* court's reasoning to the facts before it, arguing that "the same considerations apply here [*i.e.*, where a judge had been counsel for a party to an appeal]—proving misuse would be just as difficult, and damage to the profession just as extensive, if lawyers who become appellate judges might take confidential information with them for future use."[147]

---

[143] 924 S.W.2d at 13.

[144] 221 S.W.3d at 553 (quoting *In re O'Connor*, 92 S.W.3d 446, 449 (Tex. 2002)).

[145] *Nat'l Med. Enters.*, 924 S.W.2d at 131.

[146] *Id.* at 131-32.

[147] *Tesco*, 221 S.W.3d at 554.

125.    Thus, Texas law is more accurately described by the third (albeit equally inapposite) case cited by the U.S. Trustee.[148]    In *Unauthorized Practice of Law Committee*, the court again considered issues related to client conflicts under the Texas Disciplinary Rules, and put a finer point on Tesco's gloss on Texas law:  "Texas law imputes ***knowledge of confidential information*** to counsel's lawyer-associates so that in a private law firm, all of the lawyers are irrebuttably [*sic*] presumed to have ***knowledge of the confidential information***."[149]

126.    These cases do not provide controlling law or useful guidance for addressing the facts and issues raised in the Motion.  Texas law that imputes knowledge from one attorney to her entire firm (a) implicates only a certain ***kind*** of knowledge (*i.e.*, the attorney's knowledge of a client's protected, confidential information), and (b) does so for the limited purpose of enforcing ethics rules governing, *inter alia*, concurrent representations and former-client conflicts.  Here, of course, there is no allegation that Ms. Freeman was disqualified due to any conflict of interest in respect of JW's clients or that she had access to protected information or otherwise violated client confidences in any case.  For the purposes of vacatur under Rule 60(b)(6) and any other requested relief here, what matters are the applicable provisions of the Bankruptcy Code and Rules, and the only bankruptcy case the U.S. Trustee cites in this respect is *In re Bradley*.[150]

127.    In *Bradley*, the bankruptcy court imposed sanctions against both an attorney and his law firm.  The attorney in *Bradley* was found to have committed a litany of misdeeds; crucially,

---

[148] *Unauthorized Practice of Law Committee v. American Home Assurance Co., Inc.*, 261 S.W.3d 24, 40 (Tex. 2008). In *Unauthorized Practice of Law Committee*, various liability insurers brought suit against a county's unauthorized practice of law committee for a declaratory judgment that use of staff attorneys to represent insureds did not constitute the unauthorized practice of law. The trial court ruled in the committee's favor and the insurers appealed.  The court of appeals reversed and remanded, and the Texas Supreme Court affirmed (as modified) in part and reversed in part. The Texas Supreme Court held that, among other things, such staff attorneys need to fully disclose to an insured his or her affiliation with the liability insurer.

[149] 261 S.W.3d at 40 (citing *Tesco*, 221 S.W.3d at 553) (emphasis added).

[150] 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013).

***all*** of his misconduct concerned the performance of legal services in the course of his employment in respect of cases pending before the bankruptcy court (*e.g.*, he failed to personally meet with the debtors or review their schedules and statements, he filed those documents without the debtors' signatures or authorization, he allowed his assistant to forge the debtors' signatures, and he failed to notify the debtors that he would not attend a hearing and did not adequately prepare his colleague to appear). Not only did the attorney engage in gross misconduct before the court, his firm did, too. The court found that the evidence indicated these "improper practices" were not rare occurrences ***for the firm*** or its attorneys, and that "such practices are directly related to the Firm's poor supervision of its attorneys and other personnel."[151]

128. Accordingly, in *Bradley*, the evidence demonstrated that the firm itself had engaged in misconduct before the bankruptcy court. Although the court stated, in *dicta*, that "[k]nowledge and actions are said to be imputed" to the firm, neither the *Bradley* court nor the cases it relied on construed the term "knowledge" under Bankruptcy Rule 2014 or any other relevant Bankruptcy Code provision.[152] And critically, the *Bradley* court was not asked to impute the attorney's personal knowledge of, or actions taken in, his ***private life*** outside the scope his employment or courtroom conduct. The *Bradley* court's ruling, therefore, stands for the unexceptional proposition that a court may impose sanctions against a law firm for the conduct of its attorneys in the course of their employment in matters pending before that court, particularly where the firm habitually failed to supervise its attorneys.

---

[151] 495 B.R. at 757.

[152] *Id.* at 790-91.

129. Imputation is inapplicable, and the U.S. Trustee's strained application of case law to the instant facts cannot be harmonized with the unambiguous language in the Bankruptcy Code and Rules.

**(b) JW Did Not Violate Any of the Texas Disciplinary Rules of Professional Conduct.**

130. In its "kitchen sink" approach, the U.S. Trustee next points to the Texas Disciplinary Rules of Professional Conduct to fault JW. The U.S. Trustee's attacks fall equally short for several reasons.

131. First, the Disciplinary Rules do not give rise to private causes of action.[153]

132. Second, the Disciplinary Rules the U.S. Trustee cites govern the conduct of individual attorneys, not law firms.[154] So, even if there were a private right of action, the U.S. Trustee could not cite any authority that alleged violations of these Rules by an individual attorney for her secret conduct allow for relief against her former law firm, rather than the culpable attorney herself.

133. And third, the Disciplinary Rules require a showing of ***actual knowledge***.[155] The Rules explain that the terms "*Knowingly*," "*Known*," or "*Knows*" refer to ***actual knowledge*** of the fact in question.[156] Actual knowledge means "something other than constructive or imputed

[153] *Jones v. Blume*, 196 S.W.3d 440, 449 (Tex. App.—Dallas 2006, pet. denied) ("A private cause of action does not exist for violation of the disciplinary rules."); TEX. R. PROF. CONDUCT Preamble, No. 15 ("Violation of a rule does not give rise to a private cause of action nor does it create a presumption that a legal duty to a client has been breached.").

[154] *Compare* Motion, at § IV.C.1 (citing Rule 3.03 ("***A lawyer*** shall not…"), 4.01 ("In the course of representing a client ***a lawyer*** shall not…), 5.01 ("***A lawyer*** shall be subject to discipline because of another lawyer's violation of these rules of professional conduct ***if…the lawyer*** is a partner or supervisory lawyer…), 8.04(a)(6) ("***A lawyer*** shall not…); *with* Rule 5.04(a) ("A ***lawyer or law firm*** shall not…) and TEX. R. PROF. CONDUCT Preamble (separately defining the term "firm" or "law firm").

[156] *See* TEX. R. PROF. CONDUCT, Preamble, "Terminology".

knowledge."[157] It requires "substantial certainty."[158] A hunch, a feeling, or a suspicion are insufficient to prove a disciplinary rule violation.[159] The U.S. Trustee's imputation theory fails.

**(i) JW Did Not Violate Disciplinary Rule 3.03 Requiring Candor.**

134. Disciplinary Rule 3.03(a)(1) prohibits "[a] lawyer" from "***knowingly*** mak[ing] a false statement of material fact or law to a tribunal." This duty has been described as the "duty to disclose material facts; esp[ecially], a lawyer's duty not to allow a tribunal to be misled by false statements, either of law or of fact, that a lawyer ***knows*** to be false."[160]

135. The U.S. Trustee does not claim that JW made a false statement to the Court, nor could he. Instead, relying on the comments to Rule 3.03, the U.S. Trustee argues that certain JW attorneys violated the Rule because "there are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." According to the U.S. Trustee, by failing to disclose Ms. Freeman's relationship with former Judge Jones, JW "effectively made an affirmative

---

[157] *Attorney U v. The Mississippi Bar*, 678 So. 2d 963, 970 (Miss. S. Ct. 1996) (holding that the attorney in question lacked sufficient knowledge—actual knowledge—of another attorney's ethical misconduct to require reporting the misconduct to the appropriate disciplinary authority).

[158] Vincent R. Johnson & Alan Gunn, *Studies in American Tort Law 41* (4th ed. 2009); *see generally* Restatement (Third) of Torts: Liability for Physical & Emotional Harm §1 (2010) (discussing knowledge).

[159] *See, e.g., Tex. Comm. on Prof'l Ethics*, Op. 520, 60 Tex. B.J. 490 (1997) (stating that a violation of Texas Disciplinary Rule 8.03 "requires that a lawyer *have knowledge* (rather than suspicion) that another lawyer has committed a violation of the applicable rules before informing the disciplinary authority. . . . A report of misconduct therefore must be based upon such objective facts that are likely to have evidentiary support." (emphasis in original)); *see also* S.C. Bar Ethics Advisory Comm., Op. 04 (2005), available at 2005 WL 483384 ("[E]ven if Attorney John made the statement about billing 15 hours in one day, Attorney Jane would still have no actual knowledge of a violation, and therefore, would not be required to reopen. Attorney Jane has no ***"firm knowledge"*** of Attorney John schedule, or whether his statement reflects anticipated time to be spent during the evening or already spent on early morning work."); *Conn. Bar Ass'n Comm. on Prof'l Ethics*, Informal Op. 13 (2004) ("Sometimes one has a visceral reaction to conduct that produces a 'feeling' that the conduct ought to be reported. That is a reasonable starting point for sorting things out. But it is not enough."); *Phil. Bar Ass'n Prof. Guidance Comm*., Op. 03 (1997), available at 1997 WL 428087 ("It is important that Rule 8.3(a) addresses ***actual knowledge*** of misconduct and not suspect[ed] misconduct. AB such, since you do not have any *actual knowledge* that any attorney at the defendant law firm had any knowledge of its employees' conduct with respect to the signing and notarization of the Release and Trust Agreement, you are not required . . . to report these facts to the Disciplinary Board."); *see also Restatement (Third) of the Law Governing Lawyers* § 5 cmt. i (2000) ("Knowledge is assessed on an objective standard. It includes more than a suspicion that misconduct has occurred, and mere suspicion does not impose a duty of inquiry.").

[160] Black's Law Dictionary (11th ed. 2019), duty of candor (emphasis added).

misrepresentation and violated the duty of candor."[161] However, in each case the U.S. Trustee cites, the attorney made an affirmative statement the attorney knew to be false or had actual (not imputed or constructive) knowledge of a fact that he or she decided not to disclose.[162] None of the cases hold a law firm responsible for a firm member's ethical violation, let alone a violation based on facts the firm did not know.

136. Turning again to the comments (but not the plain text) of Rule 3.03, the U.S. Trustee claims that JW failed to make a "reasonably diligent inquiry" of its connections, when it failed to uncover Ms. Freeman's and former Judge Jones's intimate relationship—the same relationship that the U.S. Trustee admits was secret.[163] The U.S. Trustee again misses the mark: the Rule requires attorneys to make a "reasonably diligent inquiry" before making factual assertions in open court and in court filings.[164] This does not, however, charge JW with constructive knowledge of facts it might have uncovered through an investigation.[165]

---

[161] Motion, § IV.C.1.

[162] *See id.* (citing *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.,* 23 F.4th 529, 543 (5th Cir. 2022) (sanctions award against attorney for intentionally concealing his financial interest in one of the plaintiffs from corporate disclosures filed with the court remanded to consider when the relationship should have been disclosed and why it would have mattered); *United States v. Gellene,* 182 F.3d 578, 585-86 (7th Cir. 1998) (affirming bankruptcy attorney's criminal conviction for ***knowingly and fraudulently making a false material declaration*** in a bankruptcy case in violation of 18 U.S.C. § 152, and using a document under oath, *knowing* it contained a false material declaration in violation of 18 U.S.C. § 1623); *In re Ronco, In*c. 838 F.2d 212, 218, 220 (7th Cir. 1988) (affirming sanctions against an attorney for seeking a continuance from the district court based on his recent retention on a bankruptcy case without disclosing his prior, extensive involvement in that bankruptcy case); *In re Brown*, 511 B.R. 843, 852 (Bankr. S.D. Tex. 2014) (holding that an attorney violated Disciplinary Rule 3.03 by agreeing to produce his client's phone even though he ***knew*** it was lost but hoped his client could find it)).

[163] *See supra* n.32.

[164] *See* TEX. R. PROF. CONDUCT 3.03, Comment 2; *see also, In re Hickman*, 673 S.W.3d 188, 195 (Tenn. 2023) (lawyer violated his duty of candor by filing pleadings falsely stating that the heir of his client's estate had authorized him to disburse funds from the estate for his fees under an arrangement the heir had not approved); *In the Matter of Foster*, 215 N.E.3d 394, 424-25 (Mass. 2023) (lawyer violated her duty of candor by making affirmative misrepresentations in court filings without conducting a reasonably diligent inquiry of whether the underlying information was true); *Office of Disciplinary Counsel v. Price*, 732 A.2d 599, 174-75 (Pa. 1999) (lawyer violated the duty of candor by filing court documents that contained false allegations based upon rumors, innuendo, and his own perceptions instead of conducting reasonably diligent inquiry).

[165] *Larsen v. Utah State Bar (In re Larsen)*, 379 P.3d 1209, 1213-14 (Utah 2016) (reversing lower court's determination that the lawyer had violated the duty of candor by treating a "misstatement that a reasonably diligent

137. Undeterred by the plain language of the Rule, and citing no legal authority for what a reasonably diligent inquiry should entail, the U.S. Trustee further argues that JW violated its duty of candor because it "adopted a different schedule of material parties than [JW's co-counsel] in preparing its disclosures that failed to include connections with judges." The U.S. Trustee theorizes that if JW had properly analyzed the firm's potential connections to judges like its co-counsel, JW would have uncovered Ms. Freeman's connection to former Judge Jones. But how those disclosures—which identify attorneys of the firm that previously served as law clerks for judges in the district—would have revealed a secret romantic or cohabiting relationship is not and cannot be explained.

138. The Disciplinary Rules place the onus on individual attorneys, not their law firms, to disclose pertinent information that may implicate their ethical duties. When examining attorney conduct for other disciplinary purposes, courts have concluded that a reasonable inquiry has been made if the investigation he or she has undertaken and the conclusions drawn therefrom are reasonable under the circumstances.[166] Ultimately, what is reasonable, is a matter for the court to decide based on the totality of the circumstances.[167] And including judges in disclosure schedules simply would not have revealed the secret Freeman-Jones relationship for any of the Pre-March

inquiry would have avoided" as the legal equivalent of a knowing misstatement in violation of the rules of professional conduct).

[166] *See Chapman & Cole v. Itel Container Int'l B.V.,* 865 F.2d 676, 685-86 (5th Cir. 1989) (examining whether a reasonably diligent inquiry was conducted under Federal Rules 11 and 26 in connection with assessing discovery sanctions); *see also Price*, 732 A.2d at 175-76 (a reasonably diligent inquiry is measured by an objective standard and requires an examination of the factual basis for an assertion made to the court); Advisory Committee's 1983 Note on subd. (g) of Fed. R. Civ. P. 26 ("The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11.").

[167] *Id.*

2022 Cases, and in the Post-March 2022 cases, neither Ms. Freeman nor former Judge Jones would agree to a truthful disclosure which ultimately led to Ms. Freeman's separation from the firm.[168]

139. Next, the U.S. Trustee claims that JW did not exercise sufficient diligence (or haste) to uncover Ms. Freeman's secret intimate relationship with former Judge Jones because it only conferred with an ethics expert and required Ms. Freeman to confirm JW's understanding of the relationship. Not only does the U.S. Trustee ignore that the country was in the midst of an unprecedented viral pandemic in 2020 and 2021, but he also glosses over the myriad steps JW took when the ***allegations*** were first made.[169]

140. As described above, JW identified all connections "to the best of [its] knowledge" when it sought court approval of its employment under section 327 of the Bankruptcy Code. Because Rule 2014 does not require disclosure of connections to judges, JW did not violate any duty of candor by not disclosing a connection it was not required to disclose.

**(ii) JW Did Not Violate Disciplinary Rule 4.1's Prohibition on Knowingly Making False Statements.**

141. Disciplinary Rule 4.01 prohibits a lawyer from knowingly "[i]n the course of representing a client" making a "false statement of material fact or law to a third person" or "fail[ing] to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client."

---

[168] JW maintains a client and conflicts database to screen potential conflicts of interest. In conjunction with the client database, JW maintains a computer software system that enables a user to input the name of an entity, search the client database, and research any related entities that JW currently represents or has represented in the past. JW followed these procedures for each of the challenged cases.

[169] *See*, *supra*, section II.H through II.J.

The comments to Rule 4.01(a) and caselaw affirm that false "statements will violate this Rule, however, only if the lawyer knows they are false and intends thereby to mislead."[170]

142. The U.S. Trustee does not identify a false statement by JW that allegedly violates Rule 4.01. Instead, he accuses JW of violating Rule 4.01 through its "silence in their duty to speak" about the relationship which "was tantamount to a misrepresentation that there was no connection . . . and that would call into question either his independence or Ms. Freeman's and JW's eligibility to serve as counsel under section 327 in cases before Judge Jones."[171] This novel interpretation conflicts with the Rule's plain text: the failure to make a required disclosure only qualifies as a violation of the rule when it "is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client."[172] Neither former Judge Jones nor Ms. Freeman was JW's client; no criminal acts have been alleged. The Rule does not apply.

**(iii) JW Did Not Violate Disciplinary Rule 8.04(6)'s Prohibition on Knowingly Assisting a Judge's Ethical Violation.**

143. Disciplinary Rule 8.04(a)(6) provides that a lawyer shall not knowingly assist a judge or judicial officer in conduct that violates applicable rules of judicial conduct or other law.[173]

144. Without referring to any specific timeframe, the U.S. Trustee alleges that JW violated Rule 8.04 because it knew of the relationship between Ms. Freeman and former

---

[170] *See* TEX. R. PROF. CONDUCT 4.01, cmt. 2; *see also Gonzales v. Dankel*, 2023 WL 1781800 (E.D. Tex. 2023); *In re Adams*, 2020 WL 4922330 (N.D. Tex. 2020).

[171] *See* Motion, § IV.C.2.

[172] TEX. R. PROF. CONDUCT 4.01(a).

[173] Like the other Disciplinary Rules, possessing actual knowledge is required to violate Disciplinary Rule 8.04. *See In re LeBlanc*, 927 So. 2d 315, 318 (La. 2007) (suspending attorney from the practice of law for violating Rule 8.4 of the Louisiana Rules of professional conduct by knowingly making a cash contribution directly to a judge and knowing that the doing so violated his ethical duties); *In re Powell*, 533 N.E.2d 831, 837 (Ill. 1988) (attorney disbarred for knowingly arranging a loan for the judge to curry his favor even though he knew it was wrong); *In re Weishoff*, 382 A.2d 632, 635 (N.J. 1978) (municipal prosecutor was a knowing party to a traffic ticket fixing scheme where the deputy clerk impersonated a defendant in open court to create a false transcript).

Judge Jones but concealed it. According to the U.S. Trustee, this alleged concealment assisted former Judge Jones in violating his ethical duties and obligation to recuse. Because JW lacked actual knowledge of the relationship until March 30, 2022, it could not have knowingly assisted former Judge Jones in any duty he may have had to disclose the relationship or recuse before then. And after March 30, 2022, JW acted reasonably and responsibly and took the various remedial steps described above, which ultimately led to Ms. Freeman's separation from the firm.

**(iv) JW Did Not Violate Texas Disciplinary Rule 5.01 Because the Firm is Not a Partner or Supervisory Lawyer, and in Any Event Acted Reasonably Under the Circumstances.**

145. Texas Disciplinary Rule 5.01 has no application. The Rule subjects a partner and/or supervisory lawyer to discipline under two circumstances: (i) he or she ordered, encouraged, or knowingly allowed the conduct of a ***subordinate lawyer*** which violates the Rules, or (ii) he or she fails to take reasonable remedial action which avoids or mitigates the consequences of the violation, once the violation becomes known to the partner or supervising lawyer.

146. As set forth above, JW, a law firm, is not an individual supervisory lawyer or partner whose conduct is governed by Rule 5.01. The Rule does not apply and even if it did, the partner or supervisory lawyer must have actual knowledge of the supervised lawyer's violation to be subject to discipline. Moreover, the comments to Rule 5.01 explain that whether appropriate remedial action has been taken depends on many factors, including the partner or supervisory lawyer's involvement, and the nature of the actions that could be reasonably be taken under the circumstances to avoid or mitigate injurious consequences.[174]

[174] TEX. R. PROF. CONDUCT 5.01, Comment 4 ("[t]he duty imposed upon the partner or other authoritative lawyer by Rule 5.01(b) is to take reasonable remedial action to avoid or mitigate the consequences of the other lawyer's known violation. Appropriate remedial action by a partner or other supervisory lawyer would depend on many factors, such as the immediacy of the partner's or supervisory lawyer's knowledge and involvement, the nature of the action that can reasonably be expected to avoid or mitigate injurious consequences, and the seriousness of the anticipated

147. JW lacked actual knowledge of the secret Freeman-Jones relationship until March 30, 2022, and once JW learned of the relationship, JW moved to exit Ms. Freeman from the firm.

**B. JW Cannot be Held Liable for Former Judge Jones's Misconduct.**

148. The U.S. Trustee argues that JW's retention and compensation orders should be vacated because former Judge Jones was disqualified under section 455 of title 28 of the U.S. Code from presiding over cases (or serving as a mediator pursuant to Local Rule 16.4) where JW served as estate-retained counsel or, at a minimum, that he was disqualified from approving JW's retention and fee applications under the Bankruptcy Rules 5002 and 5004(b), respectively.[175] The U.S. Trustee effectively asks this Court to hold JW liable for former Judge Jones's alleged violations.

149. Under section 455(a), former Judge Jones was required to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[176] Under section 455(a), "[t]he test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal [or further disclosure] was sought would entertain a significant doubt about the [Judge Jones's] impartiality."[177] The Motion does not set forth the specific facts needed to evaluate former Judge Jones's alleged failure to recuse under section 455(a) or any other purportedly applicable Bankruptcy Rule or Local Rule.[178] Judicial

consequences. In some circumstances, it may be sufficient for a junior partner to refer the ethical problem directly to a designated senior partner or a management committee.").

[175] *See* Motion, § IV.A.

[176] 28 U.S.C. § 455(a).

[177] *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523 (11th Cir. 1988).

[178] For example, any recusal grounded in former Judge Jones's relationship with Ms. Freeman would need to explain the exact nature of that relationship at ***each*** relevant time in ***each*** challenged case. Each "example case" the U.S. Trustee highlights in the Motion, however, concerns allegations related to events that happened ***after*** March 2022,

impropriety, however, does not mandate vacatur under section 455 or Rule 60(b)(6).[179] Courts examine the specific facts and circumstances of the case to determine whether vacatur is warranted,[180] or whether the failure to recuse was "harmless error." The same reasoning applies to alleged violations of Bankruptcy Rules 5002 and 5004(b).[181] The Fifth Circuit applies the "harmless error" test through consideration of the following factors established by the Supreme Court in *Liljeberg v. Health Services Acquisition Corp.*: (a) the risk of injustice to the parties in this particular case, (b) the risk that the denial of relief will produce injustice in other cases, and (c) the risk of undermining the public's confidence in the judicial process.[182]

150. JW submits that, in light of the undisputed facts, equities, and the totality of the circumstances in each of the challenged cases, the entry of orders approving JW's retention and compensation, whether by former Judge Jones or by this Court after its independent review, is the paradigmatic example of "harmless error."

**i. There is No Risk of Injustice to the Parties in the Challenged Cases.**

151. As to the first *Liljeberg* factor, there is no risk of injustice to the U.S. Trustee, any debtor or reorganized debtor, or any other parties in any of the challenged cases if the Motion is denied.

---

when Ms. Freeman finally admitted to JW that she was then in a romantic relationship with former Judge Jones (but continued to hide that they lived or owned property together).

[179] *See, e.g., Air Line Pilots Assoc., Int'l v. Cont'l Airlines, Inc. (In re Cont'l Airlines Corp.)*, 901 F.2d 1259, 1263 (5th Cir. 1990). *See also Patterson v. Mobil Corp*., 335 F.3d 476, 484 (5th Cir. 2003) ("Although we conclude that Judge Cobb should have stood recused under § 455(a), we do not automatically vacate the rulings issued after he should have recused himself").

[180] *See, e.g., Obduskey v. Wells Fargo*, No. 22-1156, 2023 WL 1831128, at *11 (10th Cir. Feb. 9, 2023) ("The circumstances of this case do not present a risk of injustice to Obduskey or to litigants in other cases, nor do they risk undermining public confidence in the judicial system.").

[181] The U.S. Trustee does not cite any authority for the proposition that a bankruptcy judge's violation of either Bankruptcy Rule 5002 or Bankruptcy Rule 5004(b) mandates vacatur of the applicable order or judgment. Although, for reasons discussed in greater detail section III.B.v below, on the current record in these cases, neither Bankruptcy Rule 5002 nor 5004(b) applied to JW's retention or fee applications in the challenged cases.

[182] 486 U.S. 847 (1988). *See Patterson*, 335 F.3d at 485; *Cont'l Airlines*., 901 F.2d at 1263.

152. The U.S. Trustee does not identify any substantive ruling in the cases that was prejudiced, biased, or in any way impacted by any alleged secret intimate relationship. And for good reason—all such rulings were supported by the facts and circumstances of each case, applicable law, and the evidentiary record. Additionally, the U.S. Trustee does not and cannot dispute that JW provided the services for which it was paid and that such services were reasonable, necessary, and benefitted the debtors, their estates, and their stakeholders. Indeed, nothing in the Motion demonstrates (or even alleges) that JW or the orders approving its retention and compensation caused any specific, direct or indirect harm to any debtors, their estates, or any other party in interest in any way. JW's retention and compensation orders, along with every other order former Judge Jones entered in the cases he presided over, were entered only after the U.S. Trustee, the debtors' creditors and other stakeholders (most of whom were sophisticated, well-represented financial companies), and all other parties entitled to notice were given an opportunity to be heard. Not one objection was filed to a JW retention or fee application in the challenged cases.[183]

153. As set forth herein and in the exhibits hereto, the resolutions reached in each of the cases were, uniformly, held to be in the best interests of the applicable estates (often through a chapter 11 plan that was either consensual, broadly supported, or that did not impair trade creditors). The U.S. Trustee's argument that former Judge Jones's secret relationship tainted ***all proceedings***—while consistent with his "kitchen sink" approach—is unsupported by the record. Indeed, if the U.S. Trustee's arguments are correct, then nearly every order entered in all of the

[183] As discussed in section III.B.vi below, the risk to parties (and the other risks addressed through the *Liljeberg* factors) in the challenged cases is even lower in Mediation Cases. In the Mediation Cases, ***this Court***, not former Judge Jones, independently considered the facts, evidence, and numerous arm's-length, negotiated settlements reached among the stakeholders and entered all orders in the applicable Mediation Cases (including the applicable confirmation orders) based upon its independent judgment and consideration of the foregoing. In the Mediation Cases, former Judge Jones had no oversight or approval of JW's retention and fee orders, all of which were entered by an impartial judge after his own independent review.

cases that former Judge Jones presided over, and all settlements reached in connection with any mediation former Judge Jones participated in, are equally tainted and should be vacated—not just the small fraction of orders that the Motion seeks to vacate. No party—even the U.S. Trustee—would argue that disturbing the resolutions of any other issues in the challenged cases would benefit any of the estates. The truth is that neither the U.S. Trustee nor any other party in interest has mustered any evidence that the "playing field" was at all "unlevel" or that it would be "manifestly unjust" if JW's retention and compensation orders are allowed to stand.

**ii. There is No Risk of Injustice in Other Chapter 11 Cases.**

154. As to the second *Liljeberg* factor, there is no risk of injustice in other chapter 11 cases if the Motion is denied.

155. The U.S. Trustee has filed separate, but nearly identical, Motions in 33 different cases. The relief requested in the U.S. Trustee's Motion falls within the Court's broad discretion and requires the U.S. Trustee to demonstrate—***in each case***—that "extraordinary circumstances" mandate vacatur because orders approving JW's retention and fee applications were "manifestly unjust."[184]

156. Here, denial of the U.S. Trustee's Motion is ***not*** an endorsement of Judge Jones's misconduct, or the alleged conduct of Ms. Freeman or any other person. Former Judge Jones and his secret intimate relationship with Ms. Freeman have been fodder for national newspapers, launched disciplinary proceedings in the Fifth Circuit Court of Appeals, led to former Judge Jones's resignation, and spawned a number of proceedings in this Court, the U.S. District Court for the Western District of Texas, and the U.S. District Court for the Southern District of

[184] *See, e.g.*, *In re Roman Cath. Church of Archdiocese of New Orlean*s, No. 22-30539, 2024 WL 2125507, at *5 (5th Cir. May 13, 2024) (finding that the second *Liljeberg* factor counseled against vacatur where purportedly related cases were "not mutually dependent such that the disposition of one would necessarily control the disposition of the other.").

Texas. No reasonable person (let alone any mediator, arbitrator, judge, or attorney) would interpret this Court's denial of the Motion as a license to ignore disclosure obligations or a tacit endorsement of former Judge Jones's alleged misconduct and non-disclosure.[185] Particularly where JW, the target of the Motion, had no knowledge of the judge's misconduct or his secret relationship with a JW partner during the majority of the challenged cases.

157. That is particularly true here, where no party has even ***alleged*** that former Judge Jones or JW "acted inappropriately or ineffectively" in the performance of their respective duties; no party objected to the substance of JW's retention or fee applications; no party has sought to vacate any other underlying orders in the challenged cases, including any confirmation orders; no party has challenged any of the settlements in the cases that culminated in confirmed plans; no party has alleged that either the confirmed plans or related settlements were not in the best interests of the estates and consistent with the Bankruptcy Code; no party has identified a single order, ruling, or judgment that has been alleged to have been entered in error or otherwise unsupported by the facts and evidentiary record; and no party has alleged that any of the estates have suffered any actual harm due to the alleged non-disclosure of the Freeman-Jones relationship.

**iii. Public Confidence Will Not be Undermined if Relief is Denied.**

158. As to the final *Liljeberg* factor, the public's confidence in bankruptcy judges or the bankruptcy process generally would not be undermined if the Motion is denied.

159. In evaluating the *Liljeberg* factors, particularly the third factor, courts should consider context and all relevant circumstances bearing on the entry of a judgment and its vacatur.

---

[185] *See, e.g., CEATS, Inv. v. Continental Airlines, Inc.*, 755 F.3d 1356, 1366 (Fed. Cir. 2014) ("We find it unlikely that mediators will simply ignore their disclosure obligations if we deny relief here. To the contrary, our decision serves to reinforce the broad disclosure rules for mediators by holding that Faulkner had a duty to disclose in this case. The mere fact that the final judgment after a full jury trial will not be overturned every time a mediator fails to disclose a potential conflict is not likely to affect the disclosure decisions of other mediators.").

Here, the undisputed facts and circumstances make clear that ***granting*** the Motion in the challenged cases would undermine public confidence in this Court and its administration of chapter 11 cases.

160. The U.S. Trustee does not—and cannot—dispute any of the following specific facts and circumstances of the challenged cases (set forth in greater detail in Exhibits 2 and 3 hereto):

- the debtors' restructurings, as embodied in the applicable plans and confirmation orders (or, in the *LaForta* case, the dismissal order), were the product of months of hard-fought and arm's-length negotiations among the debtors' primary stakeholders and their respective professionals and advisors (including JW);
- the debtors' confirmed plans, among other things, strengthened their respective balance sheets and set them up for long-term financial success;
- 23 of the 33 challenged cases have been substantially administered or closed for months, if not years, before any credible allegations were made against former Judge Jones;
- the confirmation orders bind the debtors, the reorganized debtors, and all parties in interest (including the U.S. Trustee) and have the weight of a final judgment, *res judicata* as to matters covered by their respective terms;[186]
- JW most often served in a limited role as local counsel, and in that capacity generally incurred fees and expenses that were far lower than those incurred by its clients' lead counsel and other estate-retained professionals;
- various challenged cases already included voluntary fee reductions or professional-fee settlements;
- JW's retention and fee applications in all of the challenged cases were approved without objection by the U.S. Trustee or any other party in interest;
- neither the U.S. Trustee nor any other party has disputed that JW's fees and expenses were reasonable, necessary, and beneficial to the estates in any of the challenged cases, or that JW's retention and compensation orders were erroneously entered;

[186] *See Manges v. Seattle-First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1039 (5th Cir. 1994); *Eubanks v. Federal Deposit Ins. Corp.*, 977 F.2d 166, 171 (5th Cir. 1992).

