**Oren B. Haker**, OSB No. 130162
**Britta E. Warren**, OSB No. 065441
**Matthew D. Colley**, OSB No. 125084
Black Helterline LLP
805 SW Broadway, Suite 1900
Portland, OR 97205
(503) 224-5560
*Attorneys for Jackson Walker, LLP*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE: <br><br> PROFESSIONAL FEE MATTERS CONCERNING THE JACKSON WALKER LAW FIRM | Case No.: 3:24-mc-00894-AB <br><br> Related to Case No. 23-00645 (EVR) <br> (Bankr. S.D. Tex., Houston Division) <br><br> **JACKSON WALKER LLP'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL DISCOVERY** |

**SUMMARY OF OPPOSITION**

1. The narrow and extreme circumstances required to disregard "the most sacred of all legally recognized privileges" do not exist here. The United States Trustee (the "UST") is asking this Court to find that Jackson Walker ("JW") completely waived the attorney client privilege by doing what the firm was legally obliged to do and did—produce two communications for which the privilege was waived by one of its partners. JW has not used the communications as a sword or to otherwise gain advantage in the underlying litigation. And, JW

Page 1 - JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL DISCOVERY

is not asserting advice of counsel as a defense. The Court should find that JW waived privilege as to those two communications and nothing more.[1]

## PRELIMINARY STATEMENT

2.  In October 2023, a former shareholder of McDermott International, a previously bankrupt entity, filed a lawsuit against former Judge David R. Jones who presided over McDermott's bankruptcy proceeding, alleging that former Judge Jones had an intimate relationship with Elizabeth Freeman, a partner at JW, which was one of the law firms representing McDermott in its bankruptcy cases.

3.  Within several weeks, and despite JW's offer to informally meet, the UST filed motions against JW in what now amounts to thirty-three bankruptcy cases in the U.S. Bankruptcy Court for the Southern District of Texas, requesting that the Bankruptcy Court (A) vacate orders approving JW's retention as an estate professional and awarding compensation and reimbursement paid to JW for its services in such capacity, and (B) sanction JW in the total amount of all fees and expenses paid to JW in those bankruptcy proceedings to the tune of over $21 million.

4.  JW filed a *Preliminary Response* to the UST's requested relief in each of the cases on November 13, 2023, detailing the timeline of events and JW's knowledge—or lack thereof—of the alleged relationship between Ms. Freeman and former Judge Jones, and JW's actions taken in response to those allegations.[2] In its *Preliminary Response*, JW disclosed that in March 2021, upon first hearing allegations of an intimate relationship between Ms. Freeman and

---

[1] While the UST alleges that JW waived its attorney-client privilege as to a draft letter attached to a pleading in this case, for the reasons discussed below, that draft letter was never covered by attorney-client privilege and therefore no privilege was waived.

[2] *See* **Exhibit A**, filed in *In re Chesapeake Exploration, L.L.C.*, Case No. 20-33239 (Bankr. S.D. Tex.), at Dkt. 423.

Page 2 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

former Judge Jones, JW hired Peter Jarvis, Esq. as outside ethics counsel to ensure that JW understood its legal and ethical obligations with respect to the alleged relationship. Later in 2021, JW's general counsel sent an email to Ms. Freeman asking her to confirm certain facts regarding the relationship. As described in JW's *Response in Opposition*,[3] Ms. Freeman confirmed to JW at that time that she and former Judge Jones were not currently in a romantic relationship, and that any prior romantic relationship between the two was in the past, and that they were not living together.

5.  JW did not learn of any other facts pertaining to Ms. Freeman and former Judge Jones's alleged relationship until the spring of 2022. At that time, JW again reached out to Mr. Jarvis for advice in light of new information JW received, and JW suggested to Ms. Freeman that she engage separate counsel. Mr. Jarvis subsequently provided JW with advice regarding the new circumstances that had become known to JW, and both JW and Mr. Jarvis communicated with Ms. Freeman's counsel, Tom Kirkendall, regarding the parties' obligations and JW's actions with respect to Freeman. In the course of those communications, JW informed Mr. Kirkendall and Ms. Freeman that it believed Ms. Freeman's departure from the firm was the only path forward, and, to underscore its position, one of JW's partners sent Mr. Kirkendall the two memoranda from Mr. Jarvis to JW.