- the U.S. Trustee has not (and cannot) identify a single order, ruling or judgment has been alleged to have been entered in error and/or otherwise unsupported by the facts and evidentiary record;
- the U.S. Trustee has not (and cannot) identify any actual harm suffered by any of the estates due to the Freeman-Jones relationship or its alleged non-disclosure;
- in respect of the Pre-March 2022 Cases, the U.S. Trustee has not (and cannot) plead any credible allegations that JW had actual knowledge of any alleged secret intimate relationship before the debtors emerged from chapter 11 or while JW performed legal services for the estates (to the extent any such relationship did exist during this period); and
- in respect of the Post-March 2022 Cases, JW acted reasonably in its efforts to comply with any disclosure requirements under applicable law in the applicable challenged cases.

161. The U.S. Trustee ignores these "specific facts" in each of the challenged cases as well as those set forth in Exhibits 2 and 3 hereto. The Motion does not include a single allegation that, if true, would ***require*** the Court to vacate any orders approving JW's retention and compensation under applicable law. Vacatur would be tantamount to disqualification, which is not, and would never have been, the appropriate remedy. The system was designed for former Judge Jones to do the right thing: disclose or recuse, and have the case, mediation, or application transferred to another judge or mediator.[187] The system failed, not because of JW's behavior, but because two people put their personal interests above their obligations to others—including JW.

162. The integrity of the bankruptcy process is paramount indeed, but integrity would not be restored by punishing a law firm that helped to effectively and efficiently shepherd its clients through chapter 11, consummating in each case a restructuring or other resolution that was—as a matter of law—in the best interests of the applicable estate.[188] JW did the work in each case, and

[187] *See, e.g., MacNeil Bros. Co. v. Cohen*, 264 F.2d 186 (1st Cir. 1959) (finding that, even when an appellate judge is disqualified for relation or connection with a party or attorney, the remedy is assignment of another judge to sit in his or her place).

[188] *See* **Exhibits 2 & 3**.

JW earned its fees in each case. The Fifth Circuit has long recognized that "the public will ***lose faith*** in our system of justice" where a judgment is "overturned without regard to the ***merits*** of" the underlying claims.[189] There was not a whisper of impropriety, favoritism, or misconduct in the vast majority of cases.[190] And when Ms. Freeman finally came clean, JW acted promptly to address the issue and, ultimately, required that Ms. Freeman separate from the firm. Under these circumstances, vacating JW's retention and compensation orders (or denying JW's pending fee applications) would be manifestly unjust and, ultimately, "contribute to the public's distrust in our system of justice."[191]

**iv. Subsection 455(b) of the Judicial Code Does Not Apply.**

163. The U.S. Trustee also argues that former Judge Jones was disqualified under section 455(b), which provides that a judge must recuse when his "spouse . . . is acting as a lawyer in the proceeding . . . [or] [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."[192]

164. As to section 455(b), the U.S. Trustee recognizes that former Judge Jones and Ms. Freeman were not married at any time; nonetheless, he argues that Ms. Freeman should be treated as a "spouse" under section 455(b)(5). A spouse, however, is a married person.[193] The

---

[189] *Parker*, 855 F.2d at 1527 (emphasis added); *see also Cont'l Airlines*, 901 F.2d at 1263 ("We are aware of the high profile the Continental bankruptcy has had before the public and that the circumstances surrounding Judge Roberts's retirement from the bench have not gone unnoticed by the press. That we have ruled Judge Roberts's actions to be violative of Section 455(a) should serve to restore some of any public confidence lost as a result of the violation; whether vacating the orders granting summary judgment for the sake of appearances alone would help or hinder the restorative process, however, is not clear.").

[190] Notably, the first time any person alleged that a Freeman-Jones relationship existed came from Mr. Van Deelen, whose claims were found to be "scurrilous" and an "***unsupported character assassination [that] has no place in any court proceeding and cannot be grounds for recusal***." *See* Appeal No. 4:21-cv-3369, Dkt. No. 102 at pp. 37-38 (emphasis added).

[191] *Id.* (emphasis added).

[192] 28 U.S.C. § 455(b)(5)(ii) and (iii).

[193] *See* "Spouse" definition, *Black's Law Dictionary* (11th ed. 2019) ("One's husband or wife by lawful marriage; a married person.").

analysis begins and ends there, and the U.S. Trustee cites no case for the proposition that the term "spouse" means anything other than a married person. Codes of conduct and related materials cited in the Motion are not law. If section 455(b)'s language should be revised to reflect contemporary norms and expectations, Congress alone has the power to do so.

165. To this point, the U.S. Trustee principally relies on Commentary to the Code of Conduct for United States Judges and a related Advisory Opinion regarding Judicial Canon 3C from the Committee on Codes of Conduct.[194] First, although Canon 3C closely tracks section 455, the Advisory Opinion makes clear that "the Committee is not authorized to render advisory opinions interpreting [section 455]."[195] Second, Canon 3C's Commentary states that recusal considerations applicable to a judge's spouse should also be considered with respect to a person "other than a spouse with whom the judge maintains ***both*** a household ***and*** intimate relationship,"[196] which would create a two-part test to determine whether Canon 3C should apply. But nothing in the Motion demonstrates if or when both requirements were met in any case. Moreover, while the Advisory Opinion provides that recusal considerations under certain provisions of Canon 3C may be different where the judge's spouse is an "equity partner" versus a "non-equity" partner, the Motion glosses over the fact that Ms. Freeman did not become an equity partner until January 1, 2021 (yet, the Motion seeks the return of all compensation awarded to JW as early as July 2018). Accordingly, even if the Court were to find these materials relevant to its determination under section 455, the U.S. Trustee has failed to show that the relevant provisions

---

[194] *See* Motion, § IV.A.1.

[195] Advisory Opinion 58, available at https://www.uscourts.gov/file/25673/download.

[196] Code of Conduct for United States Judges, Canon 3C Commentary (effective Mar. 12, 2019). The Motion includes citations to various other ABA model codes and opinions, which are substantially similar to the provisions of the Code of Conduct for United States Judges.

in Canon 3C would apply.[197] And critically, although the U.S. Trustee relies on the Fifth Circuit's decision in *Potashnick v. Port City Const. Co.* to argue that Advisory Opinion 58 applies, *Potashnick* was issued ***before*** the Supreme Court held in *Liljeberg* that the "harmless error" analysis applies to recusal violations.[198]

**v. Bankruptcy Rules 5002 and 5004 Do Not Apply to Former Judge Jones's Approval of Any JW Retention or Fee Applications.**

166. In addition to incorporating section 455, the Bankruptcy Rules provide that a bankruptcy judge shall not approve the retention or compensation of certain individuals and their firms. The U.S. Trustee argues that, under Bankruptcy Rules 5002 and 5004, Judge Jones was prohibited from approving JW's retention and fee applications because either Ms. Freeman "should have been treated as a 'relative'" under the rule or, alternatively, "Ms. Freeman was so connected to Judge Jones given their relationship—and, therefore, so was [JW]—'as to render it improper' for [him] to have approved" JW's employment while Ms. Freeman was a partner.[199] In making his argument, the U.S. Trustee again ignores the plain meaning of the governing texts and the rules to invent bases for punishing JW for the actions of others.

167. Bankruptcy Rule 5002(a) provides, in relevant part, that "[t]he employment of an ***individual*** as an attorney, . . . pursuant to §§ 327, 1103, or 1114 shall not be approved by the court if the individual is a ***relative*** of the bankruptcy judge approving the employment."[200] Unlike Bankruptcy Rule 2014, a judge's relationship with a relative is expressly imputed to a relative's firm and all of its professionals under Bankruptcy Rule 5002(a), which states that when "an

[197] If, however, the Court ultimately determines that Judge Jones violated any provision of section 455(b), as set forth in sections III.B.i-iii above, the approval of JW's retention and fee applications was nevertheless "harmless error" in each of the challenged cases. *See Roberts v. Wal-Mart Louisiana, L.L.C.*, 54 F.4th 852, 854 (5th Cir. 2022).

[198] *See* 609 F.2d 1101 (5th Cir. 1980); *Liljeberg*, 486 U.S. 847.

[199] Motion, § IV.A.3.

[200] *Id.* (emphasis added).

individual may not be approved for appointment or employment [under Bankruptcy Rule 5002(a)], the individual's firm, partnership, corporation, or any other form of business association or relationship, and all members, associates and professional employees thereof also may not be approved for appointment or employment."[201]

168. The Bankruptcy Code defines "relative" as an "individual related by ***affinity*** or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree."[202] "Affinity," as a legal term, means a "relationship resulting from a marriage."[203] Therefore, under the Bankruptcy Code and Rules, an individual is a "relative" of a bankruptcy judge if they are related by blood or marriage.[204] Case law construing the term under the Bankruptcy Code, as well as under Texas state law, is generally in accord.[205]

---

[201] FED. R. BANKR. P. 5002(a).

[202] 11 U.S.C. § 101(45) (emphasis added).

[203] "Affinity" definition, *Black's Law Dictionary* (11th ed. 2019) ("1. A close agreement. 2. The relation that one spouse has to the blood relatives of the other spouse; relationship by marriage. 3. Any familial relation resulting from a marriage."); *see also, e.g.*, "Quasi-affinity" definition, *id.* ("The affinity existing between two persons, one of whom has been engaged to a relative of the other."); "Relative" definition, *id.* ("A person connected with another by blood or affinity; a person who is kin with another"); "Relative by affinity" definition, *id.* ("Someone who is related solely as the result of a marriage and not by blood or adoption. • A person is a relative by affinity (1) to any blood or adopted relative of his or her spouse, and (2) to any spouse of his or her blood and adopted relatives. Based on the theory that marriage makes two people one, the relatives of each spouse become the other spouse's relatives by affinity.").

[204] The Motion cites only one case in support of the argument that "relative" under the Bankruptcy Code should include parties Congress excluded from its definition. That case is factually inapposite but also generally in accord with cases holding that "affinity" refers to a relationship by marriage. *See Loftis v. Minar (In re Montanino)*, 15 B.R. 307 (Bankr. D.N.J. 1981). In *Montanino*, the bankruptcy court considered whether the parents of the debtor's live-in fiancée were "insiders" for purposes of Bankruptcy Code section 547. The court found that "Congress did not intend to limit the classification of insiders to relatives by marriage or consanguinity" and further noted that a deed used to execute a fraudulent transfer of real property stated that "this is a conveyance between relatives." In that context, the court found that the debtor's ***fiancée***—not her parents—fit within the Bankruptcy Code's definitions of "relative," but further found that, under the circumstances, the fiancée's parents were "insiders" under section 547. And notably, the challenged deed included a recital stating that "[t]his is a conveyance between relatives." Moreover, a later decision by the same bankruptcy court confirmed that a "relative" under section 101(34) must be related by blood or by marriage. *In re Hill*, 342 B.R. 183, 199 ("A spouse of a debtor would be a relative because the definition includes relationships by affinity. A former spouse, however, is not related by affinity, and therefore 'a former spouse will not be considered a relative.'") (Bankr. D.N.J. 2006).

[205] *See, e.g., In re Wibracht*, Case No. 21-50477-CAG, 2022 WL 981781, at *10 (Bankr. W.D. Tex. 2022) ("The Court will therefore conclude that a relative is a person connected to another by blood or marriage"), vacated and remanded

169. The U.S. Trustee (despite arguing that Ms. Freeman has been, at different times, either a "spouse" or a former "spouse") has not alleged that Ms. Freeman and Judge Jones were ever married; thus, Ms. Freeman was not a "relative" under section 101(34). Accordingly, Bankruptcy Rule 5002(a)'s imputation provision did not apply and former Judge Jones was not prohibited from approving JW's retention applications.

170. Bankruptcy Rule 5002(b) and 5004(b) also prohibit bankruptcy judges from approving certain other employment applications and fee applications. Under those rules, a judge cannot approve a law firm's employment application if ***that law firm*** is or was closely connected to the judge, and a judge cannot approve a law firm's fee application if ***that law firm*** is a "relative" of or closely connected with the judge.[206] Consistent with the Court's holding in *Cygnus*, under the plain language of these rules, JW—not Ms. Freeman—is the "person" that sought employment under section 327 (or section 1103, as applicable) and the "person" that sought the allowance of compensation under the Bankruptcy Code. And unlike Bankruptcy Rule 5002(a), neither Bankruptcy Rule 5002(b) nor 5004(b) impute the judge's relationship with any individual attorney to his or her firm.

**vi. In the Mediation Cases, JW's Retention and Fee Applications were Subject to Independent Review and Approval.**

171. With respect to the Mediation Cases that are the subject of the U.S. Trustee's challenge, the U.S. Trustee argues that, under Local Rules and other guidelines, former

---

on other grounds, No. SA-21-50477-CAG, 2022 WL 16825193 (W.D. Tex. Nov. 8, 2022); *see also, e.g., Curtis v. The Chapman Family Trust (In re Chapman)*, 628 B.R. 512, (Bankr. S.D. Tex. 2021) (noting that, under Fifth Circuit law, "divorce terminates the marital relation") (citing *In re Holloway*, 955 F.2d 1008 (5th Cir. 1992)).

[206] Bankruptcy Rule 5002(b) provides, in relevant part, that "[a] bankruptcy judge may not . . . approve the ***employment of a person*** as an attorney,. . . pursuant to §§ 327, 1103, or 1114 of the Code ***if that person*** is or has been so connected with such judge . . . as to render the . . . employment improper." FED. R. BANKR. P. 5002(b) (emphasis added). Bankruptcy Rule 5004(b) provides that "[a] bankruptcy judge shall be disqualified from allowing compensation ***to a person who is a relative*** of the bankruptcy judge ***or*** with whom the judge is ***so connected*** as to render it improper for the judge to authorize such compensation." FED. R. BANKR. P. 5004(b) (emphasis added).

Judge Jones should have disclosed his relationship with Ms. Freeman or declined his appointment. Even assuming, *arguendo*, that this argument is correct, the U.S. Trustee cannot meet his burden.

172. In each of the Mediation Cases, the U.S. Trustee has not, and cannot, dispute the following facts:

- after the debtors consulted with the applicable stakeholders, all such parties consented to former Judge Jones's appointment to mediate disputes among them (typically, concerning the debtors' economic restructuring and plan-related matters);
- all mediation participants were sophisticated parties (including large financial or investment companies) represented by experienced restructuring professionals;
- the mediations were successful, and helped the applicable debtors and other mediation parties negotiate and formulate a chapter 11 plan that, after the Court's independent review and analysis, was confirmed and found to be in the best interests of the applicable estates;
- although former Judge Jones, as mediator, provided "assistance," "facilitation," and "oversight," he did not—and could not—force any result and had no power to bind parties;
- no mediation party alleged that Judge Jones was biased or otherwise behaved inappropriately in connection with the mediation, misused confidential information, or that the applicable estates or any stakeholder's interest were harmed;[207]
- as discussed in section III.A.iv above, JW could not disclose a fact that it did not know and, therefore, could not have raised an issue "concerning

[207] *CEATS*, 755 F.3d at 1367. The U.S. Trustee's statement that "[w]hether or not the mediation was successful or anyone in fact challenged the result is irrelevant" is flatly wrong under applicable law. Altera Motion ¶ 124 n.12. The Fifth Circuit and other courts, in evaluating whether to vacate judgment for judicial impropriety, routinely focus on the substance of the subject judgment and the actual conduct and results in the subject proceeding. *See, e.g., id.*; *Wal-Mart*, 54 F.4th at 854 (finding that, under a harmless-error analysis, the district court judge's "ruling was based on firm legal principles, there is no evidence of bias or favor, and [the appellant] neither appealed Judge Doherty's decision at the time nor refiled her state law claims in state court within the time permitted her."). The U.S. Trustee instead relies on the wholly inapplicable decision in *Clark v. Kapila.* In that case, the court found that vacatur was appropriate because the "***error was not harmless***" where the bankruptcy judge, in an apparent change of position, "suddenly grant[ed]" a request for imposing an injunctions and sanctions after the requesting "firm had hired the judge's fiancée." 612 B.R. 808, 819 (Bankr. S.D. Fla. 2019). Again, neither the U.S. Trustee nor any other party has alleged that Judge Jones's secret intimate relationship affected his performance in the administration of any bankruptcy case or mediation—including in respect of the approval of JW's retention and fee applications.

potential ADR provider conflicts" under Local Rule 16.4.I(2) in any Pre-March 2022 Cases; and

- former Judge Jones had no oversight or approval rights in respect of JW's retention or fee applications, all of which were entered by a different Court after its own, independent review, and without objection as to reasonableness by the U.S. Trustee or any other party in interest.[208]

173. The evidence in the Mediation Cases shows that the debtors and the other mediation parties got precisely what they bargained for: a value-maximizing restructuring implemented through a confirmed plan that the debtors and their stakeholders, in many cases, still benefit from today.[209] Indeed, neither the U.S. Trustee nor any other party has sought to vacate any confirmation order or otherwise undo any other substantive ruling or mediated settlement reached in any of the Mediation Cases.[210]

174. Given that former Judge Jones did not participate in or influence this Court's approval of JW's retention and fee applications or otherwise issue a single ruling, decision, order, or judgment in the Mediation Cases, let alone a ruling, decision, or judgment alleged to have been tainted or biased in any way, JW submits that vacating its retention and compensation orders in the Mediation Cases would be particularly harmful and would only "contribute to the public's distrust in our system of justice."[211] Contrary to the U.S. Trustee's position, what ***actually*** happened and whether there was ***actual harm*** is central to the Court's inquiry, particularly under

---

[208] *See, e.g., Wal-Mart*, 54 F. 4th at 854 ("On fresh review, we conclude likewise that after "a careful study . . . of the merits," there is no "risk of injustice to the parties in th[is] particular case.").

[209] *See In re Tailored Brands, Inc.*, Case No. 20-33900 (MI) [Dkt. No. 1268] Nov. 13, 2020 Hr'g Tr. at pp. 18:4-6 & 18:19-24 (Bankr. S.D. Tex.) (The Court: I just want—and I am serious about what will sound like a joke, which is that ***credit goes to the professionals in the case and not to Judge Jones. I got it that he was helpful, but it's because of professionals in the case that in every instance—that's what enables mediation to work. It's not the personality of the judge or that he stays up late***.") (emphasis added).

[210] Indeed, *res judicata* and estoppel principles bar parties from contending that the various plans, or any agreements provided for in the plans, was anything other than "value maximizing" and in the "best interest of the estates." *See Eubanks*, 977 F.2d at 171.

[211] *Id.* (emphasis added).

Rule 60(b). The Federal Circuit's decision in *CEATS, Inv. v. Continental Airlines, Inc.* is instructive, and is the only court to analyze whether a mediator's failure to recuse pursuant to section 455 constitutes "extraordinary circumstances" under Rule 60(b)(6).

175. In *CEATS*, former magistrate judge Robert Faulkner was appointed to mediate a patent-infringement suit filed by CEATS in the U.S. District Court for the Eastern District of Texas. The parties failed to reach a settlement after two mediation sessions and proceeded to trial (during which additional mediations sessions occurred, but also failed) and, ultimately, a jury found that CEATS's patents were "infringed, but invalid." CEATS later learned through a news article that both Faulkner and Fish & Richardson P.C., counsel for certain defendants in the infringement suit, were co-defendants in an unrelated action in Texas state court alleging that Faulkner and Fish breached an "arbitration agreement and fraudulently concealed the [Faulkner-Fish] relationship."[212] CEATS then sought relief from the district court's judgment under Rule 60(b)(6) based on Faulkner's failure to disclose a relationship with Fish.[213] The court held that, while Faulkner, as mediator, violated his duty to disclose, CEATS was not entitled to relief from judgment under the *Liljeberg* factors; thus, the Court of Appeals affirmed the district court's ***denial***

[212] The unrelated action arose out of Faulkner and Fish's role in a separate partnership-dispute litigation also pending in Texas state court. In the underlying partnership-dispute action, Fish represented a party in a partnership dispute where Faulkner served as court-appointed arbitrator. Faulkner disclosed that he previously had participated in arbitrations and mediations with the named Fish attorneys, but did not disclosed other contacts with Fish or its attorneys. Faulkner later issued a $22 million award in favor of Fish's client, including $6 million in attorney's fees. Opposing counsel in that case learned that Faulkner, Fish, and a certain Fish attorney failed to disclose the true nature and extent of their relationship. Arguments concerning Faulkner's non-disclosure in the Texas state court action occurred ***during*** the CEATS infringement litigation. Indeed, "[o]n June 28, 2011—between the first two mediation sessions in [the CEATS infringement litigation]," the Texas court of appeals vacated the arbitration award finding that "Faulkner's failure to disclose . . . violated his obligations as an arbitrator and tainted" the award. *See* 755 F.3d at 1359.

[213] CEATS also sought relief from judgment under Rule 60(b)(3) related to Fish's failure to disclose the same facts. CEATS, however, conceded "that there is nothing in the record that shows it was not given a full and fair opportunity to present its case" and the district court denied the request for Rule 60(b)(3) relief, finding that "60(b)(3) standard clearly requires the movant to have to be able to show and demonstrate some impact on their ability to have a full and fair trial." The Court of Appeals affirmed.

of the Rule 60(b) motion. In its reasoning, the court determined, among other things, that there was no "meaningful risk of injustice" because (a) CEATS was "ultimately was able to fully and fairly present its case before an impartial judge and jury"; (b) it was "unlikely that mediators will simply ignore their disclosure obligations" if the Rule 60(b) motion were denied; and (c) there was limited "risk of undermining public confidence," given that CEATS "had the opportunity to present its case to a neutral judge and jury. . . ."[214]

176. Similarly, here all parties in interest in the Mediation Cases had the opportunity to dispute any agreements or settlements reached (and, in some cases, actually did so), and such agreements were approved by an impartial judge based on the facts and evidentiary record, all of which complied with applicable law. Setting aside JW's retention and compensation orders, or any other order entered in the Mediation Cases, would not serve any legitimate purpose.

### C. The Unprecedented Facts, Mitigating Circumstances, and Overall Equities Do not Warrant Sanctions Amounting to 100% of the Fees and Expenses Paid to JW in All of the Challenged Cases.

177. The U.S. Trustee, relying on section 328(c) of the Bankruptcy Code and the Court's inherent authority, urges the Court to vacate ***all*** retention and fee orders and sanction JW for 100% of all fees and expenses paid by the 33 bankruptcy estates to JW for services JW indisputably performed. Neither section 328(c) nor the Court's inherent authority justify the request under the facts and circumstances alleged here.

178. Section 328(c) authorizes the Court to deny compensation for estate retained professionals ***only*** if "at any time ***during such professional person's employment under section 327 or 1103 of this title***, such professional person is not a disinterested person, or represents or holds an adverse interest to the estate with respect to the matter on which such professional person

[214] *CEATS*, 755 F.3d at 1367.

is employed." 11 U.S.C. § 328(c) (emphasis added). In emphasizing the phrase "at any time" in section 328(c),[215] the U.S. Trustee misconstrues the temporal limitation of the statute. Even if the U.S. Trustee's allegations were proven to be true, the statute does not allow for compensation to be denied for a relationship that arose after a professional's employment has concluded. The scope of section 328(c) is, by its plain text, limited to whether JW was disinterested or held an adverse interest ***while JW was employed as a professional in the chapter 11 case***.[216] The various confirmed plans confirm this textual interpretation: professionals need not comply with sections 327 through 331 and 1103 of the Bankruptcy Code as of the confirmation date.[217] If the U.S. Trustee viewed this differently, he should have objected on this ground and/or appealed the entry of the confirmation orders. He did neither.

179. Here, of course, for the Pre-March 2022 Cases, JW was disinterested and did not hold an adverse interest.[218] JW did not have knowledge of any ongoing intimate relationship between Ms. Freeman and former Judge Jones at any time up until March 30, 2022, and Ms. Freeman's own personal knowledge of any relationship prior to that time cannot be imputed to JW for the reasons discussed above.[219] While JW was informed of a past relationship in March 2021, there was nothing for JW to disclose or supplement at that time.[220]

---

[215] *See* Motion, at § IV.G.1 (highlighting phrase "at any time").

[216] 11 U.S.C. § 328(c).

[217] *See, e.g., In re Exco Resources, Inc. et al.*, Case No. 18-30155 [Dkt. No. 2103, Art. II.A.2.d]; *In re Covia Holdings Corporation, et al.,* Case No. 20-33295 (CML) [Dkt. No. 1029, Art. II.B.4]; *In re Volusion LLC*, Case No. 20-80082 (MI) [Dkt. No. 128, Art. II.D]; *In re Bouchard Transportation*, Co., Inc., Case No. 20-34682 (CML) [Dkt. No. 1319, Art. II.C.4].

[218] *See supra* n.118.

[219] *See id.*

[220] As noted above, Ms. Freeman has confirmed on two different occasions that JW did not know about her relationship with former Judge Jones at this time. *See Defendant's Elizabeth Carol Freemans's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b), Michael D. Van Deelen v. David R. Jones, Elizabeth Carol Freeman, JW, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP*, Civ. Action No. 4:23-cv-3729 [Dkt. No. 45 at ¶ 3] (S.D. Tex. 2023) ("Freeman and Judge Jones had a close personal relationship when she joined JW in March, 2018. When JW appeared as co-debtor-in-possession counsel in the McDermott chapter 11 case, Judge Jones elected not to disclose

180. Neither the plain language of section 328 of the Bankruptcy Code nor the cases cited by the U.S. Trustee mandate supplementing disclosures with information not relevant to the period of retention after a professional's employment has concluded,[221] let alone require the professional to ask the Court to reopen a case to make such disclosures. Not only would that requirement be impractical, particularly after either the estate dissolved, the client ceased operations, or the company reorganized as a new company, it is not what the law requires.

181. Additionally, neither section 105 of the Bankruptcy Code nor the Court's inherent authority[222] "constitute a roving commission to do equity."[223] Rather, a bankruptcy court's sanction authority is limited to enforcing provisions of the Bankruptcy Code, applicable rules, and

the relationship with Freeman in the McDermott case. ***Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time*** . . . .") (emphasis added); *see also Defendant Elizabeth Carol Freeman's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)*, Civ. Action No. 4:24:cv-00693 [Dkt. No. 18 at ¶ 4] (S.D. Tex. 2024) (stating the same in respect of the Bouchard chapter 11 cases).

[221] *See* 11 U.S.C. § 328(c); Motion, § IV.G (citing *In re Consol. Bancshares*, 785 F.2d at 1256 (remanding to consider whether an ongoing conflict of interest existed during the chapter 11 cases based on counsel's former representation of the debtor's officers and directors); *In re W. Delta Oil*, 432 F.3d at 354 (special counsel violated its disclosure obligations by failing to disclose investment in a company trying to buy the debtor during the cases); *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) (debtor's counsel failed to disclose ongoing concurrent representation of the debtor's shareholders); *In re eToys*, 331 B.R. at 190 (debtor's counsel's failed to disclose concurrent representation of a creditor and a claimant during the cases)).

[222] JW recognizes that bankruptcy courts, like all federal courts, have the inherent power to impose sanctions against parties or attorneys in the cases before them. *In re Case*, 937 F.2d 1014, 1023 (5th Cir. 1991). But inherent power sanctions are reserved for punishing bad faith litigation conduct or willful disobedience of a court's orders and only when necessary to achieve the orderly and expeditious disposition of cases. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (affirming inherent power sanctions for abusing the judicial process, including filing numerous meritless motions and pleadings and delaying the case); *Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 815-16 (5th Cir. 2017) (affirming inherent authority sanctions against appellants for engaging in conduct intended to harass and delay by repeated attempts to litigate issues conclusively resolved against them or that they lacked standing to assert).

[223] *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (citations omitted).

orders of the Court.[224]  Even then, such authority is limited to what is necessary for enforcement and must be the least restrictive sanction necessary to deter the inappropriate behavior.[225]

182.    Again, putting aside the U.S. Trustee's failure to demonstrate the extraordinary circumstances and manifest injustice required to vacate ***all*** of JW's retention and fee orders under Rule 60(b), the U.S. Trustee has not asserted credible allegations that would support a finding that JW violated any ethical rules, disclosure obligations, or fiduciary duties or acted in a manner that would otherwise warrant sanctions in any of the Pre-March 2022 Cases under section 105 of the Bankruptcy Code or the Court's inherent powers.[226]

183.    JW submits that the same result should hold true for the Post-March 2022 Cases given the unprecedented situation that was thrust upon JW.  As indicated above, JW learned that it had been repeatedly lied to by a highly respected and regarded partner about her secret intimate relationship with a sitting federal bankruptcy judge who insisted that any disclosure obligations were his, and his alone.  Nonetheless, once JW confirmed the existence of the relationship, JW

---

[224] *Law v. Siegel*, 571 U.S. 415, 420-21 (2014) (a bankruptcy court may not contravene specific statutory provisions when exercising authority under section 105(a) of the Bankruptcy Code and its inherent powers); *Jamo v. Katahdin Fed. Credit Union (In re Jamo)*, 283 F.3d 392, 404 (5th Cir. 2002) (vacating sanction imposed under section 105(a) in the absence of "any antecedent violation either of the automatic stay or of some other independent provision of the Bankruptcy Code"); *Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 478 (5th Cir. 1994) (section 105(a) of the Bankruptcy Code authorizes a bankruptcy court "to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code" but "the powers granted by that statute must be exercised in a manner that is consistent with the Bankruptcy Code." The statute "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." (quoting *Chiasson v. Bingler (In re Oxford Mgmt., Inc.*), 4 F.3d 1329, 1333-1334 (5th Cir. 1993)); *Ameriquest Mortg. Co. v. Nosek (In re Nosek),* 544 F.3d 34, 49-50 (1st Cir. 2008) (vacating damages awarded under section 105(a) because neither section 1322(b) nor the debtor's confirmed plan specifically proscribed the sanctioned conduct); *In re Cushman*, 589 B.R. 469, 500 (Bankr. D. Me. 2018) ("in the absence of an antecedent violation of the Code or a related court order, section 105(a) will not ordinarily provide a basis for sanctions").

[225] *See Baker v. Cage (In re Whitley)*, 737 F.3d 980, 987 (5th Cir. 2013) (reversing bankruptcy court's imposition of a sanction against debtor's counsel to return properties to the estate that had been transferred to his wholly owned entity); *Harris v. First City Bancorporation of Tex., Inc. (In re First City Bancorporation of Tex., Inc.)*, 282 F.3d 864, 867 (5th Cir. 2002) (when a bankruptcy court imposes a disciplinary sanction it "must use the least restrictive sanction necessary to deter the inappropriate behavior.").

[226] To the extent the Court determines that any disclosures were required for the Pre-March 2022 Cases, any lack of disclosure was not intentional, which the Court should consider in determining any appropriate sanction.  *See In re Am. Int'l Refinery*, 676 F.3d at 466.

took appropriate actions in response thereto which, among other things, included: (a) confronting Ms. Freeman upon learning of the new credible allegations; (b) instructing, as before, Ms. Freeman that she could not work on any matters before former Judge Jones; (c) continuing to deduct from Ms. Freeman's compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters pending before former Judge Jones; (d) re-engaging with its outside ethics expert, Mr. Jarvis; (e) engaging with Ms. Freeman's lawyer to discuss potential disclosure language and potential separation from the firm; and (f) ultimately exiting Ms. Freeman from the firm.

184.    Nonetheless, to the extent the Court is inclined to grant any relief or to otherwise sanction JW in respect of the Post-March 2022 Cases—whether under section 328 or the Court's inherent authority—the Court should reject the U.S. Trustee's proposal to disgorge all fees and expenses awarded to JW.  The Fifth Circuit does not follow this hardline approach.[227]  And as the U.S. Trustee implicitly acknowledges, the Court is not required to deny all of JW's compensation for services already rendered even if it finds that JW had an adverse interest or was not disinterested.[228]    Indeed, courts in this District view "the denial of compensation and

---

[227] The U.S. Trustee relies entirely on decisions from courts outside the Fifth Circuit to argue that non-disclosure requires complete disgorgement of all compensation. *See* Motion, § IV.G.2 (citing *In re Futuronics*, 655 F.2d at 470); *In re EWC, Inc.,* 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992)).  As reflected in the other decisions the U.S. Trustee cites elsewhere in his Motion, the Fifth Circuit takes a more measured approach.  *Waldron v. Adams & Reese, L.L.P. (In re American Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012) (rejecting trustee's argument that all compensation should have been disgorged for violating Bankruptcy Rule 2014); *Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 n.22 (5th Cir. 2005) (explaining that the denial of all compensation is not automatic because a bankruptcy court is a court of equity); *Arenes v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 n.1, 1005 (5th Cir. 1995) (although the court affirmed the disgorgement of the entirety of pre-petition retainer, that decision was based on non-disclosure and the finding that none of the services performed by the professional benefitted the debtors or their estates)).