6.  As part of the discovery process in the bankruptcy proceedings, on June 4, 2024, the UST served subpoenas on Mr. Jarvis and his colleague, Jacqueline Harvey, both of the law firm of Holland & Knight. The subpoenas command not only that Mr. Jarvis (who is currently retired) and Ms. Harvey appear for depositions, but also that they produce seven broad categories of documents relating to their engagement by JW.

---

[3] *See* **Exhibit B**, filed in *In re Chesapeake Exploration, L.L.C.,* Case No. 20-33239 (Bankr. S.D. Tex.), at Dkt. 625.

Page 3 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

7. Mr. Jarvis and Ms. Harvey timely objected to the subpoenas on June 18, 2024, asserting JW's privileges.

8. The UST's motion to compel (the "MTC") now seeks compliance with the subpoenas on the grounds that JW has waived the attorney-client privilege as to all communications between JW and Mr. Jarvis and/or Ms. Harvey. But there has been no such waiver of "the most sacred of all legally recognized privileges." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997).

9. JW requests that the Court find that the waiver is limited to only the two documents in question, and that no broader subject matter waiver is appropriate under the circumstances. For the reasons set forth below, under the principles of fairness, the waiver should be narrowly confined and include only the two documents and nothing more.

## FACTUAL BACKGROUND[4]

10. This case stems from an alleged secret intimate relationship between Ms. Freeman, a former law partner at JW, and former U.S. bankruptcy judge David R. Jones. It was not until March 6, 2021, that the first allegations of an intimate relationship between the two were brought to JW's attention by *pro se* litigant Michael Van Deelen, who raised such claims in an email to a JW partner in connection with his effort to recuse former Judge Jones in the McDermott International bankruptcy proceedings.

11. JW promptly confronted Ms. Freeman with these allegations, at which time Ms. Freeman only acknowledged the existence of a prior romantic relationship with former Judge Jones that existed at some point prior to the COVID-19 pandemic. Ms. Freeman informed JW

---

[4] For a more thorough recitation of the facts, see **Exhibit B**.

Page 4 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

that such romantic relationship was well in the past, was not ongoing, and that she and former Judge Jones did not live together.

12. On March 8, 2021—two days after receipt of Mr. Van Deelen's email—JW engaged Mr. Jarvis, a nationally recognized expert on lawyer professional responsibility and ethics. JW sought legal advice from Mr. Jarvis in light of the relationship allegations and Ms. Freeman's confirmation of a prior romantic relationship with former Judge Jones. JW corresponded with Mr. Jarvis and Ms. Harvey for the next several months on this matter. *See* MTC Ex. 9 at 1.

13. On August 26, 2021, JW's General Counsel sent an email to Ms. Freeman asking her to review a draft letter (the "2021 Draft Letter")[5] and to confirm "that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with." MTC Ex. 1 at 114. On August 27, 2021, Ms. Freeman confirmed in an email that she "reviewed the letter and [had] no questions or issues." *Id.*

14. JW sent a slightly revised draft letter to Mr. Jarvis on August 27, 2021 (the "2021 Jarvis Request Letter").[6]

15. On September 22, 2021, Mr. Jarvis sent JW with a letter outlining Mr. Jarvis's opinions (the "2021 Memo").

---

[5] The 2021 Draft Letter was just that—a draft. It was not a privileged communication as it was not sent to Ms. Freeman for the purpose of seeking legal advice; rather, it was sent to Ms. Freeman so that she could review it factually and confirm her agreement with restrictions that had previously been discussed among Ms. Freeman and JW. The fact that the 2021 Draft Letter was later revised and actually sent to Mr. Jarvis in a different form does not make the prior draft privileged.