[228] Motion, at § IV.G.2 (citing *Waldron v. Adams & Reese, L.L.P. (In re American Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012) ("A bankruptcy court is not required, however, to deny all compensation if an attorney has an adverse interest and is found to not be disinterested.")); *In re Fish & Fisher, Inc.,* 574 B.R. 608, 619 (Bankr. S.D. Miss. 2017) ("The decision whether to deny fees to a professional who is not disinterested is within the discretion of the bankruptcy court.") (quoting 3 COLLIER ON BANKRUPTCY ¶ 328.05[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

reimbursement of expenses after services have been performed" as "draconian and inherently unfair," especially when no "actual injury or prejudice to the debtor's estate" has been shown.[229]

185. Instead, the Court should exercise its discretion to fashion an appropriate remedy depending on the particular facts of the individual cases. This means that "[w]hen a court metes out a sanction, it must exercise such power with restraint and discretion."[230] In fact, "[t]he sanction levied must . . . be commensurate with the egregiousness of the conduct."[231] "[T]o ensure that a sanction is "chosen to employ the least possible power to the end proposed," the bankruptcy court must compare the requested amount of sanctions to the offending party's conduct.[232]

186. Here, in addition to the various steps that JW took immediately upon confirming the existence of a romantic relationship between Ms. Freeman and former Judge Jones on March 30, 2022 as discussed above, JW submits that any sanction for the Post-March 2022 Cases should be tempered by the fact that, among other things, (a) JW acted reasonably in moving to exit Ms. Freeman from the firm when JW confirmed the existence of current romantic relationship on March 30, 2022; (b) JW actually performed the work for which it was paid and that such work benefitted the bankruptcy estates and their respective stakeholders; (c) no ruling, decision, order, judgment, mediator recommendation, or settlement has been plead to have allegedly been biased in any way or otherwise improperly influenced by the relationship; (d) no allegations have been raised by the U.S. Trustee as to any actual injury to any party allegedly caused by that secret relationship; (e) JW has already incurred substantial legal fees in connection with these matters

---

[229] *In re GHR Energy Corp.*, 60 B.R. 52, 68 (Bankr. S.D. Tex. 1985) (declining to deny the entirety of the professional's fees upon a finding that the professional was not disinterested) (quoting 2 COLLIER ON BANKRUPTCY § 328.04 at 328-15 (15 ed. 1979)).

[230] *In re Whitley*, 737 F.3d at 988 (internal citations omitted).

[231] *Id.* at 987 (internal citations omitted).

[232] *Id*. at 988 (quoting *In re First City Bancorporation of Tex*., 282 F.3d at 867).

and will likely incur additional substantial amounts; (f) JW has suffered significant reputational damage as a result of Ms. Freeman's and former Judge Jones's indiscretions; and (g) JW never acted with any improper motive, purpose, or intent.

187.    Sanctions are not appropriate.

## IV.    CONCLUSION

As discussed at length above, the U.S. Trustee's Motion is factually and legally flawed. JW, at all times, satisfied the requirements to be retained and compensated under the Bankruptcy Code and Bankruptcy Rules. In the Pre-March 2022 Cases, JW could not have disclosed what it did not know, and in the Post-March 2022 Cases, JW acted reasonably and responsibly to address an unprecedented situation once Ms. Freeman admitted to the secret relationship. The U.S. Trustee's "kitchen sink" request, which seeks to ensure that JW is not compensated for any of its efforts in 33 challenged cases, is unsupported by law and contrary to the facts and equities in each case. JW respectfully requests that the Court decline to grant the U.S. Trustee's requested relief in each of the challenged cases.

Dated: May 22, 2024

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Jason L. Boland*
Jason L. Boland, Bar No. 24040542
William Greendyke, Bar No. 08390450
Maria Mokrzycka, Bar No. 24119994
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
jason.boland@nortonrosefulbright.com
william.greendyke@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Jason I. Blanchard, Bar No. 24130197
2200 Ross Ave., Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8274
Email: jason.blanchard@nortonrosefulbright.com

James A. Copeland (*admitted pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5471
Email: james.copeland@nortonrosefulbright.com

*Counsel for Jackson Walker LLP*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason L. Boland*
Jason L. Boland

**From:**                     Freeman, Liz
**Sent:**                     Friday, August 27, 2021 1:15 PM
**To:**                       Cowlishaw, Pat
**Subject:**               RE: Request for Opinion [IMAN-JWDOCS.FID560826]

**Sensitivity:**            Private

**Follow Up Flag:**       Follow up
**Flag Status:**            Completed

Pat,

I reviewed the letter and have no questions or issues. I deeply appreciate the time and effort everyone has put into this very difficult situation. I lament that it was necessary. Thank you for everything.

- Liz

---

**From:** Cowlishaw, Pat <pcowlishaw@jw.com>
**Sent:** Thursday, August 26, 2021 12:57 PM
**To:** Freeman, Liz <efreeman@jw.com>
**Subject:** Request for Opinion [IMAN-JWDOCS.FID560826]
**Importance:** High
**Sensitivity:** Private

Liz,

Enclosed is a draft letter to Peter Jarvis, who is engaged by Jackson Walker to advise us from time to time regarding professional ethics matters. (Peter is a partner at Holland & Knight, where he leads a practice group in the area of legal professional ethics and risk management. He is co-author of *The Law of Lawyering*, a leading treatise on the subject).

The draft has been reviewed by Wade, Matt C, and Bruce, and it incorporates their comments. I will appreciate your review. I want to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with.

Once we have your concurrence, I will sent the letter to Peter in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion.

Please let me know if you have questions. I can say for Wade and me that we know that this has been an extraordinarily difficult matter to ask you to address, that we deeply appreciate your candor, cooperation and your commitment to the firm, and that we look forward very soon to closing the book on this. I would add Matt and Bruce, but you know that they feel that way already. Many thanks.

Pat



Patrick R Cowlishaw
(Direct Dial)
(Direct Fax)

**DRAFT**

August __, 2021

***Privileged and Confidential – Attorney-Client Communication***

Mr. Peter Jarvis
Holland & Knight LLP
601 Southwest 2nd Avenue #1800
Portland, Oregon 97204

Re: Judicial Disqualificaiton Matter

Dear Peter:

This letter concerns the relationship between one of our law firm's partners and a federal bankruptcy judge, which you and I have discussed on several occasions going back to March of this year. I describe below the pertinent circumstances and the measures that the firm and our partner have taken in response. On behalf of Jackson Walker, I ask for your advice regarding the propriety and sufficiency of these measures, both in terms of our professional ethical posture and minimizing the risk that the firm's participation in future contested matters before the judge, through our partner or others, might result in disqualification of the judge or of us.

**Background**

Elizabeth Freeman joined Jackson Walker as a partner in our bankruptcy practice group on May 14, 2018. As with virtually all lateral partner hires, she joined the firm as an "income partner" (salaried). Elizabeth had been a licensed Texas lawyer for 20 years at that time. For the six years preceding her joining Jackson Walker, Elizabeth had worked as a law clerk to Chief Bankruptcy Judge David R. Jones of the Bankruptcy Court of the United States for the Southern District of Texas, Houston Division. Prior to her clerkship, Elizabeth had been a partner in the bankruptcy practice of Porter Hedges in Houston. Prior to his taking the bench October 1, 2011, Judge Jones and Elizabeth were law partners at Porter Hedges. Consistent with this background, Elizabeth and Judge Jones were and remain close personal friends. Both individuals are, and at all relevant times have been, divorced.

Elizabeth enjooyed quick and substantial success at Jackson Walker. From the time of her arrival through today, Houston has became a favored venue for complex debtor cases, in the

DRAFT

energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but Elizabeth's leadership and contribution were recognized as integral. Throughout, Elizabeth adhered to guidelines set by Judge Jones in respect of her status as his former law clerk. Under those guidelines, she could and did work on cases in his court, and the firm's fees for her work could be included in fee applications that came before him for review, but she could not (and did not) appear in his court or sign pleadings to be filed in his court. Elizabeth's understanding has been that Judge Jones expects those guidelines to apply to her for at least as long as the six years she served as his clerk, i.e., at least through May 2024.

In view of her success and contributions, Elizabeth was elected an equity partner in the firm, effective January 1, 2021.

**Van Steelen/McDermott Claim**

Among our debtor cases in progress early this year was a Chapter 11 reorganization proceeding for McDermott International, where we acted as local counsel with Kirkland as lead, and Judge Jones presiding. *In re McDermott International, Inc.,* Case No. 20-30336. In that proceeding Michael Van Deelen, a McDermott shareholder, pursued a *pro se* adversary action against certain Kirkland officers, complaining of actions they had taken in the bankruptcy. *Michael Van Deelen v. David Dickson,* et al., Adversary No. 20-3309. Van Deelen had moved to recuse Judge Jones, citing adverse rulings as evidence of bias. That motion was set for hearing March 10, 2020.

On Saturday, March 6, 2021, Van Deelen sent an e-mail to Matt Cavenaugh, a JW bankruptcy partner who was leading our work in the McDermott case. Van Deelen claimed to have received a "most disturbing communication," which indicated that Elizabeth Freeman had had a romantic relationship with Judge Jones. Van Deelen questioned whether Judge Jones was favoring Jackson Walker and its clients because of his relationship with our partner. Van Deelen provided a copy of what he said was the referenced communication, in the form of an anonymous, unsigned letter, accompanied by an envelope with no return address.

Matt promptly contacted me as the firm's general counsel. We conferred with our managing partner and another long-time firm leader, one of our senior trial partners, that weekend. The latter reached out to Elizabeth, who confirmed that there had been a romantic relationship. No further details were sought at that time. At the firm's request, Elizabeth stopped work on all matters in Judge Jones' court, pending the firm's assessment of the matter.

One of our lawyers delivered a courtesy copy of the Van Deelen communication to Judge Jones' chambers. We also disclosed these matters to our Kirkland co-counsel, who disclosed

them to the client. At Judge Jones' request, Judge Isgur presided at the hearing on the motion. Kirkland appeared on behalf of McDermott and argued at the virtual hearing March 10. Judge Isgur denied the motion, based on Van Deelen's failure to present any competent evidence in support of his allegations, and he ordered that the anonymous letter Van Deelen had profferred be sealed. Van Deelen subsequently sought mandamus relief, which was denied.

**Jackson Walker Review**

With the Van Steelen matter resolved, the firm undertook a more complete assessment. From a legal standpoint, we reviewed judicial disqualification precedent inside and outside the Fifth Circuit based on relationships between counsel and judges, as well as opinions and commentary on relevant ethics requirements applicable to lawyers and the distinct requirements applicable to judges. I also conferred with you, beginning on March 8, and continuing from time to time as we learned more facts and were able to confer within firm management. Factually, our managing partner has met with Elizabeth on several occasions, both to better understand the relationship, in particular on a current and going-forward basis, and to keep her apprised of firm management's thinking.

Elizabeth has confirmed that there is no current romantic relationship between herself and Judge Jones and that none is expected going forward. According to Elizabeth, there has been no romantic relationship since prior to the time in March 2020 when COVID caused so many of us to shift to remote work and virtual-only meetings. Judge Jones and Elizabeth each own their own homes; they do not and have not lived together.

The firm, for its part, had concluded and has advised Elizabeth that any romantic, intimate, or sexual relationship between a firm lawyer and a federal judge would create too much risk of disqualification to be compatible with any lawyer in the firm continuing to appear before that judge. There is direct authority that a lawyer appearing before a judge with whom he or she is in a romantic relationship is cause for immediate disqualfication of the judge. *In re Schwarz,* 255 P.3 299 (N.M. 2011). *See* ABA Opinion No. 488 at 6 (2018). While we found no authority regarding judicial disqualification based on the appearance of a lawyer whose law partner has a romantic relationship with the judge, but does not herself appear, the Fifth Circuit has taken a strict approach to disqualifying judges based on other kinds of prohibited relationships between a judge and an equity partner of the lawyer who is appearing before the judge. *In re Billedeaux,* 972 F.2d 104 (5th Cir. 1992); *Potashnik v. Port City Const. Co.,* 609 F.2d 1101 (5th Cir. 1980).

We understand that a close personal relationship remains. We expect that Elizabeth and Judge Jones may see one another socially as friends with some frequency. They enjoy shared interests. Elizabeth assures us that at all times since she left her clerkship and joined Jackson Walker, she and Judge Jones have avoided any discussion of active cases and will continue to do so. With these facts as context, we understand the ethics authorities to agree that a friendship between lawyer and judge is not disqualfying. ABA Opinion No. 488 at 5. As stated by the Seventh Circuit: "In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. . . . Many courts therefore have held that a

judge need not disqualify himself just because a friend – even a close friend – appears as a lawyer." *United States v. Murphy,* 768 F.2d 1518, 1537 (7th Cir. 1985).

The cases we have reviewed treat friendship relationships as a matter of degree. In an extreme circumstance, such as a judge and trial lawyer who frequently vacation together, including shortly after a trial in which the lawyer had appeared before the judge, a close friendship might provide grounds for disqualification. As long as such extremes are avoided, however, we do not understand a continuing close friendship between Elizabeth and Judge Jones to create a basis for disqualifying Judge Jones when Jackson Walker represents clients in his court, through other lawyers or Elizabeth herself.

**Recommended Actions**

After careful consideration of all of these matters, the firm's Management Committee concluded that it would be prudent to maintain separation between Elizabeth and our firm's representation of clients in matters before Judge Jones for some reasonable time following the conclusion of any romantic relationship, and to adjust her compensation during that time so that she does not receive any portion of the profits that may be earned by the firm attributable to cases before him. The objective of these actions is to place any alleged appearance of impropriety well into the past.

More specifically, the Management Committee has determined to take the following steps:
,

1) Continue to require Elizabeth to refrain from working on matters in Judge Jones' court through March 2022, at which point it will have been at least two years since the relationship returned to one of close friendship alone. Since the firm first became aware of this issue last March, Elizabeth has done more than avoid appearing in Judge Jones' court; she has, at our request refrained from all work on any matters before Judge Jones. With the firm's concurrence, she has continued to work on complex bankrupcty matters that are planned to be filed in Houston, <u>prior to the filing of a bankruptcy petition</u>. That is, Elizabeth has worked during the planning stages on cases that may wind up being assigned to Judge Jones after they are filed, but she has refrained from further work once a case is filed if it is assigned to Judge Jones. At present, with only six months remaining until March 2022, we also consider that it will be appropriate for Elizabeth to work on certain matters after the effective date of a confirmed plan in cases assigned to Judge Jones. Her work will be limited to post-effective date matters that will not come before Judge Jones for decision. This includes such matters as advising on plan mechanics and interpretation, or on post-efffective date asset sales outside of the bankruptcy court that were authorized under a plan. None of these activities would come before Judge Jones for decision, nor would they result in fees to be recovered from the estate or presented to the court for approval.

2) Adjust Elizabeth's 2021 distribution of net income to remove any portion of firm net profits derived from cases before Judge Jones. As an equity partner at JW, Elizabeth has been

assigned a percentage share of firm profits for 2021. Her share is __%, which would result in net income of $ ________ at budgeted firm net income of $ ____________. During the year, equity partners receive a monthly draw at 60% of their share of budgeted net income. Additional distributions may be authorized around estimated tax dates, but at year end all equity partners will have received substantially less than their shares of budgeted net income. Net income is budgeted very conservatively, actual net income regularly exceeds budgeted net income by a substantial margin, and is expected to do so in 2021 based on performance to date. Once net income for the year has been determined, the balance is distributed to each equity partner in mid-January. In Elizabeth's case, her final distribution will be calculated by multiplying her assigned percentage share times firm net income, but excluding the portion of firm net income derived from fees received for firm work on cases before Judge Jones. For example, if fees from those cases accounts for 2% of total firm revenues in 2021, then Elizabeth's net income for 2021 would be calculated by multiplying her percentage share times 98% of firm net income, rather than 100%.

**Conclusion**

We will appreciate your careful review of this matter. Please let us know whether you have questions or require additional information. Please let us know whether, in your judgment, the measures we have described are appropriate and sufficient to address these circumstances, from the standpoint of avoiding disqualification of Judge Jones or Jackson Walker when we appear in cases before him and in terms of our own ongoing compliance with applicable ethical requirements. We look forward to hearing from you.

Sincerely,

**DRAFT**

Patrick R Cowlishaw

# EXHIBIT 2

Pre-March 2022 Cases[1]

[1] All capitalized terms in this Exhibit shall have the meanings ascribed to them in Plans and referenced Orders, as applicable.

***In re Westmoreland Coal Company***
**Case No. 18-35672 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
|---|---|
| **Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **October 9, 2018** – the Debtors file for chapter 11 relief<br>• **October 25, 2018** – the WLB Debtors file the WLB Plan of Reorganization [Dkt. No. 294]<br>• **November 8, 2018** – the Debtors seek to retain JW [Dkt. No. 376]<br>• **November 28, 2018** – the Court approves the Debtors' request to retain JW [Dkt. No. 617]<br>• **March 2, 2019** – the Court enters the WLB Confirmation Order [Dkt. No. 1561]<br>• **March 15, 2019 –** the WLB Plan goes effective and the WLB Debtors emerge from bankruptcy [Dkt. No. 1573]<br>• **March 15, 2019** – the WMLP Debtors file the WMLP Plan of Liquidation [Dkt. No. 1612]<br>• **April 14, 2019** – JW files its WLB final fee application [Dkt. No. 1731]<br>• **June 5, 2019** – the Court enters the WMLP Confirmation Order [Dkt. No. 1967]<br>• **June 21, 2019** – the WMLP Plan goes effective and the WMLP Debtors emerge from bankruptcy [Dkt. No. 2068]<br>• **July 21, 2019** – JW files its WMLP fee application [Dkt. no. 2162]<br>• **August 14, 2019** – the Court approves the WLB final fee application without objection [Dkt. No. 2249]<br>• **August 22, 2019** – the Court approves the WLB final fee application without objection [Dkt. No. 2280] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $676,806.00<br>• Reimbursement of expenses in the amount of $87,114.29<br>Ms. Freeman's fees account for $129,629.500 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Due to the challenging regulatory and economic conditions facing coal companies, the Debtors' businesses faced a marked downturn prior to the commencement of their Chapter 11 Cases. *See* Dkt. No. 54.<br>• Prior to the Petition Date, the Debtors engaged with a number of lenders and key stakeholders in order to achieve a successful restructuring path forward. The WMLP Debtors agreed to pursue a sale process with respect to WMLP's assets in accordance with an agreed-upon protocol. The Sale Protocol was finalized in June 2018. On August 8, 2018, the WMLP Debtors and their financial advisors launched the sale process for the WMLP Debtors' assets. *See id.* |

| *In re Westmoreland Coal Company*<br>**Case No. 18-35672 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • In parallel to the WMLP Debtors' sale efforts, the WLB Debtors engaged with their creditors on the terms of a restructuring of the WLB Debtors' funded debt. These discussions culminated in the parties' entry into RSA on October 9, 2018. *See id.*<br>• The Court found that the WMLP Debtors proposed the Plan in good faith and not by any means forbidden by law. *See* WMLP Confirmation Order, ¶ I.<br>• The Court found that the transactions contemplated by the WLB Plan were proposed in good faith. *See* WLB Confirmation Order, ¶¶ 46-47, 58. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a "Released Party under the WMLP Plan. *See* WMLP Plan Arts. I.27, IX<br>• **Exculpated Party.** JW is an Exculpated Party under the WMLP Plan and WLB Plan. *See* WMLP Plan, Arts. I.A, VII.F.3; Confirmation Order, ¶ 8; *see also* WLB Plan Arts. I.A, IX.F; WLB Confirmation Order, ¶ 9<br>• **Injunction.** The WMLP Plan's release and exculpation provisions and the WLB Plan's exculpation provisions are enforced by each Plan's injunction provisions, prohibiting any entity from asserting any action against a released or exculpated party. *See* WMLP Plan Art. VII.F.5; WMLP Confirmation Order, ¶ 9; *see also* WLB Plan Art. IX.G; WLB Confirmation Order, ¶10 |
| **Additional Facts & Plan Provisions** | • The WLB Plan provides that " upon the Confirmation Date, any requirement Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate." *See* WLB Plan Art. IV.B.4. |

<table>
<tr><th colspan="3">In re Jones Energy, Inc.<br>Case No. 19-32112 (CML) (Bankr. S.D. Tex.)<br>Chapter 11</th></tr>
<tr><th>Topic</th><th colspan="2">Summary / Description</th></tr>
<tr><td>Former Judge Jones's Role</td><td colspan="2">Presiding Judge</td></tr>
<tr><td>Case Timeline & Other Key Dates</td><td>• April 14, 2019 – the Debtors file for chapter 11 relief<br>• April 15, 2019 – the Debtors file their Chapter 11 Plan [Dkt. No. 20]<br>• April 23, 2019 – the Debtors seek to retain JW [Dkt. No. 125]<br>• May 6, 2019 – the Court enters the Confirmation Order [Dkt. No. 180]<br>• May 15, 2019 – the Court approves the Debtors' request to retain JW [Dkt. No. 208]</td><td>• May 17, 2019 – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 216]<br>• July 1, 2019 – JW files its final fee application [Dkt. No. 242]<br>• July 23, 2019 – the Court approves JW's final fee application without objection [Dkt. No. 251]</td></tr>
<tr><td>JW's Retention & Fee Applications</td><td>Role. JW was retained as co-counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>Application. JW's retention application was approved without objection by the U.S. Trustee or any party in interest.</td><td>Final Fee Application. JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $92,854.00<br>• Reimbursement of expenses in the amount of $20,915.86<br>Ms. Freeman's fees account for $10,582.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application.</td></tr>
<tr><td>Relevant Case Facts</td><td colspan="2">• On March 20, 2019, before the bankruptcy filing, the Debtors and ad hoc groups of creditors representing a supermajority of the secured first lien and unsecured bondholders reached a deal in principle that was documented in the RSA. See Dkt. No. 7.<br>• On April 2, 2019, following extensive, arm's-length negotiations over several months, the Debtors executed the RSA with both the First Lien Ad Hoc Group and the Crossover Group. Id.<br>• The RSA formed the basis of the Plan which eliminated over $1 billion in debt and was supported by the overwhelming majorities of the bondholder creditor classes. Id.<br>• Trade creditors were unimpaired under the Plan. Id.<br>• The Plan enjoyed nearly unanimous support (i.e., support from over 99% in amount and over 97% in number in each of the voting classes). See Dkt. No. 160.</td></tr>
</table>

| ***In re Jones Energy, Inc.***<br>**Case No. 19-32112 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Court found that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *See* Confirmation Order, ¶ 36.<br>• The Court further found that the Plan was the product of good faith, arm's-length negotiations by and among the Debtors, the First Lien Ad Hoc Group, and the Crossover Group. *Id.* at ¶ 46. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 36-37.<br>• **Exculpated Party.** JW is an Exculpated Party under the Plan. *See* Plan, Arts. I.41, VIII.E; Confirmation Order, ¶¶ 40-41.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting Causes of Action against a released or exculpated party. *See* Plan, Art. VIII.F; Confirmation Order, ¶¶ 42-43. |
| **Other Relevant Facts & Plan Provisions** | • These Chapter 11 cases have been closed for over four and a half years and were resolved through a prepackaged Plan that left trade creditors unimpaired. The Plan was approved 22 days after the Petition Date.<br>• The Plan provides "from and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate…" *See* Plan Art. II.B.4; Confirmation Order, ¶ 31. |

| ***In re McDermott International, Inc.*** **Case No. 20-30336 (CML) (Bankr. S.D. Tex.) Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **January 21, 2020** – the Debtors file for chapter 11 relief<br>• **January 22, 2020** – the Debtors file their Chapter 11 Plan [Dkt. No. 5]<br>• **February 19, 2020** – the Debtors seek to retain JW [Dkt. No. 424]<br>• **March 9, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 591]<br>• **March 12, 2020** – the Court enters the Confirmation Order [Dkt. No. 665] | • **June 30, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 970]<br>• **August 14, 2020** – JW files its final fee application [Dkt. No. 991]<br>• **September 8, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 1021] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as the Debtors' co-counsel. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $391,655.00<br>• Reimbursement of expenses in the amount of $21,154.16<br>Ms. Freeman's fees account for $114,002.50 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Following months of nearly around-the-clock negotiations, the Debtors and their stakeholders entered into an RSA that provided the framework for a chapter 11 plan that would equitize nearly all of McDermott's funded debt and would pay in full or otherwise leave unimpaired all general unsecured claims. *See* Dkt. No. 62.<br>• The RSA and related Plan contemplated (a) an aggregate $2.81 billion debtor in possession financing facility; (b) an agreement by the Debtors' senior secured term lenders to substantially equitize more than $3 billion for 94% of the equity in the Reorganized Debtors and $500 million in take back senior secured exit term loans; (c) commitments from the Debtors' letter of credit-issuing banks; (d) the sale of the Debtors' Lummus Technology business; (e) recovery for unsecured bondholders in form of 6% of the equity in the Reorganized Debtors; (f) repayment in full or reinstatement of all unsecured trade claims; (g) assumption of all project-related executory contracts; (h) reinstatement and assumption of unsecured bi-lateral facility letter of credit obligations and surety obligations; (i) payment in full of all administrative and priority claims; and (j) cancellation of existing preferred and common equity interests. *See* Dkt. Nos. 4 & 589. | |

| ***In re McDermott International, Inc.*** **Case No. 20-30336 (CML) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The confirmed Plan deleveraged the Debtors' balance sheet by $4.1 billion, preserved the business as a going-concern and tens of thousands of jobs, and positioned the Debtors to meet their long-term strategic goals, thereby maximizing long-term value for their stakeholders. *See* Dkt. No. 589.<br>• The Plan was supported by virtual unanimity from every voting class (99.43% in number and 99.92% in amount). *See* Dkt. No. 558.<br>• The Plan did not impair unsecured trade creditors. All unsecured trade claims were either paid in full in cash on the effective date or reinstated. *See id.*, Dkt. No. 684.<br>• The Court found that:<br>○ the Plan was the product of good faith, arm's-length negotiations by and among the Debtors and the Consenting Stakeholders, among others;<br>○ the Plan was proposed in good faith, serve[d] the public interest, and assure[d] fair treatment of holders of Claims and Interests; and<br>○ "[c]onsistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of reorganization, and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization and maximizing stakeholder value and for no ulterior purpose." *See* Confirmation Order, ¶ 49. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A., VIII.D.<br>• **Exculpated Party.** JW is an Exculpated Party under the Plan. *See* Plan Arts. I.A, VIII.E; Confirmation Order, ¶¶ 52-53.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting Causes of Action against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 54. |
| **Other Relevant Facts & Plan Provisions** | • These Chapter 11 cases were resolved through a prepackaged Plan that left trade creditors unimpaired; the Plan was accepted by 100% of voting creditors; and the Confirmation Order was entered 51 days after the Petition Date.<br>• The Confirmation Order and Plan provide "from and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate…" *See* Plan Art. II.C.4; Confirmation Order, ¶ 40. |

| ***In re Sheridan Holding Company I, LLC*** **Case No. 20-31884 (MI) (Bankr. S.D. Tex.)** **Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **March 23, 2020** – the Debtors file for chapter 11 relief<br>• **March 23, 2020** – the Debtors file their Chapter 11 Plan [Dkt. No. 11]<br>• **March 24, 2020** – the Court enters the Confirmation Order [Dkt. No. 76]<br>• **March 30, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 116] | • **April 2, 2020** – the Debtors seek to retain JW [Dkt. No. 162]<br>• **April 22, 2020** – JW files its final fee application [Dkt. No. 162]<br>• **July 13, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 211]<br>• **July 13, 2020** – the Court approves JW's final fee application, without objection [Dkt. No. 213] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $11,779.50<br>• Reimbursement of expenses in the amount of $12,025.30<br>Ms. Freeman's fees account for $3,565.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases to implement their restructuring through a prepackaged plan of reorganization. *See* Dkt. No. 5. That prepackaged Plan was the culmination of more than a full year's effort dating back to November 2018. *See* Dkt. No. 14.<br>• Through the prepackaged Plan which implemented the RSA, the Debtors reduced their prepetition debt by approximately $470 million, deleveraged their balance sheet, provided a four-year path for an orderly disposition of the Debtors' oil and gas assets, and left trade creditors unimpaired. *See* Dkt. No. 5.<br>• The Debtors solicited votes on that prepackaged Plan in advance of the Petition Date, which Plan was accepted by 100% of voting creditors. *See* Dkt. No. 23.<br>• The confirmed Plan did not impair unsecured trade creditors; rather, all unsecured trade claims were either paid in full in cash on the Effective Date or reinstated. *See* Dkt. No. 76. | |

| ***In re Sheridan Holding Company I, LLC***<br>**Case No. 20-31884 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Court found that the Debtors proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *See* Confirmation Order, ¶ 61. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A., VIII.C-D; Confirmation Order, ¶¶ 88-89.<br>• **Exculpated Party.** JW is an Exculpated Party under the Plan. *See* Plan, Arts. I.A. & VIII.E; Confirmation Order, ¶ 90.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from commencing or continuing any action or proceeding against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 91. |
| **Other Relevant Facts & Plan Provisions** | • These Chapter 11 cases have been closed for almost four years and were resolved through a prepackaged Plan that left trade creditors unimpaired, was accepted by 100% of voting creditors, and was approved one day after the bankruptcy filing.<br>• The Plan provides "from and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate…." *See* Plan Art. II.B.4; Confirmation Order, ¶ 85. |

| ***In re Whiting Petroleum Corporation***<br>**Case No. 20-32021 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **April 1, 2020** – the Debtors file for chapter 11 relief<br>• **April 17, 2020** – the Debtors seek to retain JW [Dkt. No. 173]<br>• **April 23, 2020** – the Debtors file their Chapter 11 Plan [Dkt. No. 198]<br>• **May 6, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 265]<br>• **August 14, 2020** – the Court enters the Confirmation Order [Dkt. No. 733] | • **September 1, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 756]<br>• **October 9, 2020** – JW files its final fee application [Dkt. No. 796]<br>• **November 6, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 840] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $695,091.50<br>• Reimbursement of expenses in the amount of $3,541.94<br>Ms. Freeman's fees account for $36,115.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors filed for chapter 11 to effectuate a comprehensive reorganization supported by their unsecured noteholders. In exchange for equitizing roughly $2.375 billion of debt, the Consenting Creditors committed to vote in favor of the Plan. *See* Dkt. No. 703.<br>• The Plan allowed the Debtors to implement their new business plan and maximize long-erm value by shedding over $2.7 billion of funded debt and saving millions in annual interest expense. It left trade vendor and lienholder claims unimpaired, and the Plan provided a recovery to common equity. *Id.*<br>• The Plan was overwhelmingly supported by 100% of RBL lenders who voted for the Plan and agreed to fund the proposed Exit Facility, which provided the Reorganized Debtors with financing necessary to fund their post-emergence growth strategy. *Id.*<br>• General unsecured creditors also overwhelmingly voted for the Plan by over 90% in both number of claims and principal amount. *Id.* | |

| ***In re Whiting Petroleum Corporation***<br>**Case No. 20-32021 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Court found that the Plan was proposed in good faith and was the product of good faith, arm's length negotiations by and among the Debtors, the parties to the Restructuring Support Agreement, and the Creditors' Committee. *See* Confirmation Order, ¶ R. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.B-C; Confirmation Order, ¶¶ 8-7.<br>• **Exculpated Party.** JW is an Exculpated Party under the Plan. *See* Plan, Arts. I.A, VIII.D; Confirmation Order, ¶ 9.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting Causes of Action against a released or exculpated party. *See* Plan, Art. VIII.E; Confirmation Order, ¶ 10. |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides "from and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate…" *See* Plan Art. II.E. |

| ***In re Neiman Marcus Group, LTD, LLC***<br>**Case No. 20-32519 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **May 7, 2020** – the Debtors file for chapter 11 relief<br>• **June 3, 2020** – the Debtors seek to retain JW [Dkt. No. 750]<br>• **June 6, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 77]<br>• **June 25, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 1017]<br>• **September 4, 2020**– the Court enters the Confirmation Order [Dkt. No. 1795] | • **September 25, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 661]<br>• **November 9, 2020** – JW files its final fee application [Dkt. No. 2046]<br>• **December 10, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 2147] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved by awarding JW:<br>• Compensation in the amount of $380,573.50<br>• Reimbursement of expenses in the amount of $6,103.70<br>Ms. Freeman's fees account for $49,910.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Prior to the Petition Date, the Debtors and certain of their lenders executed an RSA. The RSA was supported by holders of approximately 78% of the Debtors' first lien term loan debt, 99% of the Debtors' second lien notes debt, 70% of the Debtors' third lien notes debt, 78% of the Debtors' debentures, and 100% of the direct equity ownership in the Debtors. *See* Dkt. No. 86.<br>• Approximately four months after the Petition Date, the Debtors were able to confirm their Plan, which eliminated nearly $4 billion (or nearly three-fourths) of the Debtors' funded debt obligations, positioning the Debtors to emerge from chapter 11 a stronger, better capitalized company—a remarkable result for a retail company in the current environment. *See* Dkt. No. 1761.<br>• The Plan was overwhelmingly supported by the Debtors' economic stakeholders, including an ad hoc committee of holders of 2019 Term Loans, the Holders of Second Lien Notes Claims and Third Lien Notes Claims, the Sponsors, and the Creditors' Committee as demonstrated by the acceptance of the Plan by all voting classes except Class 10. *See id.* & Dkt. No. 1749. | |