[6] Contrary to the UST's assertions, JW never produced to Mr. Kirkendall a September 1, 2021 finalized version of the 2021 Draft Letter.

Page 5 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

16. Several months later, in February 2022, a JW partner received new information from a credible source that Ms. Freeman and former Judge Jones were in an active romantic relationship, rather than a past relationship as previously represented by Ms. Freeman to JW. That JW partner raised these new allegations with JW's management, who again confronted Ms. Freeman. On March 30, 2022, Ms. Freeman admitted to JW that she and former Judge Jones had rekindled their relationship.

17. JW again reached out to Mr. Jarvis in light of this new information. JW likewise suggested that Ms. Freeman engage counsel for herself, resulting in Ms. Freeman engaging Mr. Kirkendall.

18. Mr. Kirkendall communicated with JW, Mr. Jarvis, and Ms. Harvey on several occasions over the next several months. Notably, JW has not claimed that Mr. Kirkendall's communications with Mr. Jarvis or Ms. Harvey are privileged. MTC Ex. 15 at 2.

19. Mr. Jarvis provided JW another memorandum on June 2, 2022, analyzing JW's obligations (the "2022 Memo" and together with the 2021 Memo, the "Memos").  At that time, however, JW had already decided that the only path forward was Ms. Freeman's exit from JW.

20. JW, Ms. Freeman, and Mr. Kirkendall then worked to negotiate a form of separation agreement between JW and Ms. Freeman, and on December 1, 2022, Ms. Freeman withdrew as a partner from JW and started her own firm.

21. Neither former Judge Jones nor Ms. Freeman acknowledged or disclosed their relationship until it was publicly revealed in late 2023.[7] Shortly after the news about the relationship broke, the UST filed motions in the 33 cases at issue here.

---

[7] *See* "Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer," The Wall Street Journal, Oct. 7, 2023 (available at

Page 6 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

22. In JW's *Preliminary Response* to the UST's motions, JW explained that it had asked Ms. Freeman to confirm the facts laid out in the 2021 Draft Letter, and that she responded affirmatively. MTC Ex. 1 ¶ 15. A copy of the 2021 Draft Letter was included with the *Preliminary Response* and was cited in support of JW's understanding of the facts at the time, based on Ms. Freeman's confirmation that there was no ongoing romantic relationship with former Judge Jones and that they were not living together. MTC Ex. 1 at 7–12. The *Preliminary Response*, and JW's subsequent correspondence with the UST on this issue, make clear that the 2021 Draft Letter was not a privileged communication seeking legal advice; but rather, a method by which JW asked Ms. Freeman to confirm certain facts in order for JW to *later* seek advice from Mr. Jarvis by separate letter. *Id.* at 7 (JW's General Counsel writing: "Once we have your concurrence, I will sen[d] the letter to Peter in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion."); MTC Exs. 11 and 15.

23. On June 4, 2024, the UST sent subpoenas to Mr. Jarvis and Ms. Harvey, commanding both depositions and production of privileged attorney-client communications from them. MTC Ex. 5 and 6. The subpoenas seek seven broad categories of documents. *Id.*

24. On June 18, 2024, Mr. Jarvis and Ms. Harvey, through their counsel at Holland & Knight, each timely objected to the subpoenas,[8] noting that "the Subpoena seeks documents that are subject to protection under various privileges, including the attorney-client and work product

---

https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00) (last visited May 17, 2024).

[8] While the UST appears to believe that Mr. Jarvis and Ms. Harvey were required to file a motion to quash, *see* MTC ¶ 20, this is not the case. A nonparty objecting to document requests in a subpoena may simply object and this absolves them of any requirement to comply. *See Forsythe v. Brown*, 281 F.R.D. 577, 587 (D. Nev. 2012), report and recommendation adopted, No. 3:10-CV-00716-RCJ, 2012 WL 1833393 (D. Nev. May 18, 2012) ("If the non-party objects to the subpoena, he or she can object, and once this occurs, the subpoena recipient is not obligated to comply with the subpoena."). Thus, Mr. Jarvis and Ms. Harvey took the required action needed in these proceedings.