| ***In re Neiman Marcus Group, LTD, LLC*** **Case No. 20-32519 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan reflected a good faith compromise and settlement among the Debtors, acting at the direction of disinterested managers of Mariposa Intermediate and NMG LTD, the Creditors' Committee, the secured lenders, the Consenting Stakeholders, and the Sponsors, of any potential estate claims or causes of actions against the Consenting Parent and the Sponsors. *See* Dkt. No. 1761; Confirmation Order, ¶ 49.<br>• The Court found that the Plan was "the product of good faith, arm's-length negotiations by and among the Debtors, the Debtors' board of managers and officers, and the Consenting Stakeholders. Consistent with the overriding purpose of chapter 11, the Debtors filed these Chapter 11 Cases, and proposed the Plan, with the legitimate purpose of allowing the Debtors to maximize stakeholder value." Confirmation Order, ¶ 50. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 32-40, 85.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, VIII.E; Confirmation Order, ¶ 41.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interest. *See* Plan Art. VIII.F; Confirmation Order, ¶ 42. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate…." *See* Confirmation Order, ¶ 145; Plan Art. II.A.4. |

| ***In re Stages Stores, Inc.*** **Case No. 20-32564 (CML) (Bankr. S.D. Tex.)** **Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **May 10, 2020** – the Debtors file for chapter 11 relief<br>• **May 21, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 296]<br>• **June 4, 2020** – the Debtors seek to retain JW [Dkt. No. 385]<br>• **July 10, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 583]<br>• **August 14, 2020**– the Court enters the Confirmation Order [Dkt. No. 705] | • **October 30, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 898]<br>• **November 13, 2020** – JW files its final fee application [Dkt. No. 931]<br>• **December 16, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 983] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $182,655.50<br>• Reimbursement of expenses in the amount of $2,090.65<br>Ms. Freeman's fees account for $29,295.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Prior to the Petition Date, the Debtors diligently worked with their financial advisors since 2019 to develop and explore strategic alternatives to maximize value for the Debtors and their assets. The Debtors commenced these chapter 11 cases to stabilize their store base and operations. *See* Dkt. No. 26.<br>• The Debtors engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders. *Id.*<br>• The Plan was supported by the Committee, the prepetition lenders, landlords, trade creditors, and general unsecured creditors. *See* Dkt. No. 685. More than 99% of general unsecured creditors in number, and over 94% in amount, voted to accept the Plan, and 100% of the Debtors' prepetition secured lenders voted in support of the Plan. *See id.*; Dkt. No. 679.<br>• The Court found that the Debtors proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *See* Confirmation Order, ¶ 72. | |

| ***In re Stages Stores, Inc.***<br>**Case No. 20-32564 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Court also found that the "provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan." *Id.* at ¶ 89. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 103-104, 106-108.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, VIII.E; Confirmation Order, ¶ 109.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits all entities from asserting any Claim, Interests or Causes of Action against the Released Parties or Exculpated Parties. *See* Plan, Art. VIII.F; Confirmation Order, ¶ 110. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate…." *See* Confirmation Order, ¶ 131; Plan, Art. II.B.4. |

| *In re J.C. Penney, Company, Inc.*<br>**Case No. 20-20182 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **May 15, 2020** – the Debtors file for chapter 11 relief<br>• **June 11, 2020** – the Debtors seek to retain JW [Dkt. No. 685]<br>• **July 2, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 963]<br>• **October 20, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 1591]<br>• **December 14, 2020**– the Court enters the Confirmation Order [Dkt. No. 2169]<br>• **January 30, 2021** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 2508]<br>• **March 10, 2021** – JW files its final fee application [Dkt. No. 2739]<br>• **April 8, 2021** – the Court approves JW's final fee application without objection [Dkt. No. 2874] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $1,087,263.00<br>• Reimbursement of expenses in the amount of $14,219.21<br>Ms. Freeman's fees account for $286,159.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors filed their Chapter 11 cases to address their severe liquidity issues. During the pandemic, the net sales decreased by 88% and store sales decreased to nearly zero. *See* Dkt. No. 25.<br>• Prior to the Petition Date, after weeks of extensive and arm's-length negotiations, the Debtors and the First Lien Group reached agreement on a comprehensive, pre-negotiated restructuring as embodied in the RSA. The transaction contemplated by the RSA represented JCPenney's best and most viable option to emerge from chapter 11. *Id.* Among other things, the RSA provided for (i) a $900 million senior secured superpriority delayed-draw postpetition financing facility; (ii) a marketing test seeking interest and bids in providing debt or equity financing to the reorganized operating business and/or purchases of some or all of the assets of the Debtors; and (iii) a sale toggle allowing for a potential 363 sale of all of the Debtors' assets upon the occurrence of certain conditions. *Id.*<br>• During these chapter 11 cases, the Debtors ran an exhaustive five-month marketing process, interacting with approximately 100 potential buyers, including alternative investment firms, private equity funds, strategic, and financial partners. *See* Dkt. No. 2021. |

***In re J.C. Penney, Company, Inc.***
**Case No. 20-20182 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
| --- | --- |
| | • This marketing process resulted in the integrated transaction entered into between the Debtors, the First Lien Ad Hoc Group, a Simon Property Group, and Brookfield Property Group as reflected in the Asset Purchase Agreement approved on November 9, 2020. *See id.*; Dkt. No. 1814.<br>• The voting classes unanimously voted in favor of the Plan. Each of the Voting Classes voted in favor of the Plan except for Class 8 General Unsecured Claims at JCPenney Services, LLC and jcpSSC, Inc. which voted to reject the Plan. A total of 3 votes were received from both of these classes in the aggregate. *See* Dkt. No. 1985.<br>• The Court found that the Plan was the product of good faith, arm's-length negotiations by and among the Debtors, the ABL Lenders, the First Lien Lenders, the Committee, and the Purchasers, among others. *See* Confirmation Order, ¶ 46.<br>• The Court further found that the Debtors proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *See id.* at ¶ 64. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, X.C-D; Confirmation Order, ¶¶ 106 & 109-112.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, X.E; Confirmation Order, ¶¶ 106 & 113.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits all entities from asserting any Claim, Interests, or Causes of Action against the Released Parties or Exculpated Parties. *See* Plan Art. X.F; Confirmation Order, ¶¶ 106 & 114. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Confirmation Order, ¶ 105; Plan Art. II.C.4. |

| ***In re Hornbeck Offshore Services, Inc.***<br>**Case No. 20-32679 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **May 19, 2020** – the Debtors file for chapter 11 relief<br>• **May 19, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 7]<br>• **June 1, 2020** – the Debtors seek to retain JW [Dkt. No. 132]<br>• **June 19, 2020**– the Court enters the Confirmation Order [Dkt. No. 221]<br>• **July 13, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 260] | • **July 20, 2020** – JW files its final fee application [Dkt. No. 270]<br>• **August 11, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 283]<br>• **September 4, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 308] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $61,428.00<br>• Reimbursement of expenses in the amount of $798.75<br>Ms. Freeman's fees account for $4,727.50 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Prior to the Petition Date, the Debtors spent years engaged in vigorous negotiations with their stakeholders regarding potential in-court and out-of-court restructuring transactions. *See* Dkt. No. 4.<br>• On April 10, 2020, after these extensive, arm's-length negotiations, the Debtors and holders of approximately 100% of the ABL Claims, approximately 84% of the First Lien Claims, approximately 73% of the Second Lien Claims, and approximately 80% of Unsecured Notes Claims entered into an RSA. *Id.*<br>• The Chapter 11 cases were filed to implement the RSA through a Plan to bolster the Debtors' long-term growth prospects and operating performance. *See* Dkt. Nos. 6 & 7.<br>• The Plan gave the Debtors the best opportunity to maximize value for the benefit of all stakeholders. Among other provisions, the Plan significantly deleveraged the Debtors' balance sheet and provided for $100 million of new capital for a fully back-stopped rights offering and was supported by the overwhelming majorities of the creditor classes. *See* Dkt. Nos. 194 & 193. | |

| ***In re Hornbeck Offshore Services, Inc.***<br>**Case No. 20-32679 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • Trade creditors were unimpaired under the Plan. *Id.*<br>• The Court found that the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *See* Confirmation Order, ¶ 69.<br>• The Court further found that the Plan constituted a good faith compromise and settlement of all Claims and Interests. *Id.* at 82. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.E; Confirmation Order, ¶¶ 36-38.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.G; Confirmation Order, ¶ 40.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting Causes of Action against a released or exculpated party. *See* Plan Art. VIII.H; Confirmation Order, ¶ 41. |
| **Other Relevant Facts & Plan Provisions** | • The Debtors' prepackaged bankruptcy cases were closed three months after filing.<br>• These Chapter 11 cases have been closed for over three years and were resolved through a prepackaged Plan that left trade creditors unimpaired, was accepted by 99.8% of voting creditors, and was approved a mere 31 days after the Petition Date.<br>• The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Plan, Art. II.D.4. |

***In re Chesapeake Energy Corporation, Inc.***
**Case No. 20-33233 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **June 28, 2020** – the Debtors file for chapter 11 relief<br>• **July 16, 2020** – the Debtors seek to retain JW [Dkt. No. 370]<br>• **August 12, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 720]<br>• **September 11, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 1150]<br>• **January 16, 2021** – the Court enters the Confirmation Order [Dkt. No. 2915]<br>• **February 9, 2021** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 3058]<br>• **March 24, 2021** – JW files its final fee application [Dkt. No. 3303]<br>• **April 20, 2021** – the Court approves JW's final fee application without objection [Dkt. No. 3509] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $912,742.00<br>• Reimbursement of expenses in the amount of $21,275.94<br>Ms. Freeman's fees account for $192,258.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases following years of proactive liability management against a backdrop of consistently declining oil and gas prices. The Debtors undertook significant efforts since 2013 to address their leverage and profitability— including rationalizing capital expenditures, reducing operating and general administrative expenses, executing over $11 billion in strategic oil and gas divestitures, reducing off balance sheet liabilities and consummating multiple refinancing transactions. *See* Dkt. No. 37.<br>• On June 28, 2020, the Debtors entered into an RSA with holders of approximately 100% of the Revolving Credit Facility Loans, approximately 87% of the FLLO Term Loans, approximately 60% of the Second Lien Notes, and approximately 31% of the Unsecured Notes. *Id.*<br>• The RSA included a commitment from the Revolving Credit Facility lenders, the FLLO Term Loan Group, and Franklin to support a deleveraging of the Debtors' balance sheet by approximately $7 billion. *Id.* |

| ***In re Chesapeake Energy Corporation, Inc.***<br>**Case No. 20-33233 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan provided for over $4 billion of new money commitments, agreements to reduce total funded indebtedness by approximately $7 billion (including by equitizing approximately $3.8 billion of secured debt), and agreements to gift meaningful recoveries (currently worth over $140 million) to unsecured creditors that were billions of dollars out of the money. Equally important, the Consenting Stakeholders provided the Debtors with a going concern path to exit through a mine field—the value of which cannot be overstated. *See* Dkt. No. 2534.<br>• The Court confirmed the Plan after a 13-day confirmation trial.<br>• The Court found that the settlement incorporated into the Plan constituted a good faith compromise and settlement of all Claims and Interests, and "the Settlement [was] the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and the Settlement [was] fair, equitable, and reasonable and in the best interests of the Debtors, Reorganized Debtors, their respective Estates and property, creditors, and other parties in interest, will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtor." *See* Confirmation Order, ¶ 31 & 33.<br>• The Court also found that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders, and not by any means forbidden by law. *Id.* at ¶ 52. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 94-97.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.E Confirmation Order, ¶¶ 98-99.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any claims and interests. *See* Plan Art. VIII.F; Confirmation Order, ¶¶ 100-101. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 33, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Confirmation Order, ¶ 108, Plan Art. II.A.2d. |

| ***In re Covia Holdings Corporation*** **Case No. 20-33295 (CML) (Bankr. S.D. Tex.) Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **June 29, 2020**– the Debtors file for chapter 11 relief<br>• **July 21, 2020** – the Debtors seek to retain JW [Dkt. No. 195]<br>• **August 5, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 316]<br>• **August 20, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 443]<br>• **December 14, 2020** – the Court enters the Confirmation Order [Dkt. No. 1029] | • **December 31, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1069]<br>• **February 26, 2021** – JW files its final fee application [Dkt. No. 1205]<br>• **April 7, 2021** – the Court approves JW's final fee application without objection [Dkt. No. 1304] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $325,181.00<br>• Reimbursement of expenses in the amount of $6,200.854<br>Ms. Freeman's fees account for $51,021.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases to comprehensively address their unsustainable capital structure in the context of substantial long-term debt and excess fixed costs, and to rationalize their outsized railcar fleet and terminal networks. *See* Dkt. No. 15.<br>• On June 29, 2020, the Debtors and an ad hoc group of term lenders reached a deal in principle on a value-maximizing restructuring transaction that was documented in an RSA. The RSA provided the necessary foundation for the Debtors' Chapter 11 cases to proceed in an efficient, cost-effective, and value-maximizing manner. *See* Dkt. No. 195.<br>• The Debtors, the Committee, the Ad Hoc Term Lender Group, and certain other parties ultimately reached the Plan Settlement with respect to, among other things, the amount ascribed to the Debtors' unencumbered going concern distributable value, the treatment of general unsecured claims, and certain alleged estate claims and challenges identified by the Committee in its Standing Motion. The Debtors also reached a settlement with SCR-Sibelco NV which provided the Debtors with valuable go forward commercial arrangements with Sibelco and which provided an additional $3.75 million to holders of general unsecured claims. | |

| ***In re Covia Holdings Corporation*** **Case No. 20-33295 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • After a four-day confirmation trial, the Committee, Debtors, and Sibelco reached a settlement on remaining outstanding issues, which were not previously resolved in the Plan Settlement.<br><br>• The Court found that the Debtors proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the chapter 11 cases, the Plan itself, and the process leading to its formulation. *See* Plan Art. IX. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C; Confirmation Order, ¶¶ 38-39.<br><br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, VIII.D Confirmation Order, ¶ 41.<br><br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting Causes of Action against a released or exculpated party. *See* Plan, Art. VIII.E; Confirmation Order, ¶ 40. |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Plan, Art. II.B.4. |

| *In re Volusion LLC*<br>Case No. 20-50082 (CML) (Bankr. S.D. Tex.)<br>Chapter 11 | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **July 27, 2020** – the Debtor files for chapter 11 relief<br>• **August 26, 2020** – the Debtor seeks to retain JW [Dkt. No. 74]<br>• **September 24, 2020** – the Court approves the Debtor's request to retain JW [Dkt. No. 94]<br>• **November 2, 2020** – the Debtor files its Chapter 11 Plan of Reorganization [Dkt. No. 100]<br>• **November 20, 2020** – the Court enters the Confirmation Order [Dkt. No. 128]<br>• **January 19, 2021** – the Plan goes effective and the Debtor emerges from bankruptcy [Dkt. No. 158]<br>• **February 2, 2021** – JW files its final fee application [Dkt. No. 166]<br>• **February 26, 2021** – the Court approves JW's final fee application without objection [Dkt. No. 172] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as lead restructuring counsel to the Debtor.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $339,428.00<br>• Reimbursement of expenses in the amount of $3,025.97<br>Ms. Freeman's fees account for $62,897.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtor's Plan effected a reorganization that contemplated the ultimate sale of the Debtor's assets or a refinancing of its debt, but left non-financial general unsecured creditors unimpaired. *See* Dkt. No. 100.<br>• All voting classes voted unanimously in favor of the Plan. *See* Dkt. No. 116. |
| **Releases & Exculpation Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts .I.A, XI.D-E; Confirmation Order, ¶¶ 20-21.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, XI.; Confirmation Order, ¶ 23. |
| **Other Relevant Facts & Plan Provisions** | • This Chapter 11 case was resolved through a Plan that left trade creditors and certain employee-owned options unimpaired and was accepted by 100% of voting creditors. |

| ***In re Volusion LLC***<br>**Case No. 20-50082 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals and ordinary course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate...." *See* Plan Art. II.D. |

| ***In re Denbury Resources, Inc.***<br>**Case No. 20-33801 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **July 30, 2020** – the Debtors file for chapter 11 relief<br>• **July 30, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 16]<br>• **August 28, 2020** – the Debtors seek to retain JW [Dkt. No. 238]<br>• **September 2, 2020** – the Court enters the Confirmation Order [Dkt. No. 273]<br>• **September 18, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 311]<br>• **September 22, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 323]<br>• **October 28, 2020** – JW files its final fee application [Dkt. No. 363]<br>• **November 25, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 384] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $124,321.50<br>• Reimbursement of expenses in the amount of $890.07<br>Ms. Freeman's fees account for $37,122.50 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Prior to the commencement of these chapter 11 cases, on July 28, 2020, after months of robust and arm-length negotiations with key stakeholders, the Debtors with holders of 100% of loans outstanding under Denbury's secured revolver, approximately 67% of holders of Denbury's second lien notes, and holders of approximately 73% of Denbury's convertible notes, reached a deal in principle that was documented into an RSA. *See* Dkt. No. 3.<br>• The RSA contemplated a comprehensive restructuring that would (i) fully equitize all $2.1 billion of Denbury's bond debt; (ii) leave trade and operational creditors unimpaired; and (iii) provide access to a $615 million DIP facility (to roll into a fully committed revolving exit facility), pursuant to a prepackaged chapter 11 plan of reorganization. *See id.*<br>• The Plan provided the Debtors the ability "to stand on its own two feet for the foreseeable future." The Plan equitized $2.1 billion of bond debt that represented the entirety of the company's outstanding bond debt; left administrative, priority, and general unsecured creditors, including trade creditors, unimpaired; and provided an opportunity for out-of-the-money junior stakeholders to realize a recovery if the market rebounded sufficiently. *See* Dkt. Nos. 262 & 279. |

| ***In re Denbury Resources, Inc.*** **Case No. 20-33801 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • Each of the four classes entitled to vote on the Plan, including junior stakeholders who were out of money, all voted overwhelmingly to support the Plan (*i.e.*, the Plan received voting support from 100% of holders of second lien claims; 100% from holders of convertible note claims; 97.74% from holders of subordinated note claims; and 83% from equity). *See id.;* Dkt. No. 258.<br>• The Court found that the Plan and the process leading to its formulation provided independent evidence of the Debtors' and such other parties' good faith, serves the public interest, and assured fair treatment of holders of Claims and Interests. *See* Confirmation Order, ¶ 46.<br>• The Court further found that the Debtors and their respective directors, officers, management, counsel, and advisors, and other agents proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders. *Id.* at ¶ 66. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C; Confirmation Order, ¶¶ 38-40.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.D; Confirmation Order, ¶ 42.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by injunction provision which prohibits all Entities from commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests against the Exculpated Parties or the Released Parties. *See* Plan Art. VIII.E; Confirmation Order, ¶ 44. |
| **Other Relevant Facts & Plan Provisions** | • These Chapter 11 cases have been closed for over three years and were resolved through a prepackaged Plan that left trade creditors unimpaired; the Plan was accepted by a majority of voting creditors; and the Plan was confirmed a mere 34 days after the Petition Date.<br>• The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Confirmation Order, ¶ 32; Plan Art. II.B.4. |

| ***In re iQor Holdings, Inc.***<br>**Case No. 20-34500 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **September 10, 2020** – the Debtors file for chapter 11 relief<br>• **September 10, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 50]<br>• **September 28, 2020** – the Debtors seek to retain JW [Dkt. No. 158]<br>• **October 14, 2020** – the Court enters the Confirmation Order [Dkt. No. 188]<br>• **November 19, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 225]<br>• **November 21, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 230]<br>• **December 2, 2020** – JW files its final fee application [Dkt. No. 233]<br>• **December 30, 2020** – the Court approves JW's final fee application without objection [Dkt. No. 252] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $63,842.00<br>• Reimbursement of expenses in the amount of $3,857.50<br>Ms. Freeman's fees account for $1,670.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases to implement a restructuring through a prepackaged chapter 11 Plan that was the culmination of months of hard-fought negotiations that began in March 2020—over six months prior to the commencement of these cases. *See* Dkt. No. 177.<br>• Prior to the Petition Date, the Debtors and holders of approximately 100% of the Debtors' priority term loan debt, 85% of the Debtors' first lien term loan debt, and 50% of the Debtors' second lien term loan debt executed an RSA. *Id.*<br>• The Plan sought to deleverage the Debtors' balance sheet by approximately $513 million and provide exit financing that would fund the Debtors' businesses upon emergence from chapter 11, leaving the Debtors as a stronger and better capitalized company. The claims of general unsecured creditors were to be paid in full or reinstated and therefore were unimpaired under the Plan. *See* Dkt. No. 188. |

| ***In re iQor Holdings, Inc.*** **Case No. 20-34500 (CML) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan was accepted by all voting creditors who collectively held approximately 97% in outstanding principal amount of the First Lien Term Loan Claims and approximately 84% in outstanding principal amount of the Second Lien Term Loan Claims (representing approximately 94% of the total claims impaired under the Plan). *See* Dkt. No. 53.<br>• The Court found, among other things, that "the Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders." *See* Dkt. No. 188. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 89-90.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, VIII.E Confirmation Order, ¶¶ 91-92.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by injunction provision which prohibits all Entities from commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests against the Exculpated Parties or the Released Parties. *See* Plan, Art. VIII.F; Confirmation Order, ¶ 93. |
| **Other Relevant Facts & Plan Provisions** | • These Chapter 11 cases were resolved through a prepackaged plan that left trade creditors unimpaired, and was approved just over one month after the Petition Date.<br>• The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Confirmation Order, ¶ 85; Plan, Art. II.C.4. |

| ***In re Bouchard Transportation Co., Inc.***<br>**Case No. 20-34682 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **September 29, 2020** – the Debtors file for chapter 11 relief<br>• **October 28, 2020** – the Debtors seek to retain JW [Dkt. No. 173]<br>• **November 23, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 245]<br>• **June 16, 2021** – the Debtors file their Chapter 11 Plan of Liquidation [Dkt. No. 988]<br>• **August 26, 2021** – the Court enters the Confirmation Order [Dkt. No. 1319]<br>• **September 3, 2021** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1340]<br>• **October 18, 2021** – JW files its final fee application [Case No. 20-34758, Dkt. No. 29]<br>• **November 12, 2021** – the Court approves JW's final fee application without objection [Case No. 20-34758, Dkt. No. 63] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $436,790.00<br>• Reimbursement of expenses in the amount of $5,371.86<br>Ms. Freeman's fees account for $23,380.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • At the commencement of these chapter 11 cases, the Debtors were unable to sustain even idle operations. Certain of their ships had been arrested by creditors and were close to being sold in pending admiralty sales. The Debtors had no revenue, their remaining crews had not been paid for a substantial period of time, and their 49-vessel fleet was at risk, with the lead underwriter on critical insurance having threatened cancellation leading into hurricane season. *See* Dkt. No. 1304.<br>• The Debtors obtained court approval for over $100 million of new capital, which they utilized to pay crew members, hire and rehire employees, release vessels from arrest, maintain required insurance coverage, and fund necessary repairs and maintenance. The Debtors went on to consummate two value-maximizing sale transactions that allowed their state-of-the-art fleet to remain part of the Jones Act market and preserve jobs. *Id.*<br>• The Debtors, Wells Fargo Bank, N.A., and the Committee engaged in intensive negotiations to resolve numerous issues. These negotiations were successful, enabling the Debtors to move forward with Plan confirmation, supported by both Wells Fargo and the |

| ***In re Bouchard Transportation Co., Inc.***<br>**Case No. 20-34682 (CML) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | Committee. The Plan, which incorporated a global settlement, provided for (a) the Debtors releasing all claims against Wells Fargo; (b) Wells Fargo contributing $15 million to the Debtors' estates; (c) Wells Fargo waiving any adequate protection claims; (d) Wells Fargo subordinating its deficiency claim to the first $20 million of recoveries for other general unsecured creditors; and (e) Wells Fargo voting in favor of the Plan. *See* Dkt. No. 1304.<br>• Classes 3, 4A and 4B overwhelmingly voted to accept the Plan. Only a small contingency of holders of Claims in Class 4A voted to reject the Plan. *See* Dkt. No. 1297. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, X.D-E; Confirmation Order, ¶¶ M-P, 9-10.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, X.F, Confirmation Order, ¶¶ Q, 11.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan, Art. X.G; Confirmation Order, ¶¶ R, 12. |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate…." *See* Plan Art. II.C.4.<br>• The Plan Administrator has asserted that he has standing in respect of the pending Rule 60(b) matters and has joined in the U.S. Trustee's requested relief. *See* Dkt. Nos. 401 and 414. |

| ***In re Gulfport Energy Corporation*** **Case No. 20-35562 (CML) (Bankr. S.D. Tex.) Chapter 11** | | |
|---|---|---|
| **Topic** | **Summary / Description** | |
| **Former Judge Jones's Role** | Presiding Judge | |
| **Case Timeline & Other Key Dates** | • **November 13, 2020** – the Debtors file for chapter 11 relief<br>• **November 24, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 241]<br>• **December 11., 2020** – the Debtors seek to retain JW [Dkt. No. 390]<br>• **February 2, 2021** – the Court approves the Debtors' request to retain JW [Dkt. No. 732]<br>• **April 27, 2021** – the Court enters the Confirmation Order [Dkt. No. 1262] | • **May 17, 2021** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1393]<br>• **June 30, 2021** – JW files its final fee application [Case No. 20-35561, Dkt. No. 10]<br>• **August 23, 2021** – the Court approves JW's final fee application without objection [Case No. 20-35561, Dkt. No. 212] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest. | **Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $765,173.50<br>• Reimbursement of expenses in the amount of $7,334.20<br>Ms. Freeman's fees account for $54,252.50 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases on November 13, 2020, with the goal of completing simultaneous operational and financial restructurings at a time of unprecedented upheaval in the oil and gas sectors. *See* Dkt. No. 1216.<br>• Five months after commencing these chapter 11 cases, the Debtors were able to confirm their Plan which enjoyed widespread support from their secured and unsecured creditors, including the support of the RBL Lenders, the Ad Hoc Noteholder Group, and the Official Committee of Unsecured Creditors. *See id.*<br>• The Plan incorporated a settlement among the Debtors, the Committee, the RBL Lenders, and the Ad Hoc Noteholder Group. *See id.*; Dkt. No. 1262. The settlement allowed the Debtors to shed over $1.4 billion of funded debt and letters of credit and significantly reduced annual interest expense by over $86 million on a go-forward basis. *See id.*<br>• The Plan was overwhelmingly supported by key stakeholders. *See* Dkt. No. 1278. | |

***In re Gulfport Energy Corporation***
**Case No. 20-35562 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
| --- | --- |
| | • The Court found that the Plan constituted a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies. Confirmation Order, ¶ 8. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 9-10.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.E, Confirmation Order, ¶ 12.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 13. |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate …" *See* Plan Art. II.C.4. |

| ***In re Seadrill Partners, LLC*** **Case No. 20-35740 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **December 1, 2020** – the Debtors file for chapter 11 relief<br>• **December 23, 2020** – the Debtors seek to retain JW [Dkt. No. 110]<br>• **January 15, 2021** – the Court approves the Debtors' request to retain JW [Dkt. No. 136]<br>• **February 13, 2021** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 285]<br>• **May 14, 2021** – the Court enters the Confirmation Order [Dkt. No. 570]<br>• **May 25, 2021**– the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 586]<br>• **July 8, 2021** – JW files its final fee application [Dkt. No. 643]<br>• **August 10, 2021** – the Court approves JW's final fee application without objection [Dkt. No. 690] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $286,885.00<br>• Reimbursement of expenses in the amount of $1,617.25<br>Ms. Freeman's fees account for $28,233.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • After five months of negotiations, the Debtors confirmed the Plan, which among other things, equitized all of the Debtors' approximately $2.8 billion of funded indebtedness, resolved historical intercompany disputes, implemented the New Management Services Agreements for the Debtors' new go-forward operators, positioned the Debtors for success in meeting their long-term strategic goals, and maximized value for their stakeholders. *See* Dkt. No. 557.<br>• The Plan embodied three comprehensive restructuring settlements among the Debtors, the Consenting TLB Lenders, the Agent, Seadrill Limited, the Committee, and the members of the Committee. *Id.*<br>• The Court-approved the intercompany settlement between the Seadrill Parties and the Debtors that resolved litigation over amounts accrued on account of management services rendered in connection with the Debtors' rigs, which included amounts that Seadrill Limited asserted as secured, and significantly reduced the size of the General Unsecured Claims pool. *Id.*<br>• The negotiated settlement with the Committee increased the recovery for Holders of General Unsecured Claims by $1.5 million or 200% in the aggregate and otherwise resolved key claims with some of the Debtors' major creditors. *Id.* |

***In re Seadrill Partners, LLC***
**Case No. 20-35740 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
| --- | --- |
| | • All voting classes overwhelmingly voted in favor of the Plan. *Id*; *see* Dkt. No. 556.<br>• The Court found that the Confirmation Settlement "was product of arm's-length bargaining and good faith negotiations between sophisticated parties … [was] fair, equitable, and reasonable, and in the best interests of the Debtors, the Reorganized Debtors, their respective Estates and property, their creditors, and other parties in interest, will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and is essential to the successful implementation of the Plan." *See* Confirmation Order, ¶ 36. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.B-C; Confirmation Order, ¶¶ 38-47.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. IA, VIII.D; Confirmation Order, ¶ 48.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan, Art. VIII.E; Confirmation Order, ¶ 49. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Plan, Art. II.B.4; Confirmation Order, ¶ 136.<br>• The Reorganized Debtors have asserted that they have standing in respect of the pending Rule 60(b) matters. *See* Dkt. No. 857. |