Page 7 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

privileges, and/or Oregon Rule of Professional Conduct 1.6, Confidentiality of Information." MTC Ex. 7 at 1, Ex. 8 at 1.

25. In the meantime, discovery was ongoing in the underlying bankruptcy proceedings. On May 15, 2024, the UST served JW with forty-nine (49) requests for production and over one hundred interrogatories. JW produced documents responsive to the UST's requests, including, at issue here, the emails from the JW partner to Mr. Kirkendall that forwarded a copy of the Memos. JW produced these documents to the UST because they had been sent to Mr. Kirkendall; thus, JW could not claim privilege over these documents in these proceedings.[9] JW additionally produced the 2021 Draft Letter, which JW has never maintained is privileged. *See* MTC Ex. 15 (explaining to the UST that the 2021 Draft Letter was "sent to Ms. Freeman for her review so that she could confirm the accuracy of the facts contained therein" and that it "contains no legal analysis by Holland & Knight but, rather, sets forth Jackson Walker's understanding of the underlying facts," which are not themselves privileged).

26. JW also, at the UST's request, produced a limited privilege log describing the communications between JW and Mr. Jarvis and/or Ms. Harvey it was withholding from its document productions in response to the UST's requests for production. MTC Ex. 9. Notably, this privilege log was not prepared by Mr. Jarvis or Ms. Harvey, nor does it reveal documents in their possession, custody, or control (and not within JW's) that are responsive to the subpoenas but have been withheld under a claim of privilege.

27. The UST has also repeatedly inquired into whether JW is asserting an advice of counsel defense, to which JW has consistently responded that it is not. *See* MTC Ex. 10 at 2, MTC. Ex. 12 at 1; MTC Ex. 11 at 1 (noting JW's decision "not assert an advice of counsel

---

[9] Contrary to the UST's assertions, JW did not previously withhold the 2022 Memo under a claim of privilege.

Page 8 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

defense in these proceedings"); MTC Ex. 12 (memorializing June 19 call wherein JW attorneys represented that JW was not asserting advice of counsel defense). JW has also confirmed on multiple occasions to the UST that it does not intend to call Mr. Jarvis or Ms. Harvey as a trial witness—either fact or expert. MTC Ex. 11.

## ARGUMENT AND AUTHORITIES

28. To put it simply—JW produced the Memos because it was obligated to under the Federal Rules. JW would have preferred not to have produced those documents to the UST. But, JW produced them in good faith to the UST in discovery because the Memos were previously disclosed to Mr. Kirkendall while the parties were discussing their respective obligations. Additionally, JW produced the 2021 Draft Letter to the UST because it is not a privileged document.[10] Despite JW explaining the reason for production to the UST, the UST nonetheless insists that waiver should extend to *all* communications between JW and Mr. Jarvis and/or Ms. Harvey because JW has used the privilege "as both a sword and a shield." MTC ¶ 7. Not so. JW neither sought nor gained any strategic advantage from the production of these documents to the UST—it simply produced them because it was required to.

29. The UST now seeks to use JW's good faith actions to force Mr. Jarvis and Ms. Harvey to produce documents and reveal information at depositions that is protected by the attorney-client privilege. JW urges this Court to find that the limited waiver should not be extended broadly, under both the law and the fairness principle.

---

[10] One of the bankruptcy judges presiding over the underlying cases has framed the trial in this case as revolving around what JW knew and when it knew it. That is precisely the reason JW referenced the 2021 Draft Letter—to show that, at time JW confronted Ms. Freeman in 2021, the facts in the letter were confirmed by Ms. Freeman. The 2021 Draft Letter did not contain or seek any legal advice and thus is not privileged.