***In re Seadrill Limited***
**Case No. 21-30427 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **February 10, 2021** – the Debtors file for chapter 11 relief<br>• **March 8, 2021** – the Debtors seek to retain JW [Dkt. No. 250]<br>• **April 5, 2021** – the Court approves the Debtors' request to retain JW [Dkt. No. 302]<br>• **July 24, 2021** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 862]<br>• **October 26, 2021** – the Court enters the Confirmation Order [Dkt. No. 1158]<br>• **December 8, 2021** – JW files its final fee application [Dkt. No. 1281]<br>• **January 7, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 1340]<br>• **February 22, 2022** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1399] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $501,242.00<br>• Reimbursement of expenses in the amount of $2,123.05<br>Ms. Freeman's fees account for $5,594.50 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • During these chapter 11 cases, the Debtors spent months in constant discussions in good faith with lenders and their advisors, including the CoCom, the Ad Hoc Group, and numerous individual lenders to achieve a consensual Plan that equitized almost $5 billion of secured debt across 12 separate collateral silos. The Plan streamlined Seadrill's capital structure into a single silo consisting of $300 million of new-money first lien debt and approximately $683 million of second lien takeback debt. The rest of the prepetition secured debt converted to equity, which was allocated across the silos according to relative collateral values, together with the takeback debt and new-money subscription right. *See* Dkt. Nos. 118 & 1158.<br>• The Plan was overwhelmingly supported by key stakeholders. Over 96% by principal amount of all lenders voted, and over 88% of these voting lenders accepted the Plan. In 9 of the 12 silos, 100% of voting lenders accepted the Plan. Approximately half of the lenders by number voting were party to neither the PSA nor the Backstop Commitment. In the two silos in which SVP was a lender, the support from voting creditors was similarly overwhelming. In the NADL silo, 100% of the secured creditors voted and all creditors other than SVP voted to accept the Plan. General unsecured creditors and shareholders also accepted the Plan. *See* Dkt. Nos. 1094 & 1158. |

| ***In re Seadrill Limited*** **Case No. 21-30427 (CML) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Court found that the Plan settlement was the product of arm's-length bargaining and good faith negotiations between sophisticated parties and that it was "fair, equitable, and reasonable, and in the best interests of the Debtors, the Reorganized Debtors, their respective Estates and property, their creditors, and other parties in interest, will maximize the value of the Debtors' Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and is essential to the successful implementation of the Plan." *See* Confirmation Order, ¶ 31. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.B-C; Confirmation Order, ¶¶ 32-41.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.D; Confirmation Order, ¶ 42.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan Art. VIII.E; Confirmation Order, ¶ 43. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Plan Art. II.B.4; Confirmation Order, ¶ 130.<br>• The Reorganized Debtors have asserted that they have standing in respect of the pending Rule 60(b) matters. *See* Dkt. No. 1634. |

| ***In re Katerra, Inc.*** **Case No. 21-31861 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **June 6, 2021** – the Debtors file for chapter 11 relief<br>• **June 29, 2021** – the Debtors seek to retain JW [Dkt. No. 289]<br>• **August 4, 2021** – the Court approves the Debtors' request to retain JW [Dkt. No. 795]<br>• **August 13, 2021** – the Debtors file their Chapter 11 Plan of Liquidation [Dkt. No. 851]<br>• **October 21, 2021** – the Court enters the Confirmation Order [Dkt. No. 1372]<br>• **October 29, 2021** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1422]<br>• **December 3, 2021** – JW files its final fee application [Dkt. No. 1523]<br>• **January 28, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 1340] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $858,653.01<br>• Reimbursement of expenses in the amount of $3,934.73<br>JW provided a voluntary reduction of $4,877.49 pursuant to an informal objection received from the U.S. Trustee's office.<br>Except as set forth in the precedent sentence, neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • During these chapter 11 cases, the Debtors conducted a fulsome marketing process and consummated sales for the majority of their most valuable assets, repaid their DIP Facility, negotiated consensual stipulations with numerous stakeholders to mitigate damages and disruption caused by these cases, and reached consensus with the Committee. *See* Dkt. No. 1359.<br>• The only voting class, Class 3, overwhelmingly accepted the Plan. *See* Dkt. No. 1309.<br>• The Court found that the Plan was proposed in good faith with the legitimate and honest purpose of maximizing the value of the Debtors' estates for the benefit of their stakeholders, and not by any means forbidden by law. *See* Confirmation Order, ¶ 52. |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 35-40. |

| ***In re Katerra, Inc.*** **Case No. 21-31861 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.E; Confirmation Order, ¶¶ 41-42.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 43. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order and Plan provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, and (II) Granting Related Relief [Docket No. 558] in seeking retention or compensation for services rendered after such date shall terminate…." *See* Plan Art. II.B.4; Confirmation Order, ¶ 129.<br>• The Plan Administrator has asserted that he has standing in respect of the pending Rule 60(b) matters. *See* Dkt. No. 2104. |

| ***In re Seadrill New Finance Limited*** **Case No. 22-90001 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **January 11, 2022** – the Debtors file for chapter 11 relief<br>• **January 11, 2022** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 16]<br>• **December 12, 2022** – the Court enters the Confirmation Order [Dkt. No. 62]<br>• **February 8, 2022** – the Debtors seek to retain JW [Dkt. No. 94]<br>• **January 20, 2022** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 88]<br>• **February 21, 2022** – JW files its final fee application [Dkt. No. 99]<br>• **March 11, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 108]<br>• **June 6, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 121] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved by the Court's order awarding JW:<br>• Compensation in the amount of $27,286.00<br>• Reimbursement of expenses in the amount of $21,067.75<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • In early 2020, almost two years prior to the commencement of these chapter 11 cases, the Debtors recognized the need to examine comprehensive solutions and sought outside strategic advice. The Debtors also commenced discussions with their creditor constituencies regarding a broader and consensual restructuring. Following many months of hard-fought negotiations, on July 2, 2021, the Debtors and an ad hoc group of noteholders, among other parties, signed onto an RSA pursuant to which the parties agreed to the terms of a comprehensive restructuring. *See* Dkt. No. 6.<br>• Prior to the Petition Date, on December 8, 2021, the Debtors commenced solicitation of votes on the Plan. *See* Dkt. No. 17.<br>• All voting classes overwhelmingly voted in favor of the Plan. *See* Dkt. No. 7.<br>• The Court confirmed the Prepackaged Plan one day *a*fter the Petition Date. *See* Dkt. No. 62.<br>• The Court found, among other things, that: "the Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders." *See* Dkt. No. 62 |

| *In re Seadrill New Finance Limited*<br>**Case No. 22-90001 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | |
| **Releases, Exculpation & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 29-35.<br>• **Exculpation**. JW is an Exculpated Party under the Plan. *See* Plan Arts. IA, VIII.E Confirmation Order, ¶ 36.<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by the Plan injunction, which prohibits any entity from asserting any actions against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 37. |
| **Other Relevant Facts & Plan Provisions** | • These chapter 11 cases were resolved through a prepackaged Plan that left trade creditors unimpaired, was accepted by 100% of voting creditors, and was approved one day after the Petition Date.<br>• The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate.…" *See* Plan Art. II.B.4. |

***In re Exco Resources, Inc.***
**Case No. 18-30155 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **January 15, 2018** – the Debtors file for chapter 11 relief<br>• **February 26, 2018** – the Committee seeks to retain JW [Dkt. No. 382]<br>• **March 23, 2018** – the Court approves the Committee's request to retain JW [Dkt. No. 526]<br>• **July 19, 2018** – Court approves the Debtors' motion seeking to appoint Judge Jones as a mediator [Dkt. No. 894]<br>• **October 1, 2018** – the Debtors file their initial Plan of Reorganization [Dkt. No. 1102]<br>• **March 8, 2019** – the Debtors filed their second Plan of Reorganization [Dkt. No. 1683]<br>• **April 10, 2029** – the Debtors filed their third Plan of Reorganization [Dkt. No. 1801]<br>• **June 18, 2019** – the Court enters the Confirmation Order after a contested, multi-day confirmation trial [Dkt. No. 2128]<br>• **June 28, 2019** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 2174]<br>• **September 20, 2019** – the Court approves JW's final fee application without objection [Case No. 18-30167, Dkt. No. 122] |
| **JW's Retention & Fee Applications** | **Role.** The Committee retained JW as local counsel and oil & gas counsel. Brown Rudnick served as the Committee's lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $1,820,436.50, and<br>• Reimbursement of expenses in the amount of $68,949.98.<br>JW provided a $25,000 voluntary reduction.<br>Ms. Freeman's fees account for $ 185,702.50. of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • As per the mediation motion, "[t]he Debtors have discussed appointing [former Judge Jones as mediator] with their major stakeholders, including the Official Committee of Unsecured Creditors (the 'Committee'), Fairfax Financial Holdings Limited, Hamblin Watsa Investment Counsel Ltd., and any of their respective affiliates holding claims against the Debtors (collectively, 'Fairfax'), and Bluescape Resources Company LLC, Energy Strategy Advisory Services, and any of their respective affiliates holding claims against the Debtors (collectively, 'Bluescape' and, together with the Debtors, the Committee, and Fairfax, the 'Parties'), and all such Parties consent to mediation." *See* Dkt. No. ¶ 7.<br>• Mediation began on August 6, 2018, with a second round of mediation held on August 27, 2018, and continued on September 21, 2018, "and resolved many potential claims and causes of action that may have been brought by the Debtors or the Committee." *See* Dkt. No. 1907. |

***In re Exco Resources, Inc.***
**Case No. 18-30155 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| | • The Debtors reached an agreement with the Settling Lenders and the Committee regarding the terms of an amended Plan, which contemplated, among other things, a settlement of all estate claims and Causes of Action against the Settling Lenders pursuant to which, among other things, the Settling Lenders have agreed to contribute $60 million of value to which they are entitled to fund recoveries under the amended Plan and equitize their funded debt Claims. Additionally, the amended Plan incorporated the Debtors' and the Committee's settlement with the D&O Carriers regarding all claims and Causes of Action the Debtors, the Committee, or any other party in interest may have asserted against the Insureds in exchange for $13.35 million in Cash contributed by the D&O Carriers to the Debtors' estates. The amended Plan preserved, among other things, claims and Causes of Action against the Holders of 1.5 Lien Notes Claims and 1.75 Lien Term Loan Facility Claims other than the Settling Lenders to be litigated by the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator. *Id.*<br>• The Plan was a value-maximizing transaction that allowed the Debtors to emerge as a going concern with a significantly de-levered capital structure. In particular, the Secured Lender Settlement and the D&O Settlement were good-faith compromises that were beneficial to the Debtors' estates, pursuant to which the Debtors and their estates received substantial value. The support of these settling parties, and the value provided pursuant to these settlements, were critical to allowing the Debtors to emerge from bankruptcy as a going concern with a right-sized capital structure and a fresh start. *See id.*<br>• After over a year and a half of comprehensive restructuring negotiations with all key stakeholders, the Debtors were poised to exit from bankruptcy protection with a dramatically de-levered balance sheet, $325 million of committed financing to fund the Debtors' go-forward business needs, and a consensual resolution of multiple claims and causes of action against third parties, including certain of the Debtors' largest stakeholders. *See* Dkt. No. 2076.<br>• The Court found that the Plan was the product of good faith, arm's-length negotiations by and among the Debtors, the Settling Lenders, the Supporting Creditors, the D&O Carriers, and the Committee and that "the compromises and settlements embodied in the Settlements constitute[d] a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan." *See* Confirmation Order, ¶¶ 57 & 96. |
| **Releases, Exculpation and Injunction Provisions** | • **Releases.** JW is a Released Party under the Plan. *See* Plan, Arts. I.A & VIII.C-D; Confirmation Order, ¶¶ 100-103. The Debtors' release does not contain a carve out for "actual fraud, gross negligence, or willful misconduct" because, as explained in the Disclosure Statement: "...the Debtors' Releases are consensual, [a] carve-out for Claims and Causes of Action related to actual fraud, gross negligence, or willful misconduct is unnecessary. The Released Parties that benefit from the Debtors' Releases are providing consideration . . . , and the Debtors are consenting to the releases, which were a necessary component of the overall bargain that has put the Debtors on the path to a value maximizing restructuring." Disclosure Statement Art. IV.X.1.<br>• **Exculpation.** JW is an Exculpated Party under the Plan. *See* Plan, Arts. I.A, VIII.E; Confirmation Order, ¶ 104 |

| ***In re Exco Resources, Inc.*** **Case No. 18-30155 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • **Injunction.** The Plan's release and exculpation provisions are enforced by an injunction that prohibits, any entity from asserting Causes of Action against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order, ¶ 105. |
| **Other Relevant Facts and Plan Provisions** | • The Confirmation Order and Plan provide that, after the confirmation date, "any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. . . ." *See* Plan, Art. II.A.2.d; Confirmation Order, ¶ 122. |

| ***In re Sanchez Energy Corporation***<br>**Case No. 19-34508 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **August 11, 2019** – the Debtors file for chapter 11 relief<br>• **September 6, 2019** – the Debtors seek to retain JW [Dk. No. 269]<br>• **October 1, 2019** – the Court approves the Debtors' request to retain JW [Dkt. No. 416]<br>• **March 29, 2020** – the Court enters the Order appointing former Judge Jones to serve as mediator [Dkt. No. 1049]<br>• **April 6, 2020** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 1109]<br>• **April 30, 2020** – the Court enters the Confirmation Order [Dkt. No. 1212]<br>• **June 30, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1417]<br>• **July 2, 2020** – JW files its final fee application [Dkt. No. 1432]<br>• **July 27, 2020**– the Court approves JW's final fee application without objection [Dkt. No. 1502] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Akin Gump served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $1,905,683.35<br>• Reimbursement of expenses in the amount of $98,468.48<br>Ms. Freeman's fees account for $531,384.50 of the total amount.<br>JW agreed to waive all fees incurred after March 27, 2020 in addition to the 10% reduction of fees pursuant to a Professional Fee Settlement.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • At the end of January 2020, the Debtors, the Secured Notes Ad Hoc Group and the Committee engaged in hard fought negotiations. In March 2020, due to the collapse in the commodity markets and lowering of long-term strip pricing, the enterprise value of the Debtors was less than the $100 million of new money that the Debtors borrowed under the DIP facility. Despite hard-fought and good-faith negotiations, the Debtors and the DIP lenders reached an impasse. The parties agreed to engage the help of mediator. *See* Dkt. No. 1220.<br>• Mediation resulted in a global resolution and consensus, and allowed the Debtors to confirm the Plan. Among other things, the global resolution provided that the DIP lenders would receive 20% of equity of the Reorganized Debtors, the litigation of all DIP lender lien-related matters would be deferred until the Effective Date; and the remaining 80% of equity of the Reorganized Debtors would be based on the Court's determination in phases in accordance with the Bankruptcy Code's priority scheme. *Id.*; Dkt. No. 1205. |

| ***In re Sanchez Energy Corporation***<br>**Case No. 19-34508 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan also provided that the DIP lenders would equitize their DIP claims rather than receive payments in full in cash. *Id.*<br><br>• Professionals agreed to a fixed pool which waived all fees incurred after March 27, 2020 in addition to a 10% reduction of fees. *Id.* This accounted to more than $15 million in assistance to the Debtors and was done to help the Debtors exit from Chapter 11.<br><br>• The Debtors acknowledged that the Plan was the end product of robust, protracted, arms-length negotiations and presented the only viable plan forward. *Id.*<br><br>• Classes 3 & 4 overwhelmingly voted to accept the Plan. Only Class 5 (general unsecured claims holders) rejected the Plan. *See* Dkt. No. 1181.<br><br>• The Court found that the Plan constituted "a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including (a) any dispute regarding the treatment of any Intercompany Claims and (b) the Professional Fee Settlement." *See* Confirmation Order, ¶ 8. |
| **Exculpation & Injunction Provisions** | • **Exculpation.** JW is an Exculpated Party under the Plan. *See* Plan Arts. I.A., A VIII.B; Confirmation Order, ¶ 10.<br><br>• **Injunction.** The Plan's release and exculpation provisions are enforced by an injunction that prohibits all Entities from commencing or continuing any action against the Exculpated Parties. *See* Plan Art. VIII.C; Confirmation Order, ¶ 11 |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides that "as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional." *See* Plan Art. II.B.1. |

***In re Tailored Brands, Inc.***
**Case No. 20-33900 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
| --- | --- |
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **August 8, 2020** – the Debtors file for chapter 11 relief<br>• **August 17, 2020** – the Debtors files their Chapter 11 Plan of Reorganization [Dkt. No. 347]<br>• **September 1, 2020** – the Debtors seek to retain JW [Dkt. No. 496]<br>• **October 6, 2020** – the Court approves the Debtors' request to retain JW [Dkt. No. 792]<br>• **November 5, 2020** – the Court enters a stipulation appointing former Judge Jones as mediator [Dkt. No. 1034]<br>• **November 13, 2020** – the Court enters the Confirmation Order [Dkt. No. 1221]<br>• **December 1, 2020** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1298]<br>• **December 30, 2020**– the Court approves JW's final fee application without objection [Dkt. No. 1404] |
| **JW's Retention & Fee Applications** | **Role.** The Debtors retained JW as co-counsel and conflicts counsel. Kirkland and Ellis was retained as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $253,420.00, and<br>• Reimbursement of expenses in the amount of $1,482.05<br>Mr. Freeman's fees account for $57,345.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • Prior to the petition date, the Debtors executed an RSA with their lenders, which contemplated a comprehensive reorganization that would deleverage the Debtors' balance sheet through the reduction in the Debtors' funded indebtedness by between approximately $455 million and $555 million and would allow the Debtors to move expeditiously through the chapter 11 cases. *See* Dkt. No. 20.<br>• The Debtors, the Committee, and the Ad Hoc Group of Term Loan Lenders engaged in mediation in an attempt to reach a consensual resolution of certain issues and disputes relating to the total enterprise value of the Debtors.<br>• Mediation resulted in a global settlement. The mediated resolution materially increased the value offered to general unsecured creditors, including 7.5% of equity which was five times the amount contained in the initial Plan. *See* Dkt. Nos. 1216 & 1268.<br>• The Committee recognized that the mediation was "a hard-fought case with strong-willed stakeholders on all sides," and it believed "that the resolution reached [was] a fair one for general unsecured creditors and avoid[ed] contested litigation regarding plan valuation." *See* Dkt. No. 1268.<br>• As part of the global settlement, creditors agreed to change their vote from "no" to "yes." *See* Dkt. Nos. 1208 &1268 |

***In re Tailored Brands, Inc.***
**Case No. 20-33900 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
|---|---|
| | • The Court found that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. *See* Confirmation Order, ¶ 73. |
| **Release and Exculpation Provisions** | • **Releases.** JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C-D; Confirmation Order, ¶¶ 34-42.<br>• **Exculpation.** JW is an Exculpated Party under the Plan. *See* Plan Arts. I.A, VIII.E; Confirmation Order, ¶ 43,<br>• **Injunction.** The Plan's release and exculpation provisions are enforced by an injunction that prohibits, *inter alia*, any entity from asserting Causes of Action against a released or exculpated party. *See* Plan Art. VIII.F; Confirmation Order ¶ 44. |
| **Other Plan Provisions** | • The Plan provides that, after the confirmation date, "any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. . . ." *See* Plan Art. II.A.2.d. |

# EXHIBIT 3

Post-March 2022 Cases[1]

[1] All capitalized terms in this Exhibit shall have the meanings ascribed to them in Plans and referenced Orders, as applicable.

| ***In re Brilliant Energy, LLC***<br>**Case No. 21-30936 (EVR) (Bankr. S.D. Tex.)**<br>**Chapter 7** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **March 16, 2021** – the Debtor files for chapter 7 relief<br>• **April 13, 2021** – the chapter 7 trustee seeks to retain JW [Dkt. No. 68]<br>• **June 4, 2021** – the Court approves the chapter 7 trustee's request to retain JW [Dkt. No. 131]<br>• **May 5, 2021** – the Court approves the chapter 7 trustee's sale of the Brilliant Energy residential customer book and the assumption and assignment of contracts [Dkt. No. 108]<br>• **July 26, 2021** – the Court approves sale of gift cards [Dkt. No. 162]<br>• **December 15, 2022** – JW files its final fee application [Dkt. No. 234]<br>• **December 30, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 248] |
| **JW's Retention & Fee Applications** | **Role.** Chapter 7 trustee retained JW as special counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $186,363.50<br>• Reimbursement of expenses in the amount of $2,246.63<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • During the case, the chapter 7 trustee was able to obtain use of cash collateral and post-petition financing allowing for business stabilization and the marshalling and the sale of estate assets. *See* Dkt. Nos. 90, 83 & 108. |
| **Other Relevant Facts & Plan Provisions** | • This was a chapter 7 case; thus, no plan was filed or confirmed.<br>• Ms. Freeman did not bill any time in connection with this case.<br>• The chapter 7 trustee has asserted that he has standing in respect of the pending Rule 60(b) matters. *See* Dkt. No. 285. |

***In re Basic Energy, Inc.***
**Case No. 21-90002 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **August 17, 2021** – the Debtors file for chapter 11 relief<br>• **November 8, 2021** – the Court enters an order approving a global settlement [Dkt. No. 686]<br>• **December 13, 2021** – the Debtors seek retention of JW [Dkt. No. 809]<br>• **January 19, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 997]<br>• **June 22, 2022** – the Debtors file their Chapter 11 Plan of Liquidation [Dkt. No. 1266]<br>• **August 9, 2022** – the Court enters the Confirmation Order [Dkt. No. 1436]<br>• **August 26, 2022** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1454]<br>• **September 2, 2022** – JW files its final fee application [Dkt. No. 1459]<br>• **September 29, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 1511] |
| **JW's Retention & Fee Applications** | **Role.** The Debtors retained JW as lead counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $1,540,349.50<br>• Reimbursement of expenses in the amount of $3,082.84<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Court entered an order approving the global settlement appointing David Dunn to serve as the wind-down director to effectuate the terms of that global settlement which provided for the monetization and orderly wind-down of the estates. *See* Dkt. No. 686.<br>• During the cases, the Debtors collected nearly $60 million in from asset sales and entered into settlements with 19 pre-global settlement order administrative creditors. *See* Dkt. No. 1441. The Debtors also entered into a settlement with Ascribe following an appeal of the global settlement order that released approximately $20.7 million in disputed reserves. *Id.* Additionally, the global settlement settled issues between the Committee and the Ad Hoc Group on the disputed make-whole reserve. *Id.*<br>• The Plan was unanimously accepted by Classes 2, 3, 4, 5 and 7, and overwhelmingly accepted by over 86% of voting unsecured claims. *See* Dkt. No. 1403. |
| **Releases, Exculpations & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A.121, IX.F; Confirmation Order, ¶ 20. |

| ***In re Basic Energy, Inc.*** **Case No. 21-90002 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • **Exculpations.** JW is an Exculpated Party under the Plan. *See* Plan Arts. I.A.55, IX.F; Confirmation Order, ¶ 21.<br>• **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests against Released Parties. *See* Plan Art. IX.C; Confirmation Order, ¶ 22. |
| **Other Relevant Facts & Plan Provisions** | • JW provided a voluntary reduction in fees of $2,345.50 pursuant to an informal objection received from the U.S. Trustee.<br>• Ms. Freeman did not bill any time in connection with these cases.<br>• The Plan provides that "[f]rom and after the Confirmation Date, any requirement that Professionals comply with §§ 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate." *See* Plan Art. IV.A.1.d.ii.<br>• The Plan provides that "on the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with this Plan and the Liquidation Trust Agreement." *See* Plan, Art. V.C.3; *see also* Confirmation Order, ¶ 26.<br>• The Liquidation Trustee has asserted that he has standing in respect of the pending Rule 60(b) matters and has joined in the U.S. Trustee's requested relief. *See* Dkt. Nos. 1807 & 1788. |

***In re Strike LLC***
**Case No. 21-90054 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **December 6, 2021** – the Debtors file for chapter 11 relief<br>• **January 6, 2022** – the Debtors seek to retain JW [Dkt. No. 363]<br>• **February 4, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 661]<br>• **March 23, 2022** – the Debtors file their Chapter 11 Plan of Liquidation [Dkt. No. 898]<br>• **May 17, 2022** – the Court enters the Confirmation Order [Dkt. No. 1111]<br>• **June 6, 2022**– the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1151]<br>• **July 21, 2022** – JW files its final fee application [Dkt. No. 1220]<br>• **August 18, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 1248] |
| **JW's Retention & Fee Applications** | **Role.** The Debtors retained White & Case LLP as lead counsel. JW was retained as the Debtors' co-counsel and conflicts counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $875,026.00<br>• Reimbursement of expenses in the amount of $12,331.41<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtors commenced these chapter 11 cases to maximize the value of their estates through a competitive auction and sale of their assets and subsequent wind down of their estates through a chapter 11 plan of liquidation. *See* Dkt. No. 108.<br>• After conducting a competitive Court-supervised marketing process and selling substantially all of their assets, the Debtors confirmed a plan of liquidation that provided for the resolution of all outstanding claims against and equity interests in the Debtors. *Id.*<br>• The Liquidating Plan incorporated a global settlement and was confirmed on a consensual basis. *See* Dkt. No. 1113.<br>• The sole voting class, Class 3 general unsecured claims, overwhelmingly voted (between 86.67% to 100% depending on the relevant debtor) to accept the plan. *See* Dkt. No. 1081.<br>• The Court found that the Plan was proposed in good faith and was "the product of the open, and good faith process through which the Debtors have conducted their Chapter 11 Cases and reflects extensive, good faith, arm's length negotiations among the Debtors, Committee, the AIP Parties, and the Debtors' key economic stakeholders." Confirmation Order, ¶ 40. |
| **Releases, Exculpations & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. II.A.136, XII.C; Confirmation Order, ¶¶ 31-35, 87, 89.<br>• **Exculpations**. JW is an Exculpated Party under the Plan. *See* Plan, Arts. I.A.61, XII.D; Confirmation Order, ¶¶ 36, 87, 91. |

| ***In re Strike LLC*** **Case No. 21-90054 (MI) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • **Injunction.** The Plan's releases provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests against Released Parties. *See* Plan, Art. XII.E; Confirmation Order, ¶¶ 37, 92. |
| **Other Relevant Facts & Plan Provisions** | • Ms. Freeman did not bill any time in connection with these cases.<br>• The Plan provides that "upon the Effective Date, any requirement that Retained Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate." *See* Plan, Art. VI.C.4; Confirmation Order, ¶ 102. |

| *4E Brands Northamerica LLC*<br>**Case No. 22-50009 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **February 22, 2022** – the Debtor files for chapter 11 relief<br>• **March 24, 2022** – the Debtor seeks to retain JW [Dkt. No. 72]<br>• **May 5, 2022** – the Court approves the Debtor's request to retain JW [Dkt. No. 120]<br>• **August 5, 2022** – the Debtor files its Chapter 11 Plan of Liquidation [Dkt. No. 205]<br>• **October 27, 2022** – the Court enters the Confirmation Order [Dkt. No. 353]<br>• **November 1, 2022** – the Plan goes effective and the Debtor emerges from bankruptcy [Dkt. No. 362]<br>• **December 1, 2022** – JW files its final fee application [Dkt. No. 391]<br>• **December 29, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 427] |
| **JW's Retention & Fee Applications** | **Role.** The Debtor retained JW as lead counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved by awarding JW:<br>• Compensation in the amount of $859,425.50<br>• Reimbursement of expenses in the amount of $7,300.81<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Plan, among other things, achieved two important goals: (1) the safe and efficient destruction of the inventory which was harmful to customers, and (2) recovery for creditors. *See* Dkt. No. 363.<br>• The Plan was the result of a mediation with Judge Lopez, which resulted in an increased recovery for unsecured creditors and provided for the continued oversight of the inventory destruction by Mr. David Dunn, the Chief Restructuring Officer of the Debtors. *Id.*<br>• The Court found that the Plan was proposed in good faith, "with the legitimate and honest purpose of maximizing the value of the Debtor's Estate for the benefit of its stakeholders, and not by any means forbidden by law." *See* Confirmation Order, ¶ 32. |
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. II.A.80, VIII.F.4; Confirmation Order, ¶¶ 20-24, 63-64.<br>• **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests against Released Parties. *See* Plan Art. VIII.F.6; Confirmation Order, ¶¶ 25, 65. |
| **Other Relevant Facts & Plan Provisions** | • Ms. Freeman did not bill any time in connection with this case. |

| ***4E Brands Northamerica LLC*** **Case No. 22-50009 (MI) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The Plan provides "[f]rom and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate." *See* Art. II.A.1.c.ii.<br><br>• The Plan provides that "the Assets shall revest in the Estates for the purpose of liquidating the Estates. *See* Art. IV.A.1.<br><br>• The Plan and the Confirmation Order vest the Plan Agent as the sole and exclusive representative of the estate. *See* Plan Art. IV.A.3; Confirmation Order, ¶ 35.<br><br>• The Plan Agent has asserted that he has standing in respect of the pending Rule 60(b) matters and has joined in the U.S. Trustee's requested relief. *See* Dkt. Nos. 607 & 644. |

***In re Sungard AS New Holdings, LLC***
**Case No. 22-90018 (CML) (Bankr. S.D. Tex.)**
**Chapter 11**

| Topic | Summary / Description |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **April 11, 2022** – the Debtors file for chapter 11 relief<br>• **May 10, 2022** – the Debtors seek to retain JW [Dkt. No. 211]<br>• **June 3, 2022** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 205]<br>• **June 7, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 291]<br>• **October 17, 2022** – the Court enters the Confirmation Order [Dkt. No. 763]<br>• **November 3, 2022** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 821]<br>• **November 29, 2022** – JW files its final fee application [Dkt. No. 848]<br>• **December 30, 2022** – the Court approves JW's final fee application without objection [Dkt. No. 897]<br>• **February 2, 2023** – the Court enters an order closing certain of the Chapter 11 Cases |
| **JW's Retention & Fee Applications** | **Role.** The Debtors retained Akin Gump Straus Hauer & Feld LLP as lead counsel. JW was retained as local counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $414,495.00<br>• Reimbursement of expenses in the amount of $5,966.56<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • On April 11, 2022, the Debtors entered into an RSA with First Lien Lenders holding in excess of 80% of the term loans under the First Lien Credit Agreement and Second Lien Lenders holding in excess of 80% of the term loans under the Second Lien Credit Agreement. *See* Dkt. No. 205. The RSA contemplated, among other things, that the Debtors would run a comprehensive sale process for the sale of all or any subset of their assets and would implement a chapter 11 plan pursuant to which (i) any sale proceeds would be distributed and (ii) the Debtors would reorganize around any assets and/or business lines not sold and would distribute the Reorganized Debtor Equity to holders of Term Loan DIP Claims. *Id.*<br>• The Plan was overwhelmingly supported by creditors. All creditors in Class 3, the only class entitled to vote, submitted a ballot and voted to accept the Plan. *See* Dkt. Nos. 741 & 772. |
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. II.A.146, XII.C; Confirmation Order, ¶ 21.<br>• **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests against Released Parties. *See* Plan Art. XII.E; Confirmation Order, ¶ 23. |

| ***In re Sungard AS New Holdings, LLC*** **Case No. 22-90018 (CML) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Other Relevant Facts & Plan Provisions** | • Ms. Freeman did not bill any time in connection with this case.<br>• The Plan provides "upon the Effective Date, any requirement that Retained Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate." *See* Art. VI.A.2.<br>• The Plan Administrator has asserted that he has standing in respect of the pending Rule 60(b) matters. *See* Dkt. No. 1053. |

***LaForta - Gestao e Investmentos***
**Case No. 22-90126 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Former Judge Jones's Role** | Presiding Judge |
| **Case Timeline & Other Key Dates** | • **June 16, 2022** – the Debtor files for chapter 11 relief<br>• **July 15, 2022** – the Debtor seeks to retain JW [Dkt. No. 67]<br>• **August 11, 2022** – the Court approves the Debtor's request to retain JW [Dkt. No. 82]<br>• **November 15, 2022** – the Court approves the sale of the Debtor's assets [Dkt. No. 160]<br>• **August 31, 2023** – the Court enters an order dismissing the case [Dkt. No. 277]<br>• **September 8, 2023** – JW files its final fee application [Dkt. No. 286]<br>• **October 4, 2023** – the Court approves JW's final fee application without objection [Dkt. No. 298]<br>• **November 30, 2023** – the Debtor files its notice of dismissal of the chapter 11 case [Dkt. No. 302] |
| **JW's Retention & Fee Applications** | **Role.** The Debtor retained JW as its lead counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $505,907.50<br>• Reimbursement of expenses in the amount of $7,946.11<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • The Debtor filed its chapter 11 case because it had no money, no revenue stream, over $1 billion in secured debt, and an uncertain path to realizing value from its sole asset, which required material investment and attention to maintain and return to an active operating state. *See* Dkt. No. 11.<br>• During the case, the Debtors sold all of its assets. *See* Dkt. No. 160. |
| **Other Relevant Facts & Plan Provisions** | • This case was dismissed on November 30, 2023.<br>• Ms. Freeman did not bill any time in connection with this case. |

| ***In re GWG Holdings, Inc.*** **Case No. 22-90032 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **April 20, 2022** – the Debtors file for chapter 11 relief<br>• **May 10, 2022** – the Debtors seek to retain JW [Dkt. No. 211]<br>• **June 15, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 410]<br>• **December 1, 2022** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 1134]<br>• **January 5, 2023** – the Court enter an Order appointing former Judge Jones as mediator [Dkt. No. 1323]<br>• **June 20, 2023** – the Court enters the Confirmation Order [Dkt. No. 1952]<br>• **August 1, 2023** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 1358]<br>• **August 21, 2023** – JW files its final fee application [Dkt. No. 2158] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application remains pending. JW seeks:<br>• Compensation in the amount of $801,232.50<br>• Reimbursement of expenses in the amount of $59,972.91<br>Ms. Freeman's fees account for $228,572.81 of this total amount. |
| **Relevant Case Facts** | • The Court found that the Mediation Agreement constituted a good faith compromise and settlement between the Debtors and certain parties. *See* Confirmation Order, ¶ 30. Further, the Court found that the Plan Settlements were in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and were fair, equitable, and reasonable. *Id.*<br>• The Plan was overwhelmingly supported by Classes 3, 4. 8 & 9. *See* Dkt. No. 1893. |
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan, Arts. I.A.162, VIII.C; Confirmation Order, ¶¶ S, 32.<br>• **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any of the claims or interests released hereunder. *See* Plan, Art. VIII.G; Confirmation Order, ¶¶ U, 32. |
| **Other Relevant Facts & Plan Provisions** | • The Confirmation Order provides that "[u]pon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate…." *See* Plan, Art. II.B.4. |

| ***In re GWG Holdings, Inc.*** **Case No. 22-90032 (MI) (Bankr. S.D. Tex.) Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • The mediation parties included : (a) the Debtors; (b) the Independent Directors; (c) the Bondholder Committee; (d) Ben; (e) L Bond Management LLC; (f) the Ad Hoc Group of Broker/Dealers; (g) the securities class action plaintiffs through their counsel; and (h) Paul Capital Advisors through its counsel. |