Page 9 -  **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

### A. The Memos are protected by the attorney-client privilege.

30. "The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "The party asserting the attorney-client privilege has the burden of establishing the relationship and privileged nature of the communication." *Id.* (citing *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir.1997)). No bright-line rule governs the applicability of the attorney-client privilege. *Upjohn*, 449 U.S. at 396–97. Rather, courts apply the privilege on a case-by-case basis. *Id.*

31. Applying federal common law, the Ninth Circuit uses an eight-part test to determine whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). In general, "[i]f a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired 'as such' to give 'legal advice,' whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).

32. Here, the first seven elements are undisputed with respect to the Memos. JW sought legal advice Mr. Jarvis and Ms. Harvey—JW's retained ethics counsel—and communicated with them in furtherance of that purpose. Likewise, the communications were made in confidence by JW, which seeks to protect the privileged nature of those communications.

Page 10 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

33. The eighth element is the source of the disagreement regarding the Memos: JW acknowledges that the attorney-client privilege has been waived as to the two specific Memos disclosed to Mr. Kirkendall, which is why they were produced. However, there has been no broader subject-matter waiver of the attorney-client privilege.

**B.     The Court should not find a broad subject-matter waiver of the privilege.**

34. There are "several ways by which parties may waive the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citations omitted). First, "voluntarily disclosing privileged documents to third parties will generally destroy the privilege." *Id*. at 1126–27. Also known as an "express waiver," this type of waiver "occurs when a party discloses privileged information to a third party who is not bound by the privilege." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).

35. Here, JW acknowledges that an express waiver occurred as to the Memos when a JW partner shared them with Mr. Kirkendall in order to demonstrate what JW believed its duties and obligations to be and in order to further inform the negotiations regarding Ms. Freeman's exit from the firm. Recognizing there had been an express waiver as to the Memos, JW was obligated to produce them in discovery and did so. The UST, however, demands more, insisting that the waiver of these distinct documents should amount to a waiver of ***all*** communications, presumably under a theory of either waiver by implication or subject-matter waiver. Neither theory is legally justified or otherwise holds water.

36. Unlike express waiver, waiver by implication is based on the rule that "a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation." *Bittaker*, 331 F.3d at 718. Waiver by implication rests on the "fairness principle," which "is often expressed in terms of preventing a party from using the privilege as

Page 11 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

both a shield and a sword. . . . In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Id.* at 719 (citation omitted).

37. This fairness principle also animates the concept of subject-matter waiver. *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *see also* Fed. R. Evid. 502(a) (waiver may extend to undisclosed communications if undisclosed and disclosed communications "ought in fairness to be considered together"). A subject-matter waiver should be "reserved for those ***unusual*** situations in which fairness requires a further disclosure of related, protected information, in order to prevent a ***selective and misleading*** presentation of evidence to the disadvantage of the adversary." *Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL 4076319, at *3 (N.D. Cal. Aug. 18, 2014). Principles of fairness here dictate that no subject-matter waiver has occurred.

        a.     *JW has not put its counsel's performance at issue.*

38. First, JW has not put Mr. Jarvis or Ms. Harvey's "performance at issue" in the course of the underlying proceedings. JW is not asserting—nor has it ever asserted—an advice of counsel defense and it does not intend to call either Mr. Jarvis or Ms. Harvey as a witness at trial. *See* MTC Ex. 10 at 1 (UST acknowledging that JW attorneys represented that JW "does not intend to assert as a defense advice of counsel, and further that [JW] does not intend to call either Mr. Jarvis or Ms. Harvey as witnesses at trial"). Given that JW is not asserting an advice of counsel defense, the UST's claim that it needs to "examine the context, factual assumptions, and purported diligence that led the Respondents to reach [their] conclusions," MTC ¶ 29, is unavailing.

39. As noted by this Court, "[t]he quintessential example" of a shield/sword use of privilege is where a party "asserts and advice-of-counsel defense and is thereby deemed to have

Page 12 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

waived his [attorney client privilege] with respect to the advice that he received." *Swan v. Miss Beau Monde, Inc.*, 566 F. Supp. 3d 1048, 1059 (D. Or. 2021). Not only has JW repeatedly informed the UST that it is not asserting an advice of counsel defense, but the UST also already has the advice JW received, in the form of the two Memos. Thus, nothing else can be gained from protection of the privileged communications.