***In re HONX, Inc.***
**Case No. 22-90035 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Former Judge Jones's Role** | Co-Mediator |
| **Case Timeline & Other Key Dates** | • **April 28, 2022** – the Debtor files for chapter 11 relief<br>• **May 31, 2022** – the Debtor seeks to retain JW [Dkt. No. 128]<br>• **June 24, 2022** – the Court approves the Debtor's request to retain JW [Dkt. No. 186]<br>• **July 18, 2022** – the Court enters an order appointing former Judge Jones and Mr. Kenneth Feinberg to serve as co-mediators [Dkt. No. 209]<br>• **February 19, 2024** – the Court enters the Confirmation Order [Dkt. No. 1332]<br>• **March 28, 2024** – the Plan goes effective and the Debtor emerges from bankruptcy [Dkt. No. 1358]<br>• **April 22, 2024** – JW files it final fee application [Dkt. No. 1416] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application remains pending. JW seeks:<br>• Compensation in the amount of $393,782.00<br>• Reimbursement of expenses in the amount of $7,681.61<br>Ms. Freeman's fees account for $71,790.00 of this total amount. |
| **Relevant Case Facts** | • The Debtor commenced their cases with the goal of addressing the alleged existing and future asbestos liabilities related to the refinery in an equitable and efficient manner.<br>• After numerous intense mediation sessions and considerable time negotiating the material terms of a consensual plan, the "Plan Parties" ultimately came to an agreement in principle.<br>• On December 15, 2023, the Plan Parties executed a settlement term sheet, which memorialized the agreement reached in principle. On December 21, 2023, the Debtor filed a Notice of Settlement, along with the *Plan and the Amended Plan Supplement for the Debtor's Chapter 11 Plan of Reorganization* which reflected the terms of the agreed upon settlement among the Plan Parties. *See* Dkt. No. 1217 & 1219.<br>• The settlement and plan process spanned approximately 21 months.<br>• The Plan was supported by 99.4% of holders of current asbestos claims. |
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A.118, VIII.D; Confirmation Order, ¶¶ 55-62. |

| *In re HONX, Inc.*<br>**Case No. 22-90035 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims against a released party. *See* Plan Art. VIII.G; Confirmation Order, ¶ 53. |
| **Other Relevant Facts & Plan Provisions** | • Former Judge Jones mediated these cases along with a co-mediator, Mr. Kenneth Feinberg. Mr. Feinberg is an attorney specializing in meditation and alternative dispute resolution.<br><br>• The mediation was attended by sophisticated parties, including the Debtors, the Committee, the Honorable Barbara J. Houser (Ret.) in her capacity as legal representative for the future asbestos claimants, Hess Corporation, and Burns Charest LLP, in its capacity as counsel to certain asbestos claimants.<br><br>• Former Judge Jones's and Ms. Freeman's relationship was known by all parties prior to confirmation in these cases. In connection with the confirmation process, JW agreed to voluntarily reduce its fees by $250,000 with the agreement and consent of its client.<br><br>• On April 22, 2024, JW filed its final fee application. *See* Dkt. No. 1416. The deadline to object to JW's final fee application was May 13, 2024. No other party other than the U.S. Trustee objected to the final fee application.<br><br>• The Plan and Confirmation Order provide that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court." Confirmation Order, ¶ 187; *see* Plan Art. II.B.4. |

| *Altera Infrastructure L.P.*<br>**Case No. 22-90130 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **August 12, 2022** – the Debtors file for chapter 11 relief<br>• **September 12, 2022** – the Debtors seek to retain JW [Dkt. No. 228]<br>• **October 2, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 321]<br>• **September 1, 2022** – the Debtors file their Chapter 11 Plan of Reorganization [Dkt. No. 183]<br>• **September 19, 2022** – the Court enters an Order appointing former Judge Jones as mediator [Dkt. No. 247]<br>• **October 2, 2022** – the Court approves the Debtors' request to retain JW [Dkt. No. 321]<br>• **November 4, 2022** – the Court enters the Confirmation Order [Dkt. No. 533]<br>• **January 6, 2023** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 661]<br>• **February 17, 2023** – JW files its final fee application [Case No. 22-90129; Dkt. No. 20]<br>• **March 15, 2023** – the Court approves JW's final fee application without objection [Case No. 22-90129; Dkt. No. 40] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as co-counsel and conflicts counsel to the Debtors. Kirkland & Ellis served as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application remains pending. JW seeks:<br>• Compensation in the amount of $357,209.50<br>• Reimbursement of expenses in the amount of $6,739.23<br>Ms. Freeman's fees account for $71,790.00 of this total amount.<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • On August 12, 2022, the Debtors and Brookfield, as equity sponsor and holder of 100% of the Intermediate Obligations, and 71% of the Bank Lenders executed a restructuring support agreement, agreeing to support the Debtors' restructuring.<br>• The Debtors' Plan represented months of negotiation, including the mediation, with the Debtors' key stakeholders. The Plan was supported by 100% of the secured bank lenders representing $550 million of debt.<br>• The Plan was also overwhelmingly supported by the unsecured bondholders ($220 million of the $276 million actually voted, 99.9% by principal amount voted to accept the Plan), along with 100% of the bank lenders and Brookfield claims who voted to accept the Plan. |

***Altera Infrastructure L.P.***
**Case No. 22-90130 (MI) (Bankr. S.D. Tex.)**
**Chapter 11**

| **Topic** | **Summary / Description** |
|---|---|
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A, VIII.C; Confirmation Order, ¶¶ 34-41 & 87-88.<br>• **Injunction.** The Plan's releases provisions are enforced by an injunction that prohibits any "Person or Entity [from] commenc[ing] or pursu[ing] a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C ...." Art. VIII.F; *see* Confirmation Order, ¶¶ 43, 84 & 90. |
| **Other Relevant Facts & Plan Provisions** | • The Plan provides that "[u]pon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate." *See* Art. II.C.4.<br>• The Plan provides for vesting of all "property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor." *See* Art. IV.F. |

| *IEH Auto Parts Holding LLC*<br>**Case No. 23-90054 (MI) (Bankr. S.D. Tex.)**<br>**Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| **Former Judge Jones's Role** | Mediator |
| **Case Timeline & Other Key Dates** | • **January 31, 2023** – the Debtors file for chapter 11 relief<br>• **March 2, 2023** – the Debtors seek to retain JW [Dkt. No. 181]<br>• **March 28, 2023** – the Court approves the Debtors' request to retain JW [Dkt. No. 273]<br>• **April 10, 2023** – the Court enters a Stipulation and Agreed Order appointing former Judge Jones to serve as mediator [Dkt. No. 356]<br>• **April 28, 2023** – the Debtors file their Chapter 11 Plan of Liquidation [Dkt. No. 442]<br>• **June 16, 2023** – the Court enters the Confirmation Order [Dkt. No. 749]<br>• **September 29, 2023** – JW files its final fee application [Dkt. No. 911]<br>• **October 6, 2023** – the Plan goes effective and the Debtors emerge from bankruptcy [Dkt. No. 922]<br>• **November 4, 2024** – the Court approves JW's final fee application without objection [Dkt. No. 981]<br>• **January 16, 2024** – the Court enters a final decree closing all but one of the Chapter 11 cases [Dkt. No. 1043] |
| **JW's Retention & Fee Applications** | **Role.** JW was retained as lead restructuring counsel.<br>**Application.** JW's retention application was approved without objection by the U.S. Trustee or any party in interest.<br>**Final Fee Application.** JW's final fee application was approved awarding JW:<br>• Compensation in the amount of $4,739,576.00<br>• Reimbursement of expenses in the amount of $74,769.49<br>Neither the U.S. Trustee nor any party in interest objected to JW's final fee application or any of its interim fee applications. |
| **Relevant Case Facts** | • After five months of hard-fought negotiations and among the Debtors, the Committee and other key stakeholders, the parties reached a resolution and confirmed the Plan a consensual basis.<br>• The sole voting class, Class 2 general unsecured claims, overwhelmingly voted to accept the Plan. *See* Dkt. No. 729. |
| **Releases & Injunction Provisions** | • **Releases**. JW is a Released Party under the Plan. *See* Plan Arts. I.A.110, VIII.F.3-4; Confirmation Order, ¶¶ 22-23.<br>• **Injunction.** The Plan's release provisions are enforced by an injunction that prohibits commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any of the claims or interests released hereunder *See* Plan Art. VIII.F.6; Confirmation Order, ¶ 25. |
| **Other Relevant Facts & Plan Provisions** | • Ms. Freeman exited from JW effective December 1, 2022. Ms. Freeman was separately retained by the Debtors on April 3, 2023 [Dkt. No. 320], at which time Ms. Freeman had her own disclosure obligations. |

| ***IEH Auto Parts Holding LLC*** **Case No. 23-90054 (MI) (Bankr. S.D. Tex.)** **Chapter 11** | |
|---|---|
| **Topic** | **Summary / Description** |
| | • JW filed its final fee application on September 29, 2023. *See* Case No. 23-90054, Dkt. No. 911. The deadline to object to that final fee application was October 20, 2023. Two weeks prior to that objection deadline, on October 6, 2023, the Business Insider reported the story of former Judge Jones' relationship with Ms. Freeman. The Court entered an Order approving JW's final fee application on November 4, 2023. *See id.*, Dkt. No. 981. The U.S. Trustee had the ability to object to JW's final fee application at that time but chose not to.<br><br>• The Plan provides that "[f]rom and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate." *See* Art. II.A.1.c.ii. |

Message

**From:** Cavenaugh, Matthew [/O=JW EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MCAVENAUGH]
**Sent:** 4/25/2022 3:43:15 PM
**To:** Tom Kirkendall [bigtkirk@kir.com]
**CC:** Freeman, Liz [/o=JW Exchange/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a04006c581a84ff083db97ee781fee11-Liz Freeman]
**Subject:** Re: Judicial Disqualification Question

EXHIBIT 3

Thanks, Tom. Looking for this (Pat retired last month).

Is there a time on Wednesday where we could visit in the office in person? Bruce is happy to buy us lunch!

---

**Matthew D. Cavenaugh | Jackson Walker LLP**
1401 McKinney., Suite 1400 | Houston, TX 77010
P: +1 713.752.4284 |
mcavenaugh@jw.com www.jw.com

On Apr 22, 2022, at 4:39 PM, Tom Kirkendall <bigtkirk@kir.com> wrote:

****RECEIVED FROM EXTERNAL SENDER – USE CAUTION****

Matt, thanks. It's very helpful. If you can get your hands on a copy of Pat Cowlishaw's Sept 1, 2021 letter to Jarvis, please email that to me, too.

I'll be back in touch soon.

TK

Tom Kirkendall, Lawyer
Houston and The Woodlands, Texas
713.703.3536 (mobile & text)
281.819.3435 (conference line)

Sent via Superhuman

On Fri, Apr 22, 2022 at 10:08 AM, Matthew Cavenaugh <mcavenaugh@jw.com> wrote:

CONFIDENTIAL

Tom - sorry it took so long to track this down. We are hoping to get your input, sooner the better. Thanks!

---

**Matthew D. Cavenaugh | Jackson Walker LLP**
1401 McKinney., Suite 1400 | Houston, TX 77010
P: +1 713.752.4284 |
mcavenaugh@jw.com www.jw.com

Begin forwarded message:

**From:** "Ruzinsky, Bruce" <bruzinsky@jw.com>
**Date:** April 21, 2022 at 4:52:46 PM CDT
**To:** "Cavenaugh, Matthew" <mcavenaugh@jw.com>
**Subject: FW: Judicial Disqualification Question**

Matt, here is the Peter Jarvis letter.

I understand that Pat sent the letter to Liz sometime on or about late September 2021.

Thanks.

Bruce J. Ruzinsky
Jackson Walker L.L.P.
1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4204 (Direct)
(713) 857-0220 (Cell)
(713) 308-4155 (Direct Fax)
bruzinsky@jw.com (email)
This message may contain proprietary and confidential information protected by the attorney client or other privileges recognized by law

---

**From:** Cowlishaw, Pat <pcowlishaw@jw.com>
**Sent:** Friday, September 24, 2021 3:56 PM
**To:** Ruzinsky, Bruce <bruzinsky@jw.com>; Cavenaugh, Matthew <mcavenaugh@jw.com>
**Subject:** FW: Judicial Disqualification Question

Bruce, Matt,

Peter's signed letter is attached. Let me know if you have questions. I will send this to Liz shortly. Wanted you both to see it. I have provided to Wade. I don't anticipate distributing more broadly, possibly Wade will want to share some or all of it (or describe it) to Mancom and/or Comp Committees at an appropriate time.

The letter does not address the particular detail regarding Liz working now on the limited post-confirmation items that don't go before Judge Jones for decision (the subject of the chart that Bruce produced). I don't see those as really different, from a disqualification standpoint, from Liz working on a reorganization case prior to filing, which Peter does address and has no issue with. So I don't see any reason to press him to address that detail. It will be stored in my General Counsel workspace, where access is restricted to Wade, me, and our LAAs.

His opinion assumes (as we have understood from Liz) that when she resumes work on his cases in April 2022, she will continue not to appear or sign pleadings, per his former clerk policy, and that that practice will continue for another four years, until she has

exhausted an interval equivalent to her clerkship. I'll note that when passing this along to Liz.

Glad to have this in hand.

Pat

**Patrick R. Cowlishaw**
2323 Ross Avenue, Suite 600 | Dallas, TX | 75201
V: (214) 953-6049 | pcowlishaw@jw.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure, and no waiver of any attorney-client, work product or other privilege is intended. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender and delete all copies.

---

**From:** Kathy.Kudrna@hklaw.com <Kathy.Kudrna@hklaw.com>
**Sent:** Wednesday, September 22, 2021 10:41 AM
**To:** Cowlishaw, Pat <pcowlishaw@jw.com>
**Cc:** Peter.Jarvis@hklaw.com
**Subject:** Judicial Disqualification Question

****RECEIVED FROM EXTERNAL SENDER – USE CAUTION****

Attached please find correspondence from Peter Jarvis regarding the above-referenced question. Thank you.

**Kathy Kudrna** | **Holland & Knight**
Practice Assistant
Holland & Knight LLP
601 Southwest 2nd Avenue #1800 | Portland, Oregon 97204
Phone 503.243.5876 | Fax 503.241.8014
kathy.kudrna@hklaw.com | www.hklaw.com

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

Case No. 23-00645 (EVR)
*In Re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
In the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division



**Kirkendall Privilege Log**
**7/08/2024**

| Date | Time | From | To | Cc | Subject | Reason for Privilege | Privilege Asserted | ApprxPgs |
|---|---|---|---|---|---|---|---|---|
| 4/22/2022 | | Email exchange between Matt Cavenaugh and Tom Kirkendall | | | Holland & Knight Legal Opinion to Jackson Walker re Judicial Disqualifiation Question and Copy of Peter Jarvis Webpage dated Sept 22, 2021 | Confidential communication and confidentiality agreement | Attorney-Client; Work Product; Confidentiality Agreement | 19 |
| 5/16/2022 & 5/19/2022 | | Emails from Matt Cavenaugh regarding sealed documents in 2021 Van Deelen Matter | Tom Kirkendall | | March 2021 Documents involved in Van Deelen Matter | Documents subject to Seal Orders | Seal Orders | 29 |
| 6/8/2022 | 4:43 PM | Matt Cavenaugh Email re Holland & Knight Memorandum | Jackson & Walker, LLP | | Memorandum re Duties of Attorney with Knowledge of Judicial Misconduct dated June 2, 2022 | Confidential communication and confidentiality agreement | Attorney-Client; Work Product; Confidentiality | 5 |
| | | | | | | | | |

# UNITED STATES BANKRUPTCY COURT

Southern District of Texas

EXHIBIT 5

In re Professional Fee Matters Concerning the Jackson Walker Law Firm
Debtor

Case No. 23-00645 (EVR)

*(Complete if issued in an adversary proceeding)*

Chapter ________

______________________
Plaintiff

v.

Adv. Proc. No. ________

______________________
Defendant

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Peter R. Jarvis
*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME |
|---|---|
| **Office of the U.S. Trustee**<br>**1220 SW 3rd Avenue, Suite 315**<br>**Portland, OR 97204** | **9:00 am PST on July 11, 2024** |

The deposition will be recorded by this method:

Court reporter/digital recording

☒ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

**REQUESTED DOCUMENTS SHOULD BE PRODUCED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE ATTACHED RIDER BY JULY 5, 2024.**

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: June 4, 2024

CLERK OF COURT

OR

______________________
*Signature of Clerk or Deputy Clerk*

______________________
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Kevin M. Epstein, United States Trustee, who issues or requests this subpoena, are: Vianey Garza, Trial Attorney Office of the United States Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, vianey.garza@usdoj.gov, (713) 718-4663

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

## RIDER TO RULE SUBPOENA

**(*In re Professional Fee Matters Concerning the Jackson Walker Firm*, Case No. 23-645)**

## DEFINITIONS

As used herein, the following terms will have the meanings set forth below:

(a) "**Document**" or "**documents**" means and is intended to have the broadest possible meaning and includes any writings whatsoever, electronic transmissions, e-mails and attachments thereto, drawings, reports, records, notes, instructions, memoranda, drafts (whether or not they resulted in a final document), communications (including internal), correspondence, contracts, letters, graphs, charts, photographs, filings, forms, journals, ledgers, letters, lists, minutes, notations, notes, opinions, orders, pamphlets, papers, publications, receipts, summaries, screenshots, social media posts, telegrams, telephone records, text messages, video recordings, voicemail messages and billing statements (including drafts).

(b) "**Freeman**" means Elizabeth Freeman, a former partner at Jackson Walker and each past and present agent, representative, attorney, expert, insurer, executor, administrator, or anyone acting on her behalf.

(c) "**Holland & Knight**" means Holland & Knight LLP and each past and present affiliate, officer, director, attorney, partner, associate, employee, independent contractor, agent, servant, and each representative of such entity or individual.

(d) "**Jackson Walker**" means Jackson Walker LLP and each past and present officer, director, partner, associate, employee, independent contractor, agent, servant, and each representative of each such entity or individual, and each past and present attorney of each such entity or individual.

(e) "**Judicial Disqualification Matter Letter**" means that certain letter attached as an exhibit to the Preliminary Response.

(f) "**Judge Jones**" means David R. Jones, formerly a bankruptcy judge for the Southern District of Texas.

(g) "**Preliminary Response**" means that certain Preliminary Response of Jackson Walker LLP filed on or about November 13, 2023 to the filings made by the Office of the United States Trustee on or after November 2, 2023.

(h) "**Relationship**" means any personal relationship between Freeman and Judge Jones, including intimate, financial, fiduciary, cohabitating, romantic or sexual.

## DOCUMENTS TO BE PRODUCED

Please produce the following documents in **native format** and submit via email (or emails) to Jennifer.R.Toth@usdoj.gov organized by the numbered request with the case number and name in the subject line.

**Include a complete inventory for all documents that are produced. In the event, you do not have any documents for a particular request, please provide an affidavit stating as such.** If you unable to provide the documents via email(s), please contact Jennifer R. Toth for additional production procedures. Unless expressly stated otherwise, each request seeks documents within the period of February 1, 2021, through October 13, 2023. If You are withholding any requested documents on the basis of attorney-client privilege or attorney work product privilege, You must provide a privilege log:

1. All documents provided to You and/or Holland & Knight by Jackson Walker in connection with Jackson Walker's engagement of You and/or Holland & Knight in connection with the Relationship.

2. All documents received by You and/or Holland & Knight in connection with Your engagement by Jackson Walker to assist in matters related to the Relationship.

3. All documents relied on by You and/or Holland & Knight in providing any advice to Jackson & Walker regarding the Relationship.

4. All documents relied on by You and/or Holland & Knight in providing any advice to Jackson & Walker regarding Freeman.

5. All documents between You and/or Holland & Knight and Jackson & Walker relating to the Relationship, including the Judicial Disqualification Matter Letter and any responses to that Letter thereto from You and/or Holland & Knight.

6. All documents between You and/or Holland & Knight and Jackson & Walker relating to Freeman.

7. All agreements between You and/or Holland & Knight and Jackson & Walker in which You and/or Holland & Knight agreed to provide advice to Jackson & Walker in connection with the Relationship and/or Freeman.

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern District of Texas

EXHIBIT 6

In re Professional Fee Matters Concerning the Jackson Walker Law Firm
Debtor
*(Complete if issued in an adversary proceeding)*

Case No. 23-00645 (EVR)

Chapter ________

Plaintiff
v.

Adv. Proc. No. ________

Defendant

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Jacqueline Harvey
*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME |
|---|---|
| **Office of the U.S. Trustee**<br>**1220 SW 3rd Avenue, Suite 315**<br>**Portland, OR 97204** | **9:00 am PST on July 12, 2024** |

The deposition will be recorded by this method:

Court reporter/digital recording

☒ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

**REQUESTED DOCUMENTS SHOULD BE PRODUCED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE ATTACHED RIDER BY JULY 5, 2024.**

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: June 4, 2024

CLERK OF COURT

OR

________________________
*Signature of Clerk or Deputy Clerk*

________________________
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Kevin M. Epstein, United States Trustee, who issues or requests this subpoena, are: Vianey Garza, Trial Attorney Office of the United States Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, vianey.garza@usdoj.gov, (713) 718-4663

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

## RIDER TO RULE SUBPOENA

**(*In re Professional Fee Matters Concerning the Jackson Walker Firm*, Case No. 23-645)**

## DEFINITIONS

As used herein, the following terms will have the meanings set forth below:

(a) "**Document**" or "**documents**" means and is intended to have the broadest possible meaning and includes any writings whatsoever, electronic transmissions, e-mails and attachments thereto, drawings, reports, records, notes, instructions, memoranda, drafts (whether or not they resulted in a final document), communications (including internal), correspondence, contracts, letters, graphs, charts, photographs, filings, forms, journals, ledgers, letters, lists, minutes, notations, notes, opinions, orders, pamphlets, papers, publications, receipts, summaries, screenshots, social media posts, telegrams, telephone records, text messages, video recordings, voicemail messages and billing statements (including drafts).

(b) "**Freeman**" means Elizabeth Freeman, a former partner at Jackson Walker and each past and present agent, representative, attorney, expert, insurer, executor, administrator, or anyone acting on her behalf.

(c) "**Holland & Knight**" means Holland & Knight LLP and each past and present affiliate, officer, director, attorney, partner, associate, employee, independent contractor, agent, servant, and each representative of such entity or individual.

(d) "**Jackson Walker**" means Jackson Walker LLP and each past and present officer, director, partner, associate, employee, independent contractor, agent, servant, and each representative of each such entity or individual, and each past and present attorney of each such entity or individual.

(e) "**Judicial Disqualification Matter Letter**" means that certain letter attached as an exhibit to the Preliminary Response.

(f) "**Judge Jones**" means David R. Jones, formerly a bankruptcy judge for the Southern District of Texas.

(g) "**Preliminary Response**" means that certain Preliminary Response of Jackson Walker LLP filed on or about November 13, 2023 to the filings made by the Office of the United States Trustee on or after November 2, 2023.

(h) "**Relationship**" means any personal relationship between Freeman and Judge Jones, including intimate, financial, fiduciary, cohabitating, romantic or sexual.

## DOCUMENTS TO BE PRODUCED

Please produce the following documents in **native format** and submit via email (or emails) to Jennifer.R.Toth@usdoj.gov organized by the numbered request with the case number and name in the subject line.

**Include a complete inventory for all documents that are produced. In the event, you do not have any documents for a particular request, please provide an affidavit stating as such.** If you unable to provide the documents via email(s), please contact Jennifer R. Toth for additional production procedures. Unless expressly stated otherwise, each request seeks documents within the period of February 1, 2021, through October 13, 2023. If You are withholding any requested documents on the basis of attorney-client privilege or attorney work product privilege, You must provide a privilege log:

1.　　All documents provided to You and/or Holland & Knight by Jackson Walker in connection with Jackson Walker's engagement of You and/or Holland & Knight in connection with the Relationship.

2.　　All documents received by You and/or Holland & Knight in connection with Your engagement by Jackson Walker to assist in matters related to the Relationship.

3.　　All documents relied on by You and/or Holland & Knight in providing any advice to Jackson & Walker regarding the Relationship.

4.　　All documents relied on by You and/or Holland & Knight in providing any advice to Jackson & Walker regarding Freeman.

5.　　All documents between You and/or Holland & Knight and Jackson & Walker relating to the Relationship, including the Judicial Disqualification Matter Letter and any responses to that Letter thereto from You and/or Holland & Knight.

6.　　All documents between You and/or Holland & Knight and Jackson & Walker relating to Freeman.

7.　　All agreements between You and/or Holland & Knight and Jackson & Walker in which You and/or Holland & Knight agreed to provide advice to Jackson & Walker in connection with the Relationship and/or Freeman.

**EXHIBIT 7**

Holland & Knight

601 SW Second Avenue, Suite 1800 | Portland, OR 97204 | T 503.243.2300 | F 503.241.8014
Holland & Knight LLP | www.hklaw.com

Joseph L. Franco
+1 503-243-5891
Joe.Franco@hklaw.com

June 18, 2024

*Via Overnight FedEx and E-mail (vianey.garza@usdoj.gov)*

Vianey Garza, Trial Attorney
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002

Re: *In re Professional Fee Matters Concerning Jackson Walker Law Firm*: **Objections to Subpoena Duces Tecum to Peter Jarvis**

Dear Ms. Garza:

Thank you for the video conference that you, Laura Steele and Alicia Barcomb had with me and Jose Casal on June 13, 2024, regarding the subpoena duces tecum issued to Peter Jarvis by the U.S. Trustee in the above captioned matter ("Subpoena"). As discussed below, this letter constitutes Mr. Jarvis's objection to the Subpoena pursuant to FRCP 45(d)(2)(B).

We have been informed by counsel for the Jackson Walker Law Firm ("Jackson Walker") that it wishes to preserve all available privileges. Mr. Jarvis is bound to respect Jackson Walker's decision. As we interpret it, the Subpoena seeks documents that are subject to protection under various privileges, including the attorney-client and work product privileges, and/or Oregon Rule of Professional Conduct 1.6, Confidentiality of Information. Accordingly, Mr. Jarvis objects to producing documents in response to the Subpoena pursuant to FRCP 45(d)(2)(B).

In addition, as we discussed, because the dates set forth in the Subpoena do not work for the witnesses we also must object to the proposed dates. We ask that you please confer with counsel for the other interested parties and propose alternative dates that work for everyone.

We will of course make ourselves available at a mutually-convenient time if you wish to confer on these objections.

Atlanta | Austin | Birmingham | Boston | Century City | Charlotte | Chattanooga | Chicago | Dallas | Denver | Fort Lauderdale
Houston | Jacksonville | Los Angeles | Miami | Nashville | Newport Beach | New York | Orlando | Philadelphia
Portland | Richmond | San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

Algiers | Bogotá | London | Mexico City | Monterrey

Vianey Garza
June 18, 2024
Page 2


Sincerely,

HOLLAND & KNIGHT LLP

Joseph L. Franco

JF

Cc (via email only):    Alicia L. Barcomb
                        Laura Steele

Holland & Knight

EXHIBIT 8

601 SW Second Avenue, Suite 1800 | Portland, OR 97204 | T 503.243.2300 | F 503.241.8014
Holland & Knight LLP | www.hklaw.com

Joseph L. Franco
+1 503-243-5891
Joe.Franco@hklaw.com

June 18, 2024

*Via Overnight FedEx and E-mail (vianey.garza@usdoj.gov)*

Vianey Garza, Trial Attorney
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002

Re: *In re Professional Fee Matters Concerning Jackson Walker Law Firm:*
**Objections to Subpoena Duces Tecum to Jacqueline Harvey**

Dear Ms. Garza:

Thank you for the video conference that you, Laura Steele and Alicia Barcomb had with me and Jose Casal on June 13, 2024, regarding the subpoena duces tecum issued to Jacqueline Harvey by the U.S. Trustee in the above captioned matter ("Subpoena"). As discussed below, this letter constitutes Ms. Harvey's objection to the Subpoena pursuant to FRCP 45(d)(2)(B).

We have been informed by counsel for the Jackson Walker Law Firm ("Jackson Walker") that it wishes to preserve all available privileges. Ms. Harvey is bound to respect Jackson Walker's decision. As we interpret it, the Subpoena seeks documents that are subject to protection under various privileges, including the attorney-client and work product privileges, and/or Oregon Rule of Professional Conduct 1.6, Confidentiality of Information. Accordingly, Ms. Harvey objects to producing documents in response to the Subpoena pursuant to FRCP 45(d)(2)(B).

In addition, as we discussed, because the dates set forth in the Subpoena do not work for the witnesses we also must object to the proposed dates. We ask that you please confer with counsel for the other interested parties and propose alternative dates that work for everyone.

We will of course make ourselves available at a mutually-convenient time if you wish to confer on these objections.