40. With JW's confirmations that it is not seeking to use an advice of counsel defense or otherwise relying on the legal advice received from Mr. Jarvis or Ms. Harvey,[11] JW has chosen ***not*** to proceed with claims that would require a waiver of its privilege and, as such, there should be no broader subject-matter waiver. *See Bittaker*, 331 F.3d at 720 ("The court imposing [an implied] waiver does not order disclosure of the materials categorically; rather, the court directs the party holding the privilege to produce the privileged materials *if* it wishes to go forward with its claim implicating them.").

      *b. JW did not selectively waive its privilege to gain advantage.*

41. Further, JW did not disclose either of the Memos in order to gain an advantage in litigation, *i.e.*, as both a shield and a sword. In fact, the UST's strenuous search for documents underlying the Memos and his efforts to retain an expert to testify regarding the Memos and the advice given therein suggests that the UST may in fact view the Memos as providing the UST—rather than JW—an advantage in these proceedings. To be clear—JW did not selectively choose to waive any privilege as to the Memos by producing them to the UST. The privilege had already been waived by the disclosure to Mr. Kirkendall over a year prior. JW correctly acknowledged this prior waiver and complied with its duties to produce the Memos.

---

[11] Unlike in *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992), JW is not and has not claimed that its actions were reasonable ***because*** those actions were based on advice of counsel. To the contrary, many of JW's actions were taken prior to and independent of receiving advice from Mr. Jarvis and Ms. Harvey.

Page 13 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

42. In any event, the UST is wrong that JW is "rel[ying] on the information provided to the Respondents and the Respondents' conclusions in [the 2021 Memo] to support its assertions that no Jackson Walker attorney (other than Ms. Freeman) was aware of the Freeman-Jones relationship before March 2021." MTC ¶ 29. Rather, JW supports its position with the fact that *none* of the JW witnesses have testified that they were aware of any intimate relationship before March 2021, and the UST has not adduced a single piece of evidence otherwise.

43. Nor did JW selectively waive its privilege by referencing the 2021 Draft Letter—a document which is not itself privileged and therefore cannot factor into a waiver analysis. The letter was included with JW's *Preliminary Response* simply to illustrate that Ms. Freeman had reviewed the factual statements contained therein and had indicated that they were accurate. It contains no legal advice or analysis but, rather, sets forth JW's understanding of the underlying facts: the hiring of Ms. Freeman, her success at JW, the allegations raised by Mr. Van Deelen, Ms. Freeman's confirmation of a prior romantic relationship with former Judge Jones, and the actions taken by JW in response. These facts are not themselves privileged.

    c. *JW has acted to protect the confidential and privilege nature of the communications.*

44. Lastly, all of JW's actions in these proceedings are entirely consistent with maintaining secrecy of these communications. JW has refused to produce the subpoenaed communications to the UST and has repeatedly informed the UST that the materials are protected from disclosure. MTC Ex. 11 at 1 (attorney letter noting that revelation of facts does not mean privilege is waived); MTC Ex. 9 (privilege log of withheld communications between JW and Mr. Jarvis and/or Ms. Harvey).

45. For the above reasons, fairness does not require the categorical disclosure of communications between JW and Mr. Jarvis and/or Ms. Harvey (or, for that matter, any related

Page 14 - **JACKSON WALKER'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL**

legal research to the extent that is being requested by the UST). Mandating full disclosure of such privileged communications under these circumstances may potentially undermine the adversary process by allowing the UST the opportunity to litigate "on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (Jackson, J., concurring). The Court should therefore maintain the sacrosanct nature of the privilege and refuse to extend any waiver.