Atlanta | Austin | Birmingham | Boston | Century City | Charlotte | Chattanooga | Chicago | Dallas | Denver | Fort Lauderdale
Houston | Jacksonville | Los Angeles | Miami | Nashville | Newport Beach | New York | Orlando | Philadelphia
Portland | Richmond | San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

Algiers | Bogotá | London | Mexico City | Monterrey

Vianey Garza
June 18, 2024
Page 2

Sincerely,

HOLLAND & KNIGHT LLP

Joseph L. Franco

JF

Cc (via email only):   Alicia L. Barcomb
                       Laura Steele

EXHIBIT
9

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

| Privilege ID | Date/Time | Document Type | Email To | Email From | Email CC | Email BCC | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| PRIV_0001 | 3/12/2021 11:10 | Email | Cowlishaw, Pat [pcowlishaw@jw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Heredia, Chris [Christopher.Heredia@hklaw.com] | None | Attorney Client | Confidential email chain between P. Jarvis, P. Cowlishaw, and C. Heredia requesting legal advice regarding L. Freeman matter. |
| PRIV_0002 | 4/21/2021 11:44 | Email | Cowlishaw, Pat [pcowlishaw@jw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Heredia, Chris [Christopher.Heredia@hklaw.com] | None | Attorney Client | Confidential email from P. Jarvis to P. Cowlishaw and C. Heredia requesting legal advice regarding L. Freeman situation. |
| PRIV_0003 | 4/23/2021 17:55 | Email | Cowlishaw, Pat [pcowlishaw@jw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Heredia, Chris [Christopher.Heredia@hklaw.com] | None | Attorney Client | Confidential email from P. Jarvis to P. Cowlishaw and C. Heredia providing legal advice regarding JW response to L. Freeman matter. |
| PRIV_0004 | 4/23/2021 19:08 | Email | Cowlishaw, Pat [pcowlishaw@jw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Heredia, Chris [Christopher.Heredia@hklaw.com] | None | Attorney Client | Confidential email chain between P. Jarvis, P. Cowlishaw, and C. Heredia providing legal advice and discussing legal advice provided regarding possible JW response to L. Freeman situation. |
| PRIV_0005 | 9/1/2021 11:01 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Cowlishaw, Pat [pcowlishaw@jw.com] | | None | Attorney Client | Confidential email chain between P. Cowlishaw and P. Jarvis requesting legal opinion on L. Freeman matter. |
| PRIV_0006 | 5/3/2022 18:18 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Cowlishaw, Pat [pcowlishaw@jw.com] | Jenkins, William [wjenkins@jw.com] | None | Attorney Client | Confidential email chain between P. Cowlishaw, P. Jarvis, and W. Jenkins requesting legal advice regarding L. Freeman matter. |
| PRIV_0007 | 5/3/2022 18:36 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Cowlishaw, Pat [pcowlishaw@jw.com] | Jenkins, William [wjenkins@jw.com] | None | Attorney Client | Confidential email chain between P. Cowlishaw, P. Jarvis, and W. Jenkins requesting legal advice and discussing legal advice sought regarding possible |

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

| Privilege ID | Date/Time | Document Type | Email To | Email From | Email CC | Email BCC | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | JW response to L. Freeman situation. |
| PRIV_0008 | 5/3/2022 18:50 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Cowlishaw, Pat [pcowlishaw@jw.com] | Jenkins, William [wjenkins@jw.com] | None | Attorney Client | Confidential email chain between P. Cowlishaw, P. Jarvis, and W. Jenkins requesting legal advice and providing legal advice regarding possible JW response to L. Freeman situation. |
| PRIV_0009 | 5/6/2022 7:57 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | Jenkins, William [wjenkins@jw.com] | Cowlishaw, Pat [pcowlishaw@jw.com]; Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | None | Attorney Client | Confidential email chain between W. Jenkins, P. Cowlishaw, P. Jarvis, and J. Harvey requesting legal advice and providing legal advice regarding possible JW response to L. Freeman situation. |
| PRIV_0010 | 5/10/2022 19:06 | Email | Jenkins, William [wjenkins@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | None | Attorney Client | Confidential email from J. Harvey to W. Jenkins and P. Cowlishaw discussing legal advice regarding measures to be taken in L. Freeman matter. |
| PRIV_0011 | 5/10/2022 19:41 | Email | Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jenkins, William [wjenkins@jw.com] | Cowlishaw, Pat [pcowlishaw@jw.com]; Jarvis, Peter R [Peter.Jarvis@hklaw.com] | None | Attorney Client | Confidential email from J. Harvey to W. Jenkins and P. Cowlishaw discussing legal advice regarding measures to be taken in L. Freeman matter. |

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

| Privilege ID | Date/Time | Document Type | Email To | Email From | Email CC | Email BCC | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| PRIV_0012 | 5/30/2022 17:03 | Email | Jarvis, Peter R [Peter.Jarvis@hklaw.com]; Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jenkins, William [wjenkins@jw.com] | Cowlishaw, Pat [pcowlishaw@jw.com]; Cooper, Wade [wcooper@jw.com] | None | Attorney Client | Confidential email chain between W. Jenkins, P. Cowlishaw, P. Jarvis, and J. Harvey requesting legal advice regarding next steps to be taken in L. Freeman matter. |
| PRIV_0013 | 6/2/2022 14:28 | Email | Jenkins, William [wjenkins@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | None | Attorney Client | Confidential email from J. Harvey to W. Jenkins and P. Cowlishaw enclosing legal memorandum and providing legal advice and opinions concerning L. Freeman situation. |
| PRIV_0014 | 6/2/2022 11:21 | Attachment | | | | None | Attorney Client | Confidential memorandum prepared by J. Harvey and P. Jarvis for JW providing legal opinions and advice regarding L. Freeman situation. |
| PRIV_0015 | 6/3/2022 14:16 | Email | Ruzinsky, Bruce [bruzinsky@jw.com]; Cavenaugh, Matthew [mcavenaugh@jw.com] | Jenkins, William [wjenkins@jw.com] | Cooper, Wade [wcooper@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | None | Attorney Client | Confidential email from W. Jenkins to B. Ruzinsky, M. Cavenaugh, W. Cooper, and P. Cowlishaw discussing legal opinions received from P. Jarvis concerning L. Freeman situation. |
| PRIV_0016 | 6/3/2022 14:09 | Attachment | | | | None | Attorney Client | Confidential letter from P. Jarvis to JW providing legal analysis of issues arising from L. Freeman situation and printout of email chain between P. Cowlishaw and L. Freeman (both reflecting highlighting by W. Jenkins). |
| PRIV_0017 | 6/3/2022 14:10 | Attachment | | | | None | Attorney Client | Excerpts from Guide to Judiciary Policy (reflecting highlighting by W. Jenkins). |

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

| Privilege ID | Date/Time | Document Type | Email To | Email From | Email CC | Email BCC | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| PRIV_0018 | 6/2/2022 14:28 | Email | Jenkins, William [wjenkins@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | None | Attorney Client | Confidential email from J. Harvey to W. Jenkins and P. Cowlishaw enclosing legal memorandum and providing legal advice and opinions concerning L. Freeman situation. |
| PRIV_0019 | 6/2/2022 11:21 | Attachment | | | | None | Attorney Client | Confidential memorandum prepared by J. Harvey and P. Jarvis for JW providing legal opinions and advice regarding L. Freeman situation. |
| PRIV_0020 | 6/3/2022 14:49 | Email | Jenkins, William [wjenkins@jw.com] | Cavenaugh, Matthew [mcavenaugh@jw.com] | Ruzinsky, Bruce [bruzinsky@jw.com]; Cooper, Wade [wcooper@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | None | Attorney Client | Confidential email from M. Cavenaugh to W. Jenkins, B. Ruzinsky, W. Cooper, and P. Cowlishaw discussing legal opinions received from P. Jarvis concerning L. Freeman matter. |
| PRIV_0021 | 6/3/2022 14:09 | Attachment | | | | None | Attorney Client | Confidential letter from P. Jarvis to JW providing legal analysis of issues arising from L. Freeman situation and printout of email chain between P. Cowlishaw and L. Freeman (both reflecting highlighting by W. Jenkins). |
| PRIV_0022 | 6/3/2022 14:10 | Attachment | | | | None | Attorney Client | Excerpts from Guide to Judiciary Policy (reflecting highlighting by W. Jenkins). |
| PRIV_0023 | 6/2/2022 14:28 | Email | Jenkins, William [wjenkins@jw.com]; Cowlishaw, Pat [pcowlishaw@jw.com] | Harvey, Jacqueline [Jacqueline.Harvey@hklaw.com] | Jarvis, Peter R [Peter.Jarvis@hklaw.com] | None | Attorney Client | Confidential email from J. Harvey to W. Jenkins and P. Cowlishaw enclosing legal memorandum and providing legal advice and opinions concerning L. Freeman situation. |

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

| Privilege ID | Date/Time | Document Type | Email To | Email From | Email CC | Email BCC | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| PRIV_0024 | 6/2/2022 11:21 | Attachment | | | | None | Attorney Client | Confidential memorandum prepared by J. Harvey and P. Jarvis for JW providing legal opinions and advice regarding L. Freeman situation. |

*In re: Professional Fee Matters Concerning the Jackson Walker Law Firm*
Case No. 23-00645 (EVR)
Jackson Walker Privilege Log #1 – Communications with Holland & Knight

List of Counsel:

| Name | Email | Affiliation | Position |
|---|---|---|---|
| Harvey, Jacqueline | Jacqueline.Harvey@hklaw.com | Holland & Knight | Associate |
| Heredia, Chris | Christopher.Heredia@hklaw.com | Holland & Knight | Attorney |
| Jarvis, Peter R | Peter.Jarvis@hklaw.com | Holland & Knight | Partner |
| Kudrna, Kathy | Kathy.Kudrna@hklaw.com | Holland & Knight | Legal Assistant |
| Rich, Trisha M. | trisha.rich@hklaw.com | Holland & Knight | Partner |
| Cavenaugh, Matthew | mcavenaugh@jw.com | Jackson Walker | Partner |
| Cooper, Wade | wcooper@jw.com | Jackson Walker | Partner |
| Cowlishaw, Pat | pcowlishaw@jw.com | Jackson Walker | Partner; General Counsel |
| Jenkins, William | wjenkins@jw.com | Jackson Walker | Partner; General Counsel |
| Ruzinsky, Bruce | bruzinsky@jw.com | Jackson Walker | Partner |

6



EXHIBIT
10

**U.S. Department of Justice**
Office of the United States Trustee
Southern and Western Districts of Texas – Region 7

Southern District Offices:
515 Rusk Street, Suite 3516
Houston, Texas 77002
713-718-4650
Fax 713-718-4670

June 24, 2024
**Norton Rose Fulbright**
Jason L. Boland
William R. Greendyke
Maria Mokrzycka
1301 McKinney Street, Suite 5100
Houston, Texas 77010
jason.boland@nortonrosefulbright.com
william.greendyke@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Dear Mr. Boland,

On June 4, 2024, the United States Trustee served deposition and document subpoenas on Peter Jarvis and Jaqueline Harvey. On June 18, 2024, Holland & Knight Attorney Joseph L. Franco, counsel for Mr. Jarvis and Ms. Harvey, objected to the subpoenas of Mr. Jarvis and Ms. Harvey via correspondence to the United States Trustee. The objection states, "We have been informed by counsel for the Jackson Walker Law Firm … that it wishes to preserve all available privileges." And Attorney Franco asserts that the subpoenaed documents implicate "attorney-client and work product privileges, and/or Oregon Rule of Professional Conduct 1.6, Confidentiality of Information" citing FRCP 45(d)(2)(B). Attorney Franco further advised that Mr. Jarvis and Ms. Harvey have conflicts with the noticed dates, and requested that the United States Trustee confer with all interested parties to arrange for mutually workable deposition dates.

On June 19, 2024, Attorney Paul Trahan called Attorney Laura Steele to advise that Jackson Walker intended to file a motion to quash the United States Trustee's subpoenas of Mr. Jarvis and Ms. Harvey on the grounds of attorney client privilege. During that conversation, Mr. Trahan represented that Jackson Walker does not intend to assert as a defense advice of counsel, and further that Jackson Walker does not intend to call either Mr. Jarvis or Ms. Harvey as witnesses at trial. The parties agreed to further discuss this matter on June 21, 2024. The United States Trustee indicated that he would provide this correspondence to counsel, and that the United States Trustee would not object on a timeliness basis to a motion to quash.

Through this correspondence, the United States Trustee seeks to clarify apparent discrepancies in the defenses Jackson Walker asserts based upon the actions it took to retain and consult with Mr. Jarvis and Ms. Harvey.

***First***, please confirm in writing that Jackson Walker will not include Mr. Jarvis and or Ms. Harvey on any witness list in any action pertaining to the United States Trustee's Rule 60 motions.

***Second***, to the extent that Jackson Walker no longer asserts advice of counsel as a defense, the United States Trustee requests that Jackson Walker amend its responsive pleadings to strike the following statements:

| Case | Pleading | Statement | Agreement to Strike (Yes/No) |
|---|---|---|---|
| J. C. PENNEY DIRECT MARKETING SERVICES, LLC., et al, Case No. 20-20184 | 1244 [RELATES TO DKT. NOS. 1236 & 1237] | "Jackson Walker also took the additional step of consulting with outside ethics counsel to ensure that it understood its legal and ethical obligations. Specifically, and beginning on March 8, 2021, Jackson Walker contacted Peter Jarvis, Esq. of the respected law firm of Holland & Knight. Mr. Jarvis is a nationally recognized expert on lawyer professional responsibility and ethics, and was a co-author of *The Law of Lawyering*, a leading treatise on the subject." (ECF No. 1244 at 4, ¶ 14) | |
| *Id.* | *Id.* | "The General Counsel for the Firm presented Ms. Freeman with a draft letter that Jackson Walker intended to provide to Mr. Jarvis as part of his analysis." (ECF No. 1244 at 4, ¶ 15) | |
| *Id.* | *Id.* | "The General Counsel for the Firm presented Ms. Freeman with a draft letter that Jackson Walker intended to provide to Mr. Jarvis as part of his analysis. That draft letter, a copy of which is attached hereto as **Exhibit 1**, contained several important components. First, the draft letter was presented to Ms. Freeman with a specific request to review it for factual accuracy.[6] To this point, the draft letter stated, as factual assumptions based on Jackson Walker's knowledge at the time, (a) that Ms. Freeman and Judge Jones were close personal friends; (b) that Jackson Walker's understanding was that Judge Jones precluded Ms. Freeman from appearing personally | |

| | | | |
|---|---|---|---|
| | | in his court for six years (*i.e.*, the length of Ms. Freeman's judicial clerkship); (c) the draft letter outlined the claims and allegations asserted by Mr. Van Deelen; and (d) that Jackson Walker then understood that, while there had been a romantic relationship between Ms. Freeman and Judge Jones prior to March 2020, that such relationship had ended and that there was no ongoing romantic relationship, nor any romantic relationship expected going forward. The draft letter also stated—and asked Ms. Freeman to confirm—that Judge Jones and Ms. Freeman did not live together. The draft letter also informed Ms. Freeman of Jackson Walker's view that an ongoing intimate relationship with Judge Jones (as opposed to an intimate relationship that had terminated in the past) would be incompatible with Jackson Walker continuing to participate in cases before Judge Jones. Ms. Freeman reviewed the draft letter and confirmed in writing that "I reviewed the letter and have no questions or issues." *See* Exhibit 1. Jackson Walker's outside ethics counsel concluded that the measures taken by Jackson Walker, based on the facts stated in the letter, which were confirmed by Ms. Freeman, were sufficient to meet Jackson Walker's obligations." (ECF No. 1244 at 4, ¶ 15) | |
| *Id.* | *Id.* | "The cover email to Ms. Freeman states, in relevant part: "I will appreciate your review. I want to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with. Once we have your concurrence, I will sen[d] the letter to Peter [Jarvis] in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion." (ECF No. 1244 at 4, n 6) | |
| *Id.* | *Id.* | "above confirmation from Ms. Freeman and" (ECF No. 1244 at 5, ¶ 16) | |

| | | | |
|---|---|---|---|
| *Id.* | *Id.* | "Upon learning from Ms. Freeman that her relationship with Judge Jones had resumed, Jackson Walker again reached out to its outside ethics counsel, Mr. Jarvis. Mr. Jarvis discussed the situation with Ms. Freeman's attorney. Jackson Walker concluded that the only solution was for Ms. Freeman to leave." (ECF No. 1244 at 5, ¶ 17) | |
| *Id.* | 1244-1 [RELATES TO DKT. NOS. 1236 & 1237] | Exhibit 1 (ECF No. 1244-1 at 1-6) | |
| *Id.* | 1472 [Relates to Dkt. No. 1351] | "JW immediately consulted with outside ethics counsel and engaged Peter Jarvis of the respected law firm of Holland & Knight." (ECF No. 1472 at 28, ¶ 37) | |
| *Id.* | *Id.* | "JW took the additional step of instructing Ms. Freeman that she could not work on any matters that were assigned to former Judge Jones, and JW informed Ms. Freeman that the firm would deduct from her compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters that were pending before former Judge Jones in light of this past relationship." (ECF No. 1244, at 28, ¶ 37) | |
| *Id.* | *Id.* | To ensure that JW was accurately portraying the relevant facts, JW's general counsel presented Ms. Freeman with a draft letter that outlined the relevant facts known by JW following its discussion with Ms. Freeman; namely, JW understood: (a) Ms. Freeman and former Judge Jones were and remain close personal friends; (b) Former Judge Jones precluded Ms. Freeman from appearing personally in his court for six years (i.e., the length of Ms. Freeman's clerkship); (c) the draft letter outlined the claims and allegations raised by Mr. Van Deelen; and (d) while there existed a romantic relationship between Ms. Freeman and former Judge Jones at some time prior to March 2020, that relationship had | |

| | | | |
|---|---|---|---|
| | | ended and there was no ongoing romantic relationship, nor was any romantic relationship expected going forward.<br><br>***The draft letter also stated that former Judge Jones and Ms. Freeman each own their own homes, and that they do not and have not lived together***. The draft letter informed Ms. Freeman of JW's view that an ongoing intimate relationship with former Judge Jones (as opposed to an intimate relationship that had terminated in the past) would be incompatible with JW's continued participation in cases before Judge Jones." (ECF No. 1244, at 29, ¶ 38) | |
| *Id.* | *Id.* | "JW requested Ms. Freeman to review the letter "to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with." In response, Ms. Freeman confirmed the contents of the letter:<br>[Image of E-mail]"<br>(ECF No. 1244, at 29, ¶ 39) | |
| *Id.* | *Id.* | "JW also again engaged Mr. Jarvis. JW likewise suggested that Ms. Freeman engage counsel for herself. Ms. Freeman engaged a well-known and widely respected lawyer—Tom Kirkendall. Mr. Kirkendall communicated with both JW and Mr. Jarvis over the next couple months to discuss whether a disclosure could be made in connection with existing and future retention applications." (ECF No. 1472 at 36, ¶ 52) | |
| *Id.* | *Id.* | "Nonetheless, once JW confirmed the existence of the relationship, JW took appropriate actions in response thereto which, among other things, included: … (d) re-engaging with its outside ethics expert, Mr. Jarvis…." (ECF No. 1472 at 97, ¶ 183) | |
| *Id.* | 1472-1 | Exhibit 1 (ECF No. 1472-1 at 1-6) | |
| *In re BRILLIANT ENERGY, LLC, Case No.* | 286 [Relates to Dkt. No. 284] | "JW immediately consulted with outside ethics counsel and engaged Peter Jarvis of the respected law firm of Holland & Knight." (ECF No. 286 at 28, ¶ 37) | |

| | | | |
|---|---|---|---|
| *21-30936 (EVR)* | | | |
| *Id.* | *Id.* | "JW also again engaged Mr. Jarvis. JW likewise suggested that Ms. Freeman engage counsel for herself. Ms. Freeman engaged a well-known and widely respected lawyer—Tom Kirkendall. Mr. Kirkendall communicated with both JW and Mr. Jarvis over the next couple months to discuss whether a disclosure could be made in connection with existing and future retention applications." (ECF No. 286 at 36, ¶ 52) | |
| *Id.* | *Id.* | "Nonetheless, once JW confirmed the existence of the relationship, JW took appropriate actions in response thereto which, among other things, included: … (d) re-engaging with its outside ethics expert, Mr. Jarvis…." (ECF No. 286 at 98, ¶ 183) | |

***Third,*** please explain whether Jackson Walker intends to put forth any ethics expert in support of its defenses to the United States Trustee's Rule 60 motions. If so, please identify the name of the expert.

Please provide a written response to the above requests no later than **June 28, 2024**. If you decline to strike any of the above statements, please explain in detail your justification for not striking the statement.

OFFICE OF THE UNITED STATES TRUSTEE

By: */s/ Laura D. Steele*
Laura D. Steele, Trial Attorney
*On behalf of Kevin M. Epstein, United States Trustee Region 7*

Cc:

**Paul Trahan**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
paul.trahan@nortonrosefulbright.com

**Rusty Hardin & Associates, LLP**
Russell Hardin, Jr.
Leah M. Graham

Jennifer E. Brevorka
Emily Smith
5 Houston Center
1401 McKinney, Suite 2250
Houston, Texas 77010
rhardin@rustyhardin.com
lgraham@rustyhardin.com
jbrevorka@rustyhardin.com
esmith@rustyhardin.com

NORTON ROSE FULBRIGHT

EXHIBIT
11

July 3, 2024

**Via E-Mail**

Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010-4106
United States of America

Direct line +1 713 651 3769
jason.boland@nortonrosefulbright.com

Tel +1 713 651 5151
Fax +1 713 651 5246

Laura D. Steele
Trial Attorney
*On behalf of* Kevin M. Epstein,
United States Trustee Region 7
515 Rusk St., Suite 3516
Houston, Texas 77002
Laura.Steele@usdoj.gov

Re: June 24, 2024 Correspondence Regarding Holland & Knight Attorneys Peter Jarvis and Jacqueline Harvey

Dear Ms. Steele:

I am writing in response to your June 24, 2024 letter requesting that (1) Jackson Walker confirm that it will not include Peter Jarvis or Jacqueline Harvey on any witness list in any action pertaining to the United States Trustee's Rule 60 motions; (2) Jackson Walker amend its responsive pleadings to strike certain statements contained therein; and (3) Jackson Walker identify any ethics expert, by name, if it intends to call any ethics expert in support of its defenses to the United States Trustee's Rule 60 motions.

With respect to your first request, Jackson Walker does not intend to include Mr. Jarvis or Ms. Harvey on any witness list. We will promptly advise you if that position changes.

With respect to your second request, Jackson Walker declines to agree to strike any of the statements contained in the chart attached to your June 24, 2024 letter. Each statement or document identified in your chart relates to actions taken by Jackson Walker that are directly related to the claims and defenses at issue in the Rule 60 motions. These statements are not made to establish an advice of counsel defense; rather, the statements present the factual bases underlying Jackson Walker's knowledge at various times of the alleged relationship. Further, Jackson Walker does not believe there are any "discrepancies" in its asserted defenses and declines to amend its responsive pleadings to strike relevant facts, which will be proven through the discovery process. These facts are not themselves privileged, and their relevancy is not diminished by Jackson Walker's decision to not assert an advice of counsel defense in these proceedings. *See Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."); *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) ("While the [attorney-client] privilege extends to the entire communications, . . . a person cannot cloak a material fact with the privilege merely by communicating it to an attorney.") (internal citations omitted). Nor does Jackson Walker's reference to these facts compel the testimony of Mr. Jarvis or Ms. Harvey. *See Huie*, 922 S.W.2d at 923 (explaining that where an attorney's "only knowledge of [certain facts] is through the confidential communication, the attorney cannot be

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

called on to reveal this information."); *Popovitch v. Kasperlik*, 70 F. Supp. 376, 381 (W.D. Pa. 1947) ("[C]onfidential communications between an attorney and client are to remain inviolate, and it is only where a client waives this privilege that an attorney is permitted to testify as to any facts or circumstances which came to his attention or knowledge while acting in a confidential relationship.").

Finally, with respect to your third request, the Court set forth the applicable dates and deadlines regarding experts in its *First Amended Comprehensive Scheduling, Pre-Trial & Trial Order*, Dkt. No. 76. Jackson Walker will comply with this Schedule. Notwithstanding the above, we appreciate that the U.S. Trustee has informed us of his intention to call Professor Jonathan Lipson as a bankruptcy ethics expert, and Richard Davis as an internal investigations expert. Jackson Walker will similarly provide you with the names and subject matters of any experts if/when retained.

Sincerely,

Jason L. Boland



EXHIBIT 12

**U.S. Department of Justice**
Office of the United States Trustee
Southern and Western Districts of Texas – Region 7

Southern District Offices:
515 Rusk Street, Suite 3516
Houston, Texas 77002
713-718-4650
Fax 713-718-4670

July 5, 2024
**Norton Rose Fulbright**
Jason L. Boland
William R. Greendyke
Maria Mokrzycka
1301 McKinney Street, Suite 5100
Houston, Texas 77010
jason.boland@nortonrosefulbright.com
william.greendyke@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Dear Mr. Boland,

On June 4, 2024, the United States Trustee served deposition and document subpoenas on Peter Jarvis and Jaqueline Harvey. On June 18, 2024, Holland & Knight Attorney Joseph L. Franco, counsel for Mr. Jarvis and Ms. Harvey, objected to the subpoenas of Mr. Jarvis and Ms. Harvey via correspondence to the United States Trustee. The objection states, "We have been informed by counsel for the Jackson Walker Law Firm … that it wishes to preserve all available privileges." And Attorney Franco asserts that the subpoenaed documents implicate "attorney-client and work product privileges, and/or Oregon Rule of Professional Conduct 1.6, Confidentiality of Information" citing FRCP 45(d)(2)(B). Attorney Franco further advised that Mr. Jarvis and Ms. Harvey have conflicts with the noticed dates, and requested that the United States Trustee confer with all interested parties to arrange for mutually workable deposition dates. The United States Trustee and Attorney Franco have agreed to hold open the week of July 22, 2024, for the depositions of Mr. Jarvis and Ms. Harvey.

On June 19, 2024, Attorney Paul Trahan called Attorney Laura Steele to advise that Jackson Walker intended to file a motion to quash the United States Trustee's subpoenas of Mr. Jarvis and Ms. Harvey on the grounds of attorney client privilege. During that conversation, Mr. Trahan represented that Jackson Walker does not intend to assert as a defense advice of counsel, and further that Jackson Walker does not intend to call either Mr. Jarvis or Ms. Harvey as witnesses at trial. The parties agreed to further discuss this matter on June 21, 2024. The United States Trustee indicated that he would not object on a timeliness basis to a motion to quash. The United States Trustee sent correspondence to you on June 24, 2024, requesting clarification of whether Jackson Walker intended to call Mr. Jarvis and Ms. Harvey as witnesses, whether Jackson Walker would agree to strike statements pertaining to Mr. Jarvis and Ms. Harvey, and whether Jackson Walker intended to put forth expert witnesses. Jackson Walker provided a response on July 3, 2024.

In its response, Jackson Walker asserts that its communications with Mr. Harvey and Ms. Jarvis are subject to the attorney client privilege. Through this correspondence, the United States Trustee attempts to clarify the basis for and extent of Jackson Walker's assertion of the attorney client privilege with regard to the services of Mr. Jarvis and Ms. Harvey. Fed. R. Civ. P. 37(a)(1).

***First***, please explain the legal basis for Jackson Walker's assertion that it has not waived the attorney client privilege by including draft attorney communications in its pleadings and asserting in those pleadings, among other things, that the statement of facts was prepared as part of the ethic expert's review and that "Jackson Walker's outside ethics counsel concluded that the measures taken by Jackson Walker, based on the facts stated in the letter, which were confirmed by Ms. Freeman, were sufficient to meet Jackson Walker's obligations.". *See, e.g., J. C. PENNEY DIRECT MARKETING SERVICES, LLC., et al,* Case No. 20-20184 at DKT. NO. 1244 [RELATES TO DKT. NOS. 1236 & 1237].

***Second,*** Jackson Walker has disclosed that "[Attorney Tom] Kirkendall communicated with both JW and Mr. Jarvis over the next couple months to discuss whether a disclosure could be made in connection with existing and future retention applications." *In re Brilliant Energy, LLC*, Case No. 21-30936 at DKT. NO. 286. It does not appear that the communications among Mr. Jarvis and Mr. Kirkendall, counsel to Ms. Freeman, occurred within an attorney client context, and are not privileged. At a minimum, the United States Trustee seeks to depose Mr. Jarvis and Ms. Harvey with respect to their communications with Mr. Kirkendall. If you believe, these communications are privileged, please explain in detail with supporting legal authority.

***Third***, the United States Trustee requested in his request for production of documents that to the extent Jackson Walker asserted attorney client or work product privilege, that it provide a privilege log. To date, the United States Trustee has received no such privilege log. Please advise whether a privilege log has been prepared and when it will be provided to the United States Trustee.

***Fourth***, the United States Trustee's request for production of document no. 7 required production of all agreements among Jackson Walker and Holland & Knight pertaining to Ms. Freeman. To date, these documents have not been produced. Please explain in detail the reason for refusing to produce such documents.

Please provide a written response to the above requests no later than **July 10, 2024**.

OFFICE OF THE UNITED STATES TRUSTEE

By: */s/ Laura D. Steele*
Laura D. Steele, Trial Attorney
*On behalf of Kevin M. Epstein, United States Trustee Region 7*

Cc:

**Paul Trahan**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
paul.trahan@nortonrosefulbright.com

**Rusty Hardin & Associates, LLP**
Russell Hardin, Jr.
Leah M. Graham
Jennifer E. Brevorka
Emily Smith
5 Houston Center
1401 McKinney, Suite 2250
Houston, Texas 77010
rhardin@rustyhardin.com
lgraham@rustyhardin.com
jbrevorka@rustyhardin.com
esmith@rustyhardin.com

Holland & Knight

601 SW Second Avenue, Suite 1800 | Portland, OR 97204 | T 503.243.2300 | F 503.241.8014
Holland & Knight LLP | www.hklaw.com

EXHIBIT 13

Peter R. Jarvis
+1 503-243-5877
Peter.Jarvis@hklaw.com

September 22, 2021

*Via E-mail (pcowlishaw@jw.com)*

Patrick R. Cowlishaw
Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201

Re: Judicial Disqualification Question

Dear Pat:

**Summary and Introduction**

Based upon my work as a lawyer for lawyers,[1] you have asked for my opinion regarding the subject discussed in your September 1, 2021 letter to me. For purposes of this letter, I will assume as true the facts as stated in your letter and will not fully repeat them here.

I understand your core question to be whether the steps outlined in your letter regarding your partner, Elizabeth Freeman, and the practice that your firm and she have before U.S. Bankruptcy Court Judge David R. Jones are sufficient to meet public disclosure obligations that Ms. Freeman and your firm may have and to allow Judge Jones not to have to make further disclosures or disqualify your firm or himself from cases on which Ms. Freeman and your firm may work on a going-forward basis.[2] Although there is a lack of what I would consider "all fours" authority and thus the ultimate resolution of this issue cannot be said to be free from doubt, it is my opinion that the steps that your firm has taken and plans to take should be regarded as sufficient to meet any such obligations and avoid such disqualification.

**Legal Analysis**

28 USC §455(a) through (c), which applies to Bankruptcy Court judges, provides that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

[1] A copy of my "website bio" is enclosed herewith as Exhibit A.

[2] Although Judge Jones is not my client, I include a discussion of his potential obligations since they are pertinent to the assessment of the obligations of Ms. Freeman and your firm.

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

JW_00012070

> (b) He shall also disqualify himself in the following circumstances:
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> (2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
> (3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
> (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
> (ii) Is acting as a lawyer in the proceeding;
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
> (c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

Given, *inter alia*, that Ms. Freeman and Judge Jones have never been married or lived together and that they do not appear to have any other common economic interests or investments, the sole portion of 28 USC §455 that it is necessary to consider at length is the language in 28 USC §455(a) which would require Judge Jones to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned."

As is explained in your letter, there has been no romantic relationship between Ms. Freeman and Judge Jones since at least March 2020, and Ms. Freeman, and Judge Jones have not and do not live together. Although Ms. Freeman and Judge Jones are and can be expected to remain close personal friends, both of them recognize and agree that this must remain the extent of their relationship. In addition, and as explained in your letter, Ms. Freeman's work at your firm has for some time excluded and continues to exclude any appearances before or the signing of any pleadings in cases pending before Judge Jones. Additionally, since March 2021, when your firm management first learned of the prior romantic relationship, Ms. Freeman has not participated in any way in in cases pending before Judge Jones, and her 2021 compensation has not included and will not include any portion of firm net income earned from cases that have been or are pending before Judge Jones.

Your letter states, however, that your firm is considering changing the work that Ms. Freeman may do beginning in April 2022.[3] This will be at least two years since Ms. Freeman and Judge Jones had a romantic relationship. Even then, however, Ms. Freeman will continue not appearing before or signing pleadings submitted to Judge Jones for another four years. It follows that Judge Jones is only likely even to see Ms. Freeman's name on any documents submitted to the court when it appears along with others on attorney fee requests.

There is no question but that a too-close personal connection between a judge and a lawyer can require judicial disqualification. *See, e.g.*, *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980), noting that:

> Because 28 U.S.C. s 455(a) focuses on the appearance of impartiality, as opposed to the existence in fact of any bias or prejudice, a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street.

For purposes of this kind of analysis, however, it is neither necessary nor appropriate to indulge in suspicions or speculations beyond those which a reasonable person would consider. *See, e.g.*, *Ayati-Ghaffari v. JPMorgan Chase Bank, N.A.*, Civil Action No. 4:18-CV-483, 2019 WL 452756 (E.D. Tex. Feb. 5, 2019) at *1:

> Under § 455, Plaintiff, as the party moving to recuse, bears "a heavy burden of proof" in showing the Court should recuse. *E.g.*, *United States v. Reggie*, No. 13-111-SDD-SCR, 2014 WL 1664256, at *2 (M.D. La. Apr. 25, 2014). The statute provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455. The decision whether to recuse under § 455 is committed to the sound discretion of the Court asked to recuse. *See, e.g.*, *Garcia v. City of Laredo*, 702 F.3d 788, 793-94 (5th Cir. 2012); *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004) (quoting *Chitimacha Tribe v. Harry L. Laws* Co., 690 F.2d 1157, 1166 (5th Cir. 1982) ). The United States Supreme Court has made clear "[t]he recusal inquiry must be made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 541 U.S. 913, 924 (2004) (emphases added); *see also United States v. Morrison*, 833 F.3d 491, 506 (5th Cir. 2016), cert. denied, 137 S. Ct. 1098 (2017). The Fifth Circuit has interpreted this mandate to mean that "[courts] ask how things appear to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person," while remaining "mindful that an observer of our judicial system is less likely to credit judges' impartiality than the judiciary" would be. *United States v. Jordan*, 49 F.3d 152, 156-57 (5th Cir. 1995). Indeed, the statute exists to mandate recusal in cases

[3] You also have stated that the adjustment to her year-end 2021 compensation, to exclude any portion of fees earned by the firm in cases before Judge Jones, will not be repeated at year-end 2022.

> where it truly appears (or is the case that) the presiding judge cannot consider the case impartially—not where a litigant's speculation based on incomplete information implies concealment and impropriety. See H.R. REP. NO. 93-1453, at 6355 (1974).