> **C. If a subject-matter waiver is imposed, it must be narrow and should not extend to all of JW's communications with Mr. Jarvis or Ms. Harvey.**

46. If the Court were to find that a broader subject matter waiver is appropriate (which JW disputes), the Court must be careful to "impose a waiver no broader than needed to ensure the fairness of the proceedings before it." *Bittaker*, 331 F.3d at 720. A broader subject matter waiver here would require the Court to find that the UST would be "unfairly prejudiced" in the absence of such documents. *Id.* at 721. As noted above, JW did not produce the Memos in order to gain any upper hand in litigation—it produced these documents because it in good faith determined they were not protected from disclosure.

47. Further, this is hardly a case where JW has asserted claims that the UST "cannot adequately dispute unless it has access to the privileged materials." *Bittaker*, 331 F.3d at 719. JW has not placed the quality and substance of Mr. Jarvis's or Ms. Harvey's work at issue. The UST has the benefit of the advice that Mr. Jarvis provided to JW in the Memos and can depose Mr. Jarvis or Ms. Harvey regarding the Memos and any communications Mr. Jarvis or Ms. Harvey had with Mr. Kirkendall or any other third party. The UST was also free to examine Mr. Kirkendall on the substance of his communications with Mr. Jarvis or Ms. Harvey, and he has already done so in the UST's deposition of Mr. Kirkendall. And nothing prohibits the UST from sharing the Memos with his expert witness.

48. However, the UST has not shown any need for all of JW's correspondence with Mr. Jarvis or Ms. Harvey or otherwise shown the Court that the waiver should be extended to this correspondence. These other privileged communications should remain privileged and protected from disclosure given the absence of any unfair prejudice.

49. Accordingly, JW urges the Court to construe any waiver narrowly as to include only the two documents already in the UST's possession and to deny imposing any broader subject-matter waiver.

## II.   CONCLUSION

For the reasons set forth herein, JW requests that the Court deny the UST's Motion and that it award JW such other and further relief as to which it is entitled.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

Dated: September 17, 2024

**BLACK HELTERLINE LLP**

By: */s/ Matthew D. Colley*
Oren B. Haker, OSB No. 130162
Britta E. Warren, OSB No. 065441
Matthew D. Colley, OSB No. 125084

-and-

**NORTON ROSE FULBRIGHT US LLP**

Paul Trahan (admitted *pro hac vice*)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201

Jason L. Boland (admitted *pro hac vice*)
Julie Harrison (admitted *pro hac vice*)
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151

*Counsel for Jackson Walker LLP*

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing **JACKSON WALKER LLP'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO COMPEL DISCOVERY** upon the following named person(s) on the date indicated below by notice of electronic filing using the CM/ECF system:

Stephen P. Arnot, Office of the U.S. Trustee
Laura D. Steele, Trial Attorney
Alicia Barcomb, Trial Attorney
W. Joel Charboneau, Trial Attorney
Vianey Garza, Trial Attorney
Millie Aponte Sall, Assistant U.S. Trustee
on behalf of Kevin M. Epstein United States
Trustee for Region 7
Southern and Western Districts of Texas
steve.arnot@usdoj.gov
Laura.Steele@usdoj.gov
Alicia.barcomb@usdoj.gov
Joel.Charboneau@usdoj.gov
Vianey.Garza@usdoj.gov
Millie.Sall@usdoj.gov

Joseph L. Franco, Holland & Knight LLP
on behalf of Respondents Peter Jarvis and
Jacqueline Harvey
joe.franco@hklaw.com

DATED this 17th day of September, 2024.

        BLACK HELTERLINE LLP

        By: */s/ Matthew D. Colley*
        Oren B. Haker, OSB No. 130162
        Britta E. Warren, OSB No. 065441
        Matthew D. Colley, OSB No. 125084
        (503) 224-5560
        *Attorneys for Jackson Walker, LLP*

## CERTIFICATE OF COMPLIANCE

      This response complies with the applicable word-count limitation under LR 26-3(b), as modified by this Court's order, because it contains 4,843 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

                                    By: */s/ Matthew D. Colley*