*See also Womack v. Wright*, Civil Action No. 4:18-CV-567, 2019 WL 442254 (E.D. Tex. Feb. 4, 2019) at *1 ("Under § 455, Defendant, as the party moving to recuse, bears a heavy burden of proof in showing the Court should recuse") (internal quotation omitted); *Fields v. Texas Department of State Health Services*, Civil Action No. 4:16-CV-607, 2018 WL 2933962 E.D. Tex. June 12, 2018) at *1 ("The decision whether to recuse under § 455 is committed to the sound discretion of the Court asked to recuse"); *In re Prince*, Adv. Proc. No. 15–4010, 2016 WL 1398480 (Bkr. E.D. Tex. Apr. 6, 2016) at *3 ("This objective standard cannot be satisfied by mere speculation about a judge's state of mind"); Charles Gardner Geyh & Kris Markarian, Judicial Disqualification: An Analysis of Federal Law 21 (Third Ed. 2020).[4]

By the time that six or more years will have passed since any romantic relationship existed between Ms. Freeman and Judge Jones, it would seem most unlikely that Judge Jones' partiality could reasonably be questioned if Ms. Freeman personally appears before him or personally signs pleadings submitted to him. Even before then, however, it would seem most unlikely that Judge Jones would be consciously or unconsciously biased because Ms. Freeman had worked outside of court on aspects of a bankruptcy matter that ultimately came before him or because Judge Jones may be called upon to pass upon the reasonableness of a fee request that includes some of Ms. Freeman's time.[5] But even if these risks to impartiality could be said to be more than most unlikely, they seem to me to fall within the range of what Judge Jones is entitled to consider as not requiring recusal. In other words, it is my opinion that a reasonable observer aware of all

---

[4] As this monograph notes:

> In *Sensley v. Albritton*, [385 F.3d 591(5th Cir. 2004)] the trial judge's wife was employed as an assistant district attorney in the office representing the defendants, though she herself was in no way involved in the case. The plaintiffs moved to disqualify. Relying on §455(b)(5)(iii), they alleged that the outcome of the case might have an indirect effect on the judge's wife's ongoing employment in the office, in the event that the district attorney lost political popularity by losing the case. The Fifth Circuit found the plaintiffs' allegations unconvincing because "they are only able to make this argument by layering several speculative premises on top of one another to reach a speculative conclusion." [385 F.3d at 600.]

Geyh & Markarian, *supra*, at 70-71. In *Sensley*, the risk of changed compensation was to the judge's spouse and not to someone with whom the judge was never married and had never lived with.

[5] In reaching this conclusion, I am assuming that until at least six years have passed, Judge Jones will not be called upon to assess the propriety of actions taken by Ms. Freeman as a lawyer.

surrounding facts and circumstances would conclude that there presently is and will continue to be an insufficient basis to question Judge Jones' impartiality.

I hope this letter is sufficient to address your questions and concerns in full. If not, or if I can provide you with additional information or input on any other issues, please let me know.

Sincerely yours,

HOLLAND & KNIGHT LLP

Peter R. Jarvis

Peter R. Jarvis

PRJ:kfk

Enclosure

Holland & Knight

## Peter R. Jarvis

PARTNER

Peter.Jarvis@hklaw.com

Portland
503.243.5877

PRACTICES
Lawyer Ethics, Risk Management and Regulation |
Litigation and Dispute Resolution

INDUSTRY
Legal Profession

**Peter Jarvis** is a partner in Holland & Knight's Portland office, where he practices primarily in the area of attorney professional responsibility and risk management. Mr. Jarvis advises lawyers, law firms, corporate legal departments and government legal departments about all aspects of the law governing lawyers. This includes, but is not limited to, matters relating to conflicts of interest, duties of confidentiality, other legal or professional ethics issues, advice on the avoidance of civil or criminal liability, law firm breakups, and questions relating to law firm or legal department structure and operation. Mr. Jarvis also serves as an expert witness and is an avid lecturer for public and private/in-house continuing legal education seminars. He has written numerous publications and is a co-author of The Law of Lawyering (4th Ed. 2015), one of the country's leading professional responsibility treatises.

Mr. Jarvis has decades of experience as a trusted adviser to lawyers and also draws on his substantial background as a civil litigation attorney in matters involving antitrust, appellate, business tort, general contract, insurance, product liability, tax and Uniform Commercial Code (UCC) concerns. He is a past president of the national Association of Professional Responsibility Lawyers (APRL) and is a regular speaker both at APRL events and at the American Bar Association's (ABA) National Conference on Professional Responsibility.

In 2019, the ABA Center for Professional Responsibility honored Mr. Jarvis with its prestigious Michael Franck Professional Responsibility Award. This award is given annually to one individual whose career commitment in areas such as legal ethics, disciplinary enforcement and lawyer professionalism demonstrates the best accomplishment of lawyers. It is Peter's second award from the ABA.

Prior to joining Holland & Knight, Mr. Jarvis was the partner-in-charge of the Portland office of a multistate law firm and was co-leader of that firm's national professional responsibility/risk management practice group. He also served for many years as the in-house ethics counsel for a multistate law firm. Mr. Jarvis was honored to contribute an article, "Geoff Hazard: My Views as a Law Student, Mentee and Coauthor," in the *Hastings Law Journal* tribute to former Yale Law School Professor Geoff Hazard.

## Credentials

### Education

- Yale Law School, J.D.

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

- Yale University, M.A., Economics
- Harvard University, B.A., *magna cum laude*

**Bar Admissions/Licenses**

- Alaska
- California
- New York
- Oregon
- Washington

**Court Admissions**

- U.S. Court of Federal Claims
- U.S. Court of Appeals for the Ninth Circuit
- U.S. District Court for the District of Oregon
- U.S. District Court for the Eastern District of Washington
- U.S. District Court for the Western District of Washington
- U.S. District Court for the Northern District of California
- U.S. District Court for the District of Alaska
- U.S. Tax Court

**Memberships**

- Multnomah Bar Association Equity, Diversity & Inclusion Committee
- American Bar Association, Ethics and Professional Responsibility Committee for the Solo, Small Firm and General Practice Division
- Association of Professional Responsibility Lawyers, former Board Member and President
- Committee on the Future of the Profession, Washington State Bar Association
- Committee on Professional Ethics, Washington State Bar Association
- Committee to Define the Practice of Law, Washington State Bar Association
- Rules of Professional Conduct Committee, Washington State Bar Association
- Legal Ethics Committee, Oregon State Bar
- Ad Hoc Committee on Attorney Advertising, Oregon State Bar
- Rights of the Handicapped Committee, Oregon State Bar
- American Law Institute
- DRI Lawyers' Professionalism and Ethics Committee, Professionalism Chair

**Honors & Awards**

- *The Best Lawyers in America* guide, Ethics and Professional Responsibility Law, 2010-2022
- Oregon *Super Lawyers* magazine, 2011-2021
- Michael Franck Professional Responsibility Award, American Bar Association Center for Professional Responsibility,

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

2019

- *The Best Lawyers in America* guide, Portland Ethics and Professional Responsibility Law Lawyer of the Year, 2019
- 2012 Distinguished Legal Writing Award, Burton Award for Legal Achievements
- ALI-ABA Harrison Tweed Special Merit Award, 1993
- President's Membership Services Award, Oregon Bar Association, 1991
- Martindale-Hubbell AV Preeminent Peer Review Rated
- Phi Beta Kappa, Harvard University

## Publications

- The Litigation Funding Case That Keeps On Giving, *Holland & Knight Alert*, May 27, 2021
- Time To Consider Percentage Rental Agreements For Lawyers, *Law360*, July 2, 2020
- Court Bars Defendant's Direct Communications with Law Firm Customers, Other Class Action Members, *Holland & Knight Alert*, June 17, 2020
- Oregon Supreme Court Provides Common Sense Guidance for Lawyers Moving from One State to Another, *Holland & Knight Alert*, June 3, 2020
- Fifth Circuit Reaffirms That Client Identity Is Privileged Only in Narrow Circumstances, *Holland & Knight Alert*, May 19, 2020
- Restatement to the Rescue: 20-Year-Old Treatise May Help Ease Work-at-Home Privilege Problems, *Holland & Knight Alert*, April 3, 2020
- 7 Ethics Considerations for Lawyers Using Lead Generators, Co-Author, *Law360*, March 13, 2020
- Marijuana Legal Ethics 101: Asking the Right Questions, *DRI Professionalism Perspectives Volume 20, Issue 1*, May 20, 2019
- Risk Management Lawyers Rejoice as Clear Scope of Representation Defeats Malpractice Claim, *Holland & Knight Alert*, February 22, 2019
- The Case For Lawyer-Directed Litigation Funding In NY: Part 2, Co-Author, *Law360*, January 11, 2019
- The Case For Lawyer-Directed Litigation Funding In NY: Part 1, Co-Author, *Law360*, January 10, 2019
- 2 Clients Seeking Damages from 1 Pool of Money Equals 1 Disqualified Attorney, *Holland & Knight Alert*, October 16, 2018
- Calif. Supreme Court Breaks New Ground on Arbitrability, Future Waivers and *Quantum Meruit*, *Holland & Knight Alert*, September 7, 2018
- New York City Bar Opinion on Commercial Litigation Funding Raises Concerns, *Holland & Knight Alert*, August 20, 2018
- ABA Explains When a Lawyer Must Tell a Client About a Mistake by the Lawyer, *Holland & Knight Alert*, April 19, 2018
- The New ABA Opinion on the “Generally Known” Exception to Former-Client Confidentiality and Disqualification: An Attempt to Put a Pin in a Moving Target?, *Holland & Knight Alert*, December 28, 2017
- Ruling Elevates Conflicts Considerations in Insurance/Tripartite Relationship Cases, *Holland & Knight Alert*, September 20, 2017
- Eastern District of California Adopts Broad Approach to Screening, *Holland & Knight Alert*, June 27, 2017

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

- Employers May Wish to Update Electronic Access Policies to Assure Access to Employee's Emails with Counsel, *Holland & Knight Alert*, June 22, 2017
- Washington Supreme Court Creates Bright-Line Rule, *Holland & Knight Alert*, October 26, 2016
- New York Appellate Division Strongly Supports In-House Law Firm Privilege Claim, *Holland & Knight Alert*, July 14, 2016
- New York City Bar Addresses Local Counsel Ethics and Risk Management Issues, *Holland & Knight Alert*, January 20, 2016
- Defining Aggregate Settlements: The Road *Not* to Take, *The Professional Lawyer*, 2015
- D.C. Adopts Screening of Laterals, But Adds Delayed or No Notice Exception, *Holland & Knight Alert*, October 21, 2015
- Entire In-House Legal Department Disqualified Following Lateral Hire, *Holland & Knight Alert*, April 21, 2015
- California Is Latest State To Tackle Lawyer Blogs, *Law360*, April 9, 2015
- *Birbrower* Was Right: Foreign Attorneys Are Entitled to Appear in International Commercial Arbitrations Held in California, *Dispute Resolution Journal*, March 2015
- Proposed California Bar Opinion Seeks to Clarify Advertising Rules for Lawyer Blogs, *Holland & Knight Alert*, March 31, 2015
- Attorney Withdrawal: Protect the Client, Obey the Court or Go to Jail?, *Holland & Knight Alert*, February 19, 2015
- The Law of Unintended Consequences: Whether and When Mandatory Disclosure Under Model Rule 4.1(b) Trumps Discretionary Disclosure Under Model Rule 1.6(b), *Hofstra Law Review*, Volume 44, No. 2, Winter 2015
- How Not to Hire Experts, *Paragon International Insurance Brokers Newsletter*, January 19, 2015
- The Law of Lawyering, Co-Author, *Hazard, Hodes and Jarvis*, Updated Annually
- Clearly Enforceable Future Conflicts Waivers, *ABA/BNA Lawyers' Manual on Professional Conduct*, October 23, 2014
- Moving Smarter: Avoiding Common Ethical Concerns in Lateral Attorney Transitions, *CBA Record*, September 28, 2014
- Following Orders… Sometimes, but Not Always, Straight to Discipline? *DRI for the Defense*, September 2014
- The Role of General Counsel in Law Firm Risk Management, Chapter Author, *Law Firm Practice Management*, 2014
- Massachusetts Court Awards Attorneys' Fees for In-House Counsel's Work, *Holland & Knight Alert*, August 26, 2014
- Oregon Supreme Court: Law Firm In-House Privilege Is Alive and Well, *Holland & Knight Alert*, June 11, 2014
- Curiouser and Curiouser, *DRI Today*, May 28, 2014
- The Practical Case for Civility, Chapter Co-Author, *Essential Qualities of the Professional Lawyer*, ABA 2013
- A 'Safe Harbor' for Future Conflicts Waivers, Co-Author, *ABA/BNA Lawyers' Manual on Professional Conduct*, June 19, 2013
- Pros or Cons: Thoughts for the Modern Sports Attorney — Part I, Co-Author, *Sports Law Blog*, April 20, 2013
- Instructor's Manual: Essential Qualities of The Professional Lawyer, Chapter Author, *American Bar Association*, 2013
- Risk Management: Survival Tools for Law Firms, Co-Author, American Bar Association, 2007
- The Ends Don't Justify Illegal or Unethical Means, *Los Angeles Daily Journal*, June 16, 2006

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

- Patent Opinion Firm's Inadvertent Conflict of Interest Bars Evidence of Patent, *The Business Suit*, Defense Research Institute's Commercial Litigation Committee, June 2006
- Zeal in Client Representation - FAQ's, *The Professional Lawyer*, 2005
- The Ethical Oregon Lawyer, Co-Editor and Author of Multiple Chapters , Oregon State Bar CLE, 2003, 2006
- Washington Legal Ethics Deskbook, Co-Editor and Author of Multiple Chapters, Washington State Bar Association, 2003
- Oregon Rules of Professional Responsibility Annotated, Oregon Law Institute, 2003
- Small World After All or Ball of Confusion? Some Thoughts on National Multijurisdictional Practice, *Vanderbilt Journal of Transnational Law, Vol. 34*, 2001
- Aspiring to Be a Lawyer-Mensch, *Oregon State Bar Bulletin*, 2001
- Aspiring to Be a Lawyer-Mensch, *Washington State Bar News*, Summer 2000
- Aspiring to Be a Lawyer-Mensch, *Professional Lawyer*, Summer 2000
- Inside an In-House Legal Ethics Practice, Co-Author, *Notre Dame Journal of Law, Ethics & Public Policy*, 2000
- Zealousness in Contract Drafting: Where to Draw the Line, *Professional Lawyer*, 1999
- Sixteen Years On Screen: Oregon's Lateral Hire Screening Rules, *Professional Lawyer*, 1999
- Eight Privilege-Related Aspects of Corporate Investigations, *Oregon Litigation Journal*, October 1998
- When Waiver Should Not Be Good Enough: An Analysis of Current Client Conflicts Law, Co-Author, *Willamette Law Review*, 1997
- Competence and Confidentiality in the Context of Cellular Telephone, Cordless Telephone and Email Communications, Co-Author, *Willamette Law Review*, 1997
- Professionalism in the Late 1990s: The Four Components of the Professional Lawyer, Co-Author, *Oregon State Bar Bulletin*, 1996
- Professionalism in the Late 1990s: The Four Components of the Professional Lawyer, *New Jersey Law Journal*, 1996

## Speaking Engagements

- Examining the Rules of Professional Responsibility: Rules 1.10, 1.11, and 1.12, Holland & Knight Program, March 31, 2021
- Examining the Rules of Professional Responsibility: Rule 1.9, Holland & Knight Program, October 5, 2020
- Examining the Rules of Professional Responsibility: Rule 1.8, Holland & Knight Program , September 25, 2020
- Examining the Rules of Professional Responsibility: Rule 1.7 Part II, Holland & Knight Program, September 8, 2020
- Examining the Rules of Professional Responsibility: Rule 1.7 Part I, Holland & Knight Program, August 19, 2020
- Examining the Rules of Professional Responsibility: Rule 1.6, Holland & Knight Program, July 29, 2020
- Examining the Rules of Professional Responsibility: Rule 1.5, Holland & Knight Program, July 17, 2020
- Examining the Rules of Professional Responsibility: Model Rules 1.3 and 1.4, Holland & Knight Program, July 1, 2020
- Examining the Rules of Professional Responsibility: Model Rule 1.2, Holland & Knight Program, June 18, 2020
- Examining the Rules of Professional Responsibility: Preamble, Scope, and Rule 1.1, Holland & Knight Program,

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

June 5, 2020

- Ethical Issues in Closely-Held Business Disputes, Oregon State Bar Business Litigation Section, November 20, 2019
- Attorney Discipline for Discrimination: Present Law and Future Possibilities, Holland & Knight Program, November 12, 2019
- Firm General Counsel Summit, September 25-27, 2019
- ORCP 17: Limitations and Applicability, Multnomah Bar Association (MBA), June 12, 2019
- 45th ABA National Conference on Professional Responsibility, Rule 8.4(a) and Attempted Rule Violations, American Bar Association, May 29-31, 2019
- 2019 Ethical Reception, Holland & Knight Program, May 22, 2019
- Professionals Can Get Smoked Advising the Marijuana Industry, DRI, November 29, 2018
- Firm General Counsel Summit, Holland & Knight, October 31 – November 2, 2018
- Predicting and Avoiding Conflicts of Interest, Oregon State Bar Elder Law Section, October 5, 2018
- No Three Strikes, but the Lawyer is Still Out Panel: Discipline for Attempted Ethics Violations under RPC 8.4(a), Panelist, Association of Professional Responsibility Lawyers (APRL) Annual Meeting, August 2-4, 2018
- 44th ABA National Conference on Professional Responsibility, Alternative Funding Models and Other Hot Topics in Attorneys Fees, May 30-June 1, 2018
- 2018 Ethical Reception, Holland & Knight Program, May 24, 2018
- Hot Topics in Real Estate Development - Ethical Considerations, The Seminar Group, May 10, 2018
- Labor & Employment Law Conference - Ethical Considerations, The Seminar Group, May 8, 2018
- Ethical & Effective: Enforceable Future Conflict Waiver, ABA Webinar, April 18, 2018
- For the Love of Money: Risk Management and Ethical Considerations in Collecting Attorneys' Fees, ALI CLE Webcast, April 12, 2018
- Ethics Issues in Using Social Media as Evidence, Practising Law Institute, March 16, 2018
- Mistakes: Coping Ethically and Wisely with the Inevitable, ABA Webinar, October 24, 2017
- Firm General Counsel Summit, Speaker, Holland & Knight Program, October 11-13, 2017
- 19th Annual Ethics, Professionalism and Civility Workshop, ABA Webinar, September 2017
- IP Ethical Issues, WSBA, September 22, 2017
- Mistakes: Coping Ethically and Wisely with the Inevitable, ABA 43rd National Conference on Professional Responsibility, June 2, 2017
- 2017 Ethical Reception, Holland & Knight Program, May 24, 2017
- Pushing the Envelope Without Tearing it Open, American Law Institute, May 21, 2017
- The Unauthorized Practice of Law ("UPL"), Alaska Bar Association, April 19, 2017
- Ethics in Social Media 2017, Practicing Law Institute, March 17, 2017
- Ethics Law Issues for Multistate Tax Practitioners, OSB Taxation, Business Law & Estate Planning Section, March 14, 2017
- Social Media and Pretrial Publicity: What Can We Learn From Bundy?, Oregon Criminal Defense Lawyers Association, December 3, 2016

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

- Joint Representation, Differences in Washington and Oregon Law Re: Conflict Waivers, In-Firm Lawyer-Client Privilege, and Withdrawal Matters, OSB, November 9, 2016
- Firm General Counsel Summit, Holland & Knight Program, November 2-4, 2016
- CLE on Advisory Opinion 201501, Washington Judiciary Committee, October 25, 2016
- Who is the Client? Attorney-Client Privilege in the Growing Complexity of the ANC Corporate Family, Alaska Bar Association, October 14, 2016
- Conflicts of Interest and Confidentiality and Privilege, Oregon State Bar, October 6, 2016
- Joint Representations, American Law Journal, September 28, 2016
- 18th Annual Ethics, Professionalism, and Civility CLE, Washington State Bar Association, September 15, 2016
- Ethical and Effective: Enforceable Future Conflicts Waiver, ABA Webinar, September 13, 2016
- Marijuana Law: Ethical & Risk Management Updates and Implications, Washington State Office of Administrative Hearings and the Tacoma/Pierce County Bar Association, August 19, 2016
- Legal Ethics and Risk Management in IP Licensing, WSBA IP Licensing Seminar, August 16, 2016
- Ethics of Legal Practice in the Marijuana Industry, University of Washington School of Law, Marijuana Policy in Washington State: Moving Forward Conference, June 14, 2016
- Judicial Disqualification Boot Camp, 42nd ABA National Conference on Professional Responsibility, June 1-3, 2016
- Holland & Knight 2016 Ethical Reception, Holland & Knight Program, May 18, 2016
- Pushing the Envelope Without Tearing It Open, Equipment Leasing & Finance Association (ELFA) Legal Forum, San Francisco, May 2-3, 2016
- Counseling Clients in a Changing Securities Landscape, Northwest Securities Institute, Washington State Bar, April 29-30, 2016
- Social Media and Law Firm Marketing: A Review of Ethics Guidance Opinions, American Bar Association Webinar, April 13, 2016
- Ethical Considerations in Running a Cannabis Law Practice: Client Intake, Advice, and Internal Risk Management, WSBA, April 12, 2016
- Marijuana Law, Washington State Bar Association, April 12, 2016
- Atticus Finch: Role Model, Racist or Realist?, Multnomah Bar Association, March 29, 2016
- Ethics in Social Media - Keeping your Ticket in the Age of Social Media, Practicing Law Institute, March 18, 2016
- Four Risk Management Hypotheticals Relevant to Firm's Practice, Holland & Knight CLE Program, March 15, 2016
- Yours, Mine, and Ours: Ethical Considerations for Co-Counsel Relationships, American Law Institute CLE Program, March 2, 2016
- Cybersecurity/Social Media/ Internet - Ethics and Risk Management, Washington State Bar Association's 13th Annual Law of Lawyering, December 10, 2015
- Legal Ethics in the Era of Law Firm Mergers and Vereins: Navigating Fee-Splitting, Referral, Conflicts and Other Ethical Issues, Strafford Legal Ethics CLE Webinar, December 3, 2015
- Ethical Considerations for Business Lawyers, Oregon State Bar, November 5, 2015
- The Ethics of Working with the Marijuana Industry, Oregon Society of Certified Public Accountants, November 2, 2015
- Hot Topics in Legal Ethics - Ripped from the Headlines: Notable Ethics Breaches, Oregon Law Institute, October 30,

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

2015

- Fun with Former Client Conflicts, ABA Center for Professional Development Webinar, August 6, 2015
- Conflicts, Confidentiality, and Exceptions to the Internal Law Firm Privilege, American Law Institute CLE Program, June 19, 2015
- Ethics for Tax Practitioners, Oregon State Bar Program, June 11, 2015
- Holland & Knight 2015 Ethical Reception, Holland & Knight Program, June 4, 2015
- Riding the Aggregate Settlement Bronco, 41st ABA National Conference on Professional Responsibility, May 28, 2015
- Ethics Program - Covering All the Bases, ABA Public Contract Law Section's Federal Procurement Institute Program, May 13, 2015
- The Law of Unintended Consequences: Whether and When Mandatory Disclosure Under Model Rule 4.1(b) Trumps Discretionary Disclosure Under Model Rule 1.6(b), Hofstra Law Institute for the Study of Legal Ethics, Conference on Lawyers as Targets: Suing, Prosecuting and Defending Lawyers, April 1, 2015
- Stayin' Alive: Managing Risk in the Practice of Law, Holland & Knight CLE Program, March 27, 2015
- Dual Representation issues for Business Immigration Attorneys CLE, Washington State Bar Association, March 20, 2015
- Ethics of Settlement Agreements, Clear Law Institute Webinar, February 11, 2015
- Enforceable Future Conflicts Waivers, ABA Center for Professional Responsibility, January 8, 2015
- Stayin' Alive: Managing and Overcoming Risk in the First Seven Years of Practice, Complimentary Ethics and Risk Management CLE Program, December 17, 2014
- Ethical Issues Involving Damaged, Altered or Stolen Evidence, OLI's Evidence Program: How to Get it and How to Use It, November 21, 2014
- For the Love of Money: Risk Management and Ethical Considerations in Collecting Attorneys' Fees, ALI CLE Telephone Seminar, October 22, 2014
- The Year's Hottest Legal Ethics Issues, Holland & Knight Program, Chicago, Ill., May 15, 2014
- Ethics and Risk Management Issues for Lawyers and Law Firms, Holland & Knight Program, May 7, 2014
- Pushing the Envelope Without Ripping it Open: The Ethics of Counseling Clients in Legal Gray Areas, 34th Annual Northwest Securities Institute, May 3, 2014
- Breaking Up Is Hard to Do: Ethically Terminating the Attorney-Client Relationship, ALI CLE Program, March 20, 2014
- 13th Annual Legal Malpractice & Risk Management Conference, The Tactical, and Practical, Case for Professionalism, Chicago, Ill, March 5-7, 2014
- Ethics: Knowing and Protecting Your Client, DRI Sexual Torts Seminar, November 2013
- Essential Qualities of the Professional Lawyer, American Bar Association, July 2013
- Stump the Panel, Legal Malpractice and Risk Management Conference, Chicago, Ill., March 2013
- Litigation Funding, Legal Malpractice and Risk Management Conference, Chicago, Ill., March 2013
- Squealing vs. Squeaking By: The Duty to Report (or Not) One's Colleagues, Legal Management Resources General Counsel Roundtable, October 2012
- Special Ethical Considerations for Lawyers Involved with Taking Cases, Law Seminars International (LSI) Seminar,

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

Holland & Knight

October 2012

- Ethics, Professionalism and Responsibility: The Hard Questions, Moderator, Washington State Bar's 14th Annual Ethics, Professionalism and Civility Seminar, September 2012
- Conflicts of Interest and Confidentiality in Multi-Generational Estate Planning and Administration, Oregon State Bar's Advanced Estate Administration Seminar, June 2012
- Adding Potholes: An Advanced Course, Portland Roundtable Event, June 2012
- Unauthorized Practice of Law and Conflict of Interest Issues, Jones Lang LaSalle, June 2012
- Modern Legal Ethics vs. Justice Holmes' Tax Court Case Comment, Oregon State Bar CLE Seminar, June 2012
- Current Issue in Conflicts, 38th ABA National Conference on Professional Responsibility, May 2012
- What You Really Need to Know About Conflicts and Why You Really Need to Know It, Wells Fargo Advisor Group, April 2012
- Ethical Duties and Liability Risks for Law Firm Supervisors, Roundtable Event, Portland, Ore., March 2012
- Caution! Ethical Considerations When Developing Business, DRI Seminar, March 2012
- Screening and Future Conflicts Waivers: The Advanced Course, Moderator, Legal Malpractice and Risk Management Conference, March 2012
- Litigation Funding, Federal Bar Council's Winter Bench and Bar Conference, Hawaii, February 2012
- Stump the Panel, Moderator, Legal Malpractice and Risk Management Conference, February 2012

Attorney Advertising. Copyright © 1996–2021 Holland & Knight LLP. All rights reserved.

EXHIBIT
14

| | |
|---|---|
| **From:** | Steele, Laura (USTP) |
| **To:** | "Paul Trahan"; "Emily Wolf"; Garza, Vianey (USTP); Barcomb, Alicia (USTP); Layng, Pat S. (USTP); Toth, Jennifer R. (USTP); Baruch, Greg (USTP) |
| **Cc:** | "William Greendyke"; "Julie Goodrich Harrison"; "Maria Mokrzycka"; "Jason L. Boland"; "Jennifer (Jenny) Brevorka"; "Rusty Hardin"; "Leah Graham"; "Emily Smith" |
| **Subject:** | RE: USTP draft protective order - Revised 7 18 24 |
| **Date:** | Wednesday, July 24, 2024 4:21:00 PM |
| **Attachments:** | image001.png |

Paul, any response from your side on this proposal?

Additionally, is there an update on the Holland and Knight privilege log/retainer agreements that were promised to be provided today?

Laura D. Steele
Trial Attorney
United States Trustee Program
517 E. Wisconsin Ave., Suite 430
Milwaukee, Wisconsin 53202
Cell: (202) 603-5188
Direct: (414) 297-1247
General Office: (414) 297-4499
Email: laura.steele@usdoj.gov



This message and any attachments are intended only for the use of the addressee and may contain privileged and/or "Limited Official Use" (LOU) information. If the reader of the message is not the intended recipient(s) or an authorized representative of the intended recipient(s), you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail message or by telephone at (202) 603-5188, and delete the message and any attachments from your system. Thank you.





NORTON ROSE FULBRIGHT

July 26, 2024

**Via E-Mail**

Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010-4106
United States of America

Direct line +1 713 651 3769
jason.boland@nortonrosefulbright.com

Tel +1 713 651 5151
Fax +1 713 651 5246

Laura D. Steele
Trial Attorney
*On behalf of* Kevin M. Epstein,
United States Trustee for Region 7
515 Rusk St., Suite 3516
Houston, Texas 77002
Laura.Steele@usdoj.gov

Re: July 5, 2024 Correspondence Regarding Holland & Knight Attorneys Peter Jarvis and Jacqueline Harvey

Dear Ms. Steele:

I am writing in response to your July 5, 2024 letter requesting that Jackson Walker (1) explain the legal basis for Jackson Walker's assertion that it has not waived the attorney-client privilege by including draft attorney communications in its pleadings; (2) clarify whether Jackson Walker believes that communications between Ms. Harvey and Mr. Jarvis, on one hand, and Tom Kirkendall, on the other, are privileged; (3) provide a privilege log covering its privileged communications with counsel at Holland & Knight; and (4) explain in detail the reason for refusing to produce any agreements between Holland & Knight and Jackson Walker pertaining to Ms. Freeman.

With respect to your first request, Jackson Walker has not waived the attorney-client privilege by including the referenced draft letter in its pleadings. The letter attached to Jackson Walker's pleadings was a draft letter that was prepared by Jackson Walker and sent to Ms. Freeman for her review so that she could confirm the accuracy of the facts contained therein. Neither Mr. Jarvis nor the Holland & Knight law firm were involved in drafting this draft letter (or reviewing this draft letter prior to it being sent to Ms. Freeman), and this draft letter was not the exact letter that Jackson Walker ultimately discussed with and provided to Mr. Jarvis. The final letter that Jackson Walker ultimately sent to Mr. Jarvis, and Mr. Jarvis's letter outlining his legal advice to Jackson Walker, was never attached to any of Jackson Walker's pleadings. Moreover, the draft letter provided to Ms. Freeman contains no legal analysis by Holland & Knight but, rather, sets forth Jackson Walker's understanding of the underlying facts: the hiring of Ms. Freeman, her success at Jackson Walker, the allegations raised by Mr. Van Deelen, Ms. Freeman's confirmation of a prior romantic relationship with former Judge Jones, and the actions taken by Jackson Walker in response. These facts are not themselves privileged. *See Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."); *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) ("While the [attorney-client] privilege extends to the entire communications, . . . a person cannot cloak a material fact with the privilege merely by communicating it to an attorney.") (internal citations omitted). The statement in Jackson Walker's

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

pleadings that Mr. Jarvis "concluded that the measures taken by Jackson Walker, based on the facts stated in the letter, which were confirmed by Ms. Freeman, were sufficient to meet Jackson Walker's obligations" likewise does not reveal privileged attorney-client communications, as it does not address any of the legal advice sought or received. Again, it was simply to reaffirm the factual premise upon which Jackson Walker understood at the time as to the nature of the relationship with Ms. Freeman and former Judge Jones. *See Sunoco Partners Mktg. & Terminals, LP v. U.S. Venture, Inc.*, No. 4:19-CV-1145, 2021 WL 4242368, at *2 (S.D. Tex. Jan. 15, 2021) (finding no waiver by disclosure when disclosure was "a disclosure of a legal conclusion and not the disclosure of a confidential attorney-client communication."); *YETI Coolers, LLC v. RTIC Coolers*, LLC, No. A-15-CV-597-RP, 2016 WL 8677303, at *1 (W.D. Tex. Dec. 30, 2016) (finding no waiver where a single email produced in discovery stated that "[w]e believe and our attorney has confirmed that we are not infringing on YETI Patent or Trade Dress"); *Nat'l W. Life Ins. Co. v. W. Nat'l. Life Ins. Co.*, No. A-09-CA-711 LY, 2010 WL 5174366, at *7 (W.D. Tex. Dec. 13, 2010) (finding no waiver where "communications merely note that they have sought advice from their attorneys . . . regarding [a] name change" and "do not disclose the confidential advice and the opinions of their legal counsel").

With respect to your second request, Jackson Walker does not believe, and has not asserted, that communications between Mr. Kirkendall and Mr. Jarvis and/or Ms. Harvey are privileged.

With respect to your third request, and as previously indicated to you, Jackson Walker will prepare a privilege log reflecting the withheld communications between Jackson Walker and Holland & Knight.

Finally, Jackson Walker does not have an engagement agreement with Holland & Knight specific to this matter. As such, no agreements among Jackson Walker and Holland & Knight pertaining to Ms. Freeman exist.

Sincerely,

Jason L. Boland